# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

In re:

USA GYMNASTICS,[1]

Debtor.

Chapter 11

Case No. 18-09108-RLM-11

## NOTICE OF CANCELLED HEARING

PLEASE TAKE NOTICE that the telephonic hearing (the "**Hearing**") previously scheduled for **October 19, 2020 at 1:30 p.m. (prevailing Eastern time) has been cancelled**.

PLEASE TAKE FURTHER NOTICE that all matters previously set to be heard at the Hearing have been continued and will be heard at the omnibus hearing scheduled for **November 30, 2020 at 1:30 p.m. (prevailing Eastern time)** (the "**November Omnibus Hearing**").

PLEASE TAKE FURTHER NOTICE that the November Omnibus Hearing will be a telephonic hearing unless and until the Court orders otherwise.

PLEASE TAKE FURTHER NOTICE that a dial-in telephone number for interested parties to participate in the November Omnibus Hearing by conference call is 1-888-273-3658, passcode: 9247462#. All callers shall keep their phones muted unless addressing the Court. All callers must identify themselves and the party(ies) they represent when addressing the Court. Callers shall not place their phones on hold during the November Omnibus Hearing.

PLEASE TAKE FURTHER NOTICE that copies of all filings in the above-captioned case may be accessed at: https://omnimgt.com/usagymnastics, or by contacting the Debtor's attorneys, on PACER, or from the Clerk of the Court.

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

In re USA GYMNASTICS,                    |        Case No. 18-09108-RLM-11
                                         |
                    Debtor.              |

**DESIGNATION OF RECORD AND STATEMENT OF ISSUES ON APPEAL OF
CREDITOR TERIN HUMPHREY**

Terin Humphrey, creditor ("Appellant"), by counsel, in regard to the Notice of

Appeal [Doc. No. 1295] filed by her in this case, respectfully submits the following:

**I.        Designation of Record**

| Bankruptcy Docket No. | Date Entered on Bankruptcy Docket | Description of the Document or Transcript |
|---|---|---|
| 1303 | October 12, 2020 | Creditors' Notice of Transcript Regarding Hearings Held on August 26, 2020 |
| 1295 | September 30, 2020 | Notice of Appeal and Statement of Election on Order/Minute Entry denying Terin Humphrey's Motion to Allow Late Filed Claim to be Treated as Timely Filed [Docket No. 1252] |
| 1270 | September 2, 2020 | Order Granting Motion to Extend Time to Appeal Pursuant to Fed. R. Bankr. P. 8002(D) |
| 1265 | September 2, 2020 | Motion to Extend Time to File Appeal Pursuant to Fed. R. Bankr. P. 8002(d) |
| 1259 | August 31, 2020 | Notice of Filing of Transcript and Deadlines Related to Restriction and Redaction |
| 1252 | August 26, 2020 | Minute Entry/Order Denying Creditor's Motion to Allow Late Filed Claim to be Treated as Timely Filed [Docket No. 1213] |
| 1235 | August 24, 2020 | Reply in Support of Motion to Allow Late Filed Claim to be Treated as Timely Filed |
| 1230 | August 8, 2020 | Joint Motion Requesting the Court to Conduct a Settlement Conference and for Other Relief |
| 1227 | August 19, 2020 | The Additional Tort Claimants Committee of Sexual Abuse Survivors' Consolidated Objection to Motion to Allow Late Filed Claim to be Treated as Timely Filed [1213] |
| 1213 | July 30, 2020 | Motion to Allow Late Filed Claim to be Treated as Timely Filed filed by Creditor Terin Humphrey, including Exhibit "A", Terin |

1

| | | |
|---|---|---|
| | | Humphrey Affidavit [1213-1] and Exhibit "B", Elig Declaration [1213-2]. |
| N/A, Contained on Sealed Docket Maintained by Claims Agent Omni Agent Solutions, and also attached hereto as Exhibit "A" | July 30, 2020 | Sexual Abuse Proof of Claim filed by Terin Humphrey via counsel Joseph L. Mulvey on July 30, 2020, with Omni Agent Solutions, with confirmation email from Omni Agent Solutions on July 30, 2020 at 3:26 p.m., redacted to remove Claimant's address. |
| 1161 | June 24, 2020 | Minute Entry/Order re Telephonic Status Conference on Motion to Dismiss Case filed by Tort Claimants Committee of Sexual Abuse Survivors [Docket No. 892] |
| 1145 | June 19, 2020 | Order on Pretrial Conference scheduling Disclosure Statement and Confirmation Hearing for hearing on October 19, 2020 at 1:30 PM EDT in Room 329 |
| 1060 | May 19, 2020 | Objection of the Additional Tort Claimants Committee of Sexual Abuse Survivors to Disclosure Statement for First Amended Chapter 11 Plan of Reorganization Proposed by USA Gymnastics |
| 931 | February 21, 2020 | USA Gymnastics Motion for Order Approving the Disclosure Statement and Plan Confirmation Procedures |
| 930 | February 21, 2020 | USA Gymnastics Disclosure Statement for First Amended Plan |
| 928 | February 21, 2020 | USA Gymnastics First Amended Chapter 11 Plan |
| 892 | January 21, 2020 | Motion to Dismiss Case |
| 797 | | Order Approving Joint Stipulation Deeming Sexual Abuse Claim 546 to be Timely Filed and Denying Late Claims Motion |
| 750 | September 10, 2019 | Joint Stipulation and Agreed Order Deeming Sexual Abuse Claim 546 to be Timely Filed and Withdrawing Late Claims Motion |
| 657 | July 15, 2019 | Amended Motion for Authority to File Claim After Bar Date |
| 301 | February 25, 2019 | Order Approving Debtor's Motion for Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof |

Humphrey Appellant Appendix 003

| 97 | December 19, 2018 | Notice of Appointment of Additional Tort Claimants Committee of Sexual Abuse Survivors |
| 1 | December 5, 2018 | Chapter 11 Voluntary Petition (Non-Individual) with List of 20 Largest Unsecured Creditors and Verification of Creditor List |

## II.    Statement of Issues on Appeal

1.      Whether Claimant Terin Humphrey, who received 2 silver medals competing with USA Gymnastics in 2004 at the Olympic Games in Athens, Greece, and who suffered sexual abuse at the hands of Larry Nassar in July 2002 at the age of fifteen (15) years old at a USA Gymnastics meet in Virginia Beach, Virginia, can be barred by the Bankruptcy Court, via the *Order Approving Debtor's Motion for Orders Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Doc. 301] (the "Bar Date Order"), and *Minute Entry/Order Denying Creditor's Motion to Allow Late Filed Claim to be Treated as Timely Filed* [Doc. No. 1213] ("Denial of Claimant's Motion") from pursuing a claim against USA Gymnastics for her sexual abuse, when she was not aware of the fact of her sexual abuse until after the Bar Date, and when her abuse was not communicated to her by a doctor until July, 2020, where the Bankruptcy Court, via the Bar Date Order and Denial of Claimant's Motion, exceeded its statutory authority by abrogating Virginia law in respect to the statute of limitations  for sexual abuse claims, where Virginia's statute of limitations requires a cause of action for sexual abuse to be brought within 20 years of the cause of action accruing, and the cause of action does not accrue until "the injury and its causal connection to the sexual abuse is first communicated to the person by a licensed physician, psychologist, or clinical psychologist." Va. Code Ann. §§ 8.01-243(D); 8.01-249 (6).

3

2.      Whether, notwithstanding the Bankruptcy Court's abrogation of Virginia's statute of limitations for sex abuse claims via the Bar Date Order and Denial of Claimant's Motion, Creditor exhibited excusable neglect in filing a late proof of claim where: (1) the Debtor will suffer no prejudice, as evidenced by its choice to not oppose the Creditor's motion; (2) the Creditor did not realize she may have a claim against the Debtor until June of 2020, which was not confirmed by a doctor until July, 2020, and her claim was filed on July 30, 2020; (3) the reason for the delay was that Creditor could not confirm that she had suffered sexual abuse by Larry Nassar until she was diagnosed by Dr. Elig in July of 2020; and (4) the Creditor, as movant, acted in good faith as a sexual assault survivor who sought to be treated equal to those who were aware of their sexual abuse claims, who were permitted to file those claims (despite some of those claims being barred by the applicable state [Michigan] statutes of limitations), and where Creditor's right to recovery will be extinguished before she even realized she had been sexually abused---twenty years before applicable Virginia law would have barred her claim.

Dated:      <u>October 14, 2020.</u>

Signed:      <u>/s/ Joseph L. Mulvey</u>
            Joseph L. Mulvey, Atty No. 30052-49
            Attorney for Creditor / Appellant Terin Humphrey
            MULVEY LAW LLC
            133 W. Market St., #274
            Indianapolis, IN 46204
            (317) 721-1339
            joseph@mulveylawllc.com

4

**CONFIDENTIAL SUBJECT TO BANKRUPTCY COURT ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-09108-RLM-11 |
| Debtor. | |

## SEXUAL ABUSE PROOF OF CLAIM FORM

**THIS FORM MUST BE *RECEIVED* NO LATER THAN
APRIL 29, 2019 AT 4:00 P.M. (PREVAILING EASTERN TIME).**

**THIS PROOF OF CLAIM IS FOR SURVIVORS OF SEXUAL ABUSE ONLY. ANY PERSON ASSERTING A CLAIM BASED ON ANYTHING OTHER THAN SEXUAL ABUSE (DEFINED BELOW) MUST USE THE GENERAL PROOF OF CLAIM FORM (BANKRUPTCY FORM 410)**

**IF YOU HAVE GENERAL QUESTIONS REGARDING THIS FORM,
YOU MAY CALL 888-682-0360—DO NOT CALL THIS NUMBER FOR LEGAL ADVICE**

**YOU MAY WISH TO CONSULT AN ATTORNEY REGARDING THIS MATTER**

---

For purposes of this Sexual Abuse Proof of Claim Form, "**sexual abuse**" is defined as any and all acts or omissions that USA Gymnastics may be legally responsible for that arise out of, are based upon, or involve sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault and/or battery, rape, pedophilia, ephebophilia, or sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, or any other sexual misconduct or injury, or contacts or interactions of a sexual nature between an adult or child and a medical professional, coach, trainer, therapist, volunteer, or other authority figure affiliated with USA Gymnastics, or any current or former employee or volunteer of USA Gymnastics, or any other person for whose acts or failures USA Gymnastics is or was allegedly responsible, or the alleged failure by USA Gymnastics or its agents, employees, or volunteers to report the same. An adult or child may have been sexually abused whether or not this activity involved explicit force, whether or not this activity involved genital or other physical contact, and whether or not there was physical, psychological, or emotional harm to the adult or child.

---

Carefully read the instructions included with this Sexual Abuse Proof of Claim Form and complete ALL applicable questions. Please print clearly and use blue or black ink. You may submit the Sexual Abuse Proof of Claim Form: (a) electronically by filing the Sexual Abuse Proof of Claim Form at: https://omnimgt.com/usagymnastics/sexualabuseclaims; or (b) by first-class U.S. Mail, overnight mail, or other hand-delivery system at the following address: USA Gymnastics Sexual

---

[1] The last four digits of the Debtor's federal tax identification number 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

Abuse Claims Processing, c/o Omni Management Group, 5955 DeSoto Avenue, Suite 100, Woodland Hills, California 91367.

**TO BE VALID, YOU OR YOUR AUTHORIZED AGENT MUST SIGN THIS PROOF OF CLAIM. IF THE SEXUAL ABUSE SURVIVOR IS DECEASED OR INCAPACITATED, THE FORM MAY BE SIGNED BY THE SEXUAL ABUSE SURVIVOR'S REPRESENTATIVE OR THE ATTORNEY FOR THE ESTATE. IF THE SEXUAL ABUSE SURVIVOR IS A MINOR, THE FORM MAY BE SIGNED BY THE SEXUAL ABUSE SURVIVOR'S PARENT OR LEGAL GUARDIAN, OR THE SEXUAL ABUSE SURVIVOR'S ATTORNEY.**

Penalty for presenting a fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**UNLESS YOU INDICATE OTHERWISE BELOW, YOUR IDENTITY WILL BE KEPT STRICTLY CONFIDENTIAL, UNDER SEAL, AND OUTSIDE THE PUBLIC RECORD. HOWEVER, INFORMATION IN THIS CLAIM WILL BE PROVIDED PURSUANT TO COURT-APPROVED GUIDELINES TO COUNSEL FOR THE ADDITIONAL TORT CLAIMANTS COMMITTEE OF SEXUAL ABUSE SURVIVORS, THE DEBTOR, ITS INSURERS, AND TO SUCH OTHER PERSONS AS THE COURT DETERMINES NEED THE INFORMATION IN ORDER TO EVALUATE THE CLAIM.**

**THIS SEXUAL ABUSE PROOF OF CLAIM (ALONG WITH ANY ACCOMPANYING EXHIBITS AND ATTACHMENTS) WILL BE MAINTAINED AS CONFIDENTIAL UNLESS YOU EXPRESSLY REQUEST THAT IT BE PUBLICLY AVAILABLE BY CHECKING THE BOX AND SIGNING BELOW.**

☐    I <u>do not</u> want this Proof of Claim (along with any accompanying exhibits and attachments) to be kept confidential. Please verify this election by signing directly below.

Signature: _Terin Humphrey_

Print Name: _Terin Humphrey_

2

Humphrey Appellant Appendix 007

**CONFIDENTIAL SUBJECT TO BANKRUPTCY COURT ORDER**

## SEXUAL ABUSE PROOF OF CLAIM FORM

*"You" and/or "Claimant" refers to the person alleging that she/he was sexually abused or is otherwise asserting any claim related to the Claimant's sexual abuse. If the person completing this form is not the person alleging that she/he was sexually abused, please provide the below information regarding the person alleging that she/he was sexually abused.*

*If you previously submitted a pre-mediation form ("Questionnaire") to USA Gymnastics (USAG) attesting to your claim of sexual abuse, and if that Questionnaire contains complete and current information regarding any and all sexual abuse claims you assert against USAG, you may elect to attach that form to this Sexual Abuse Proof of Claim Form instead of completing the questions in Parts I-VI below, provided that you sign the certification at page 8 verifying the information provided on your Questionnaire. If you have not previously submitted a Questionnaire to USAG, if the information concerning your claim substantively differs from that in the prior Questionnaire response, if you allege that someone other than Nassar sexually abused you, or if you prefer not to attach a Questionnaire, you must complete the questions below.*

*If the space provided is not sufficient to record your response, please attach additional pages.*

### PART I—CLAIMANT IDENTIFYING INFORMATION:

Claimant's Current Name: Jenn Humphrey

Former Name(s) (if applicable):

Litigation Case Number, Court, and Alias (if applicable):

Claimant's Date of Birth: 08-14-1986

Claimant's Place of Birth: St Joseph, MO

Claimant's Current Address:

Name of Parents/Guardian (if Claimant is a minor):

Claimant's Relationship To Individual Alleging She/He Was Abused (only applicable if the claimant submitting this form is not the individual alleging she/he was abused):

Parent: _____   Spouse: _____   Other: _____

Joseph Mulvey
**Claimant's Counsel (if applicable):**

133 W. Market St., #274   Indianapolis, IN 46204
**Counsel's Address (if applicable):**

joseph@mulveylawllc.com   317-721-1339
**Counsel's E-Mail Address and Phone Number (if applicable):**

**If the Claimant completing this form is not the person alleging that she/he was abused, but is claiming damages such as loss of consortium, please provide the identifying information below regarding the person who alleges that she/he was abused:**

Current Name:                    Former Name(s) (if applicable):

Litigation Case Number, Court, and Alias (if applicable):

Date of Birth:              Place of Birth:

Current Address:

**PART II—NATURE OF COMPLAINT:**

1.      Were you sexually abused by Larry Nassar?

   **YES**   NO (circle one)

2.      Were you sexually abused by a person(s) for whom you contend USAG is responsible <u>other than Nassar</u> (including, without limitation, a coach, trainer, therapist, volunteer or USAG employee)? YES   **NO** (circle one)

   a.      If yes, please provide the name of the person(s) who you allege sexually abused you and their role, title, and/or connection to USAG (this/these person(s) other than Nassar is referred to below as an "Other Abuser"):

2

3. When was the first time you were sexually abused by Nassar or the Other Abuser?

*I know it was on the East Coast I believe to be July 13, 2002 weekend*

4. On how many separate occasions were you sexually abused by Nassar or the Other Abuser?

*One weekend twice*

5. When and where did this sexual abuse occur? Please specify the location(s) (e.g., Michigan State University (MSU) Sports Medicine Clinic, Jenison Field House, Nassar's home, Twistars, meet/sporting event, USAG national competition, Karolyi Ranch) and the associated date(s). If you do not know the exact dates, please approximate the year or your age at the time.

*2002 July 12, 13, 14 US Classic hosted by Excalibur Gymnastics in Virginia Beach, Virginia*

6. To the extent you were sexually abused by Nassar or any Other Abuser, at one or more meets or sporting events, please list the name and location of the meet(s)/event(s) and state whether the meet(s)/event(s) involved MSU, a USAG affiliated gym or coach, or USAG.

*One Competition in Virginia Beach (USAG)*

7. If, during any incident of sexual abuse by Nassar or any Other Abuser,, any other person was in the room or nearby, please provide the name(s) of such person(s) and their relationship to you:

*Coach Armine Barutyan-Fong*

8. Aside from your attorneys, did you, or your parent, or legal guardian tell anyone about the sexual abuse by Nassar or any Other Abuser? YES (NO (circle one)

   a. If yes, please list the names of all persons told, the approximate date on which you told them, their relationship to you, a USAG affiliated coach or gym, or USA Gymnastics (if any), and describe, in detail, what you told them?

3

Humphrey Appellant Appendix 010

    b.  If you know, what did these people do in response when you told them about the sexual abuse?

_____

9.    Did you, or your parent, or legal guardian report to anyone the sexual abuse of Nassar or any Other Abuser?   YES  (NO) (circle one)

    a.  If yes, please list the names of all persons to whom you, your parent, or legal guardian reported the sexual abuse by Nassar or any Other Abuser,, and their connection to a USAG affiliated gym or coach, or USAG (if any), the approximate date of the report, and describe in detail what was reported:

_____

    b.  If you know, what did these people do in response when you told them about the sexual abuse?

_____

10.    When and how did you first discover that Nassar or any Other Abuser, sexually abused you? When it happened, I felt it was uncomfortable, but I trusted USAG. I am now 33 years old and the birth of my child brought back memories of this incident. January 2020 was the beginning of me coming to terms with my abuse by Larry Nassar.

11.    Please describe in your own words what Nassar, or any Other Abuser did that forms the basis of your claims:
Doctor Nassar was supposed to look at my hips. He put me on the training table. I was in a leotard and briefs. Mr. Nassar positioned himself to where my coach could not see what was going on. He then pulled my briefs + leo so high I could feel that I was exposed. He stroked my vagina to where the first time I literally jumped and moved my body away from his hand, but was unsuccessful. He smiled at me and continued to stroke my vagina. Dr. Nassar's fingers were touching my inner and outer labia part of my vaginia. I could feel my lips flapping. This happened during the training day (and the next day) so it was no longer than 10-15 minutes at a time.

Humphrey Appellant Appendix 011

**PART III—CONTACT WITH LARRY NASSAR**

*If you do not allege that Nassar sexually abused you, you do not need to complete this Part III.*

1.    Were you seen by Nassar for purported medical treatment? **YES**   NO (circle one)

    a.    If yes, please state when you began seeing Nassar for purported medical treatment and when you stopped seeing Nassar for purported medical treatment.

        July 12, 13, 14 weekend only 2002 I believe

    b.    If yes, please state the approximate number of times you saw Nassar for purported medical treatment during which he sexually abused you.

        Two times / one weekend

2.    Did someone refer you to Nassar?   YES   **NO** (circle one)

    a.    If yes, please list the name of each person who referred you to Nassar, their relationship to you, and if applicable, their connection to USAG, MSU, or Twistars.

        Just the doctor at the event

**PART IV—CONNECTIONS TO USA GYMNASTICS AND MICHIGAN STATE UNIVERSITY**

1.    Have you ever trained at a USAG member gym(s)? **YES**   NO (circle one)

    a.    If yes, please provide the name of the USAG gym and dates of training:

        Ansing Stars 1988-1996 ; Great American Gymnastics Express 1996-2004

2.    Have you ever trained with a USAG member coach(es)? **YES**   NO (circle one)

    a.    If yes, please provide the name of the USAG member coach(es) and the dates of training with the USAG member coach:

        Robin Weidmeir, Al Fong, Armine Barutyan-Fong

3.    Have you ever been a member of USAG? **YES**   NO (circle one)

    a.    If yes, please provide your dates of membership:

        2000-2020

4.    Have you ever been a USAG national team member? **YES**   NO (circle one)

    a.    If yes, please provide your dates of membership:

        2000-2004

Humphrey Appellant Appendix 012

Case 1:20-cv-00522-RLM-MPB Document 31-2 Filed 12/30/20 Page 13 of 283 PageID #: 1591
11

5.    Have you ever participated in a national competition, such as the U.S. National, U.S. Classic, or American Classic? YES   NO (circle one)

    a.    If yes, please provide the dates of your participation:

       *Every competition from 2000-2004 (2004 Olympic Gymnast)*

6.    Have you ever attended a training camp or other event at the former National Team Training Center (Karolyi Ranch)? YES   NO (circle one)

    a.    If yes, please provide the dates of attendance:

       *Every national team camp 2000-2004*

7.    Have you ever been a student at MSU? YES   NO (circle one)

    a.    If yes, please provide your dates of attendance and date of graduation, if applicable:

       _____

8.    Do you have any past or present connection to MSU, including but not limited to participation in a MSU-sponsored program? YES   NO (circle one)

    a.    If yes, please describe, including the name, location, and date of·any such program:

       _____

**PART V—DAMAGES:**

1.    To date, have you sought medical treatment as a result of sexual abuse by Nassar or any Other Abuser? YES   NO (circle one)

    a.    If yes, please describe, including approximate dates of treatment, name of treating physician, diagnosis, treatment plan, and medical expenses incurred to date:

       _____

2.    To date, have you sought mental· health treatment or counseling as a result of sexual abuse by Nassar or any Other Abuser? YES   NO (circle one)

    a.    If yes, please describe, including approximate dates of treatment, name of treating physician, diagnosis, treatment plan, and medical expenses incurred to date:

       *PHD Mary M. Neubauer: PTSD: See her as needed*
       *1/29/20. 2/19/20. 3/4/20. 7/1/20. 7/15/20.*
       *7/22/20. 7/29/20   Billed $120 per visit*
       *MD Steven Elig 7/18/20: PTSD. Depression.*
       *See therapist* **6**
       *twice a week*

3. Please describe any other damage you have suffered to date as a result of sexual abuse by Nassar or any Other Abuser: Unable to work normal. Insomnia. Depression. PTSD. Anxiety. Anti-social behavior, Angry outbursts

4. Have you ever received mental health treatment for reasons unrelated to the sexual abuse by Nassar or the Other Abuser? YES NO (circle one)

   a. If yes, please describe, including approximate dates of treatment, location of treatment, name of treating mental health professional, and diagnosis: (same therapist as question with damages) I was cyberbullied and had numerous threats against me while pregnant

5. Are you the survivor of sexual abuse unrelated to Nassar or the Other Abuser? YES NO (circle one)

   a. If yes, please describe the abuse and the date(s) of the abuse:

   _____

6. Have you commenced any lawsuit seeking damages stemming from the sexual abuse described in this Sexual Abuse Proof of Claim Form? YES NO (circle one)

   a. If yes, please provide a copy of the complaint you filed and/or provide the case number of the lawsuit and state the court in which the lawsuit is pending:

   _____

7. Have you received a settlement or judgment for any claims associated with the sexual abuse described in this Sexual Abuse Proof of Claim Form? YES NO (circle one)

   a. If yes, please provide a copy of the settlement or judgment and state: (1) the amount of the settlement; and (2) if the settlement was pre-litigation, the name of the entity(ies) being released by the settlement:

   _____

Humphrey Appellant Appendix 014

**PART VI—CLAIMANT BACKGROUND INFORMATION:**

*If Claimant does not seek damages for loss of income, Claimant does not need to complete these questions.*

1.  **Please provide your educational history (list all schools attended, degrees obtained, and date(s) of graduation:** Odessa High School May 2004 Graduate
    University of Alabama · December 2008 · Bachelor
    MCC Blue River Police Academy May 2010 · Graduate · License
    Pinnacle Career Institute · Massage Therapy 2016 License

2.  **Please state your current employer, position, salary, and length of time with which Claimant has held that position:** Nov. 2014 - March 2020 X-treme Gymnastics
    Unemployed

3.  **Please provide your work history, including all former places of employment, positions held, and approximate dates of employment:**
    Raymore Police Department May 2010 - Nov. 2014 Police Officer
    X-treme Gymnastics Nov. 2014 - March 2020 · Coach
    USA Gymnastics Athlete Representative Nov. 2009 - May 2019

**CERTIFICATION:**

Pursuant to 28 U.S.C. §1746, I certify under penalty of perjury that the foregoing (or, to the extent I submitted a pre-mediation form, the information on that form) is true and correct to the best of my knowledge and recollection.

Dated: July 30, 2020

Signed: Terin Humphrey

Print Name: Terin Humphrey

8

Humphrey Appellant Appendix 015

☆ **documentsend@omniagnt.com**          📁 Inbox - j…veylawllc.com     July 30, 2020 at 3:26 PM     **D**

USA Gymnastics Claim Upload Confirmation

To:  Joseph Mulvey



Hello **joseph@mulveylawllc.com,**

Thank you for your submission in the matter of USA Gymnastics.

Your claim has been transmitted to USA Gymnastics and will appear on the sealed docket. Please contact USA Gymnastics if you have questions about the handling or processing of your claim.

© Omni Agent Solutions

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re USA GYMNASTICS, | &#124;     Case No. 18-09108-RLM-11 |
| | &#124; |
| Debtor. | &#124; |

**NOTICE OF APPEAL AND STATEMENT OF ELECTION**

Terin Humphrey, creditor ("Appellant") appeals under 28 U.S.C. § 158(a)(1) from the final[1] order of the bankruptcy judge denying her *Motion to Treat Late-Filed Claim as Timely Filed* (the "Motion") entered in the above-captioned matter on the 26th day of August, 2020 (Doc. No. 1252), a copy of which is attached hereto as Exhibit "A". The name and attorney information for Appellant, the subject of the appeal, and all parties to the order appealed from and the names and addresses of their respective attorneys are as follows:

1. **Appellant Information:**

Party:       Terin Humphrey
Party Role:  Creditor
Counsel:    Joseph L. Mulvey
            MULVEY LAW LLC
            133 W. Market St., #274
            Indianapolis, IN  46204
            joseph@mulveylawllc.com

2. **Subject of the Appeal:**

Order denying Claimant's *Motion to Treat Late-Filed Claim as Timely Filed* (the "Motion") entered in the above-captioned matter on the 26th day of August, 2020 (Doc.

---

[1] *See Ritzen Group, Inc. v. Jackson Masonry, LLC*, 140 S.Ct. 582 (Jan. 14, 2020) ("Bankruptcy Court's order conclusively denying . . . motion is "final." The court's order . . . left nothing more for the Bankruptcy Court to do in that proceeding. The Court of Appeals therefore correctly ranked the order as final and immediately appealable . . .")

1

No. 1252), attached hereto as Exhibit "A".

### 3. **Other Parties to this Appeal:**

USA Gymnastics      Attorney:      Catherine I. Steege, Esq.
(Debtor)                                           Dean Panos, Esq.
                                                       Melissa M. Root, Esq.
    Jenner & Block LLP
    353 N. Clark Street
    Chicago, IL 60654

                           Attorney:      Gregory Michael Gotwald, Esq.
    George Plews, Esq.
    Plews Shadley Racher Braun LLP
    1346 N. Delaware Street
    Indianapolis, IN 46202

                           Attorney:      Mark. D. Stuaan, Esq.
    Barnes & Thornburg
    11 South Meridian Street
    Indianapolis, IN 46204

                           Attorney:      John Thomas Piggins, Esq.
    Miller Johnson
    45 Ottawa Ave., SW, Ste 1100
    P.O. Box 306
    Grand Rapids, MI 49501

Tort Claimants Committee      Attorney:      James I. Stang, Esq.
(Creditor Committee)                                Kenneth H. Brown, Esq.
    Pachulski Stang Ziehl & Jones LLP
    150 California St., 15th Floor
    San Francisco, CA 94111

                           Attorney:      Steven W. Golden, Esq.
    Ilan D. Scharf, Esq.
    Pachulski Stang Ziehl & Jones LLP
    780 Third Ave., Ste 34th Floor
    New York, NY 10017

                           Attorney:      Deborah Caruso, Esq.
    Meredith Theisen, Esq.
    Rubin & Levin, P.C.
    135 N. Pennsylvania St., Ste 1400
    Indianapolis, IN 46204

Humphrey Appellant Appendix 018

Dated: <u>September 30, 2020</u>

Signed: <u>/s/ Joseph L. Mulvey</u>
     Joseph L. Mulvey, Atty No. 30052-49
     Attorney for Creditor / Appellant Terin Humphrey
     MULVEY LAW LLC
     133 W. Market St., #274
     Indianapolis, IN 46204
     (317) 721-1339
     joseph@mulveylawllc.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2020, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System.  Parties may access this filing through the Court's system.

   All ECF Parties of Record

I further certify that on September 30, 2020, a copy of the foregoing was mailed by first-class U.S. Mail, postage prepaid, and properly addressed to the following:

  n/a

     <u>/s/ Joseph L. Mulvey</u>
     Joseph L. Mulvey (#30052-49)

Humphrey Appellant Appendix 019



**From:** courtmail@insb.uscourts.gov
**Subject:** 18-09108-RLM-11 Minute Entry/Order
**Date:** August 26, 2020 at 4:29 PM
**To:** courtmail@insb.uscourts.gov

---

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30-page limit do not apply.

### U.S. Bankruptcy Court

### Southern District of Indiana

Notice of Electronic Filing

The following transaction was received from Dole, Michelle entered on 08/26/2020 at 4:27 PM EDT and filed on 08/26/2020

**Case Name:**       USA Gymnastics
**Case Number:**     18-09108-RLM-11
**Document Number:** 1252

**Docket Text:**
Minute Entry/Order: re: elephonic Hearing on :Tort Claimants' Committee's objection to Motion to Allow Late Filed Claim to be Treated as Timely Filed re: Terin Humphrey and Humphrey's reply in support of motion and Motion to Strike in Part Objection, filed by Creditor Terin Humphrey (re: Doc # [1213]). Disposition: Hearing held. Parties appear telephonically. Creditor Exhibit A and B admitted without objection. Court denies motion. (mjd)

The following document(s) are associated with this transaction:

**18-09108-RLM-11 Notice will be electronically mailed to:**

Nancy D Adams on behalf of Defendant Liberty Insurance Underwriters Inc.
ndadams@mintz.com

Robert Allard on behalf of Creditor Terin Humphrey
rallard@cmalaw.net

John Joseph Allman on behalf of Creditor Jane Doe JJ
jallman@hbkfirm.com, dadams@hbkfirm.com

Annemarie C Alonso on behalf of Creditor M. DOE, a minor child
annie@sllawfirm.com

Annemarie C Alonso on behalf of Creditor Erin Kaufman
annie@sllawfirm.com

Annemarie C Alonso on behalf of Creditor kelly cutright
annie@sllawfirm.com

Martin Beeler on behalf of Creditor United States Olympic Committee
mbeeler@cov.com

Thomas R. Behm on behalf of Creditor Sexual Abuse Survivors
trbehm@gmnp.com

Megan A Bonanni on behalf of Creditor Sexual Abuse Survivors
mbonanni@pittlawpc.com

Tonya J. Bond on behalf of Plaintiff USA Gymnastics
tbond@psrb.com, jscobee@psrb.com

Wendy D Brewer on behalf of Interested Party Endurance American Insurance Company
wbrewer@fmdlegal.com, cbellner@fmdlegal.com

Kenneth H. Brown on behalf of Creditor Committee Tort Claimants Committee
kbrown@pszjlaw.com

Charles D. Bullock on behalf of Defendant Gedderts' Twistars USA Gymnastics Club, Inc.
cbullock@sbplclaw.com, lhaas@sbplclaw.com

**SO ORDERED: September 3, 2020.**



Robyn L. Moberly
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
Southern District of Indiana
46 E. Ohio St., Rm. 116
Indianapolis, IN 46204

SGENERIC (rev 10/2019)

In re:

**USA Gymnastics,**
      Debtor.

Case No. **18–09108–RLM–11**

### ORDER GRANTING MOTION TO EXTEND TIME TO FILE MISCELLANEOUS DOCUMENTS/INSTALLMENT PAYMENT

A Motion to Extend Time to File Appeal Pursuant to Fed.R.Bankr.P. 8002(d) was filed on September 2, 2020, by Creditor Terin Humphrey.

**IT IS ORDERED** that the Motion to Extend Time to File Appeal Pursuant to Fed.R.Bankr.P. 8002(d) is **GRANTED**. The deadline for filing is extended to September 30, 2020.

Attorney for Creditor Terin Humphrey must distribute this order.

###

**SO ORDERED: September 2, 2020.**

Robyn L. Moberly
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

In re:

USA GYMNASTICS,
                    Debtor.

Chapter 11

Case No. 18-9108-RLM-11

### ORDER DIRECTING PARTICIPATION IN  SETTLEMENT CONFERENCE

USA Gymnastics ("USAG"), the debtor, and the Additional Tort Claimants'
Committee of Sexual Abuse Survivors (the "Survivors' Committee") filed their joint
motion requesting that the Court order certain parties to participate in a settlement
conference in light of the most recent mediation ordered by this Court that did not
result in settlement.  The joint motion alleged that the representatives chosen by the
insurers to participate in the most recent mediation lacked settlement authority to
offer meaningful settlement offers contrary to this Court's June 19th order (the "June
19 Order").  Several of USAG's insurers objected to the joint motion, primarily
disputing the allegation that their representatives at the mediation lacked
settlement authority.

At the August 26th hearing on this matter, the insurers voiced no objection to this Court directing them to participate in a settlement conference. However, they contended that the settlement conference pertains to settlement of claims, a matter of day to day operations in which chief executive officers typically do not directly participate and thus the Court should not order the participation of the insurers' CEOs at the settlement conference. The insurers also voiced concern that this Court would be participating in a settlement conference with insurers who have insurance coverage disputes pending before this Court.

The Court has considered the joint motion, the insurers' objections and responses, and the oral arguments made in the August 26th hearing and now orders as follows :

(1)     the joint motion is GRANTED as modified herein and all objections to the joint motion are overruled;

(2)     the undersigned judge will not preside over the settlement conference. The Survivors' Committee, USAG, the United States Olympic and Paralympic Committee ("USOPC") and their respective insurers are ordered to participate in a telephonic settlement conference/mediation to be conducted by the Honorable James M. Carr, Bankruptcy Judge for the Southern District of Indiana. Not only is Judge Carr a well-known litigator and judge, he has successfully mediated cases for other judges since he assumed the bench. Judge Carr is willing to act in a mediator role provided the June 19 Order and rules of mediation under which the parties have heretofore mediated fully apply, including but not limited to confidentiality. He would require that he be allowed to review prior mediation statements provided to the mediators (or updated mediation statements) and that he be permitted to speak with Judge Zive to ascertain how the prior mediations were conducted, where the prior mediation deadlocked and other pertinent information which would otherwise be confidential.

(3)    Judge Carr will be considered to be a successor to Judge Zive in his role as mediator. Judge Zive may communicate with Judge Carr regarding the matters disclosed to him in connection with and about his earlier mediation effort notwithstanding the confidential provisions of the June 19 Order. Any matters communicated by and between Judges Carr and Zive will be considered confidential and also subject to the June 19 Order.

(4)    all parties to the mediation shall appear and actively participate by their general counsel or higher officer, as well as any other persons employed by their organization who is deemed essential to a successful resolution by that organization.

(5)  the parties shall have 14 days to object to Judge Carr serving as a mediator. If no objections are made, a telephonic conference will be scheduled with Judge Carr to organize the mediation process.

#    #    #

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA

IN RE:                    .    Case No. 18-09108-RLM-11
                          .
USA GYMNASTICS,           .    U.S. Courthouse
                          .    46 East Ohio Street
          Debtor.         .    Indianapolis, IN  46204
                          .
. . . . . . . . . . . . ..     August 26, 2020


TRANSCRIPT OF TELEPHONIC HEARING
ON MOTIONS TO ALLOW LATE FILED CLAIMS

BEFORE HONORABLE ROBYN L. MOBERLY
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


TELEPHONIC APPEARANCES:


For the Debtor:           Jenner & Block LLP
                          BY:  CATHERINE L. STEEGE, ESQ.
                          353 N. Clark Street
                          Chicago, IL 60654

                          Plews Shadley Racher & Braun, LLP
                          BY:  GREGORY M. GOTWALD, ESQ.
                               GEORGE M. PLEWS, ESQ.
                               TONYA BOND, ESQ.
                          1346 N. Delaware Street
                          Indianapolis, IN  46202


Audio Operator:           Michelle Dole


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

2

APPEARANCES (Continued):

For Terin Humphrey:        Mulvey Law
                           BY:  JOSEPH L. MULVEY, ESQ.
                           133 W. Market Street, No. 274
                           Indianapolis, IN  46204

For Jane Doe:              Hester Baker Krebs LLC
                           By: JOHN JOSEPH ALLMAN, ESQ.
                           One Indiana Square, Suite 1330
                           211 N. Pennsylvania Street
                           Indianapolis, IN 46204

For the Sexual Abuse       Pachulski Stang Ziehl & Jones, LLP
Survivors Committee:       BY:  JAMES I. STANG, ESQ.
                           10100 Santa Monica Blvd., 13th Floor
                           Los Angeles, CA 90067

For Liberty Insurance      Hangley Aronchick Segal Pudlin &
Underwriters, Inc.:        Schiller
                           BY:  MATTHEW HAMERMESH, ESQ.
                                JOHN HILL, ESQ.
                           One Logan Square, 27th Floor
                           Philadelphia, PA  19103

For National Casualty      Morris James
Company:                   By:  CARL N. KUNZ, III, ESQ.
                           500 Delaware Avenue, Suite 1500
                           Wilmington, DE 19801

For National Union:        Foran Glennon Palandech Ponzi &
                           Rudloff PC
                           By:  SUSAN GUMMOW,ESQ.
                           222 North LaSalle Street
                           Suite 1400
                           Chicago, IL 60601

For Great American:        Shipman & Goodwin, LLP
                           By:  JOSHUA WEINBERG, ESQ.
                           1875 K Street NW
                           Suite 600
                           Washington, DC 20006

For TIG Insurance          Ifrah Law
Company:                   By:  GEORGE CALHOUN, IV, ESQ.
                           1717 Pennsylvania Avenue NW, Suite 650
                           Washington, DC 20006

Humphrey Appellant Appendix 026

3

APPEARANCES (Continued):

```
For Western World      Norris Choplin & Schroeder, LLP
Insurance Co.:         By:  BRUCE KAMPLAIN, ESQ.
                       101 West Ohio Street, Ninth Floor
                       Indianapolis, IN 46204-4213
                              -  -  -
```

4

**I N D E X**

**EXHIBITS:**                                          **PAGE**

    Humphrey Exhibits
    A                                                    9
    B                                                    9

    J.J. Doe Exhibits
    A                                                    28

**WWW.JJCOURT.COM**

1           THE COURT:  Good afternoon.  This is Judge Moberly

2 and I'm joining the call on 18-9108, In re USA Gymnastics.

3 I've been asked to take the motions to allow late filed claims

4 first and I believe that the one filed by Ms. Humphrey who is

5 represented by Mr. Mulvey was the one that was to be teed up

6 first because I believe Mr. Mulvey has another court

7 appearance.

8           Mr. Mulvey, are you on the phone?

9           MR. MULVEY:  Yes, Your Honor.  Good afternoon.

10           THE COURT:  Good afternoon.  And on behalf of USA

11 Gymnastics, who's here?

12           MS. STEEGE:  Good afternoon, Your Honor.  This is

13 Catherine Steege on behalf of USA Gymnastics.

14           THE COURT:  Okay.  And for the Survivors' Committee,

15 who's going to speak on their behalf?

16           MR. STANG:  Good morning, Your Honor.  James Stang,

17 Pachulski, Stang, Ziehl and Jones.

18           THE COURT:  Okay.  With respect to Ms. Humphrey's

19 specific motion, is there anyone else who will be speaking to

20 just this one motion or will -- meaning, you may be only

21 interested in a different matter, but if you're going to speak

22 as to this matter, please identify yourself.

23                     (No audible response)

24           THE COURT:  Okay.  I think we've got the universe of

25 people who are interested in this particular motion.

1          Mr. Mulvey, you want to speak to it?

2          MR. MULVEY:  Yes, Your Honor.  We're here today to

3    decide whether my client, Terin Humphrey, is permitted to have

4    her late filed claim for sexual abuse that occurred when she

5    was 15 years old and whether it should be allowed.

6          First, Your Honor, I filed recently a motion to

7    strike Paragraph 14 of the objection that was filed by the

8    Survivors' Committee.  That objection -- that paragraph of the

9    objection refers to hyperlink to a newspaper article citing

10   unsworn, unsubstantiated statements purportedly made by my

11   client and I think it's improper for it to be considered in

12   resolving the motion and the objection.  So preliminarily, I'd

13   like to address that first if I may.  Frankly --

14         THE COURT:  I've just got to tell you, I tried to

15   click on it on two or three different computers and I could

16   never get it to open.  So I haven't even got a clue what it

17   says.  I don't know if other people are able or if the link is

18   broken or if the federal court computer is picky about what

19   it -- or pickier than usual about what it will let me open.

20   I'm not sure, but it appeared to me the link was broken.

21         MR. MULVEY:  Well, I was -- I'm hesitant to provide a

22   way to get to the link, Your Honor, because we don't think that

23   the information contained therein is a, relevant to the motion,

24   or b, properly in evidence.  And that's all my motion seeks,

25   Your Honor, is that paragraph of the objection simply speaks to

1   the proposition that my client was aware of the bar date.  We

2   don't dispute that.  That is -- it's admitted in the motion

3   itself.  It's mentioned half a dozen times in the objection.  I

4   just -- my only request is that whatever -- to the extent you

5   can't access it, so much the better, but it does contain a link

6   to -- well, I'm not sure about the access issues, but it does

7   describe an interview that happened with my client, and that's

8   simply not proper to be considered at this time.  So I'd ask

9   that that paragraph be struck and simply that those statements,

10  unsworn, obtained out of context, and frankly, irrelevant, that

11  those not be reviewed in adjudication of this, my client's

12  motion because again, they're hearsay.  They're --

13          THE COURT:  I'm not in position to consider it.

14  Ms. Theisen or Ms. Caruso or Mr. Stang.  I think Ms. Theisen

15  signed the pleading.  Does anybody find it or believe that it

16  is particularly relevant to the decision-making here and that I

17  need to read this?

18          MR. STANG:  Your Honor, this is Mr. Stang.  If I may

19  address it.

20          The relevance is that the claimant was on the

21  debtor's athletes' counsel from 2009 to approximately 2019.

22  That is set forth in the article.  Her participation in that

23  high level of USAG governance is important in the context of

24  this claim objection.  Whether she -- so that is an important

25  part of what is in that article, and --

8

1          THE COURT:  I understand that and I don't think

2    there's any dispute as to what position and involvement she had

3    with USAG during relevant times, relevant specifically to the

4    abuse of the athletes by Nassar and others as well as the

5    filing of the bankruptcy.  How about if we just take it at face

6    value there and we move on?

7          Mr. Mulvey?

8          MR. STANG:  Your Honor --

9          MR. MULVEY:  That's fine, Your Honor.  We concede as

10   to the involvement with USA diving during that period and as to

11   her being on the athletes' counsel.  We don't have any

12   objection to that being a stipulated fact.  I just -- I have an

13   issue with the article and all the other commentary in it

14   that's inadmissible hearsay.

15         MR. STANG:  Well, Your Honor, it's clear from her

16   position on the athletes' counsel for that period of time that

17   she must have been aware of the allegations against Mr. Nassar.

18   And so whether she issued a meme or not and whether that

19   demonstrated insensitivity perhaps is beside the point.  But

20   her position and what that -- knowledge that position would

21   have -- what knowledge she would have had by virtue of that

22   position we think is important.

23         THE COURT:  Okay.  All right.  Proceed Mr. Mulvey.

24   I'm not going to strike it, but I'm never going to read it.  So

25   go ahead.

9

1          MR. MULVEY:  Okay.  And then, secondly, from a

2    procedural perspective, Your Honor, I've spoken or communicated

3    with counsel for the Survivors' Committee and they've agreed to

4    stipulate to the admissibility of Exhibits A and B to the

5    motion which are the affidavit of Terin Humphrey and the

6    declaration of Dr. Elig, respectively.  I would move to have

7    those affidavits admitted into evidence for purposes of

8    adjudicating the motion.

9          THE COURT:  Okay.  Hearing no objection, we'll admit

10   those two for the purpose of this hearing.

11         (Humphrey Exhibits A and B admitted to evidence)

12         MR. MULVEY:  Okay.  So finally, Your Honor, getting

13   to the substance of the motion.  I think the parties are in

14   agreement as to number one, the Court's authority to

15   potentially deem this claim to be timely filed and also as to

16   the standard that should be applied.  This is a question of

17   whether there is excusable neglect.  And although the cases

18   that we cite are different, I cite the Pioneer case, they cite

19   the Kmart case, the standard is the same, and it's a question

20   of four factors, whether there's prejudice to the debtor, the

21   length of the delay and its impact on judicial proceedings, the

22   reason for the delay, including whether it was in the

23   claimant's control, and whether the movant acted in good faith.

24         And with that standard in mind, Your Honor, speaking

25   about the facts of this case, my client was 15 years old when

1 this happened to her.  When she was in a gymnastics

2 competition, she was told to see Dr. Nassar, and she underwent

3 what she thought was a routine medical procedure and didn't

4 understand it, and with her 15-year-old mind, that what he was

5 doing was wrong and what he was doing constituted abuse.  She

6 recalled that it happened but she didn't understand what

7 that -- that it was abuse.  She just recalled an examination.

8        And it wasn't until my client was lucky enough to be

9 having her first child and she was being examined by doctors

10 and those doctors' proximity to her genitalia and the area at

11 issue here caused her to be -- the flood of memories that were

12 triggered.  She experienced pain and anxiety, a flood of

13 emotions that are described in detail in Dr. Elig's report.

14 She couldn't sleep.  She couldn't eat.  She couldn't maintain

15 relationships.  She felt helpless and overwhelmed because

16 people were staring at her.  And she has destructing memory

17 flashbacks and intense psychological distress.

18        She has persistent negative beliefs about herself,

19 irritable behavior, depression.  All of these behaviors, not

20 only the behaviors themselves but the failure to acknowledge or

21 to understand those symptoms until a triggering event, such as

22 childbirth, is all very common.  It's accepted in medical

23 literature.  Dr. Elig's analysis documents that.  It documents

24 the fact that her testimony to him bears all the indications of

25 truthfulness, that she's showing symptoms of child sexual abuse

1  and post traumatic stress disorder and that she wasn't aware of
2  the fact of this abuse until she not only she experienced the
3  symptoms and had them corroborated by her interview with him.

4          And in fact, the statute of limitations that controls
5  here under Virginia law specifically says that that statute
6  doesn't even start until someone who's been -- sexual abuse and
7  constitutes when someone's made aware of it by a doctor.  It's
8  when the facts or the injury and its cause or connection to
9  sexual abuse is first communicated to the person by a licensed
10  physician.  So the triggering event here is when she understood
11  what happened to her and she didn't understand what happened to
12  her until she met with that doctor in June of 2020.

13          And so with those facts in mind, Your Honor, we move
14  to -- the third and fourth factors of the Pioneer test of, you
15  know, whether she acted in good faith and whether what she did
16  was in her -- whether the delay was in her reasonable control.
17  And frankly, Your Honor, these cases, the situation here is
18  very similar to the cases cited in my brief in Sun Trust and
19  the CFX case where there are injury -- there's an occurrence
20  that happens.  She recalls the event, but the symptoms, the
21  injury, the abuse they weren't triggered until the pregnancy.
22  She did not have a claim when the claims bar date was filed.
23  So the fact that she was aware of the claims bar date itself,
24  whether through publication or through her working with the
25  athletes' counsel, she didn't -- it's not her knowledge of the

1 claim that is late.  There's no dispute about knowledge of the

2 claims bar date.  The dispute is about did she know about her

3 claim, and she didn't.

4          She had no idea what had occurred to her constituted

5 abuse until she had been sitting in the room with her doctors

6 and started to trigger those memories and that flood of pain

7 and emotion that the doctors documented.  So it was not in her

8 control.  This is something that happened.  Obviously, it

9 wasn't in her control to be abused at 15 years old.  It wasn't

10 in her control for her memories about that to be set aside and

11 repressed and unrealized.  And it wasn't in her control that

12 recollection of those memories were triggered by her pregnancy

13 or by doctors touching her and examining her in her pelvic

14 area.

15          Now that these memories have returned, she has to

16 live with this for rest of her life, and it's something that

17 she -- that we're all here and this bankruptcy is here to

18 address these very same injuries.  And so given that her -- and

19 there's no dispute about this in the objection.  No one

20 contends that these are made-up symptoms, that there's any

21 delay in the reporting once she became aware of the symptoms.

22 The full thrust of the objection is that she knew of the date

23 so therefore her claims are bad.  And the cases that were cited

24 just don't speak to that.

25          And if we think about the analysis of this inelastic

13

concept of excusable neglect, it requires a balancing of the
equities, and so the first two factors speak to the state of
the bankruptcy.  And I think it's abundantly clear to everyone
on the line that this bankruptcy is in no way finalized,
confirmed, or in the state where there's going to be plan
payments made.  All of the cases that talk about prejudice
barring payout are situations where there was already a
confirmed plan and payments were already being made or there
was some act or confirmation that had occurred that barred
subsequent revisiting so that people who had already received
some funds were going to be prejudiced.

       And here, there is no even, I think, a concept of
what amount of money the insurance carriers are going to end up
paying to this plan, if any, if it's going to come close to
what the plan contemplates, and the number of claims involved
are going -- obviously, all these numbers are going to impact
that calculus, but without knowing the front end number the
back end, you know, how it's going to be divided is almost
irrelevant.  The objection talks about how it would be
prejudicial to add claimants at this stage, but I can't
understand mathematically or practically how that's the case.

       There's simply not enough information about what the
ultimate recoveries are going to look like for one or two
additional claimants being added to have any real impact.  And
as I mentioned in the brief, to the extent that the amended

14

1  plan is confirmed, which appears unlikely, but that's the only

2  numbers that we have to go on, the other Subclass 6(a) elite

3  gymnast claimants, there are 66 of them that have been, were

4  filed after the bar date.  If my client -- if Ms. Humphrey's

5  claim is allowed, that goes from 66 to 67, and that's a 1.5

6  percent decrease in what those claimants would recover, which

7  is about $18,000 on a $1.26 million claim -- 1.5 percent

8  reduction.

9        And whereas, the impact to my client if this isn't

10  allowed, it's unclear what would happen if she was deemed a

11  future claimant (indiscernible) action was opted for.  But if

12  the litigation election is opted for, the plan specifically

13  states that she would get nothing.  And so it seems to me in

14  the balance of the equities that on the one hand, my client

15  didn't know -- didn't understand the abuse that had happened to

16  her.  She filed the proof of claim and the motion -- as soon as

17  she was diagnosed and had retained counsel to represent her,

18  she filed the claim and she filed the motion.  And the impact

19  to the creditors and to the bankruptcy estate is just a change

20  in the variables on the front end.  There's -- 66 becomes 67.

21  That's not a huge (indiscernible) -- 66 claimants, and it's not

22  something that requires you to -- there's a hearing later today

23  about requiring a settlement conference and forcing some

24  participation on the settlement front.  The proceedings are

25  confidential so I have no idea what numbers are being thrown

1 around or what the possible settlement looks like.  But it's

2 certainly, based on the filings that have been made and even

3 the objection itself, we're not at a point where changes in

4 circumstances can't be addressed and worked through in terms of

5 coming up with a plan.

6        And so for all these reasons, I think the balance of

7 the equities that is required to be undertaken in evaluating a

8 motion for a claim to be deemed timely filed under the <u>Pioneer</u>

9 standard, it requires that Ms. Humphrey's claim be allowed as

10 timely filed.  And I think, more broadly speaking, it's

11 important to think about what's going on here.  This is

12 survivors of sexual abuse telling another survivor of sexual

13 abuse that, oh, I'm sorry, you didn't get your claim in in

14 time, you didn't remember what happened to you fast enough, so

15 you don't get anything, or potentially won't get anything.  And

16 that's simply -- the posture of this is problematic.

17        There's a huge process going on here to see these

18 victims recover what's possible for having endured suffering to

19 an extreme level for hundreds of people and it seems

20 inequitable that my client's claims should be barred or limited

21 because her claim wasn't filed specifically on time because she

22 wasn't aware of it and there's precedent to support that in the

23 cases that we cited.  For all these reasons, I request that

24 Ms. Humphrey's claim be deemed as timely filed.

25        THE COURT:  Okay.  All right.  Ms. Steege, the debtor

 1   didn't file an objection.  Is there any comment you want to
 2   make on the debtor's behalf?
 3            MS. STEEGE:  No, Your Honor.  We're not taking a
 4   position with respect to this particular motion.
 5            THE COURT:  Okay.  Mr. Stang?
 6            MR. STANG:  Thank you, very much, Your Honor.
 7            Your Honor, the Committee spent enormous amounts of
 8   time and energy.  The individual Committee members did on
 9   crafting a bar date motion and protections for the abused
10   athletes a long time ago in this case.  They considered their
11   own experiences, which included being abused as minors and
12   their own (indiscernible) that the abuse they suffered, be it
13   at the hands of Mr. Nassar or other coaches and representatives
14   and agents (indiscernible) of USA Gymnastics and the Olympic
15   Committee, and putting together how to protect people in the
16   context of coming forward with claims.  And in fact, well over
17   500 people who were abused as minors -- I don't think there's a
18   single person whose abuse did not start at least when they were
19   a minor, or if there are, there are truly a handful -- have
20   come forward pursuant to that carefully crafted order.
21            The debtor spent enormous sums of money getting the
22   word out and providing for abuse survivors having a chance to
23   tell their story.  Part of that carefully crafted process was
24   the creation of the future claims representative who is
25   involved in the case, represented by counsel, has participated

1   in the mediations and the negotiations.

2          As we point out in our response, Ms. Humphrey is the

3   classic future claimant.  She is not being ignored by this

4   process.  She should file a future claim if such a opportunity

5   arises through the confirmation of a plan, and if it doesn't

6   and if she has the right under Virginia law -- Your Honor, I

7   would -- unless that's you, Your Honor, I would ask if people

8   could be please be on mute because of the paper rustling.

9          As she has pointed out, (indiscernible) viable claims

10  under Virginia law.  So she is not being left out.  And the

11  notion that this is survivor hurting survivor really is unfair

12  and raises, frankly, rises to the level of being offensive to

13  the women who have devoted now almost two years to try and

14  protect survivors.  We know there is no question that

15  Ms. Humphrey knew about the bankruptcy and the bar date.  But

16  even more so, she had a unique position in USA Gymnastics to

17  understand the history of what Mr. Nassar had done and the

18  impact that other survivors said his so-called treatments gave

19  rise to.

20         The USA Gymnastics Athletes' Council's website says

21  that their function, Ms. Humphrey's function, was to "share the

22  concerns of athletes with representatives from USA Gymnastics

23  and advocate on behalf of the athletes they serve."

24  (Indiscernible) can be no realistic question that Ms. Humphrey

25  knew about the allegations made against Mr. Nassar, knew what

1  athletes were saying about what these treatments actually were,

2  which was abuse, and that it had a impact on their lives.

3        Nowhere in any of the pleadings submitted by

4  Ms. Humphrey, other than the advocacy part by Counsel, is there

5  the term "repressed memory."  I word searched the doctor's

6  affidavit.  Those words, that phrase, does not appear in the

7  word search.  And so she knew what Mr. Nassar had done and she

8  had the opportunity to file a claim.  And she has an

9  opportunity to receive compensation if a plan is confirmed as a

10 future claimant.  And nowhere does Ms. Humphrey contest that

11 she falls into that classification.  This is not the time to

12 disrupt something that has been in place for almost two years.

13       The plan, in terms of whether it, you know, what

14 percentage change Ms. Humphrey's claim might represent is

15 irrelevant in that sense.  It would effectively be a plan and

16 the future claimant status is not irrelevant.  There is a

17 future claims rep.  That future claim rep has to be a part of

18 the plan.  And the people falling under his purview, if you

19 will, will get treated.  (Indiscernible) plan provisions are

20 irrelevant, and they're irrelevant to the Committee in part

21 because that matrix was not negotiated by the Committee.  The

22 Committee had no input on that matrix.  The treatment of late

23 claims and what the plan says will happen to those late claims

24 had no input from the Committee.

25       And so referring to the plan and suggesting that

1   Ms. Humphrey's claim would be *de minimis* or contrary to the

2   provisions of the plan itself simply should not be the subject

3   of conversation because that plan, at least from our

4   perspective, is, as you know, something that we do not accept.

5   But clearly, even putting aside whether we accept it or not was

6   not the subject of any input from the Committee, at least on

7   those issues.

8          Taking a step back, Your Honor, the Committee is not

9   giving up on the possibility of having a negotiated settlement

10  of this case.  We joined in the motion that is going to be

11  heard by you later on calendar.  So when the Committee has been

12  negotiating regarding the amounts to be paid into a settlement,

13  it is doing it from the perspective of claims that are timely

14  filed.  And I guess one could say as counsel has, hey, it's

15  just one claim.  It's one or two claims, what's the big deal?

16  But if this motion is granted, especially given these facts, we

17  expect that there will be an avalanche of claims that

18  (indiscernible) our efforts to try to bring some finality to

19  this case.

20          And the debtor was very careful when it previously

21  stipulated to a late claim being timely allowed that this did

22  not apply to any other claims because it understood, and the

23  Committee understood, that this could be the tip of the iceberg

24  and we did not want to be in a position of opening Pandora's

25  box.  And that is what we fear will happen with the Court

1  allowing this claim and the next claim to come in.

2         So that's where we are, Your Honor.  You had a very

3  highly negotiated crafted bar date motion.  There were

4  objections to it.  You heard them.  You resolved them.

5  Provision was made for a future claims rep.  That is where

6  Ms. Humphrey -- she is in that claim rep's constituency.  She

7  has not shown that she was not aware of what Mr. Nassar had

8  done to her.  She must have been aware of what people were

9  saying, was the effects of his so-called treatments, and she

10 did not do anything.  She even put in a placeholder claim to

11 ensure that it would be timely filed.

12         Thank you, Your Honor.

13         THE COURT:  Okay.  Mr. Mulvey, do you want to make

14 any very brief response?

15         MR. MULVEY:  Yes.  As to the claim that -- the

16 repeated claim that there was a very crafted process for

17 creating this claim's bar date, it sounds as if the survivors

18 participated in those discussions, but they're not medical

19 experts.  They're not doctors.  They can't speak to whether or

20 not there are other claimants whose symptoms would be delayed

21 or unrepresented later on down the line.  This is a very

22 delicate sort of conduct that we're talking about here.

23         My client didn't understand what had occurred.  She

24 recalled the examination, but she did not understand the nature

25 that it was abuse and the pain, and the suffering, and the

1  psychological impact of that until she was examined in terms of

2  her pregnancy.  And the affidavit of Dr. Elig is very clear on

3  that.  He's correct.  It's not -- repression of memory is my

4  lawyer's term for what I understood to have happened, but

5  that's not what the doctor says.  The doctor says she did not

6  understand these symptoms.  She did not understand that she

7  suffered abuse until she had a flood of emotions upon the child

8  birth.

9       The doctor's opinion speaks for itself.  She didn't

10  realize -- it's just as in those other cases.  She didn't

11  realize she had a claim.  She didn't realize she had been

12  abused until she had symptoms occur as a result of the exam

13  from her pregnancy.

14       And so in terms of this carefully crafted bar date,

15  it's essentially an argument that, well, everyone got together

16  and set up the bar date and want to shut the door as quickly as

17  possible to these survivors.  And yet, there's 500 survivors.

18  First, we have no evidence that there is a flood or an

19  avalanche of other claimants.  And what's the equity for

20  limiting these -- my client and Ms. Doe who's represented by

21  Mr. Allman that the equities are in favor of letting these

22  people share in the recovery.  They all suffered abuse.  The

23  deadline is an imposition.  It speaks to -- it was in some ways

24  somewhat arbitrary the way that line was drawn.  And my

25  client -- yes, there's a future claims representative who under

1  the plan is going to get 5 percent of the total payout, but

2  that's going to be, you know, (indiscernible) that the future

3  plan encompasses claimants who come after the plan is

4  confirmed, claimants who come after -- that are further along

5  down the line in this process where there would be prejudice

6  because things are set in place and payments have been made and

7  recoveries are being calculated.

8          She's not -- my client is not in the future in

9  respect to this bankruptcy.  She's right now.  We're right in

10  the middle of it.  We're trying to figure it out.  It's being

11  negotiated and if the parties are at an impasse, changing a

12  small variable isn't going to -- isn't going to impact those

13  negotiations substantively.  And so I think all the equities

14  point to letting my client pursue her claims as a claimant with

15  a timely proof of claim.

16          THE COURT:  Okay.  With respect to the comment that

17  some parties to they short the door quickly to claimants, I

18  just want to comment that the bar date was many months after

19  this bankruptcy was filed, and the bar date was April 29, 2019.

20  If this was May 2019, you could argue that somehow the door

21  should just stay open a little bit, you know.  But, you know,

22  15 months --

23          MR. MULVEY:  I understand.

24          THE COURT:  -- that's not a sound argument.  This is

25  really about -- not about, as Mr. Mulvey acknowledged.  It's

1  not a repression of memory.  This is a claimant who knew

2  exactly what happened to herself, she just didn't experience

3  the suffering and the damages from it until it was sparked

4  by -- apparently by a childbirth occurrence.  I mean, women

5  have gynecological exams all the time, but somehow having

6  childbirth was the one that triggered it.  I don't have any

7  question about her veracity.  She's been very truthful about

8  it.  She knew she had a claim, she just didn't know how big her

9  damages were.  That's exactly what the argument is.

10      When you say there's no danger of prejudice, we

11  haven't really left this door open because I can't make these

12  decisions on a whim or on sympathy.  There has to be bright

13  lines so that everybody knows.  And if I let anybody in who now

14  claims that they were abused by Nassar years ago, they knew it

15  the whole time, they knew there was a bankruptcy, they knew

16  there was a claims bar date, they were very involved, but they

17  just didn't know what the (indiscernible) emotionally would be,

18  that's no reason to open the door and potentially let anyone in

19  who has -- who can make a likewise argument.

20      So I just think my bright line rule has to exist.  We

21  have a bar date of April 29, 2019.  I'm very glad that with

22  this one particular claimant, if a plan is ultimately

23  confirmed, there will be some money for her.  And not that her

24  primary interest (indiscernible) isn't, or at least, at this

25  point, it's not being discussed, the significant benefits to

24

1  future athletes in the reorganization of USAG and the safe

2  sport rules and all the other cautionary policies that have

3  been put into place, that's enormous.

4         And I know that doesn't directly benefit your client,

5  and I understand that this discussion is just about money.  But

6  she's been involved in all of this and been around talk.  I

7  just have trouble opening that door for her and potentially

8  letting anybody in who could come up with a similar reason for

9  requesting that their late filed claim be allowed.

10         So I kind of rambled her at the end.  I apologize for

11  that.  So I am glad that she will get some monetary

12  compensation if a plan is confirmed for the future claimant's

13  fund.  So the motion is denied.

14         And Mr. Mulvey, I understand you have another

15  hearing.  I hope we didn't keep you from that.

16         MR. MULVEY:  No, Your Honor.  Thank you.

17         THE COURT:  Okay.  Thank you very much.

18         Okay.  So we are going to move on to the second

19  motion to allow a late filed claim by J.J. Doe and representing

20  Ms. Doe is, help me.

21         MR. ALLMAN:  John Allman, Your Honor.  Good

22  afternoon.

23         THE COURT:  Oh, that's, John.  And I'm sorry.  I knew

24  it was somebody I knew, I just couldn't remember.  I apologize.

25  How are you doing, John?

1          MR. ALLMAN:  I'm okay.  Thank you.  How are you?

2          THE COURT:  I'm well.  Thanks, very much.

3          Okay.  Would you like to -- I know after the last

4  one, you're trying to regroup a little bit.  Do you want to

5  make some comments on behalf of your client?

6          MR. ALLMAN:  Absolutely, Judge.

7          My client wishes to remain anonymous to protect her

8  privacy and she is not on this call.  However, I'm prepared to

9  move forward with the motion.

10          THE COURT:  Okay.  Thank you.

11          MR. ALLMAN:  Judge, just to summarize the facts

12  surrounding my client's situation.  She was a member of USAG

13  for about 10 years from age 7 to age 17.  During that time, she

14  was sexually abused by Larry Nassar.  She never disclosed that

15  abuse to anyone until August of 2019, which was after the bar

16  date when she told her mother.  The family immediately began

17  searching for counsel to protect her interests.  They then

18  became aware for the first time of this bankruptcy and the bar

19  date order.  She shortly thereafter filed her Claim Number 550

20  that was filed on or about October 3, 2019.  She never received

21  actual notice of the bankruptcy or the bar date.

22          As just discussed in the last matter, this Court does

23  have the discretion to extend the bar date if cause is shown

24  under Federal Bankruptcy Procedure 3003(c)(3).  Mr. Mulvey laid

25  out the facts -- the relevant standard, excusable neglect in

1  the Pioneer case.  Judge, we submit that those factors weigh in

2  our client's favor and that you should find that the bar

3  date -- excuse me, that her failure to file by the bar date was

4  the result of excusable neglect.

5        The reason for the delay was outside her control.

6  The sort of trauma that was suppressed or repressed her

7  understanding and until she finally disclosed it to her mother,

8  she didn't realize that she had been abused in the way that she

9  now does.  We submit that there's little to no prejudice to the

10 debtor and the affected parties, but there is extreme prejudice

11 if this motion is denied, Judge.

12       I understand from the last hearing that you believe

13 the future claimant is here to help, and while I believe that

14 is the intent, my understanding is that future claims -- I

15 think it's a trustee -- has discretion.  And so we're asking

16 for this Court to exercise its discretion under Rule 3003(c) so

17 that we don't have to later hope that the trustee or

18 administrator of the future claimants rules against us.

19       Going forward, Judge, again, it was not until she

20 became aware of -- it was not until, excuse me, she disclosed

21 the trauma to her mother that she became of this bankruptcy and

22 the bar deadline.  We submit there's no delay in these

23 proceedings.  The debtor and the Committee have been aware of

24 her claim since last October.  Unfortunately, it sounds like

25 the recent mediation was unsuccessful.  That should lead to

1 further discussions and negotiations, which kind of underscores

2 there's little to no prejudice.  My client has acted in good

3 faith, Judge.

4          In regards to notice, the Committee in its objection

5 stated that my client was not a known creditor and therefore

6 was entitled to constructive notice only.  In the reply, I

7 respectfully disagree with that position and I cite to the

8 Fifth Circuit case of In re Placid Oil.  In that case, the

9 court states that known creditors get actual notice and known

10 creditors include claimants known to the debtor whose

11 identities are reasonably ascertainable.  And a claimant is

12 reasonably ascertainable if he can be discovered through

13 reasonably diligent efforts.

14          Judge, my claimant grew up in Michigan where Larry

15 Nassar lived and worked outside of USAG.  The debtor should

16 have served all of its gymnasts who lived in Michigan who

17 probably had proximity to Larry Nassar.  This case was filed as

18 a result of a known predator.  Unlike the asbestos case where

19 the court denied a late claim on the basis that they were not

20 known because anyone in the vicinity could have been damaged by

21 asbestos and at the time of the filing, the debtor did not know

22 of actual injuries, it only knew of potential risk.  That's not

23 the case here.  The debtor in this case knew of actual injuries

24 and that's why they went into bankruptcy.

25          So for all those reasons, Judge, we submit that her

1  failure to file by the bar date was the result of excusable

2  neglect and that cause exists to extend it as it relates to

3  her.   Judge, at this time, I would like to introduce into

4  evidence the affidavit that I filed along with the motion and

5  yesterday I submitted to chambers and counsel and marked as

6  Exhibit A.

7          THE COURT:  It's the affidavit, obviously, of your

8  client.  Is there any objection, Mr. Stang?

9          MR. STANG:  No objection, Your Honor.

10          THE COURT:  Okay.  Then, we'll admit the affidavit as

11  Exhibit A.

12          (Claimant's Exhibit A admitted to evidence)

13          MR. ALLMAN:  Thank you, Judge.

14          In conclusion, we obviously ask that the Court

15  overrule the objection and grant our motion and we have -- we'd

16  be happy to upload a revised order.  We had previously

17  submitted an order with our motion as an exhibit that reflected

18  no objection, and so we have a revised order that reflects the

19  pleadings filed and that there was a hearing today.  And we ask

20  the Court to make a finding that cause exists to extend the

21  deadline as it relates to my client's claim.  Thank you.

22          THE COURT:  Okay.  Mr. Stang?

23          MR. STANG:  Thank you, Your Honor.

24          Your Honor, this motion, perhaps more so than the

25  prior one, really raises a collateral attack on the bar date

1  order.  Because in effect what is being said today is that

2  anyone, regardless of whether they were known to have come into

3  contact with Mr. Nassar, should have received direct notice.

4  Now, that argument might have been convincing to you at the

5  time that the bar date motion was being litigated.  And you

6  might have said, you know, that's not a bad idea, or you would

7  have said that's just too broad notice given the publication

8  notice that the debtor was proposing and then, in fact,

9  effectuated at a cost as I understand of several million

10  dollars.

11         So we're looking at this, not from the courtroom

12  hearing when you were considering the bar date motion, but well

13  after all the efforts were made to give notice.  The motion for

14  relief at Paragraph 39 says excusable neglect -- that

15  they're -- I'm sorry, Ms. Doe, can demonstrate excusable

16  neglect "because she did not receive notice of the bankruptcy."

17  Well, when I read that, I hear the publication notice is

18  meaningless because she didn't receive direct notice.  And so

19  what does publication notice mean if it doesn't have any

20  effect?

21         She says in her affidavit that she did not disclose

22  the abuse she suffered from Mr. Nassar -- I'm sorry.  At

23  Paragraph 10 of her affidavit, she says for years she kept the

24  abuse to herself because she was not comfortable discussing it

25  or her relationship with the debtor to anyone, including her

1   parents.  Now, I don't know if that takes her in or out of the

2   future claims constituency.  The Committee is not trying to

3   keep people from receiving compensation as a matter of

4   principal.  They're trying to maintain order to this

5   proceeding.  And if Ms. Doe falls within the future claims

6   constituency, she will be treated however the plan ultimately

7   treats them.

8          But the idea that now we're going back and saying, oh

9   you should have given notice to every gymnast in the State of

10  Michigan, regardless of whether they were in touch with Nassar

11  or not, is (indiscernible) a true collateral attack on the

12  prior order.  Your Honor, I'm not going to repeat the prejudice

13  issues that we discussed on the last matter.  Counsel was on

14  the phone and I just don't see the point in repeating myself.

15         So that is our position on Ms. Doe's motion, Your

16  Honor.

17         THE COURT:  Mr. Allman, do you want to make any

18  response?

19         MR. ALLMAN:  Yes, Judge.

20         Your Honor, I find it hard to believe that my client

21  should be punished for not receiving notice of the bar date and

22  having her opportunity to argue.  (Indiscernible) maybe she's

23  the type of person that received -- should have received actual

24  notice.  I'm sorry.  That just falls on deaf ears and it

25  doesn't seem like a credible argument.  And in regards

1  to -- Congress set up Rule 3003 to allow courts such as

2  yourself to, in certain circumstances, extend the bar date.

3  This is one of those extenuating circumstances, Judge, where

4  you have discretion to allow the claim.

5          My client immediately upon realizing she had a claim

6  filed it and we're here today, Judge, asking you to let it be

7  in as an allowed claim.  Nothing further.

8          THE COURT:  Okay.  Thank you.

9          These are unpleasant rulings to make because the

10  claimants are so sympathetic to me, but if -- I thought that

11  the -- and still think that the publication notice that was

12  given was extraordinary.  Setting aside -- and it's only about

13  the actual constructive notice by law, but I do want to mention

14  that the bankruptcy had to have been -- I mean, if you were in

15  this country and didn't know there was a bankruptcy filed, you

16  were unreachable unless someone tapped you on the shoulders.

17  It was in the Wall Street Journal, Reuters, USA Today, NPR, LA

18  Times, CNN, Washington Post, it goes on and on and on, and of

19  course, the actual publication notice was in USA Today.  I

20  don't think that she -- I don't -- I know she was not entitled

21  to actual notice.

22          They may have somewhere in some file somewhere have

23  had her name as having been a gymnast, but that doesn't make

24  her known to claimant.  They have to have known that she was

25  abused by Nassar to have her been a known claimant.  She could

1    have written a letter to USA Gymnastics at some point and she
2    probably would have been swept up in that group that got actual
3    notice.  They would have known she (indiscernible).

4            There has to be some responsibility to
5    (indiscernible) national discussion and, you know, just picking
6    up the phone, looking at a newspaper, there are, you know,
7    innumerable ways she could have made her self aware and there
8    is some responsibility on a human being to be aware.  And
9    she -- as I said, she wasn't entitled to constructive notice --
10   I'm sorry, to actual notice.  She was only entitled to
11   constructive notice.  And again, (indiscernible) my concern
12   about opening a floodgate.  Everyone that knows they were
13   abused, if they haven't filed a claim, the only thing that
14   would stop them at this point would be the bar date.
15   Otherwise, if I said anybody who didn't file a claim can tell
16   me that they didn't get actual notice of the filing and the bar
17   date, that could potentially be a pretty wide net.

18           So I think there is danger of prejudice to debtor.  I
19   think, as I said, the length of the delay is somewhat notable.
20   As I said, she was well aware that she had a claim, she just
21   didn't act to bring the claim presumably because she, as she
22   said, she only got constructive and not actual notice.  I'm not
23   going to open the door to any more.  It's not my intention to
24   open the door to any more late claims and the very, very few
25   that we have, so I'm going to deny the motion, Mr. Allman.

33

1          Okay.  Thank you.

2                    (End of requested portion)

3

**C E R T I F I C A T I O N**

          We, KAREN WATSON, court approved transcribers,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, and to the best of our ability.


/s/ Karen Watson
_____

KAREN WATSON

J&J COURT TRANSCRIBERS, INC.      DATE:  September 1, 2020

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| USA GYMNASTICS,[1] | ) | |
| | ) | CASE NO. 18-09108-RLM-11 |
| DEBTOR. | ) | |

## REPLY IN SUPPORT OF MOTION TO ALLOW LATE FILED CLAIM TO BE TREATED AS TIMELY FILED

Comes now creditor, Terin Humphrey ("Claimant"), by counsel, and files her *Reply*[2] in support of her *Motion to Allow Late Claim to be Treated as Timely Filed* (the "Motion") [Doc. No. 1213], filed on July 30, 2020, seeking authority for the claim filed by Claimant at 3:26 p.m. EDT in the above-referenced Bankruptcy Case under Claimant's name and signed by Claimant (the "Claim") to be deemed timely filed, which Reply is in response to *The Additional Tort Claimants Committee of Sexual Abuse Survivors'* ("Survivors Committee") *Consolidated Objection to Motions to File Claim After Bar Date* [Doc. No. 1227] (the "Objection") filed on August 19, 2020, all in advance of the hearing set with respect to the Motion and Objection currently scheduled for August 26, 2020 at 1:30 p.m. (the "Hearing").

1. The primary thrust of the threadbare Objection is that, because Claimant was aware of the Bar Date, the Motion must be denied. The Objection, however, fails to cite any case law in support

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

[2] Pursuant to previous Case Management Orders, Claimant is required any reply in support of the Motion to be filed by 4 p.m., three (3) days prior to the Hearing, which date was yesterday, Sunday, August 23, 2020. Pursuant to Bankruptcy Rule 9006(a)(C), that deadline is shifted to 4:00 p.m., today, Monday, August 24, 2020.

1

Humphrey Appellant Appendix 058

of this contention[3], and fails to address, or even acknowledge, Claimant's very real, medically accepted, and diagnosed condition of memory repression, which has prevented her recollection of the horrific circumstances of abuse that give rise to the Claims until after the Bar Date.

2.      Although the Objection cites the same 4-factor[4] standard as the Motion for determining whether a claimant has established such that a late-filed claim should be timely allowed, the Objection fails to provide any legal or evidentiary support as to why Claimant's Claim does not meet this standard.

3.      More specifically, **the Objection fails to [1] describe any specific prejudice to the Debtor, or to the Survivor's Committee, or [2] to specify any impact on the judicial proceedings**. By contrast, the facts set forth in the Objection confirm the lack of prejudice to either the Debtor or the Survivors Committee if the Motion is granted, and the lack of impact on the proceedings. The Survivors Committee concede in the Objection that "mediation is at an impasse" [Objection, p. 3], "the

---

[3]   The Objection erroneously state that Claimant's awareness of the Bar Date is "fatal" to Claimant's Motion [Objection, p. 13]—the Objection completely fails to address those cases, cited in the Motion, whereby claimants that knew of the bar date, but, similarly to Claimant, were not aware of injuries providing a basis for filing a claim, were permitted to have their late-filed claims deemed timely filed. *In re SunCruz Casinos, LLC*, 377 B.R. 741 (Bankr. S.D. Fla. 2007) (allowing late-filed claim when claimant was aware of bar date, but was not aware of his claim because his injuries had healed but regressed) *Needy v. CSX Transp., Inc.,* 2000 WL 34249112, 2000 U.S. Dist. LEXIS 22603 (W.D. Ky. Mar 21, 2000) (exposure to chemicals caused latent symptoms triggering basis for claim after bar date of which claimant was aware).

[4]   "[1] the danger of prejudice to the debtor;
[2] the length of the delay and its potential impact on judicial proceedings;
[3] the reason for the delay, including whether it was within the reasonable control of the movant; and
[4] whether the movant acted in good faith." [Objection, p. 4] (quoting *In re Kmart Corp.*, 381 F.3d 709, 713 (7th Cir. 2004)).

2

Survivors' Committee opposes the Plan" [Objection, p. 5], and that hearings on the Disclosure

Statement, the Survivors Committee's objection to the Plan remain pending [Objection, p. 3].

4.　　Simply put, the Objection fails to describe any prejudice to the Survivors' Committee or

the Debtor, or impact on the proceedings, arising from the granting of the Motion because, at this stage

of the bankruptcy, there is no prejudice. The landscape of this case is still shifting. It is unclear whether

the Plan, or any plan, will be funded to by insurance carriers of the Debtor and the United States

Olympic & Paralympic Committee—or if those carriers will participate in meaningful mediation. *See*

*Joint Motion Requesting the Court to Conduct a Settlement Conference and for Other Relief* [Doc. No.

1230] (filed by Debtor and the Survivors' Committee on August 20, 2020, and further confirming that

mediation is at an impasse, and alleging that the applicable insurance carriers are not participating in

good faith by refusing to participate in meaningful settlement discussions).

5.　　With respect to "[3] the reason for the delay, including whether it was within the

reasonable control of the movant; and [4] whether the movant acted in good faith", the Objection is

again silent. Claimant has stated under oath, which testimony has been corroborated by Dr. Elig's

diagnosis, that she was not aware of the Claim until her memories were triggered by the birth of her

first child and her subsequent treatment of the emotional trauma stemming from those memories. This

is why the Claim was filed after the Bar Date—Claimant was not aware of the memories providing the

basis for the Claim until after the Bar Date. The Objection fails to refute, address, or even acknowledge

this fact or the medical literature supporting it. Thus, the Objection has not rebutted Claimant's

justifiable reasoning for filing the late Claim, the lack of her control in so doing, or Claimant's good

faith with respect thereto, all as established in the Motion.

3

6.      The prejudice to Claimant, however, if the Motion is denied, is significant. Based on the current Plan, to the extent it is confirmed and the litigation election is taken, Claimant would receive nothing. [Plan, p. 40].

7.      The two (2) cases that are cited in the Objection are completely dissimilar to the circumstances of Claimant's claim and thus do not rebut the excusable neglect established in the Motion. In *In re Kmart Corp.*, 381 F.3d 709, 713 (7th Cir. 2004) the claimant and her counsel knew of the claim, knew of the bar date, and yet, due to the alleged mistake of a clerk, the claim was filed one day after the bar date. In the face of such knowledge, and claimant's knowing delay by waiting until the last minute to file the claim, the bankruptcy court denied the motion to deem the claim timely filed—refusing to shift the burden of claimant and claimant's counsel's *knowing* delay to the debtor. *Id.* Also of significance in *Kmart* was the fact that the motion to have the late claim deemed timely filed was not filed until 53 days after the late claim was filed—Claimant filed her Motion on the same day that her Claim was filed.

8.      In *In Re Nat'ls Steel Corp.*, 316 B.R. 510, 515 (Bankr. N.D. Ill. 2004) a sophisticated corporate entity, which owned majority of Chapter 11 debtors' stock, was fully aware of the claims bar date, and was heavily involved in Chapter 11 case from its inception, was not permitted to file untimely proof of claim on excusable neglect theory. It is difficult to imagine how a corporate entity in the posture of *Steel Corp.* bears any similarity to Claimant's memory of sexual abuse being repressed.

9.      Additionally, the Objection fails to address the relevancy of the expected nature of the Claim, and that claims such as the Claim would seek to be timely filed, all as set forth in the Plan.[5] *In*

---

[5]  Plan, p. 82, "**4.2.5. Late-Filed Abuse Claims.** There are seven (7) Abuse Claims that were filed after the deadline for submitting Abuse Claims in the Case. The Trustee, in his sole discretion, may treat such late-filed Abuse Claims as timely or disallowed. If the Trustee treats late-filed Abuse Claims

4

*re Eagle Bus Mfg., Inc.,* 62 F.3d 730, 737-738 (5th Cir. 1995) (finding relevant that "[q]uite the contrary, these late filed claims were clearly expected by the debtor." (quoting *In re Alexander's Inc.,* 176 B.R. at 722 (expectation of claim is one factor to consider in determining if the debtor is prejudiced))).

### Conclusion

The Objection serves only to repeat Claimant's admission that she was aware of the Bar Date. The Objection does more to support the Motion than to oppose it, because it fails to describe any actual, cognizable or describable prejudice to the Survivors Committee or the Debtor to the extent the Motion is granted. Neither Claimant's reason for the Claim being filed after the Bar Date, Claimant's supporting case law cited in the Motion, nor Claimant's discussion of the lack of prejudice to the Debtor or other creditors are even addressed in the Objection. The lack of substantive resistance to the Motion contained in the Objection make clear that Claimant, via the Motion, has met her burden to show excusable neglect for failing to file the Claim prior to the Bar Date, and thus Claimant reiterates her request that her Claim be determined to be timely filed.

**WHEREFORE,** Claimant respectfully petitions the Court for an order: (1) approving the Motion; (2) overruling the Objection; (3) authorizing Claimant's Claim filed on July 30, 2020 to be treated as timely filed; and (4) for all other just and proper relief.

Respectfully submitted,

MULVEY LAW LLC

By:＿＿＿/s/ Joseph L. Mulvey＿＿＿＿＿＿＿＿＿＿＿＿＿
＿＿＿＿Joseph L. Mulvey (#30052-49)

as timely filed, each late-filed Abuse Claim shall be classified in Subclass 6A, 6B, 6C, or 6D, as appropriate."

5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

In re:

USA GYMNASTICS,[1]

              Debtor.

Chapter 11

Case No. 18-09108-RLM-11

## JOINT MOTION REQUESTING THE COURT TO CONDUCT A SETTLEMENT CONFERENCE AND FOR OTHER RELIEF

USA Gymnastics, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**" or "**USAG**"), and the Additional Tort Claimants Committee of Sexual Abuse Survivors (the "**Survivors' Committee**") jointly move this Court (the "**Motion**") for the entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, pursuant to sections 105(a) and (d) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") and Local Rule B-9019-2, ordering certain parties to participate in a settlement conference conducted by this Court. In support of this Motion, the Debtor and the Survivors' Committee respectfully state as follows:

### JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. § 1408.

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

## BACKGROUND

2.      From its start, the focus of USAG's chapter 11 case has been to reach a mediated resolution of the claims of the Survivors. To accomplish that goal, on May 17, 2019, the Court entered an Order appointing the Honorable Gregg W. Zive as the mediator in this case. [Dkt. 514.] Judge Zive conducted multiple mediation sessions in 2019 and 2020.  When discussions among USAG and USOPC's insurance carriers bogged down, the Court authorized the participation in the mediation of a second mediator, Paul Van Osselaer, to mediate the intra-carrier insurance disputes.

3.      On June 19, 2020, the Court entered a further Order in aid of the mediation directing that: (i) additional mediation sessions occur no later than August 14, 2020; (ii) the Survivors' Committee, the United States Olympic and Paralympic Committee ("**USOPC**"), and the USAG and USOPC insurers submit "meaningful" settlement offers before such mediation, and (iii) the Debtor may file an amended plan and disclosure statement at any time up until August 27, 2020. [Dkt. 1145 at ¶¶ 2, 4.]

4.      Judge Zive conducted mediations on August 11 and 12, 2020 with the participation of Mr. Van Osselaer. No settlement was reached. The members of the Survivors' Committee attended the mediation sessions as did USAG's Chief Executive Officer, Li Li Leung, and its Board Chair, Kathryn Carson. The insurers for USAG and USOPC did not bring their CEOs to the mediation session. Moreover, not all of the carriers brought persons with ultimate, unrestricted settlement authority.

5.      The insurance carriers for USAG and USOPC did not comply with this Court's June 19 Order to make meaningful settlement offers. USAG and the Survivors' Committee consider the insurance carriers' positions to be in violation of this Court's June 19, 2020 Order and

Humphrey Appellant Appendix 064

believe that the carriers have acted in bad faith with the goal of delaying this case for their own economic benefit.

## RELIEF REQUESTED

6.      By this Motion, USAG and the Survivors' Committee seek entry of an order directing the Committee, USAG, USOPC, and the insurance carriers for USAG and USOPC to attend a settlement conference to be conducted by this Court via teleconference. The Debtor and the Survivors' Committee further request that the Court direct each of the insurance carriers to bring their chief executive officers and all other persons necessary for final, unrestricted settlement authority to attend the settlement conference. USAG and USOPC should be directed to bring their leadership teams, including their chief executive officers and board chairs. The Debtor and the Survivors' Committee also request that the Court extend the deadline for filing an amended plan and disclosure statement to a date following such settlement conference.

## BASIS FOR RELIEF

7.      This Court has broad authority to issue orders and manage the conduct of the cases before it. *See* 11 U.S.C. § 105; *In re Volpert*, 110 F.3d 494, 500 (7th Cir. 1997) ("Section 105 grants broad powers to bankruptcy courts to implement the provisions of Title 11 and to prevent an abuse of the bankruptcy process"); *Citizens Gas & Coke Utility v. Matthews*, No. 03-2064, 2004 WL 2137637, at *8 (S.D. Ind. Aug. 13, 2004) (same).

8.      USAG filed its chapter 11 case to resolve the Survivors' claims equitably. Failure to reach a settlement benefits no one.

9.      To date, no settlement has been reached. As a result of the mediations that occurred on August 11 and 12, 2020, USAG and the Survivors' Committee contend that the insurance carriers who participated did not do so in good faith and acted in violation of this Court's June 19,

Humphrey Appellant Appendix 065

2020 Order. Before launching another round of litigation on these and other issues, USAG and the Survivors' Committee believe that it is in everyone's best interests for this Court to conduct a settlement conference to determine if costly and protracted litigation can be avoided. This Court is uniquely positioned to conduct a settlement conference because it will never be called upon to try the Survivors' claims given that the district court will be required to withdraw the reference of any objection to the personal injury claims. *See* 28 U.S.C. § 157(b)(5).

10.     The Survivors' Committee and the Debtor believe that this Court's participation in a settlement conference will ensure that all parties come to the table with meaningful offers as previously directed and may help to avoid the delay tactics that have plagued the prior mediations.

11.     To ensure that all parties participate fully, the Survivors' Committee and the Debtor further request that the insurance carriers be ordered to bring their chief executive officers and all persons necessary for final, unrestricted settlement authority to the settlement conference. USAG and USOPC should be directed to bring their leadership teams, including their chief executive officers and board chairs. The Seventh Circuit has held that courts have the authority to issue such orders and doing so would be appropriate here given the gravity of the claims that the Survivors have made. *See, e.g.*, *G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 652-53, 656 (7th Cir. 1989); *accord ARAC Roof It Forward v. Nationwide Mut. Ins. Co. of Am.*, No. 17-CV-4468, 2019 U.S. Dist. LEXIS 94077 (S.D. Ind. June 5, 2019) (ordered CEO of Nationwide Insurance to attend settlement conference). As a district court in this Circuit explained, "[n]umerous courts have found authority under Federal Rule 16 to order a party's insurance carrier to attend court-ordered settlement conferences." *Neal v. Target Corp.*, No. 13 C 5907, 2016 WL 3365432, at *3 (N.D. Ill. June 15, 2016) (collecting cases). Indeed, the "authority of a federal court

4

to order attendance of attorneys, parties, and insurers at settlement conferences and to impose sanction for disregard of the court's orders is so well established as to be beyond doubt." *Id.*

12.     If the Court is willing to hold the settlement conference, the Debtor and the Survivors' Committee also suggest that the Court hold a pre-conference to address how the settlement conference should be conducted.

13.     The Debtor also asks that the deadline for filing an amended plan and disclosure statement be moved to a date after the settlement conference.

WHEREFORE, the Debtor and the Survivors' Committee respectfully request that the Court enter the proposed order substantially in the form annexed hereto as <u>Exhibit A</u> granting the relief requested herein and such further relief as is just and proper.

Humphrey Appellant Appendix 067

Dated: August 20, 2020

| | |
|---|---|
| **JENNER & BLOCK LLP** | **PACHULSKI STANG ZIEHL & JONES LLP** |

By: /s/ *Catherine Steege*           By: /s/ *James I. Stang*

Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root (#24230-49)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com

*Counsel for the Debtor*

James I. Stang, Esq. (admitted *pro hac vice*)
Ilan D. Scharf, Esq. (admitted *pro hac vice*)
Joshua M. Fried, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
(310) 277-6910
jstang@pszjlaw.com
isharf@pszjlaw.com
jfried@pszjlaw.com

-and-

**RUBIN & LEVIN, P.C.**

By: /s/ *Meredith R. Theisen*

Meredith R. Theisen, Esq.
Deborah J. Caruso, Esq.
135 N. Pennsylvania Street, Suite 1400
Indianapolis, IN 46204 Telephone:
(317) 634-0300
dcaruso@rubin-levin.net
mtheisen@rubin-levin.net

*Counsel for the Survivors' Committee*

6

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-09108-RLM-11 |
| Debtor. | |

**THE ADDITIONAL TORT CLAIMANTS
COMMITTEE OF SEXUAL ABUSE SURVIVORS' CONSOLIDATED
OBJECTION TO MOTIONS TO FILE CLAIM AFTER BAR DATE**

The Additional Tort Claimants Committee of Sexual Abuse Survivors (the "**Survivors'
Committee**"), respectfully objects to (a) *Creditor's Motion to Allow Late Filed Claim to be
Treated as Timely* (the "**DOE JJ Motion**") [Doc 1218] filed by Jane Doe JJ ("**Doe JJ**") and (b)
*Motion to Allow Late Filed Claim to be Treated as Timely Filed* (the "**Humphrey Motion**" and,
collectively, with the Doe JJ Motion, the "**Motions**") [Doc 1213] filed by Katherine Humphrey
("**Humphrey**" and, collectively, with Doe JJ, the "**Movants**").

**INTRODUCTION**

1.      At this stage of this chapter 11 case, it would be irresponsible to allow
additional claims to be asserted against the USA Gymnastics (the "**Debtor**").  This case has been
widely reported in the general media, as well as sports and gymnastics focused media.  The bar
date was widely noticed and publicized.  As such, there is no basis for a finding of excusable
neglect to allow claims to be filed sixteen months after the bar date.

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal
office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

## BACKGROUND

2.      On January 31, 2019, the Debtor filed its *Motion For Order Establishing Deadlines For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof* ("**Bar Date Motion**") [Doc 203].  The Bar Date Motion explained in detail the notice procedures that the Debtor intended to follow if the Bar Date Motion was granted.  Although three objections were filed to the Bar Date Motion, none of the objectors argued that the Debtor should be required to locate addresses and provide direct mail notice of the bar date to every current or former member of the Debtor going back to the organization's beginning.  [*See* Docs 257, 260, and 261.]

3.      On February 25, 2019, the Court entered its order (the "**Bar Date Order**") [Doc 301] fixing April 29, 2019 (the "**Bar Date**") as the bar date for individuals to file claims arising from sexual abuse.  The Bar Date Order included notice provisions (including publication requirements) requested by the Survivors' Committee which were designed to provide broad publication notice of the Bar Date.  No party appealed the Bar Date Order and the Bar Date Order is now a final order.  The Debtor fulfilled its notice obligations under the Bar Date Order.

4.      Since the Bar Date Order, the Survivors' Committee, counsel for hundreds of Sexual Abuse Claimants, the Debtor, the Debtor's insurers, the Future Claims Representative, the United States Olympic and Paralympic Committee and its insurers engaged in mediation to resolve the sexual abuse claims against the Debtor.  That mediation was predicated on the claims filed against the Debtor.  As such, inclusion of additional claims at this late stage would not reasonably allow for additional funding based on the additional claims.

Humphrey Appellant Appendix 070

5.      Mediation was last conducted on August 11, 2020.  After that session, the mediators informed the parties that the mediation is at an impasse.

6.      On January 21, 2020, the Survivors' Committee filed its *Motion of the Additional Tort Claimants Committee of Sexual Abuse Survivors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 349 and 1112(b) Dismissing the Bankruptcy Case and Granting Related Relief* [Doc 892], seeking dismissal of this case.  A status hearing on that motion is currently scheduled for October 19, 2020.

7.      On February 21, 2020, the Debtor filed its *First Amended Chapter 11 Plan of Reorganization Proposed by USA Gymnastics* (the "**Plan**") [Doc 928] and its *Disclosure Statement for First Amended Chapter 11 Plan of Reorganization Proposed by USA Gymnastics* (the "**Disclosure Statement**") [Doc 930].  A hearing to consider approval of the Disclosure Statement is scheduled for October 19, 2020.

8.      On May 19, 2020, the Survivors' Committee filed its objection to the Disclosure Statement (the "**DS Objection**") [Doc 1060].  The DS Objection was joined by hundreds of sexual abuse survivors who asserted timely claims against the Debtor.  [*See* Doc Nos. 1064, 1066, 1067, 1076, 1090, 1091.]  The Survivors' Committee believes that the Plan is patently unconfirmable for the reasons stated in the DS Objection, and may supplement such objection in advance of any hearing to consider approval of the Disclosure Statement. [2]

---

[2] Pursuant to the *Order on Pretrial Conference* ("**Pretrial Conference Order**") [Doc 1145] entered on June 19, 2020, the Debtor may file an amended plan and disclosure statement any time up until August 27, 2020.  In addition, the Pretrial Conference Order provides that any objections to the Debtor's anticipated amended disclosure statement are due 28 days after the filing of the Debtor's amended disclosure statement.  Accordingly, the Survivors' Committee reserves its right to file an objection to any amended disclosure statement filed by the Debtor and/or supplement its current DS Objection.

3

9.      The Debtor's Plan is premised on the timely filed claims.  If the Court allows untimely claims to be filed at this juncture, the assumptions underlying the Debtor's Plan will not be reliable and the Plan may require even further amendment.  While the Survivors' Committee opposes the Plan, creditors are entitled to know the number of timely claims and how those claims could impact distributions to creditors.

## OBJECTION

10.      The Court should deny the Motions on the bases that (a) the Movants have not established excusable neglect and (b) allowing additional claims to be filed is futile given the impasse of this case.

**A.      The Movants Have Not Shown Excusable Neglect.**

11.      Because the Debtor's creditors all received the notice required by due process, the Bar Date Order should not be vacated. Instead, to the extent that additional creditors come forward seeking to have their late claims allowed as timely, those creditors should only be granted such relief if they can establish excusable neglect.  *See* Fed. R. Bankr. P. 9006(b)(1).

12.      To determine whether excusable neglect exists, the Court must evaluate "'(1) the danger of prejudice to the debtor, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was in the reasonable control of the movant, and (4) whether the movant acted in good faith.'"  *In re Kmart Corp.*, 381 F.3d 709, 713 (7th Cir. 2004).  The burden is on the Movants to prove that these factors and they must do so by a "preponderance of the evidence."  *Kmart*, 381 F.3d at 714; *In re Nat'l Steel*

4

*Corp.*, 316 B.R. 510, 515 (Bankr. N.D. Ill. 2004) (refusing to deem claim timely filed because of excusable neglect).

**B.**   **Ms. Humphrey's Motion Must Be Denied.**

13.   Ms. Humphrey admits that she "received notice of the Bankruptcy and or the opportunity to file a claim in the Bankruptcy prior to the Bar Date…." [Humphrey Motion at ¶ 13.] She further states that she did not file a claim because she did not recall the details of her abuse at the time of the notice. [*Id.*] This admission is fatal to Ms. Humphrey's Motion. After receiving notice of the Bar Date, the burden shifted to Ms. Humphrey to file a timely claim. She did not do so, and should not be permitted to do so at this time. Such delay was in Ms. Humphrey's reasonable control.

14.   Ms. Humphrey was also a member of the Debtor's Athlete's Council prior to and subsequent to the Bar Date. She was removed from the position due to a posting on Facebook that was insensitive and hurtful to gymnasts and other athletes, especially in light of the abuse suffered by survivors of abuse by coaches and others that led to the Debtor's chapter 11 filing. *See* CNN Wire, *Controversial meme costs Olympian her role with USA Gymnastics*, June 12, 2019 (https://wgno.com/news/nationalworld-news/controversial-meme-costs-olympian-her-role-with-usa-gymnastics/) (last visited August 18, 2020). Clearly, Ms. Humphrey was well aware of the Bar Date and the chapter 11 process due to her active participation as an athlete representative to the Debtor. Ms. Humphrey had a responsibility to come forward prior to the Bar Date, but failed to do so.

5

15.     Ms. Humphrey argues that there is no danger of prejudice to the Debtor and the length of delay has no impact on judicial proceedings.  [Humphrey Motion at ¶¶ 31-40.] She relies in large part on the provisions of the Debtor's proposed Plan, which includes a settlement option that allows untimely abuse claims to be treated the same as timely filed claims. [Humphrey Motion at ¶ 35.]  However, allowing late claims would be highly prejudicial to the Debtor and other creditors.  First, as noted, the Survivors' Committee asserts that the Plan is not confirmable.  Second, any assertion that the Plan's settlement option will be implemented is highly speculative.  Third, the Survivors' Committee and other survivors engaged in negotiations with the Debtor, its insurers and other parties based on the claims filed prior to the Sexual Abuse Claims Bar Date.  While one late claim filed shortly before mediation commences might not affect negotiations, claims filed sixteen months after the Bar Date – and after mediation has concluded – would be highly prejudicial.  There is also a risk of opening the floodgates to additional claims if any late claims are treated as timely at this late stage of the case, there is risk that additional survivors may come forward at this time.  Based on negotiations, the Survivors' Committee believes that allowing additional claims will reduce amounts available to pay survivors who filed timely claims prior to the start of mediation.[3]

---

[3] The Survivors' Committee notes that Ms. Humphrey appears to fall squarely within the definition of a *Future Claimant pursuant to the Order Authorizing Appointment of Future Claimants' Representative and Appointing Fred C. Caruso as Future Claimants' Representative* [Doc 516], which provides that a Future Claimant "is a Person who (a) held a Sexual Abuse Claim against the Debtor as of the Sexual Abuse Claims Bar Date and (b) meets one of the following criteria:…(ii) as of March 1, 2019, the statute of limitations for such Person was tolled under applicable state law…"  Id. at ¶ 2.  Given Ms. Humphrey's assertion that she has viable claims under Virginia law, she should be able to avail herself of relief provided for Future Claimants.  [Humphrey Motion at ¶¶ 24-26.]

**C.**     <u>**Doe JJ's Motion Must Be Denied**</u>.

      16.    Doe JJ asserts that she lived in Michigan and was unaware of the Bar Date because she did not receive direct notice of the Bar Date. However, Doe JJ does not assert any facts to support an assertion that she was a known creditor of the Debtor entitled to direct notice. Rather, as an unknown creditor, she is entitled to constructive notice. The Debtor provided ample constructive notice through both general and specialized media pursuant to the Bar Date Order. Such notice is sufficient, and thus Doe JJ should have filed a timely claim.

<u>**CONCLUSION**</u>

      17.    The Sexual Abuse Survivors' Committee respectfully requests that the Court deny the Motions.

7

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

Dated: <u>August 19, 2020</u>

<u>/s/James I. Stang</u>
James I. Stang, Esq. (admitted *pro hac vice*)
Ilan D. Scharf, Esq. (admitted *pro hac vice*)
Joshua M. Fried, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: jstang@pszjlaw.com
       kbrown@pszjlaw.com
       isharf@pszjlaw.com
       jfried@pszjlaw.com

-and-

RUBIN & LEVIN, P.C.

<u>/s/ Meredith R. Theisen</u>
Meredith R. Theisen, Esq.
Deborah J. Caruso, Esq.
135 N. Pennsylvania Street, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 634-0300
Facsimile: (317) 263-9411
Email: dcaruso@rubin-levin.net
mtheisen@rubin-levin.net

*Counsel for the Survivors' Committee*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on August 19, 2020, a copy of the foregoing *The Additional Tort Claimants Committee of Sexual Abuse Survivors' Consolidated Objection to Motions to File Claim After Bar Date* was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

Nancy D Adams    ndadams@mintz.com
Robert Allard    rallard@cmalaw.net
John Joseph Allman    jallman@hbkfirm.com, dadams@hbkfirm.com
Annemarie C Alonso    annie@sllawfirm.com
Martin Beeler    mbeeler@cov.com

Humphrey Appellant Appendix 076

Amanda Koziura Quick    amanda.quick@atg.in.gov, Marie.Baker@atg.in.gov
Michael L. Ralph    mralph@rsslawoffices.com
Melissa M. Root    mroot@jenner.com, wwilliams@jenner.com
James Pio Ruggeri    jruggeri@goodwin.com
Syed Ali Saeed    ali@sllawfirm.com, betty@sllawfirm.com
Ilan D Scharf    ischarf@pszjlaw.com
Thomas C Scherer    thomas.scherer@dentons.com, faith.wolfe@dentons.com
Ronald Paltin Schiller    rschiller@hangley.com, baw@hangley.com;ecffilings@hangley.com
David J. Schwab    djschwab@rsslawoffices.com
Igor Shleypak    ishleypak@fgppr.com, bcastillo@fgppr.com
Heather Elizabeth Simpson    heather.simpson@kennedyslaw.com
Casey Ray Stafford    cstafford@k-glaw.com, lsmith@k-glaw.com
James I. Stang    jstang@pszjlaw.com
Catherine L. Steege    csteege@jenner.com,
mhinds@jenner.com;thooker@jenner.com;aswingle@jenner.com
Laura B. Stephens    lbstephens@mintz.com
Mark D. Stuaan    mark.stuaan@btlaw.com
Keith Teel    kteel@cov.com
Meredith R. Theisen    mtheisen@rubin-levin.net,
atty_mtheisen@bluestylus.com;mralph@rubin-levin.net;csprague@rubin-levin.net
Jonathan Toren    jtoren@cozen.com, bbuckner@cozen.com
U.S. Trustee    ustpregion10.in.ecf@usdoj.gov
Susan Walker    susan.walker@dentons.com
Joshua D Weinberg    jweinberg@goodwin.com
Gabriella B. Zahn-Bielski    gzahnbielski@cov.com

I further certify that on August 19, 2020, a copy of the foregoing *The Additional Tort Claimants Committee of Sexual Abuse Survivors' Consolidated Objection to Motions to File Claim After Bar Date* was served via electronic mail to the following:

**United States Olympic Committee:** Chris McCleary at Chris.McCleary@usoc.org
**The Alexander, a Dolce Hotel and Wyndham Hotel Group, LLC:** Daniel M. Eliades at daniel.eliades@klgates.com and David S. Catuogno at david.catuogno@klgates.com

*/s/ Meredith R. Theisen*
Meredith R. Theisen

11

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| USA GYMNASTICS,[1] | ) | |
| | ) | CASE NO. 18-09108-RLM-11 |
| DEBTOR. | ) | |

**MOTION TO ALLOW LATE FILED CLAIM TO BE TREATED AS TIMELY FILED**

Comes now creditor, Terin Humphrey ("Claimant"), by counsel, and files her *Motion to Allow Late Claim to be Treated as Timely Filed* (the "Motion"), pursuant to 11 U.S.C. § 502(b)(9) and Fed R. Bankr. P. 9006(b)(1) and hereby petitions the Court for the Court to allow the proof of claim, filed confidentially today, confirmation of which filing was received via electronic correspondence to undersigned counsel at 3:26 p.m. EDT in the above-referenced Bankruptcy Case under Claimant's name and signed by Claimant (the "Claim"), to be treated as timely filed, and in support thereof states as follows:

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)and (O), and the Court may enter a final order consistent with Article III of the U.S. Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested herein are sections 3003 and 9006 of the Bankruptcy Code.

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

1

## RELEVANT PROCEDURAL BACKGROUND

3.      Debtor filed a Voluntary Petition for Relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on December 5, 2018 (the "Petition Date"), in the United States Bankruptcy Court for the Southern District of Indiana as Case No. 18-09108-RLM-11 (the "Bankruptcy").

4.      On December 19, 2018, the United States Trustee appointed the Additional Tort Claimants Committee of Sexual Abuse Survivors (the "Committee").

5.      On February 25, 2019, the Court entered an order (the "Bar Date Order") fixing April 29, 2019 as the bar date for general claims and claims asserting sexual abuse (the "Bar Date"). [Doc. No. 301].

6.      On May 17, 2019, the Court approved a Future Claims Representative as proposed by the Debtor [Doc. No. 516].

7.      On February 21, 2020, Debtor filed its First Amended Chapter 11 Plan of Reorganization Proposed by USA Gymnastics [Doc. No. 928] (the "Amended Plan"), as well as its Disclosure Statement for First Amended Plan [Doc. No. 930] (the "Disclosure Statement"), and Debtor's Motion for Order Approving the Disclosure Statement and Plan Confirmation Procedures [Doc. No. 931] (the "Plan Confirmation Procedure Motion"), to which numerous objections have been filed by the Additional Tort Claimants Committee of Sexual Abuse Survivors (the "Survivors Committee") [Doc. No. 1060], and others, which Plan Confirmation Procedure Motion and objections thereto are currently set for hearing October 19, 2020 at 1:30 p.m. (the "Hearing").

2

## ADDITIONAL FACTS RELATING TO CLAIMANT'S DELAY IN FILING THE CLAIM

8.      Claimant was born on August 14, 1986, and has been a member of USA Gymnastics ("USAG") from 1989 through the present. [Affidavit of Terin Humphrey, attached hereto as Exhibit "A" ("Humphrey Aff."), ¶1].

9.      In 2002, likely at the July 2002 U.S. Classic gymnastics meet in Virginia Beach, VA, hosted by Excalibur Gymnastics, while she was fifteen (15) years of age, Claimant was sent by her coaches to be examined by Dr. Larry Nassar ("Nassar") for a hip injury, during which examination Claimant was sexually abused by Nassar for approximately fifteen (15) minutes. During the same tournament, Claimant was re-directed by her coaches to Nassar for treatment at the same competition, at which point she was abused by Nassar again in the same fashion. [Humphrey Aff. ¶2].

10.     At the time she suffered the abuse from Nassar, Claimant was a member of USAG and Nassar was working in his capacity as a physician for USAG. [Humphrey Aff. ¶3].

11.     Claimant has not filed a claim against Michigan State University relating to her claims against Nassar. [Humphrey Aff. ¶4].

12.     In 2004, at the age of 18, Claimant earned two silver medals in gymnastics at the Olympic Games in Athens, Greece. [Humphrey Aff. ¶5].[2]

13.     Although Claimant received notice of the Bankruptcy and of the opportunity to file a claim in the Bankruptcy prior to the Bar Date, she did not do so because it was only within the past

---

[2] Thus, to the extent the Amended Plan is confirmed and Claimant's claim is allowed, she would become a member of Class 6, subclass 6A (Elite Gymnasts). The Class 6A Elite Gymnasts are to receive a total of $82,550,000.00 under the currently proposed Amended Plan, which, based on the 66 members of this subclass identified in the Disclosure Statement, would receive $1,250,757.58 per subclass member [Disclosure Statement, p. 13].   If the Motion is granted, and Claimant's claim is allowed as a deemed-timely filed Class 6A Elite Gymnast claim, it would increase the number of claimants of this subclass from 66 to 67, thus decreasing each of the other 66 Elite Gymnasts claims to $1,232,089.52—a per subclass member reduction by 1.49% percent or $18,668.03 per Elite Gymnast.

3

month that Claimant came to recall and realize that she had been abused by Nassar. [Humphrey Aff. ¶6].

14.    More specifically, Claimant became pregnant with her first child in May of 2019, which was born in January, 2020. [Humphrey Aff. ¶7].

15.    During the course of her pregnancy, Claimant became acutely anxious when anyone touched her stomach without permission and she experienced severe anxiety when she required pelvic examinations during this time, and her distress rose even further at the time of childbirth when she "felt helpless and overwhelmed because people were staring at me (my genitals) and examining me, especially when the male doctor, not my usual doctor, did it." [Humphrey Aff. ¶¶8-9].

16.    During and after her childbirth, Claimant suffered numerous other negative psychological outcomes, including distressing memories and flashbacks to the repressed sexual abuse she suffered from Nassar. [Humphrey Aff. ¶10].

17.    As the recurrence of these memories intensified and clarified in June of 2020, Claimant first began to realize that she may have suffered abuse by Nassar.    [Humphrey Aff. ¶11].

18.    Claimant was psychologically examined by Dr. Steven A. Elig, M.D. ("Dr. Elig") on July 18, 2020, and Dr. Elig made the following observations:

> Following the powerful external cue of being genitally examined and manipulated prior to and after childbirth, which resembled and symbolized a developmentally inappropriate sexual experience, Ms. Humphrey reports the following resulting symptoms:
>
>     a. Intrusion/reexperiencing - Intrusive distressing memories, flashbacks, and intense psychological distess with marked physiological reactions upon exposure to cues that symbolize or resemble an aspect of the traumatic events.
>
>     b. Avoidance - Efforts to avoid distressing memories, thoughts, feelings, and external reminders of the traumatic events.

4

      c. Negative cognitions - Persistent negative beliefs and expectations about herself and the world, distorted cognitions about the consequences of the traumatic events, persistent negative emotional state, markedly diminished interest and participation in significant activities, feelings of detachment or estrangement from others, and persistent inability to experience positive emotions.

      d. Hyperarousal - Irritable behavior and angry outbursts, hypervigilance, exaggerated startle response, problems with concentration, and sleep disturbance.

      e. Depression - Depressed mood, markedly diminished interest and pleasure in activities, insomnia, psychomotor agitation, fatigue, feelings of excessive guilt, and diminished ability to concentrate.

These disturbances have caused clinically significant distress and impairment in social, occupational, and other important areas of functioning. Ms. Humphrey reports negative impact on her general sense of life contentment and emotional outlook, intimate relationships, family relationships, friendships, work motivation, and interests and activities.

[Declaration of Licensed Mental Health Practitioner, Steven A. Elig, M.D. (dated July 28, 2020), attached hereto as Exhibit "B" (the "Elig Dec."), ¶¶8-9].

      19.    As a result of the foregoing symptoms and Dr. Elig's analysis, Dr. Elig concluded that Claimant satisfied diagnosis criteria for Child Sexual Abuse, Post-Traumatic Stress Disorder, and Major Depressive Disorder. [Elig Dec, ¶¶13-17].

      20.    As to Claimant's Posttraumatic Stress Disorder diagnosis, Dr. Elig states:

The psychiatric diagnosis of Posttraumatic Stress Disorder is based on a pattern of intrusion symptoms, avoidance of stimuli, negative alterations in cognitions and mood, and alterations in arousal and reactivity following exposure to actual or threatened death, serious injury, or sexual violence. For children, sexually violent events may include developmentally inappropriate sexual experiences without physical violence or injury. 1 Ms. Humphrey reports a multitude of these specific symptoms in a clinically valid manner. These **symptoms were not present prior to the visceral reminder of sexual abuse occasioned by genital examination during pregnancy** and childbirth, and they are thematically closely related to the incidents of sexual abuse. Therefore, it is my opinion to a reasonable degree of medical certainty that Ms. Humphrey meets psychiatric criteria for Posttraumatic Stress Disorder **with delayed expression**, as a direct result of her experience of child sexual abuse by Dr. Larry Nassar.

5

[Elig Dec, ¶16 (emphasis added)].

21.　　As to Claimant's Major Depressive Disorder diagnosis, Dr. Elig states:

　　17.　　The psychiatric diagnosis of Major Depressive Disorder is based on a pattern of depressed mood and/or loss of interest or pleasure in almost all activities, accompanied by symptoms such as weight loss, insomnia, psychomotor retardation, fatigue, feelings of worthlessness or excessive guilt, diminished ability to concentrate, and recurrent thoughts of death, suicidal ideation, or suicide attempt. (See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, 5th edition, 2013). Ms. Humphrey convincingly describes the initial onset of severe symptoms beginning in January 2020. She had never before experienced similar symptoms. Therefore, it is my opinion to a reasonable degree of medical certainty that Ms. Humphrey meets psychiatric criteria for Major Depressive Disorder, single episode, with anxious distress and peripartum onset, as a direct result of child sexual abuse by Dr. Larry Nassar.

　　18.　　Due to the severity of her condition and the resulting functional interferences, Ms. Humphrey's prognosis is guarded. Although not expressed formally in the DSM-V diagnostic format, the most clinically worrisome aspect of her presentation is the potential impact on her ability to care for and to promote the healthy development of her baby. The maternal tasks of providing protection and promoting attachment and basic trust without undue worry and anxiety have been directly and substantially affected by her experience of child sexual abuse.

[Elig Dec, ¶¶17-18 (emphasis added].

22.　　With respect to Claimant's inability to recognize or disclose her prior abuse by Nassar,

Dr. Elig concluded:

　　**Delayed symptoms and disclosure of sexual abuse are not uncommon**, and must be understood individually with respect to content, context, and developmental stage. Ms. Humphrey clearly recalled the incident of child sexual abuse during adolescence and early adulthood, but **she did not experience significant psychological symptoms until genital examination during pregnancy and childbirth served as a powerful reminder and precipitated a feeling of recurrence of sexual abuse**. She was then flooded with feelings of vulnerability, helplessness, guilt, defectiveness, and lack of trust. Prior to that time, she had also been in the child sexual abuse, creating a potent loyalty bind. **These factors credibly explain Ms. Humphrey's pattern of delayed symptoms and disclosure from a psychiatric viewpoint.**

6

[Elig Dec, ¶19 (emphasis added).[3]

### RELIEF REQUESTED

23.     By this Motion, Claimant seeks the Court's authority to treat the Claim as timely filed.

### LEGAL AUTHORITY SUPPORTING REQUESTED RELIEF

24.     Claimant's sexual abuse by Nassar occurred in Virginia, thus, Virginia law applies with respect thereto.   Pursuant to Va. Code Ann. § 8.01-243(D) "Every action for injury to the person, whatever the theory of recovery, resulting from sexual abuse occurring during the infancy or incapacity of the person as set forth in subdivision 6 of § 8.01-249 shall be brought within 20 years after the cause of action accrues."

25.     Va. Code § 8.01-249 (6) provides: "In actions for injury to the person, whatever the theory of recovery, resulting from sexual abuse occurring during the infancy or incapacity of the person, upon the later of the removal of the disability of infancy or incapacity as provided in § 8.01-229 or when the fact of the injury and its causal connection to the sexual abuse is first communicated to the person by a licensed physician, psychologist, or clinical psychologist. As used in this subdivision, "sexual abuse" means sexual abuse as defined in subdivision 6 of § 18.2-67.10 and acts constituting rape, sodomy, object sexual penetration or sexual battery as defined in Article 7 (§ 18.2-61 et seq.) of Chapter 4 of Title 18.2."

26.     Thus, Claimant's claims for sexual abuse by Nassar in July of 2002 are timely filed under Virginia law, because they are not time-barred until, at the earliest, 20 years after her 18th birthday-August of 2024.

---

[3]  Fragmented and incomplete memories in rape and trauma survivors is a well-documented phenomenon. *See* James Hopper, Ph.D. and David Lisak, Ph.D., *Why Rape and Trauma Survivors Have Fragmented and Incomplete Memories*, TIME MAGAZINE, December 9, 2014 (viewable at: https://time.com/3625414/rape-trauma-brain-memory/).

Humphrey Appellant Appendix 084

27.     11 U.S.C.§502(b)(9) permits allowance and payment of tardily-filed claims " . . . as permitted under paragraph (1), (2), or (3) of section 726(a) of this title or under the Federal Rules of Bankruptcy Procedure."

28.     Fed. R. Bankr. P. 9006(b)(1) provides, in pertinent part:

**(b) Enlargement (1) In general**. Except as provided in paragraphs (2) and (3) of this subdivision, when an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

29.     *Pioneer Investment Srvcs. v. Brunswick Assoc. Ltd. P'ship,* 507 U.S. 380, 392-395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), provides the cornerstone for determining excusable neglect under Fed. R. Banrk. P. 9006(b)(1), providing generally that excusable neglect is an "elastic concept", which requires analysis of "all relevant circumstances surrounding the party's omission", with specific focus on:

[1] the danger of prejudice to the debtor;

[2] the length of the delay and its potential impact on judicial proceedings;

[3] the reason for the delay, including whether it was within the reasonable control of the movant; and

[4] whether the movant acted in good faith.

30.     More generally, the Supreme Court in *Pioneer* explained that "by empowering the courts to accept late filings where the failure to act was the result of excusable neglect, Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings

8

caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Id.* at 388.

### *Pioneer* Factors 1 and 2: There is no danger of prejudice to the Debtor and the length of the delay has no impact on the judicial proceedings.

31.     "The first *Pioneer* factor, prejudice, does not refer to an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on the facts in evidence." *In re New Century TRS Holdings, Inc.* 2014 WL 2198247 (Bankr. D. Del. May 23, 2014) (citing *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envtl Energy, Inc.),* 188 F.3d 116, 127 (3d Cir.1999)).

32.     "When addressing the issue of prejudice under the *Pioneer* test, the *O'Brien* Court discussed several relevant considerations, including: (i) whether the debtor was surprised or caught unaware by the assertion of a claim that it had not anticipated; (ii) whether payment of the claim would force the return of amounts already paid out under the confirmed plan or affect the distribution to creditors; (iii) whether payment of the claim would jeopardize the success of the debtor's reorganization; (iv) whether allowance of the claim would adversely impact the debtor; and (v) whether allowance of the claim would open the floodgates to other late claims." *Id.*

33.     At this stage of the Bankruptcy, although the Amended Plan has been proposed, it has not been voted upon, nor has the Plan Confirmation Procedure Motion been ruled upon as it is currently set for Hearing on October 19, 2020.

34.     As of the filing of the Amended Plan, there were 553 Abuse Claims filed, 33 of which were duplicative, one of which has been disallowed, one of which is subject to a pending objection and

9

one of which has been withdrawn. Of the remaining 517 claims, seven were filed after the Bar Date. [Disclosure Statement, p.4, n.2]

35. Further, the Disclosure Statement provides "Special Considerations If Your Claim Was Filed After the Bar Date. For those seven Claimants who filed their Abuse Claims after the Bar date, the Settlement Election is the only option that allows you to recover. . . **Under the Settlement Election, untimely Abuse Claims will be treated the same as timely Abuse Claims without any requirement that the Claimant seek Bankruptcy Court approval for such treatment**." [Disclosure Statement, p. 9 (emphasis added)]. Thus, it is unclear from the proposed Disclosure Statement if Bankruptcy Court approval of this Motion is even necessary—with the possibility that Claimant's Claim will be allowed notwithstanding this Motion.

36. Also, as previously noted (p. 3, note 2, *supra*) to the extent that the Motion is granted and Claimant's Claim treated as timely filed, under the current Amended Plan, the only parties impacted would be the 66 claimants of the current Class 6A Elite Gymnasts subclass, via a 1.49% reduction of each of their $1,250,757.58 claims to $1,232,089.52—a per subclass member reduction of $18,668.03.

37. Thus, although the Claim was filed on July 30, 2020, 458 days after the Bar Date, in light of the foregoing unresolved status of the Amended Plan, the ambiguity of same as it relates to untimely Abuse Claims, and (assuming that the Amended Plan is ultimately approved) the overall limited impact on the 66 existing Class 6A Elite Gymnasts in their recovery if the Claim is allowed, each of the first two *Pioneer* factors mitigate in favor of the Motion being granted and the Claim being deemed timely filed.

38. Further, of the five *O'Brien* subfactors deemed relevant under the first *Pioneer* factor, the facts of Claimant's claim support the granting of the relief sought via the Motion, because: (i)

10

USAG is not surprised or caught unaware by the assertion of the Claim—it understands the existence of, and the Disclosure Statement specifically contemplates treatment of, untimely Abuse Claims, which are potentially treated the same as timely filed Abuse Claims ; (ii) there have been no payments made to creditors of Claimant's class under the Amended Plan, so nothing would need to be returned—although there would be an impact to the payment made to the existing Class 6A Elite Divers, that impact, distributed amongst each of those 66 claimants is less than a 1.5% reduction; (iii) payment of the Claim would not jeopardize the success of USAG's reorganization, because there are sufficient funds being contemplated for distribution under the Amended Plan for Claimant's claim to be paid as a Class 6A Elite Diver claim; (iv) allowance of the Claim would not adversely impact USAG because it already has allocated funds for claims in the class of Claimant's Claim; and (v) there are no facts to suggest that allowance of this claim would open the floodgates to other late claims—the universe of potential Class 6A Elite Divers generally is very small, 66 of them have already filed claims, and it appears extraordinarily unlikely that there are numerous other potential Class 6A Elite Diver future claimants with psychological symptoms similar to Claimant's that have not yet filed claims.

39.     It must be emphasized that impact to the **Debtor** on the treatment of Claimant's Claim as timely filed is the central inquiry, not impact to other parties. In a similar situation, where, as of the date of Debtor's receipt of notice of the late claim the reorganization plan was unconfirmed, being negotiated, and was expected, the Fifth Circuit Court of Appeals has stated:

> Under *Pioneer,* the central inquiry is whether the *debtor* will be prejudiced. We note that Greyhound's reorganization plan was negotiated and approved *after* Greyhound had notice of these claims. **This is not a situation where the debtor's plan was formulated, negotiated, and confirmed before notice was given of a substantial late claim** *See, e.g., In re Drexel Burnham Lambert Group, Inc.,* 148 B.R. 1002, 1007 (S.D.N.Y.1993) ("acceptance of a substantial late claim after consummation of a vigorously negotiated claims settlement and Plan of Reorganization thereon and a

Humphrey Appellant Appendix 088

> distribution of a major part of the assets thereunder, would disrupt the economic model on which the creditors, the debtor and the stockholders reached their agreements"); *In re Alexander's Inc.,* 176 B.R. 715, 722 (Bankr.S.D.N.Y.1995) ("Debtors and other creditors will be prejudiced because the Proof of Claim was filed *after* the Debtors' Plan was formulated, negotiated and confirmed. Debtors had proposed the Plan based upon a claims analysis ... which did not include [claimant's] substantial claim.... Creditors who had timely filed their claims voted on a Plan based on this estimate.... Thus, allowance of [claimant's] claim would disrupt the 'economic model' on which all parties reached their agreements.") (emphasis added). **Quite the contrary, these late filed claims were clearly expected by the debtor**. *In re Alexander's Inc.,* 176 B.R. at 722 (expectation of claim is one factor to consider in determining if the debtor is prejudiced).

*In re Eagle Bus Mfg., Inc.*, 62 F.3d 730, 737-738 (5th Cir. 1995) (italicized emphasis in original, bold emphasis added).

40.    Thus, there is essentially no impact on Debtor due to the delay in Claimant's filing of the Claim, and thus no prejudice to Debtor relating to same.

*Pioneer* **Factors 3 and 4: Claimant's delay was the result of a medically-recognized phenomenon of repressed memory, not in her reasonable control, and she acted in good faith upon discovering the basis for the Claim.**

41.    Claimant did not begin to realize that she may potentially have a claim in the Bankruptcy until the nature of her medical examinations in the late stages of her pregnancy during the end of 2019 and early 2020 triggered memories of the abuse she suffered at the hands of Nassar. Claimant's realizations did not fully crystallize until June of 2020, and Elig's Declaration confirming Claimant's abuse, Post-Traumatic Stress Disorder, Major Depressive Disorder and delayed expression thereof, was not completed until June 28, 2020—two days prior to the Claim being filed.

42.    As Dr. Elig notes in his Declaration, Claimant's expression of her Post-Traumatic Stress Disorder and Major Depressive Disorder did not occur until the birth of her child in 2020, and Claimant's presentation and symptoms match a diagnosis for delayed expression—this delayed expression is the reason for Claimant's delay in filing the Claim.

12

43.     Claimant's circumstances are somewhat similar to that of the movant in *In re SunCruz*

*Casinos, LLC*, 377 B.R. 741 (Bankr. S.D. Fla. 2007). The *SunTrust* court, holding in favor of the

late-filed claim asserted by a claimant for an injury attributable to the debtor, determined that

> [Claimant testified that] he did not file a claim before the bar date because **he was not aware that he had a claim under the Bankruptcy Code.** He realized of course that he was injured during the 2002 incident, but the pain had subsided and he no longer thought he had any reason to file a claim. [Claimant] points to the Florida Department of Labor Maximum Medical Improvement form prepared by Dr. Warren (Sheridan's Ex. 4), a physician engaged by SunCruz, which states that [claimant] achieved maximum medical improvement on October 8, 2003 and that the percentage of permanent impairment to his body as a whole was zero percent. . . .
>
> I find that the facts in this case more closely resemble those in *Needy v. CSX Transp., Inc.,* 2000 WL 34249112, 2000 U.S. Dist. LEXIS 22603 (W.D. Ky. Mar 21, 2000). The claimant Needy was put on notice that he had suffered an injury after consulting with several of physicians but the information he received from them was insufficient to suggest to him to file a claim against his employer for causing him injury, in light of the fact that he was not having any pain that he could connect to the performance of his job. . . . The court noted that at the time, he was not necessarily suffering from any illness causally related to his exposure to chemicals. It was only when he progressed from headaches and eye problems to total blindness that the court found that he should have been aware of his injury and its relation to his employment. *Id.* at *3, 2000 U.S. Dist. LEXIS 22603, * 8. . . . [claimant] credibly testified that he was pain-free after the 2002 accident and that the doctor to whom his employer SunCruz had referred him told him that he had reached his maximum recovery. It is understandable that [claimant]would not be able to draw a connection between his post–2005 accident pain and the accident in 2002.
>
> SunCruz/Foothill correctly argues that the claims bar date is established to create finality in the process and further argues that it is prejudiced by Sheridan's attempt to pursue the claim after the bar date. I am required to **balance the important finality that bar dates and other statutory limitations provide with fairness and justice for those who seek recovery**. Certainly the Debtor (or at least Wells Fargo Foothill) would be prejudiced by allowing a late filed claim which it would otherwise not have to defend against, but the Court finds that the prejudice is not so great as to outweigh the rights of [claimant] to pursue a claim which I find he honestly **did not believe he had until well after the applicable bar date of September 15, 2004**. . . . After observing [the claimant's] testimony, and after carefully considering the third *Pioneer* factor, I find that [claimant]'s delay in filing the claim was not unreasonable and that Sheridan has acted in good faith in all matters relating to the filing of the claim. I am convinced that [claimant] did not knowingly delay in filing a claim and that he promptly filed one once he believed he had a claim. I find [claimant]'s explanation that he did not think he had a claim because the Debtor's doctors told him

13

he was not permanently injured and because he felt minimal pain from the incident to be entirely credible. . . . I accordingly find that [claimant]'s actions have been taken in good faith.   In sum, I find that in applying the factors set forth in *Pioneer* to the facts in this case, those factors weigh in favor of a finding that [claimant]'s failure to file a claim before the applicable bar date was the result of excusable neglect, and that [claimant] should be allowed to pursue his late filed claim.

*Id.* at 746-748.

44.    As to good faith, "an honest oversight that is not part of a sinister, well-conceived plan to frustrate" the opponent will not bar a finding of excusable neglect. *Kimberg v. Univ. of Scranton,* 411 Fed.Appx. 473, 478 (3d Cir. 2010).

45.    Claimant's actions are in good faith because her failure to file the Claim prior to the Bar Date was not part of any plan or deliberate action—she simply did not realize that she had a claim until her pregnancy and birth of her first child triggered traumatic memories of Nassar's abuse, and the nature of her prior abuse and memory representation were only elucidated after psychological examination this month.

### Conclusion

Claimant is an Olympic-medal winning gymnast that was twice sexually abused by Nassar as a minor. Claimant has been diagnosed by a licensed mental health physician with the medically-recognized conditions of Post-Traumatic Stress Disorder and Major Depressive Disorder as a result of this abuse. Claimant's recollection and memory of her abuse were not triggered until her pregnancy, grew stronger with her child's birth in January of 2020, and did not fully form until June 2020, after which she was evaluated and diagnosed, and after which diagnosis her Claim was immediately filed. This repression of memory and piecemeal recall is a known medical fact to be a common side effect of sexual abuse. Claimant's situation, viewed in its entirety within the context of the Bankruptcy, the state of plan reorganization, the Plan

14

itself, and the relative impact to other Class 6A claimants establishes that Claimant's failure to file the Claim prior to the Bar Date constitutes excusable neglect, such that Claimant's Claim should be treated as timely filed.

**WHEREFORE,** Claimant respectfully petitions the Court for an order: (1) approving this Motion; (2) determining Claimant's Claim filed on July 30, 2020 to be treated as timely filed; and (3) for all other just and proper relief.

Respectfully submitted,

MULVEY LAW LLC

By:      /s/ Joseph L. Mulvey
        Joseph L. Mulvey (#30052-49)
        MULVEY LAW LLC
        133 W. Market Street, No. 274
        Indianapolis, IN    46204
        (317) 721-1339
        joseph@mulveylawllc.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2020, a copy of the foregoing Motion was filed electronically.  Notice of this filing will be sent to the following parties of record through the Court's Electronic Case Filing System.

/s/ Joseph L. Mulvey
Joseph L. Mulvey

Nancy D Adams ndadams@mintz.com
Annemarie C Alonso annie@sllawfirm.com
Martin Beeler mbeeler@cov.com
Thomas R. Behm trbehm@gmnp.com
Megan A Bonanni mbonanni@pittlawpc.com
Tonya J. Bond tbond@psrb.com , jscobee@psrb.com
Wendy D Brewer wbrewer@fmdlegal.com , cbellner@fmdlegal.com
Kenneth H. Brown kbrown@pszjlaw.com
Charles D. Bullock cbullock@sbplclaw.com , lhaas@sbplclaw.com
George Calhoun george@ifrahlaw.com
Heather.Simpson@kennedyscmk.com
Douglas N. Candeub dcandeub@morrisjames.com
John Cannizzaro john.cannizzaro@icemiller.com
Thyrza.Skofield@icemiller.com
Deborah Caruso dcaruso@rubin-levin.net, dwright@rubin-levin.net; csprague@rubinlevin.net;
    atty_dcaruso@bluestylus.com

15

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

IN RE:                      )

                             )      Chapter 11

USA GYMNASTICS      )

                             )      CASE NO. 18-09108-RLM-11

              DEBTOR.     )

## VERIFIED AFFIDAVIT OF TERIN HUMPHREY

Comes now Terin Humphrey, and, being first duly sworn upon her oath, deposes and says:

1.     I was born on August 14, 1986, and have been a member of USA Gymnastics ("USAG") from 1989 through the present.

2.     In 2002, at a USA Gymnastics meet on the east coast, which I believe to have been the 2002 U.S. Classic gymnastics meet in Virginia Beach, VA, hosted by Excalibur Gymnastics, while I was fifteen (15) years of age, I was sent by my coaches to be examined by Dr. Larry Nassar ("Nassar") for a hip injury, during which examination I was sexually abused by Nassar for approximately fifteen (15) minutes. During the same tournament, I was re-directed by my coaches to Nassar for treatment at the same competition, at which point I was abused by Nassar again in the same fashion.

3.     At the time I suffered the abuse from Nassar, I was a member of USAG and Nassar was working in his capacity as a physician for USAG.

4.     I have not filed a claim against Michigan State University relating to my claims against Nassar.

5.      In 2004, at the age of 18, I earned two silver medals in gymnastics at the Olympic Games in Athens, Greece.

6.      Although I received notice of the USA Gymnastics Bankruptcy (the "Bankruptcy") and of the requirement to file a claim in the Bankruptcy prior to April 29, 2019, I did not do so because it is only since June of 2020 that I came to realize that I had been abused by Nassar.

7.      I became pregnant with my first child in May of 2019, which was born in January, 2020.

8.      During the course of my pregnancy, I became acutely anxious when anyone touched my stomach without permission and experienced severe anxiety when I had to undergo required pelvic examinations during this time.

9.      My distress rose even further at the time of childbirth when I felt helpless and overwhelmed because people were staring at me (my genitals) and examining me, especially when the male doctor, not my usual doctor, did it.

10.     During and after childbirth, I suffered distressing memories and flashbacks to the the sexual abuse from Nassar.

11.     As the recurrence of these memories has intensified and clarified, I began to realize that I suffered abuse by Nassar, and it was not until June of 2020 that I fully began to recall and comprehend what had happened to me.

FURTHER AFFIANT SAYETH NAUGHT.

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Terin Humphrey

7-30-2020

1 | **B. ROBERT ALLARD (#175592)**
2 | **MARK J. BOSKOVICH (#298688)**
| **CORSIGLIA MCMAHON & ALLARD LLP**
3 | 96 North Third Street, Suite 620
| San Jose, California 95112
4 | (408) 289-1417
| Fax: (408) 289-8127
5 | rallard@cmalaw.net
| mboskovich@cmalaw.net
6 |
7 | **JOSEPH L. MULVEY (#308766)**
| MULVEY LAW LLC,
8 | 133 W Market Street, Suite 274
| Indianapolis, Indiana 46204-2801
9 | (317) 721-1339
| joseph@mulveylawllc.com

Attorneys for Plaintiff

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

| In re | Chapter 11 |
| USA GYMNASTICS, | Case No. 18-09108-RLM-11 |
| Debtor. | **DECLARATION OF LICENSED MENTAL HEALTH PRACTITIONER** |

I, STEVEN A. ELIG, M.D., do hereby declare and certify:

1.     I am a California licensed mental health care practitioner. I currently practice in the state of California.

2.     I have prepared this report in response to your request for a psychiatric evaluation by an independent medical expert of Terin Humphrey (DOB 8/14/1986). It is intended to present a summary of my evaluation and recommendations for your use in legal proceedings. Because this information is presented in abridged fashion, additional information

1

DECLARATION OF LICENSED MENTAL HEALTH PRACTITIONER

and opinions may be offered upon further request. My opinions are based on the information that is currently available to me, and they may be modified or expanded in the future if supplementary information becomes available.

Diagnostic Interview

3.       I interviewed Terin Humphrey for 4 hours and 15 minutes on July 18, 2020. Due to travel and interpersonal contact limitations imposed by the COVID-19 pandemic, Ms. Humphrey participated in this interview via Zoom video conferencing from her home in Blue Springs, Missouri

Brief Developmental History:

4.       She began full-time training for the Olympics immediately after finishing high school, and she earned two silver medals just after turning 18 years old in 2004. She then attended the University of Alabama, where she continued competing in gymnastics. She earned a degree in Criminal Justice with a minor in Psychology in 2008, with a GPA of about 3.4.

5.       She was married in October 2019, and her daughter was born after a healthy pregnancy in January 2020. She now works as a homemaker, and her future career direction is uncertain.

History of Relevant Events:

6.       Ms. Humphrey reports that she was sent by her coaches to be examined by Dr. Larry Nassar when she injured her hips in 2002 at age 15. The sexual abuse lasted approximately 15 minutes. Nassar positioned his body so the coach couldn't see what he was doing.  "He didn't even stretch my hips or do any other kind of exam.... I was so embarrassed and uncomfortable. I didn't know what he was doing or how it could help, but he was so knowledgeable so I thought it must be okay."

7.       During her pregnancy in 2019, Ms. Humphrey became acutely anxious when anyone touched her belly without permission. She experienced severe anxiety when she required  pelvic examinations during this time, and her distress rose even further at the time of childbirth when "I felt helpless and overwhelmed because people were staring at  me (my genitals) and  examining me, especially when the male doctor, not my usual doctor, did it." These events reminded her directly of her confusion and embarrassment when being examined

DECLARATION OF LICENSED MENTAL HEALTH PRACTITIONER

by Dr. Larry Nassar. Further reminders immediately followed when she needed physical therapy for pelvic/back pain caused by childbirth with a previous spinal injury. She ended treatment prematurely because she could not endure it any longer, prolonging her physical pain.

Resulting Psychological Symptoms and Psychosocial Impact:

8.     Following the powerful external cue of being genitally examined and manipulated prior to and after childbirth, which resembled and symbolized a developmentally inappropriate sexual experience, Ms. Humphrey reports the following resulting symptoms:

a.   Intrusion/reexperiencing - Intrusive distressing memories, flashbacks, and intense psychological distress with marked physiological reactions upon exposure to cues that symbolize or resemble an aspect of the traumatic events.

b.   Avoidance - Efforts to avoid distressing memories, thoughts, feelings, and external reminders of the traumatic events.

c.   Negative cognitions - Persistent negative beliefs and expectations about herself and the world, distorted cognitions about the consequences of the traumatic events, persistent negative emotional state, markedly diminished interest and participation in significant activities, feelings of detachment or estrangement from others, and persistent inability to experience positive emotions.

d.   Hyperarousal - Irritable behavior and angry outbursts, hypervigilance, exaggerated startle response, problems with concentration, and sleep disturbance.

e.   Depression - Depressed mood, markedly diminished interest and pleasure in activities, insomnia, psychomotor agitation, fatigue, feelings of excessive guilt, and diminished ability to concentrate.

9.     These disturbances have caused clinically significant distress and impairment in social, occupational, and other important areas of functioning. Ms. Humphrey reports negative impact on her general sense of life contentment and emotional outlook, intimate relationships, family relationships, friendships, work motivation, and interests and activities.

DSM-V Diagnoses

10.    Child Sexual Abuse (T76.22XD)

11.    Posttraumatic Stress Disorder, with delayed expression (F43.10)

3

DECLARATION OF LICENSED MENTAL HEALTH PRACTITIONER

12.     Major Depressive Disorder, single episode, severe, with anxious distress, with peripartum onset (F32.2)

Opinions and Discussion

13.     Causes and consequences of events in a court setting are conclusory issues properly left for a judge or a jury to determine. Therefore, I offer these opinions only as they pertain to psychiatric evaluation and treatment planning. In arriving at these opinions, I have integrated aspects of my training and experience with the information available to me. I have considered symptom, content, and contextual validity, as well as the pattern of symptoms and impact with respect to the subject's developmental history.

14.     The psychiatric diagnosis of Child Sexual Abuse encompasses any sexual act involving a child that is intended to provide sexual gratification to a parent, caregiver, or other individual who has responsibility for the child.[1] Because this occurred during Ms. Humphrey's interaction with Dr. Larry Nassar at age 15, it is my opinion to a reasonable degree of medical certainty that Ms. Humphrey meets psychiatric criteria for Child Sexual Abuse.

15.     Child sexual abuse is psychologically damaging because the child's immature mind cannot healthily integrate the powerful overstimulation of complex thoughts and sexual feelings in a situation involving a serious violation of trust from an adult in a position of authority. This can result in observable symptoms and interference with developmental progress. However, there is of course a range of responses to various childhood sexual experiences in terms of onset, type, severity, and duration of symptoms and developmental interference.

16.     The psychiatric diagnosis of Posttraumatic Stress Disorder is based on a pattern of intrusion symptoms, avoidance of stimuli, negative alterations in cognitions and mood, and alterations in arousal and reactivity following exposure to actual or threatened death, serious injury, or sexual violence. For children, sexually violent events may include developmentally inappropriate sexual experiences without physical violence or injury.[1] Ms. Humphrey reports a multitude of these specific symptoms in a clinically valid manner. These symptoms were not present prior to the visceral reminder of sexual abuse occasioned by genital examination during pregnancy and childbirth, and they are thematically closely related to the incidents of sexual

DECLARATION OF LICENSED MENTAL HEALTH PRACTITIONER

abuse. Therefore, it is my opinion to a reasonable degree of medical certainty that Ms. Humphrey meets psychiatric criteria for Posttraumatic Stress Disorder with delayed expression, as a direct result of her experience of child sexual abuse by Dr. Larry Nassar.

17. The psychiatric diagnosis of Major Depressive Disorder is based on a pattern of depressed mood and/or loss of interest or pleasure in almost all activities, accompanied by symptoms such as weight loss, insomnia, psychomotor retardation, fatigue, feelings of worthlessness or excessive guilt, diminished ability to concentrate, and recurrent thoughts of death, suicidal ideation, or suicide attempt. (See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, 5th edition, 2013). Ms. Humphrey convincingly describes the initial onset of severe symptoms beginning in January 2020. She had never before experienced similar symptoms. Therefore, it is my opinion to a reasonable degree of medical certainty that Ms. Humphrey meets psychiatric criteria for Major Depressive Disorder, single episode, with anxious distress and peripartum onset, as a direct result of child sexual abuse by Dr. Larry Nassar.

18. Due to the severity of her condition and the resulting functional interferences, Ms. Humphrey's prognosis is guarded. Although not expressed formally in the DSM-V diagnostic format, the most clinically worrisome aspect of her presentation is the potential impact on her ability to care for and to promote the healthy development of her baby. The maternal tasks of providing protection and promoting attachment and basic trust without undue worry and anxiety have been directly and substantially affected by her experience of child sexual abuse.

Pattern of Disclosure

19. Delayed symptoms and disclosure of sexual abuse are not uncommon, and must be understood individually with respect to content, context, and developmental stage. Ms. Humphrey clearly recalled the incident of child sexual abuse during adolescence and early adulthood, but she did not experience significant psychological symptoms until genital examination during pregnancy and childbirth served as a powerful reminder and precipitated a feeling of recurrence of sexual abuse. She was then flooded with feelings of vulnerability, helplessness, guilt, defectiveness, and lack of trust. Prior to that time, she had also been in the

DECLARATION OF LICENSED MENTAL HEALTH PRACTITIONER

1 child sexual abuse, creating a potent loyalty bind. These factors credibly explain Ms.

2 Humphrey's pattern of delayed symptoms and disclosure from a psychiatric viewpoint.

3      I declare under penalty of perjury, and pursuant to the laws of the state of California,

4 that the foregoing is true and correct and that the certificate was executed on July 28, 2020, at

5 _La Jolla_____, California.

6

7                  _____

8                  STEVEN A. ELIG, M.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6
DECLARATION OF LICENSED MENTAL HEALTH PRACTITIONER

| | | |
|---|---|---|
| | | LLP as Debtor's Attorney (Fee: $4,121,129.22, Expense: $109,986.97) **Attorney for Special Counsel Jenner & Block LLP must distribute this order.** (btw) (Entered: 06/29/2020) |
| 06/29/2020 | [1167](#) (3 pgs) | Order Granting First Interim Application for Compensation and/or Reimbursement of Expenses Pursuant to Sec. 330 for Barnes & Thornburg, LLP as Debtor's Attorney (Fee: $208,572.69, Expense: $1,681.39) (re: Doc # [1040](#)). **Attorney for the debtor must distribute this order.** (btw) (Entered: 06/29/2020) |
| 06/29/2020 | [1166](#) (5 pgs; 2 docs) | Order Granting First Interim Application for Compensation and/or Reimbursement of Expenses Pursuant to Sec. 330 for Rubin & Levin, P.C. as Special Counsel (Fee: $291,597.39, Expense: $5,114.16) (re: Doc # [1026](#)). **The Clerk's Office will distribute this order.** (btw) (Entered: 06/29/2020) |
| 06/29/2020 | [1165](#) (2 pgs) | Order Granting First Interim Application Compensation and/or Reimbursement of Expenses Pursuant to Sec. 330 for John Thomas Piggins as Special Counsel (Fee: $1,071,177.50, Expense: $31,407.57) (re: Doc # [1050](#)). **Attorney for the debtor must distribute this order.** (btw) (Entered: 06/29/2020) |
| 06/25/2020 | [1164](#) (35 pgs; 2 docs) | Notice of Draw on Retainer/Payment of Fees or Expenses Pursuant to Local Rule S.D.Ind. B-2014-1 RE: JENNER & BLOCK, filed by Catherine L. Steege on behalf of Debtor USA Gymnastics (re: Doc # [187](#)). (Attachments: (1) Exhibit A) (Steege, Catherine) CORRECTION: Missing docket text added in all capital letters. Modified on 6/26/2020. (btw) (Entered: 06/25/2020) |
| 06/25/2020 | [1163](#) (6 pgs) | Certificate of Service re: Order Setting Hearing, filed by Noticing Agent on behalf of Debtor USA Gymnastics (re: Doc # [1145](#)). (Ewing, Scott) (Entered: 06/25/2020) 🛈 |
| 06/24/2020 | 1162 | Minute Entry/Order: re: Telephonic Hearing on Motion for Authority / Debtor's Motion for Order Approving the Disclosure Statement and Plan Confirmation Procedures (re: Doc # [931](#)). Disposition: Hearing held. Matter continued. *Hearing to be held on 10/19/2020 at 01:30 PM EDT in Teleconference at 888-273-3658; access code 9247462 (RLM).* (mjd) (Entered: 06/24/2020) |
| 06/24/2020 | 1161 | Minute Entry/Order: re: Telephonic Status Conference on Motion to Dismiss Case filed by Creditor Committee Tort Claimants Committee (re: Doc # [892](#)). Disposition: Hearing held. Matter continued. *Hearing to be held on 10/19/2020 at 01:30 PM EDT in Teleconference at 888-273-3658; access code 9247462 (RLM).* (mjd) (Entered: 06/24/2020) |
| 06/24/2020 | 1160 | Minute Entry/Order: re: Telephonic Hearing on Notice of Submission of Supplement to First Interim Fee Application of FrankGecker LLP, Counsel To Fred C. Caruso, Future Claimants Representative (For The Period May 28, 2019-March 31, 2020) (re: Doc # [1052](#)). Disposition: Hearing held. Applications approved over objections made by National Casualty Company and other insurers as to certain fees of the applications. Orders to be submitted. (mjd) (Entered: 06/24/2020) |
| 06/24/2020 | 1159 | Minute Entry/Order: re: Telephonic Hearing on Application for Interim Compensation and/or Reimbursement of Expenses Pursuant to Sec. 330 |

**SO ORDERED: June 19, 2020.**

Robyn L. Moberly
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| USA GYMNASTICS | ) | CASE NO. 18-9108-RLM-11 |
| | ) | |
| DEBTOR | ) | |
| | ) | |

## ORDER ON PRETRIAL CONFERENCE

The Debtor, the Committee of Abuse Survivors, certain Insurance carriers, the United States Olympic and Paralympic Committee ("USOPC"), and counsel for certain abuse survivors participated in a telephonic pretrial conference with the court on June 17, 2020. As a result of that conference, the Court enters the following case management order:

1. The Court has ordered the taking of certain depositions and the production of certain documents in the Court's Order docketed June 16, 2020. As a result of statements of positions made by the affected parties, the Court specifically orders that the depositions shall be taken in-person in the state of Colorado and in compliance with the Covid-19 precautions suggested by the Governor

of Colorado.  The documents produced by Mr. Adams shall include the universe of documents previously produced by the USOPC to the United States Congress and to the authors of the Ropes & Gray report, after proper review for relevance and confidentiality.  Relevance, as the Court stated in the June 16, 2020 Order, means that the document and the deposition shall only pertain to the matters directly affecting this bankruptcy case: these sexual abuse survivors, the perpetrators as alleged against Debtor, and the insurance coverage potentially available to satisfy any claims by these survivors against both Debtor and USOPC.  The document production shall take place no later than July 10, 2020 and the depositions shall take place within two business days thereafter.

2. The Debtor is relieved of any obligation to file a response to the objections filed as to the Plan and Disclosure Statement, since Debtor will be filing an amended plan.  The Debtor may file the amended plan and disclosure statement any time up until August 27, 2020.

3. **The June 24, 2020 hearing on Debtor's Disclosure Statement and Motion for Order Approving the Disclosure Statement and Plan Confirmation Procedures is vacated.**  Objections to Debtor's anticipated Amended Disclosure Statement are due 28 days after the filing of the Debtor's Disclosure Statement and Plan Confirmation Procedures, and the Debtor's response thereto is due 14 days after the due date for the objections.  The hearing on the Disclosure Statement and Confirmation Procedures is set for to October 19, 2020 at 1:30 pm Eastern prevailing time.  Official Notice of the hearing date will issue after filing of the Amended Plan and Amended Disclosure Statement.

4. The Committee of Abuse Survivors, the USOPC, the insurance carriers, and the Debtor are ordered to participate in a remote mediation with the mediators to occur on a date and time set by the mediators but to occur between July 27, 2020 and August 14, 2020.  Ten (10) days prior to the mediation date, the Committee of Abuse Survivors, the USOPC, and the insurance carriers shall submit a *confidential and meaningful* settlement offer on the same date to the mediators.  The mediators shall not disclose, other than to one another, neither the substance nor the amounts of the settlement offers provided confidentially by each of the parties.

5. **All other matters currently scheduled for June 24, 2020 shall remain on the calendar and are not continued.**

#        #        #

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-09108-RLM-11 |
| Debtor. | |

**OBJECTION OF THE ADDITIONAL TORT
CLAIMANTS COMMITTEE OF SEXUAL ABUSE
SURVIVORS TO DISCLOSURE STATEMENT FOR FIRST AMENDED
CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY USA GYMNASTICS**

The Additional Tort Claimants Committee of Sexual Abuse Survivors (the "Survivors' Committee"), appointed in this case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), hereby objects (the "Objection") to the *Disclosure Statement for First Amended Chapter 11 Plan of Reorganization Proposed by USA Gymnastics* (the "Disclosure Statement") [Doc 930].[2]  In support of its Objection, the Survivors' Committee respectfully states as follows:

## I. PRELIMINARY STATEMENT

The proposed Plan and Disclosure Statement are premised on the Settling Insurers funding the Settlement Election under the terms and conditions set forth in the Plan.  On April 9, 2020, the Settling Insurers revealed that they have no agreement with the Debtor to fund the settlement.[3]  This is the first and only disclosure to the Survivors' Committee and the Abuse

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

[2] All capitalized terms not defined herein have the meaning ascribed to such term in the *First Amended Chapter 11 Plan of Reorganization Proposed by USA Gymnastics* (the "Plan") [Doc 928].

[3] *See Motion to Further Extend Time to Object to Motion for Entry of an Order Approving the Disclosure Statement and Plan Confirmation Procedures* ("Insurers Motion") [Doc 1009].

Claimants (as defined below) that the Settlement Election in the Plan is illusory.[4]  The Debtor's ongoing refusal to be transparent and candid with the Survivors' Committee and the Abuse Survivors has caused them to believe that the Debtor is using the bankruptcy process to avoid accountability for the agony inflicted on the Abuse Claimants.

The lynchpin of the proposed Plan is a settlement option, to be funded by the Settling Insurers that the Settling Insurers have not agreed to.  Moreover, the Plan cannot be confirmed as a matter of law and the Disclosure Statement lacks the most basic information necessary for the creditors to assess the Plan in an informed fashion.  In some instances, the Disclosure Statement conflicts with the Plan.

The Disclosure Statement is inadequate and misleading in multiple ways as discussed in detail below.  The most glaring inadequacies are the following:

First, the Disclosure statement provides no information on the contributions, if any, to be made to the settlement embodied in the Settlement Election (the "Settlement") by individual Settling Insurers.  In order to provide adequate information to enable members of Class 6 (the "Abuse Claimants") to vote on the Plan and make one of the elections, the Disclosure Statement must contain a table that shows the following information with respect to each Settling Insurer: (1) which Settling Insurers are not contributing to the Settlement; (2) which Settling Insurers are contributing on behalf of USAG only; (3) which Settling Insurers are contributing on behalf of USAG and USOPC; and (4) which Settling Insurers are contributing on behalf of USOPC only. The table should also disclose the amount each Settling Insurer is contributing and the years of coverage being released.

---

[4] *See* Insurers Motion at ¶ 6 ("[T]he Proposed Plan does not reflect necessary material terms, injects different terms than proposed when offers were made, and further, is deficient as to other fundamental terms, including scope of injunctive protection, scope of buy back of insurance, releases (including from USOPC and other Protected Parties) and other affirmative obligations.").

Humphrey Appellant Appendix 106

Second, the Disclosure Statement fails to disclose that USOPC is not an additional insured on all of the Debtor's Insurance Policies and misstates that USOPC's consent is required for the proceeds of those Insurance Policies to be contributed to the Settlement.

Third, the Disclosure Statement does not provide adequate information on who is receiving the benefits of the releases and channeling injunctions and why, including describing what contribution, if any, they are making to the Plan and the nature of their relationship to the Debtor and why they are receiving the benefits of the release and channeling injunction.

Fourth, the Liquidation Analysis is misleading and inadequate because it overstates the value of USOPC's indemnity claims against the Debtor and does not include in its analysis of assets the Debtor's potential avoidance actions, Insurance Reimbursement Claims and bad faith claims against its Insurers, and the Debtor's intellectual property (including trademarks and logos) and ignores the insurance proceeds that would be available to the Abuse Claimants if the Debtor were liquidated.

Fifth, the Disclosure Statement contains a misleading and one-sided characterization of the merits and value of the Abuse Claims. The Disclosure Statement should contain a consolidated statement by counsel for each of the members of the Survivors' Committee presenting their view, after they have had an opportunity to conduct discovery.

Sixth, the Disclosure Statement fails to discuss the benefits to the Abuse Claimants of rejecting the Plan or voting for the Litigation Election and misrepresents the "race to the courthouse" and "race to judgment" issues which do not exist for Insurance Policies without aggregate limits.

Seventh, the Disclosure Statement fails to adequately explain that a significant portion of the insurance proceeds contributed to the Trust will be used for purposes other than to pay the

Humphrey Appellant Appendix 107

Abuse Claimants and in fact falsely states that *all* of the insurance proceeds will be used to pay Abuse Claimants. *Compare, e.g.*, Section 2.7 and Article IV of the Trust Agreement accompanying the Plan as Exhibit D, with the description of the Settlement Election in the Disclosure Statement at pages 3-4. It is impossible to even estimate from the information contained in the Disclosure Statement what portion of the insurance proceeds will actually be used to pay the Abuse Claimants, although it clearly will not be all of the insurance proceeds.

Eighth, the Disclosure Statement gives the misleading impression that *each* Class 6 claimant will be able to elect to settle or litigate if they accept the Plan, and make the corresponding election, when in reality *all* claimants within Class 6 will be required to settle or litigate if the Plan is accepted by Class 6.

Ninth, the Disclosure Statement contradicts the Plan in its description of acceptance of the Plan by Class 6 claimants. Article 8.2 of the Plan states that holders of claims in an impaired class shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number have voted to accept the Plan. However, Section III.C.3 of the Disclosure Statement states on page 22 that if individuals holding more than half of the Class 6 Abuse Claims vote in favor of the Plan, it will have been accepted by the Class, with no mention of the two-thirds (2/3) requirement.

With respect to its inability to be confirmed, the Plan fails in at least eight respects:

First, the Plan contains impermissibly broad non-consensual releases and a channeling injunction for the benefit of non-debtors that are not making any contribution of their own funds to the Plan. The releases and channeling injunctions extinguish the claims of the Abuse Claimants against USOPC and others for prepetition conduct, unrelated to and not arising out of the reorganization, including prepetition claims based on willful misconduct and fraud. USOPC

4

and other non-debtors receive this expansive relief under the Plan without contributing a dime of their own funds.  The Settling Insurers receive essentially the same relief under the Plan even though the Disclosure Statement contains no information about what amounts, if any, the Settling Insurers are contributing to the Settlement.  These Plan provisions make the Plan patently unconfirmable.

Second, the Settlement Election under the Plan requires the proceeds of the Debtor's insurance be used for purposes other than paying the allowed claims of the Abuse Claimants. Under the Plan, insurance proceeds will be used to pay the fees and costs of the Survivors' Committee's professionals, the Debtor's costs of publication and notice and the costs to indemnify the Trust and hold harmless the non-debtors that are to receive the benefits of the channeling injunction.  This is impermissible because the proceeds of the Debtor's general liability policies are not property of the estate and can only be used to pay the classes of claims that are covered by the policies.

Third, the Plan does not meet the best interests test for at least two reasons. First, the Debtor's liquidation analysis, upon which it purports to show the test is met, gives no consideration of the recoveries the Abuse Claimants would receive from USOPC and the other non-debtor parties that would be released under the Settlement Election but would not receive releases in a hypothetical chapter 7 liquidation of the Debtor.  Second, the test is not met because as set forth in the second point above, under the Plan Settlement Election, insurance proceeds will be used to pay the Debtor's administrative expenses and to indemnify non-debtors that receive releases. However, in hypothetical chapter 7 liquidation, the insurance proceeds could only be used to pay the Abuse Claimants.

Humphrey Appellant Appendix 109

Fourth, the Debtor filed the Plan in bad faith. Under the Plan, the Debtor receives a discharge without contributing any of its own assets (other than insurance). The Plan is a transparent attempt by the Debtor to effect a dismissal of the case and receive a discharge.

Fifth, the Plan unfairly discriminates against the Abuse Claimants by classifying them separately from other unsecured creditors in Class 5 and by giving Class 5 a higher recovery from the Debtor's assets than the Abuse Claimants will receive.

Sixth, the Plan unfairly discriminates among Abuse Claimants within Class 6, by arbitrarily providing different treatment for similarly-situated Class 6 claimants, by dividing them into various sub-classes and providing substantially different treatment for claims within such sub-classes.

Seventh, to the extent the Plan proposes that Class 6 will be deemed to have accepted the Plan if a simple majority of Class 6 claimants accept the Plan as stated in Section III.C.3 of the Disclosure Statement, the Plan would directly contravene section 1126(c) of the Bankruptcy Code, which requires that a plan be accepted by holders of claims at least two-thirds (2/3) in amount of the total claims in the class.

Eighth, the Plan contradictorily states that all insurance proceeds paid to the Trust will be used to satisfy claims of Abuse Claimants under the Settlement Election, while also stating that numerous other claims and expenses will first be deducted from such insurance proceeds before payment is made to Abuse Claimants. *Compare, e.g.*, Section 2.7 and Article IV of the Trust Agreement accompanying the Plan as Exhibit D, with sections 3.1 and 3.1.1 of the Plan.

Humphrey Appellant Appendix 110

## II. ARGUMENT

A. **The Disclosure Statement Cannot be Approved Because It Does**
   **Not Contain Adequate or Accurate Information as Required by 11 U.S.C. § 1125.**

1.     The proposed Disclosure Statement lacks sufficient information for creditors, including Abuse Claimants, to make an informed decision whether to accept or reject the Plan, and in some instances contains false or misleading information.  In order for the Disclosure Statement to be approved, if it can even be approved (see argument below regarding the inability to confirm the Plan), it must be amended to address the objections and issues raised below.

### 1.     Applicable Legal Standard.

2.     Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain "adequate information."  "Adequate information" is defined as "information of a kind, and in sufficient detail . . . [to enable] a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a); *see also In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987); *In re Malek*, 35 B.R. 443, 443 (Bankr. E.D. Mich. 1983) (citing numerous factors to determine whether adequate information has been provided).  This standard is purposefully malleable "so as to permit a case-by-case determination based on the prevailing facts and circumstances."  *In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990).

3.     The supporting information in a disclosure statement must be factually based, and not based merely upon the debtor's beliefs and opinions; the sources and methodology utilized by the debtor must therefore be disclosed.  *In re Egan*, 33 B.R. 672 (Bankr. N.D. Ill. 1983); *In re Pappas*, 17 B.R. 662 (Bankr. N. Mass. 1982).

Humphrey Appellant Appendix 111

## 2. Disclosure Statement Objections.

4. The Disclosure Statement is replete with inaccurate, incomplete, one-sided or misleading statements on material issues and has other critical deficiencies, which must be addressed by the Debtor, including the following infirmities:

### a. Insurance Issues.

#### i. The Disclosure Statement does not Provide Adequate Information on Insurer Contributions.

5. The Disclosure Statement does not provide sufficient information for the Abuse Claimants to determine which of the CGL Settling Insurers are making a contribution to the settlement.[5]

6. The Disclosure Statement identifies the Settling Insurers but does not disclose which carriers are contributing, the amounts, if any, being contributed by each of them and whether the insurers insure both USAG and USOPC or only one of them.  In order to provide adequate information to enable the Abuse Claimants to vote on the Plan and make one of the elections, the Disclosure Statement must contain a table that shows the following information with respect to each Settling Insurer:  (1) which Settling Insurers are not contributing to the Settlement; (2) which Settling Insurers are contributing on behalf of USAG only; (3) which Settling Insurers are contributing on behalf of USAG and USOPC; and (4) which Settling Insurers are contributing on behalf of USOPC only.  The table should also disclose the amount each Settling Insurer is contributing and the years of coverage being released.

---

[5] "The Settling Insurers will pay the cumulative amount of Two Hundred Nineteen Million Seven Hundred Fifty Thousand ($219,750,000.00) (the "Insurance Settlement Amount").  [Disclosure Statement at 44.]  Not all of this amount will be paid to the Abuse Claimants.  The Survivors' Committee reserves its right to object to the Plan on all grounds, including that individual Settling Insurers and other parties are not making a substantial contribution sufficient to support third party releases and a channeling injunction.

Humphrey Appellant Appendix 112

7.     The Disclosure Statement also contains a statement regarding insurance coverage that is inconsistent with pleadings that USOPC has recently filed with the Court:  The Disclosure Statement represents that the Settlement amount includes contributions from Insurers that insure *only* USOPC "which constitutes additional consideration from USOPC."  [Disclosure Statement at 10, 19.]  In apparent contrast, USOPC has informed the Court that "[t]he source of [the] Plan Payment is the proceeds of certain USAG Policies that insure ***both*** USAG and USOPC."  [USOPC Statement[6] at ¶ 7.]  The Disclosure Statement must reconcile these inconstant positions and provide accurate information to the Abuse Claimants.

### ii.     The Disclosure Statement fails to Disclose USOPC Is Not an Additional Insured on All USAG's Policies and Its Consent Is Not Required for the Proceeds of those Policies to be Contributed to a Settlement.

8.     The Debtor maintains that the funding of the Settlement by the Settling Insurers pursuant to the Settlement Election would not be possible without a release of the USOPC.  The Debtor contends:

> This treatment is required because the USOPC is an additional or named insured under the CGL Insurance Policies.  The USOPC has rights to payment under those policies that are independent of any of the Debtor's rights.  The CGL Settling Insurers have conditioned the payment of their settlement contributions upon the USOPC giving up its rights under the policies.  The only way the USOPC will agree to that result is if it is protected by the releases and injunctions described above.

[Disclosure Statement at 19.]

---

[6] "USOPC Statement" shall mean the *Statement and Reservation of Rights of the United States Olympic and Paralympic Committee in Response to the Application to Employ Gibbins Advisors, LLC as Financial Advisor to the Additional Tort Claimants Committee of Sexual Abuse Survivors* [Doc 943] filed on March 6, 2020.

Humphrey Appellant Appendix 113

9.     The Disclosure Statement is incomplete and misleading because it fails to disclose that ***USOPC is not an additional insured during key years of abuse***.[7]  For these years, USOPC was not an "additional insured" and its consent to the use of insurance funds during such years is not required.  Thus, contrary to the Debtor's contentions in the Disclosure Statement, it is not "likely that the Bankruptcy Court would hold that the USOPC has equal and independent rights" in these policies.  Similarly, USOPC cannot be given "credit" for contributing anything to the Settlement by *permitting* USAG's insurers to fund the Settlement for those policy years, since its consent is not necessary or required.  The lack of value of USOPC's release of the Insurers from exposure to USOPC's liability as an additional insured on policies where USOPC was not an additional insured is never discussed.  Complete and accurate information regarding years in which USOPC was and was not an additional insured must be supplied and addressed in the Disclosure Statement in order to provide adequate information to enable the Abuse Claimants to make an informed decision on the Plan.

### iii.     The Disclosure Statement Does Not Provide Adequate Information On Who Is Being Released and Why.

10.     The Disclosure Statement lists non-debtor organizations and individuals who will receive non-consensual third party releases and the benefits of a channeling injunction extinguishing the claims of Abuse Claimants against them relating to sexual abuse,[8] but provides no information as to what, if anything, they are contributing to the Settlement.  [Disclosure Statement at 5.]  If the Non-Debtor CGL Settling Insurer Covered Persons and Participating Parties are "contributing" solely by virtue of their status as additional insureds on a Settling CGL

---

[7] National Casualty Company CGL Policy for August 2011 to August 2016 (per year primary insurance $1 million per occurrence and no aggregate limit and excess insurance no occurrence limit and $25 million aggregate limit).

[8] Referred to as "Non-Debtor CGL Settling Insurer Covered Persons" and "Participating Parties" on page 5 of the Disclosure Statement.

Humphrey Appellant Appendix 114

Insurer's policy, this fact should be explained, and the relevant policies should be identified by Insurer, policy number and coverage year. Similarly, no information is provided on the relationship of these persons and entities to the Debtor and why they need and are entitled to have the Abuse Claimants' claims against them extinguished. The Abuse Claimants need this information to make an informed decision on whether to vote for or against the Plan and make either the Settlement Election or the Litigation Election.

11.     For example, National Gymnastic Foundation will be released and receive the benefits of a channeling injunction, yet there are no disclosures of its relationship to the Debtor, why it needs or is entitled to a release or what, if anything, it is contributing.[9] If these non-debtor individuals and organizations are not making any contribution to the Settlement and are to receive non-consensual releases from the Abuse Claimants under the Settlement Election, the Disclosure Statement must disclose the reasons they are receiving non-consensual releases and the benefits of a channeling injunction.

12.     Finally, some of the Non-Debtor CGL Settling Insurer Covered Persons that are receiving releases under the Plan are under criminal investigation or have been charged with crimes related to sex abuse against the Abuse Claimants. The Disclosure Statement should identify these individuals (e.g., Steve Penny, former President and CEO of the Debtor) and summarize the criminal proceedings or investigations against them.

---

[9] The release for National Gymnastics Foundation appears inappropriate without further explanation. In resisting discovery by the Survivors' Committee into its financial condition and transfers it received from the Debtor, National Gymnastics Foundation informed the Court that (i) it is not a defendant in any lawsuit filed against the Debtor; (ii) it was not a debtor and not in bankruptcy; and (iii) it is a separate legal entity with a separate board of directors. *See Objection of the National Gymnastics Foundation to the Additional Tort Claimants Committee of Sexual Abuse Survivors' Motion Pursuant to Rule 2004 Directing Production of Documents and Materials* [Doc 482] filed on May 13, 2019.

Humphrey Appellant Appendix 115

> b.     **Language Concerning Settlement Negotiations to be Corrected or Clarified.**

13.     Certain statements in the Disclosure Statement are required to be revised in order to accurately and adequately represent the pre-Plan settlement negotiations.  For example, the Debtor states (emphasis added):

> Following its bankruptcy filing, the Debtor has engaged its insurance carriers, the Survivors' Committee, athletes, creditors, and other parties in interest in good faith and lengthy negotiations over the terms of a plan of reorganization that will compensate all persons holding Allowed Claims against the Debtor, with the Debtor's paramount focus on reaching an equitable resolution of the Abuse Claims.  <u>As a result of these efforts,</u> the Debtor submits the Plan, which the Debtor believes is in the best interests of, and provides the highest and most expeditious recoveries to, all parties who hold Claims against the Debtor, including Holders of Abuse Claims.  The Debtor recommends that all Classes of Claims entitled to vote accept the Plan, and further recommends that all Holders of Abuse Claims make the Settlement Election (described below).

[Disclosure Statement at 1.]  An Abuse Claimant reading the foregoing language—especially the "[a]s a result of these efforts" clause—could easily be misled into believing that a global settlement among the key parties was actually reached supported by the Survivors' Committee and that the Plan embodies that settlement in the "Settlement Election."  This is untrue because the Survivors' Committee does not support the Settlement embodied in the Settlement Election.  Rather, the Plan represents the Debtor's unilateral settlement proposal after the mediation hit an impasse.  The Disclosure Statement should make the facts clear.

14.     For the same reasons, on page 35 of the Disclosure Statement, the Debtor's discussion of the Survivors' Committee's Dismissal Motion[10] should be expanded to set forth the

---

[10] "Dismissal Motion" shall mean the *Motion of the Additional Tort Claimants Committee of Sexual Abuse Survivors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 349 and 1112(b) Dismissing the Bankruptcy Case and Granting Related Relief* [Doc 892] filed on January 21, 2020.

Humphrey Appellant Appendix 116

Survivors' Committee's allegations of the Debtor's, the USOPC's, and Insurers' lack of good faith during this case and other material contentions, which have a bearing on, *inter alia*, the Debtor's purported good faith in proposing the Plan.

           **c.**      **The Discussion of the Merits and Value of the Abuse Claims is One-Sided and Misleading.**

15.      Similarly, the Disclosure Statement on pages 7 through 8 sets forth a one sided and misleading characterization of the merits of the Abuse Claims and the purported likelihood that the Abuse Claimants will receive nothing if they do not vote for the Plan and the Settlement Election. The Abuse Claimants are entitled to a more balanced and accurate description of the litigation issues. Therefore, the Disclosure Statement should include a joint statement by counsel for each of the members of the Survivors' Committee representing their views on the merits and value of the Abuse Claims. Counsel for the members of the Survivors' Committee will need to conduct discovery to obtain the information necessary to prepare this statement.

           **d.**      **The Disclosure Statement Fails to Discuss the Upside of the Litigation Election.**

16.      The Disclosure Statement is inadequate because it fails to include any discussion of the potential upside of (i) either voting for the Plan and making the Litigation Election, or (ii) rejecting the Plan. The Abuse Claimants need information on both to evaluate the choices the Debtor is requiring them to make under the Plan. For many, if not most, of the Abuse Claimants one of these options may be preferable to accepting the Plan and making the Settlement Election because they may obtain judgments enforceable against the USOPC and other parties covered by the Settling Insurers, far in excess of what they would receive under the Plan. Moreover, the purported "race to the court house" or "race to judgment" the Debtor warns of is a non-issue for claims covered by Insurance Policies with no aggregate policy limit, and judgments on these

Humphrey Appellant Appendix 117

claims would be paid in full regardless of when the judgments were obtained. The Disclosure Statement should include a discussion of the circumstances under which it may be in the best interest of those Abuse Claimants to vote for the Litigation Election or simply vote to reject the Plan.

### e.    The Cash Flow Projections are Inadequate.

17.    The Debtor's cash flow projections (on a year-only basis, for 2020, 2021 and 2022), attached as Exhibit 2 to the Disclosure Statement, do not include any information on potential avoidance action recoveries, and while a $1.5 million cash disbursement regarding "Olympics" is reflected in the projections for 2020, there appear to be no cash receipts resulting from or relating to the 2020 Olympics in 2020, 2021 or 2022.

### f.    The Debtor's Liquidation Analysis Overstates the Potential Liability to USOPC and Omits the Value of Other Assets.

18.    The Liquidation Analysis, attached as Exhibit 3 to Disclosure Statement, contains the following serious flaws:

- The analysis values Indemnification Claims at $41,400,000.00 based on the filed amount of those claims. However, as discussed below in paragraph 41, the contractual indemnity purportedly owed by the Debtor is not covered by insurance and therefore will not impact the amount the Abuse Claimants receive from the Insurance Policies. The impact of these claims is thus vastly overstated.

- The analysis does not address the value of bad faith claims litigation against the insurers, which will be extinguished under the Settlement Election.

- The analysis omits contribution/indemnification payments to the estate by third parties in relation to Abuse Claims, potential avoidance action recoveries, potential recoveries on Insurance Reimbursement Claims and intellectual property and related rights owned by the Debtor, including trademarks and logos.

Humphrey Appellant Appendix 118

**g.**       **The Tallying Procedures are Unclear and Contradict the Plan.**

19.     Section III.C.3 of the Disclosure Statement directly contradicts Article 8.2 of the Plan. Article 8.2 of the Plan states that holders of claims in an impaired class shall have accepted the Plan if it is accepted by at least two-third (2/3) in dollar amount and more than one-half (1/2) in number have voted to accept the Plan. However, Section III.C.3 of the Disclosure Statement states on page 22 that if individuals holding more than half of the Class 6 Abuse Claims vote in favor of the Plan, it will have been accepted by the Class, with no mention of the two-thirds (2/3) requirement. The Disclosure Statement and Class 6 Ballot are also vague and misleading on how votes will be counted. They incorrectly imply that *each* Abuse Claimant can effect a Litigation or Settlement Election for herself if the Plan is accepted. What happens, for example, if an Abuse Claimant wants to accept the Plan but only on the condition that the Settlement Election is chosen by the class? What happens if more than one-half of Class 6 accepts the Plan, but neither the Settlement Election, nor the Litigation Election, receives more than half of the Class 6 votes? The Debtor must explain its proposed tallying procedure. The Disclosure Statement and the Class 6 ballot must address and clarify all of these issues.

**h.**       **Notice and Technical Issues.**

20.     The Plan separates Class 6 into four subclasses, with each subclass receiving different amounts under the Settlement Election. This raises multiple issues which the Disclosure Statement fails to address or inaccurately addresses, including:

      (a)     The Disclosure Statement should inform each Abuse Claimant which subclass she has been "assigned" to and provide an explanation of the basis for the assignment. The Disclosure Statement provides no information on if, or how, an Abuse Claimant can object to the Debtor's sub-classification;

      (b)     The Disclosure Statement must explain what happens if an Abuse Claimant falls into more than one subclass; and

15

(c)     The Disclosure Statement falsely states that all of the contributed insurance proceeds will be used to pay the Abuse Claimants and provides no information on how the recovery estimates at page 6 of the Disclosure Statement were calculated or whether all of the potential expenditures out of the Trust Assets (including Trust related fees and costs) were taken into account, and if not, why not.

21.     Survivors who settled with the Debtor pre-petition are not creditors of the Debtor. Accordingly, they will not receive notice of the Disclosure Statement and Plan and will receive nothing under the Plan.  However, it appears they will be adversely affected by the Plan because under the Settlement Election, their claims against USOPC and other non-debtors will be released and channeled to the Trust.  At the very least, the Disclosure Statement should identify these survivors to the Survivors' Committee and provide notice of the impact the Plan will have upon their claims against non-debtors and an opportunity to object.

### i.     Disclosure Issues Related to the Trust Agreement.

22.     Trust Assets.  Neither the Disclosure Statement nor the Trust Agreement (Exhibit D to the Plan) adequately explain that not all of the Trust Assets will be used to pay the claims of the Abuse Claimants.[11]  See Sections 1.3 (Purpose), 2.1 (Trust Corpus), and 4.1 (Trust Assets Available for Abuse Claims) of the Trust Agreement.  In fact, the false impression is given that the Trust Assets will only be used to pay Abuse Claims, when the Trust Assets will actually be depleted (by unknown and uncapped amounts) by the Debtor's costs of publication/notice, the allowed unpaid fees and expenses of the Survivors' Committee's professionals incurred during this case, and the fees, costs and other claims to defend, indemnify and hold harmless the Protected Parties.  [See Trust Agreement at § 2.7 (stating "[t]hese payments shall be deducted from Available Trust Assets . . . .").]  The Trust Agreement and Disclosure Statement must be

---

[11] As discussed below, this aspect of the Plan also makes it patently unconfirmable because while the Debtor's Insurance Policies are property of the estate, the proceeds are not and may not be used to pay the Debtor's administrative claims or the claims of non-Abuse Claimants.  The proceeds of the Debtor's Insurance Policies may only be used to pay the class of claimants that have claims covered by such policies.

Humphrey Appellant Appendix 120

corrected to clearly state that the amounts contributed by the Settling Insurers are gross amounts, that the entirety of the contributions will not be used to pay Abuse Claimants, but rather will be used to pay other amounts and should provide a principled estimation of the actual amount that will be available to pay Abuse Claimants, rather than the inaccurate amounts set forth in Article IV of the Trust Agreement and at page 4 of the Disclosure Statement.

23. <u>Survivors' Committee</u>. The Plan provides that the Trust will pay the unpaid allowed fees and costs of the Survivors' Committee's professionals. The Disclosure Statement should explain the justification for this provision and for not requiring the allowed administrative fees to be paid upon confirmation of the Plan and in compliance with the interim compensation order in this case. The Disclosure Statement should also explain the basis for requiring the Abuse Claimants to pay the estates' professionals rather than paying those claims out of the estate.

24. <u>Indemnification Claims</u>. The Disclosure Statement should provide an estimate of potential indemnification claims referenced in Section 2.7 of the Trust Agreement that will be paid from the Trust Assets, and that will reduce the recoveries for Abuse Claimants.

25. <u>Future Claimant Reserve</u>. The Disclosure Statement should explain the basis upon which the Debtor determined the $10.75 million amount for the Future Claim Reserve.

26. <u>Duplicative Claims</u>. The Trust Agreement provides there are 33 duplicative Claims that will not receive a distribution from the Trust Assets. The Disclosure Statement should include a schedule that identifies the Abuse Claimants at issue (by claim number) and set forth the procedures for disputing the Debtor's characterization of the claim.

27. <u>The Trust Agreement and the Disclosure Statement are Inconsistent in the Treatment of Late Filed Abuse Claims</u>. The Disclosure Statement states that the Trust

17

Agreement gives the Trustee discretion to treat late filed Abuse Claims as timely filed or as disallowed. [Disclosure Statement at 4, n. 2.] The Plan and Trust Agreement are consistent with this. However, the Disclosure Statement also later states that "[u]nder the Settlement Election, untimely Abuse Claims will be treated the same as timely Abuse Claims without any requirement that the Claimant seek Bankruptcy Court approval for such treatment." [Disclosure Statement at 9.] This statement conflicts with the prior statement in the Disclosure Statement, the Plan and the Trust Agreement.

28.     The Trustee's Authority to Donate Trust Funds to Charity is Inconsistent or Inappropriate. The provisions for termination of the Trust are unclear and/or inconsistent. The Trust Agreement provides that the Trust shall terminate when the amount remaining in the Trust is less than $50,000. The Trust Agreement further provides that upon termination, the Trustee shall deliver all funds remaining in the Trust to a charity agreed upon by the Trustee and the Debtor. [Trust Agreement at § 6.2.] However, the Trust Agreement and the Disclosure Statement indicate that after five years elapse, the Future Claimant Reserve shall be released to the Disbursing Trustee and may, at the Disbursing Trustee's discretion, be distributed to the Abuse Claimants or to a charity. [Disclosure Statement at 49; Trust Agreement at § 2.2.1.]

29.     Under the Settlement Election, the Future Claimant Reserve will be funded with $10,750,000. If few, or no, future claims are filed and paid, the Trustee appears to have the discretion to distribute to charity, not just $50,000 provided for in the termination provisions of the Trust Agreement, but the entire amount of the $10,750,000, plus interest. The Debtor should clarify its intentions on this issue. In any event, the Trustee should not have discretion to distribute any more than $50,000 to charity and any proceeds from the Future Claimant Reserve not used to pay Future Claims should be used to pay Abuse Claimants.

Humphrey Appellant Appendix 122

### h.     Miscellaneous Disclosure Statement Issues.

30.     The Debtor states in the Disclosure Statement that after the Settling Insurers conditioned their Plan contributions on blanket releases and injunctions, the Debtor "evaluated potential reasonably available alternatives and determined that none exists." [Disclosure Statement at 9.] The Disclosure Statement should discuss the potential alternatives that the Debtor considered and on what basis it determined these alternatives were not viable.

31.     In sum, the proposed Disclosure Statement does not contain sufficient information for Abuse Claimants and other creditors to make an informed decision whether to accept or reject the Plan, and thus, in the event the Court is inclined to approve the Disclosure Statement, it should not be approved absent the Survivors' Committee's changes as discussed herein.

**B.    The Disclosure Statement Should Not Be**
      **<u>Approved Because the Plan is Facially Unconfirmable.</u>**

#### 1.     Applicable Legal Standard.

32.     A disclosure statement for a facially defective plan cannot be approved as containing "adequate information" within the confines of section 1125 of the Bankruptcy Code. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012) (bankruptcy court can determine at the disclosure statement stage that a chapter 11 plan is unconfirmable); *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bnakr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement . . . if the plan could not possibly be confirmed"); *In re O'Leary*, 183 B.R. 338, 338-39 (Bankr. D. Mass. 1995) ("Court may refuse to approve disclosure statements that describe plans that cannot be confirmed"). "If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures." *Eastern Maine Elec. Coop.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *In re Beyond.com Corp.*, 289 B.R. 138, 140

Humphrey Appellant Appendix 123

(Bankr. N.D. Cal. 2003); *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("notwithstanding adequate disclosure of information required by section 1125(b), a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed.") (citations omitted); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd*, (E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation."); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) (analysis of such issues at this stage of the confirmation process has become a "standard Chapter 11 practice").

Humphrey Appellant Appendix 124

### 2. The Plan Cannot Be Confirmed.

The Plan is patently unconfirmable for at least the following reasons:[12]

#### a. The Plan Contains an Impermissible Nonconsensual Release and Overbroad Channeling Injunction.

33. The non-Debtor non-consensual releases[13] and channeling injunction set forth in the Plan do not pass muster in the Seventh Circuit.[14]  Not only do the releases vastly exceed the scope of releases that have been approved within this Circuit, they are also being granted to non-

---

[12] The Survivors' Committee reserves its right to assert additional objections to confirmation of the Plan if the Disclosure Statement is approved and solicitation of votes is authorized by the Court.

[13] The Plan releases are non-consensual because if the Plan is accepted by Class 6 and a majority of the Class 6 votes for the Settlement Election, all of the Abuse Claimants who voted to reject the Plan or to accept the Plan but voted for the Litigation Election, would still have their Abuse Claims extinguished against USOPC and other non-debtors and channeled to the Trust.

[14] Outside of the Seventh Circuit, courts that have allowed non-consensual non-debtor do so only in very limited circumstances if certain factors are satisfied.  In *In re Master Mortgage* Inv. *Fund, Inc.*, 168 B.R. 930, 934 (W.D. Mo. 1994) the  court identified the factors: (1) identity of interest between the debtor and the third-party,  usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) the non-debtor has made a substantial contribution of assets to reorganization; (3) the release is necessary to the reorganization and without it there is little likelihood of reorganization; (4) a  substantial majority of the creditors agree to the injunction, specifically, the impacted class, or classes, has "overwhelmingly" (over 90%) voted to accept the proposed plan treatment; and (5) the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction. Courts in the First and Eighth Circuits have allowed third-party non-debtor releases based on the *Master Mortgage.* factors.  *See In re Mahoney Hawkes, LLP*, 289 B.R. 285, 299-303 (Bankr. D. Mass. 2002); *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 519 (Bankr. E.D. Mo. 2012). While the Third Circuit has not adopted a specific test for when such releases are appropriate, bankruptcy court for the District of Delaware use the *Master Mortgage* factors as the foundation for such an analysis, with additional consideration of other relevant factors. *Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 591 B.R. 559, 584 (D. Del. 2018); *In re Washington Mutual, Inc.*, 442 B.R. 314, 346-47 (Bankr. D. Del. 2011) ("Determining the fairness of a plan which includes the release of nondebtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case.") (citing *In re Continental Airlines*, 203 F.3d at 212-14); *see also In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (in considering debtor's release of third parties, court applied *Master Mortgage* five factor test). The Sixth Circuit permits non-consensual non-debtor releases only in "unusual circumstances"  and where the five Master Mortgage factors are present and (i)  the plan provides an opportunity for those claimants who choose not to settle to recover in full; and (ii)  the bankruptcy court has made a record of specific factual findings that support its conclusions. *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002). Courts in the Fifth and Ninth Circuits have held a bankruptcy court does not have authority to issue and enforce third-party non-debtor releases in a Chapter 11 plan.  *In re Pac. Lumber Co.*, 584 F.3d 229, 252-53 (5th Cir. 2009); *Resorts Int'l, Inc., v. Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir.1995) ("this court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors.").

Humphrey Appellant Appendix 125

debtors that are not contributing their own assets to fund the Settlement.  *See, e.g.*, *Airadigm Commc'ns v. FCC (In re Airadigm Commc'ns)*, 519 F.3d 640, 655-58 (7th Cir. 2008) (any nonconsensual third party release and related injunction must meet the following requirements: (i) the release must be narrow in that it applies only to claims "arising out of or in connection with" the reorganization and may not include "willful misconduct," (ii) it must be necessary for the reorganization, (iii) it may not provide for "blanket immunity," (iv) the immunity afforded by the release must not affect matters beyond the jurisdiction of the court or unrelated to the reorganization, and (v) there must be "adequate evidence" that the beneficiaries of the releases required them before making a monetary contribution "which was itself essential to the reorganization").

34.     In *In re Ingersoll, Inc*., 562 F.3d 856 (7th Cir. 2009), the Seventh Circuit "preached caution" in approving non-debtor releases, and announced that "[i]n most instances, [non-debtor] releases . . . will not pass muster under [the *Airadigm*] rule.  Bankruptcy litigants should keep that in mind when they sit down at the negotiating table."  *Id.* at 865.  After plan confirmation, the Seventh Circuit enforced a plan releasing the former owners of the corporate debtor from liability arising out of or relating to two cases involving a fee dispute with an overreaching attorney.  The Seventh Circuit was the sixth forum "to take a stab" at putting "a stake through the heart" of the fee dispute caused by overreaching lawyers appears to be a key aspect of the Court's approval of the release.  *Id*. at 858.  The release involved only two lawsuits and the Seventh Circuit noted that it was going "no further than to apply the rule we adopted in *Airadigm*."  *Id.* at 865.  "A nondebtor release should only be approved in 'rare cases' . . . because

22

it is 'a device that lends itself to abuse.'" *Id.* (quoting *In re Metromedia Fiber Network, Inc.,* 416
F.3d 136, 141, 142 (2d Cir. 2005)).[15]

35.     Other than *Ingersoll*, the Survivors' Committee has found no reported decision
within the Seventh Circuit that has approved a non-consensual third party release that covers pre-
petition claims.  Courts within the Seventh Circuit have consistently rejected plans containing
third party releases where they are more expansive than the very narrowly tailored release of
post-petition claims relating to the bankruptcy approved by the Court in *Aradigm*.

36.     In *In re Berwick Black Cattle Co.*, 394 B.R. 448, 457 (Bankr. C.D. Ill. M. 2008),
the bankruptcy court denied confirmation of a plan that included blanket third party release
provisions that included prepetition claims and claims unrelated to the bankruptcy case.  The
court held that the releases went well beyond what the Seventh Circuit approved in *Airadigm,* as
they purported to release from liability third parties in a nonbankruptcy suit over which the court
had no jurisdiction.  *Id.* at 462 ("The release at issue in *Airadigm* was nothing more than the kind
of narrowly tailored release that is customary in Chapter 11 plans . . . [N]evertheless, it was not
simply rubber stamped by the Seventh Circuit, which applied a three-part analysis.").  The court
observed that the reasoning used by the Seventh Circuit in *Airadigm* was essential to the
outcome.  "The Seventh Circuit's comparative references to blanket immunity and matters
outside of the bankruptcy court's jurisdiction are properly taken as instructive guidance as to
what the Seventh Circuit would find to be inappropriate."  *Id.* at 460.

37.     Other examples of courts within the Seventh Circuit refusing to approve releases
under the narrow *Aradigm* standard are *OPS3 LLC v. Am. Chtd. Bank*, No. 13-cv-04398, 2017

---

[15] The *Ingersoll* court was enforcing releases already approved in a plan that was the subject of notice and
opportunity to object without an objection being filed.  *Ingersoll*, 562 F.3d at 865 ("the Gaylords are nondebtors, but
Miller is not a creditor of Ingersoll.  But we don't think that is dispositive when the party whose claim was
extinguished received fair notice and an opportunity to object.").

23

U.S. Dist. LEXIS 120442, at *7 (N.D. Ill. Aug. 1, 2017) (rejecting non-consensual third party release of "all guaranties by or on behalf of any of the Debtors" as beyond the scope permitted by *Aradigm*); *In re GAC Storage Lansing, LLC*, 489 B.R. 747, 768-69 (Bankr. N.D. Ill. 2013) (rejecting plan provisions that would release guarantors of the debtor's pre-petition debt as beyond the permissible scope of *Aradigm*); *In re Draiman,* 450 B.R. 777, 799 (Bankr. N.D. Ill. 2011) (rejecting releases of "the Liquidation Trustee, the Debtor, and their respective officers, directors, shareholders, employees, consultants, agents, advisors, attorneys, accountants, financial advisors, and other representatives and Professionals" as overly extensive); *Kelleher v. Nat'l Asset Loan Mgmt., Ltd. (In re Shelbourne N. Water St. L.P.)*, 556 B.R. 874, 884 (Bankr. N.D. Ill. 2016) (plan provision releasing non-debtor from claims by non-creditor not enforceable).  On the other hand, *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, No. 13 C 03306, 2015 U.S. Dist. LEXIS 180376, at *42 (N.D. Ill. Aug. 21, 2015) is an example of the type of narrow release of claims arising out of the bankruptcy case that will pass muster (approving third-party release expressly limited to claims arising in connection with the bankruptcy case).

38.     Here, the Plan release and channeling injunction include all claims "of any kind or nature"[16] relating to sex abuse, including claims for willful misconduct or fraud, as well as claims that do *not* arise out of or in connection with the reorganization, contrary to the controlling law in this Circuit.  [*See* Plan at § 12.2.]

39.     USOPC has recently argued to the Court that the contribution by the Settling Insurers is sufficient to justify a release and channeling injunction for its benefit notwithstanding that it is not contributing any of its own funds to the Settlement.  [USOPC Statement at ¶ 8.]

---

[16] The only exclusion is for a person that has personally committed an act of abuse.  [Plan at § 12.2.1.]

Humphrey Appellant Appendix 128

40. However, USOPC's argument relies solely on unpublished plan confirmation orders—*that were consensual joint plans submitted by the debtor and the Committee*, reflecting global settlements that were supported and agreed to by the committees and the vast majority of tort claimants. *See In re Crosier Fathers and Brothers Province, Inc.*, Case No. 17-41681, Dkt. No. 175 at *2 (Bankr. D. Minn. Mar. 26, 2018) (Order Confirming Joint Plan of Reorganization); *In re Christian Brothers' Institute,* Case No. 11-22820, Dkt. No. 652 at * 18 (Bankr. S.D.N.Y. Jan. 13, 2014) (Order Confirming First Amended Joint Plan of Reorganization); *In re Roman Catholic Bishop of Helena, Montana, a Montana Religious Corporation Sole,* Case No. 14-60074, Dkt. No. 475 at *9-10 (Bankr. D. Mont. Mar. 5, 2015) (Order Confirming Second Amended Joint Plan of Reorganization). These plans had the support of the individual abuse survivors as stated in the confirmation order of *Crosier Fathers and Brothers Province, Inc., supra,* Dkt. No. 175 at *2 ("The creditors most affected by the releases and injunctions—the tort claimants—have indicated by an overwhelming majority that they accept such provisions; indeed the committee is a proponent of the plan."). USOPC has not, and cannot, cite to reported decisions holding that a non-debtor can receive a nonconsensual release without contributing any of its own funds, where that issue was contested and litigated.

41. USOPC's release of its indemnity claims against the Debtor has no value to the Debtor and cannot be viewed as a substantial contribution to the Plan or the Settlement. [*See* Plan at § 7.4.2 (requiring USOPC to release its rights to receive reimbursement, indemnification or a defense under any of the Debtor's insurance policies in consideration for the third-party releases and channeling injunction).] Although the Disclosure Statement contains no information regarding the basis for or actual value of those purported claims, it is evident they have no value. USOPC's contractual indemnity claims are primarily based upon its annual

Humphrey Appellant Appendix 129

participation contracts with the Debtor.  [*See* USOPC's Proof of Claim No. 299 filed on April

26, 2019.]  The Debtor's CGL Insurance Policies expressly exclude contractual obligations.  The

remainder of USOPC's claim is for equitable indemnity and contribution, but they are contingent

and are therefore not allowable under section 502(e) of the Bankruptcy Code.[17]

    42.     Even if USOPC's indemnity claims were allowed, the Debtor claims to have no

assets to pay these claims and will receive a discharge under the Plan.  Therefore, no value flows

to the Debtor for giving USOPC's insurers a release or channeling injunction on account of

indemnity obligations.

    43.     At the very least, the value of the release being given to USOPC and its insurers is

grossly disproportionate relative to its alleged contribution.  Under the Settlement Election,

USOPC will be released from all its potential liability for both exemplary and punitive damages

which are not insured, but which USOPC could pay if they are awarded.

    44.     In addition, while all of the Settling Insurers will receive the benefits of the

channeling injunction and release, the Disclosure Statement does not reveal which of them are

contributing to the Settlement and in what amounts, if any.  Without knowing the amounts of

their payment, it is impossible to evaluate whether their contribution justifies the expansive relief

they would receive.  *See*, *In re Mahoney Hawkes, LLP,* 289 B.R. 285, 300-01 (Bankr. D. Mass.

2002) (suggesting that payment of policy proceeds limits is a contractual obligation and should

not be considered a substantial contribution worthy of a non-debtor release in favor of an

insurer).

---

[17] Disallowance of a claim pursuant to section 502(e)(1)(B) requires three elements to be established: (i) the claim must be for reimbursement or contribution; (ii) the claim must be contingent; and (iii) the debtor and the claimant must be co-liable on the claim.  *In re Pinnacle Brands,* 259 B.R. 46, 55 (Bankr. D. Del. 2001) (disallowing contingent contractual claim for indemnification against the debtor).  Once these three elements are established, disallowance under section 502(e)(1)(B) is mandatory.  *See* 11 U.S.C. § 502(e)(1)(B) ("[T]he court shall disallow any claim . . . .").

Humphrey Appellant Appendix 130

45. Sections 11.5 and 11.6 of the Plan provide for an unreasonable, unclear mechanism to add more Participating Parties and Settling Insurers as Released Parties after the Effective Date, after "notice and hearing." The Plan does not provide to whom the notice must go to. The Plan must require that notice must be given to all those who may have claims extinguished and give them a reasonable opportunity to object to the additional releases.

> **b.** **The Plan's Use of the Proceeds of the Settling Insurer Policies to Pay Administrative Claims and to Indemnify and Hold Harmless Claims of the Participating Parties Is Impermissible.**

46. Under the Settlement Election, the proceeds of the Debtor's Settling Insurer Policies will be used to pay the Debtor's costs of publication/notice, the allowed unpaid fees and expenses of the Survivors' Committee's professionals incurred during this case, and the fees, costs and other claims to defend, indemnify and hold harmless the Protected Parties. *See* discussion at paragraph 22 above.

47. In the Seventh Circuit, the Plan's proposed use of general liability insurance proceeds for this purpose is impermissible. The Seventh Circuit has adopted the approach of the Fifth Circuit set forth in *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 55-56 (5th Cir. 1993) (discussed below) for determining if the proceeds of an insurance policy are property of the estate. *Stinnett v. LaPlante (In re Stinnett)*, 465 F.3d 309, 312-13 (7th Cir. 2006); *Edward E. Gillen Co. v. Ins. Co.*, 825 F.3d 816, 818 (7th Cir. 2016). As here, where the proceeds can only be paid for the benefit of those harmed by the Debtor under the terms of the policies, the proceeds are not property of the estate.

48. The proceeds of the Settling Insurer Policies cannot be used to pay anyone other than the Abuse Claimants because while the Settling Insurer Policies are property of the estate, the *proceeds* of these policies are not. *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51,

27

55-56 (5th Cir. 1993) (if the debtor does not have the right to receive and keep insurance proceeds when the insurer pays on claim, the proceeds "cannot inure to the debtor's pecuniary benefit" and the proceeds "should neither enhance nor decrease  the bankruptcy estate.  In other words, when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate.").[18]  The Fifth Circuit instructed that under liability policies (like the Settling Insurer Policies at *issue* here) "the debtor will not have a cognizable interest in the proceeds of the policy.  Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract."[19]

49.    In a thoughtful and scholarly opinion, the bankruptcy court in *Landry v. Exxon Pipeline Co. Mendoza Marine, Inc*., 260 B.R. 769 (M.D. La. 2001) explained the rational of *Edgwood*:

> In the liability insurance context the debtor has no cognizable claim to the proceeds paid by an insurer on account of a covered claim.  The proceeds are paid to the victim of the insured's wrongful act.  The insured debtor cannot ask the insurance company to pay him, or determine on its own how the proceeds of the policy should be distributed, nor can any creditor of the insured seize the proceeds in satisfaction of a claim not falling within the terms of the insurance contract.
>
> As pointed out in *Edgeworth*, the proceeds could not be made available for distribution to the creditors other than those who have claims under the policies.  In effect, the proceeds of liability insurance policies do not become, for example, assets on a balance sheet.  In fact, prior to the existence of a covered claim, it is nonsensical to talk about "proceeds of a policy," because the

---

[18] Where the claims against the debtor's insurers might exhaust policy limits and thus threaten the debtor's estate over and above limits of liability insurance policies, courts have held the proceeds of liability insurance policies are property of the bankruptcy estate.  *Martinez v. OGA Charters, L.L.C. (In re Charters, L.L.C.)*, 901 F.3d 599, 604 (5th Cir. 2018); *MacArthur Co. v. Johns-Manville Corp*., 837 F.2d 89, 92 (2d Cir. 1988).  However, even when this exception applies, insurance policy proceeds are not available to all creditors, but only to the class of creditors that are covered by the policies and in that sense are different than other estate property.  *In re Charters,* 901 F.3d at 604, citing and quoting 3 *Collier on Bankruptcy* ¶ 362.03 (16th ed.).

[19] In contrast, the proceeds of casualty, collision, life, and fire insurance policies, in which the debtor is a beneficiary, can be property of the estate.  993 F.2d at 56.

> "proceeds" are merely a component of the asset structure of the insurance company… .
>
> The liability insurance proceeds protect the estate; another entity's property (the proceeds) is used to pay the estate claim. This keeps the estate's property from being used. This proposition is one of the very few conceptual propositions that, to this Court, seems self-evident and easy to grasp.
>
> Property, however, does not become property of the estate merely because such property has the effect of reducing the estate's liability, or because of some other beneficial effect such property has on the estate. The estate must have a legal or equitable interest in the property which benefits the estate.

*Id.* at 786-90.

50. The Court characterized as "untenable" subjecting the proceeds of a general liability insurance policy to the distributive priorities of the Bankruptcy Code by the happenstance of viable claims of certain creditors to proceeds from the insurance policies, because this would allow creditors with claims not covered under the insurance policies to recover indirectly through a distribution of property of the estate. *Id.* at 786 n.62.

51. This is precisely what the Plan seeks to accomplish by using the proceeds of the Debtor's general liability policies to pay the Debtor's administrative claims and the indemnification and hold harmless claims of the Participating Parties. This is not permissible in the Seventh Circuit. *Stinnett*, 465 F.3d at 312-13[20] (only where debtor has a right to receive and keep insurance payments, are proceeds estate property, citing and quoting *Edgeworth*); *Gillen*,

---

[20] The Seventh Circuit, quoted with approval, the entire operative analysis from *Edgewood*: *"As explained by the Fifth Circuit: The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim. When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate. In other words, when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate. . . . Proceeds of such insurance policies, if made payable to the debtor rather than a third party such as a creditor, are property of the estate and may inure to all bankruptcy creditors." Id.* at 313 (italics added).

Humphrey Appellant Appendix 133

825 F.3d at 818 ("under the Bankruptcy Code insurance proceeds pass to the beneficiaries free of other creditors' interest," citing *Edgeworth*).

### c.    The Plan is not in the Best Interests of Creditors.

52.    Pursuant to section 1129(a)(7) of the Bankruptcy Code, the Plan must enable each non-consenting creditor to receive as much as the creditor would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Plan cannot be confirmed if a non-consenting creditor does not "receive or retain under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such [creditor] would so receive or retain if the debtor were liquidated under chapter 7 of the [Bankruptcy Code] on such date . . . ."[21] This is referred to as the "best interests of creditors test." Failure to meet the test can be asserted by a creditor even if that creditor's class votes to accept the plan. Therefore, it is one of the "strongest protections individual creditors have in a Chapter 11."[22] Since the Plan contemplates that the Settlement Election can be imposed on the entire class of Abuse Survivors by a majority vote, the Plan Settlement Election must meet the best interests test with respect to the Abuse Survivors that do not vote for the Settlement Election but will nevertheless by bound by it and have their claims against USOPC and other non-debtors extinguished by the Plan releases and channeling injunction.

53.    The best interest test requires a comparison between the value of the property which unsecured creditors are to receive under the Plan and the hypothetical value that creditors could realize if the debtor is liquidated under chapter 7 of the Bankruptcy Code.

---

[21] Bankruptcy Code Section 1129(a) (7).

[22] *ACC Bondholder Group. v. Adelphia Communs. Corp. (In re Adelphia Communs Corp.)*, 361 B.R. 337 (D. S.D.N.Y. 2007). *In re Sierra-Cal*, 210 B.R. 168 (Bankr. E.D. Cal. 1997) (By virtue of the best interests of creditors test, each creditor has a "pocket veto").

Humphrey Appellant Appendix 134

54.     In a chapter 7 liquidation, the USOPC and other non-debtors would not get releases.   Courts have held that when a plan proposes the release of non-debtor third parties, the Best Interests of Creditors Test requires the inclusion of asset values of the non-debtor third parties in the hypothetical, alternative liquidation recovery comparison: "[T]he best interests equation also properly mandates consideration of creditors' comparative recoveries on non-debtor claims, to the extent the plan is treating those non-debtor claims by release."[23]  Thus, the Plan value distributed to any non-consenting creditor (*e.g.*, that votes to reject the plan or votes to accept the plan, but makes the Litigation Election) must exceed the aggregate of the hypothetical chapter 7 distribution to that creditor from the Debtor's estate, plus the value of that creditor's claims against the USOPC and the other non-debtors receiving a release under the Plan.

55.     The discussion of the best interests test (Disclosure Statement at 13 and 64) is fatally flawed because it compares the projected creditor recoveries that would result from the liquidation of the Debtor in a hypothetical case under chapter 7 ***without any consideration of the recoveries the Abuse Claimants would receive from USOPC and the other non-debtor parties that would be released under the Settlement Election.***

56.     The best interests test is not met for another reason.   The Debtor claims that "[b]ecause the Debtor has committed to make the value of the Insurance Policies available to

---

[23] *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D.Conn.2006); *see also* (*In re Ditech Holding Corp.*, 606 B.R. 544, 614 (Bankr. S.D.N.Y. 2019)(same); *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ("in a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at lease as well under chapter 11 plan as they would in a chapter 7 liquidation"); *In re Quigley*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) ("The confirmation of the Fourth Plan and discharge of Pfizer will affect the dissenting Non-Settling Claimants because they would "retain" their right to sue Pfizer if Quigley were liquidated under chapter 7. As the parties recognize, the critical question is whether I should consider the value of these derivative claims in deciding whether the Fourth Plan is in the "best interest" of the dissenting Non-Settling Claimants. I conclude that I must.").

Humphrey Appellant Appendix 135

Abuse Claimants, Abuse Claimants are receiving at least what they would receive in a chapter 7 liquidation form the Insurance Policies." [Disclosure Statement at 13.] The Debtor claims that Abuse Claimants will receive distributions under the Plan no more than and no less than what they would receive in chapter 7 liquidation. This is not true.

57. First, in a chapter 7, the proceeds of the Debtor's CGL Insurance Policies would not be used to pay for non-Abuse Claims. However, as noted, under the Settlement Election, the insurance proceeds will be used to pay the Debtor's costs of publication/notice, the allowed unpaid fees and expenses of the Survivors' Committee's professionals incurred during this case, and the fees, costs and other claims to defend, indemnify and hold harmless the Protected Parties. *See* discussion at paragraphs 22 and 46-51 above.

58. Second, the Plan does *not* make the full potential value of the CGL Insurance Policies available to pay Abuse Claimants because the payments proposed to be made by the Settling Insurers under the Plan are substantially less than the maximum coverage limits under the CGL Insurance Policies. In a chapter 7 proceeding, settlements could be reached or judgment obtained providing for higher payouts by some or all of the Insurers for some or all of the Abuse Claimants. At a minimum, scenarios of higher insurance payouts (on an individual or aggregate basis, or both) outside of the Plan must be disclosed by the Debtor. Because the Debtor's Liquidation Analysis contains no such disclosure or comparison, it cannot be said that that the treatment of Abuse Claimants by the Debtor's Plan is comparable or superior to what they would receive in a chapter 7 liquidation.

### d. The Plan is not Proposed in Good Faith.

59. The Plan is also unconfirmable because the Settlement is not fair, equitable, or reasonable, and is not consistent with the objectives of the Bankruptcy Code (including the

32

objective of the equitable distribution of the debtor's assets to creditors).  A plan must be proposed in good faith to be confirmable.  11 U.S.C. § 1129(a)(3).  This means the plan must achieve a result consistent with the objectives and purposes of the Bankruptcy Code.  *In re Madison Hotel Assoc.*, 749 F.2d 410, 424-425 (7th Cir. 1984).  The court assesses good faith in proposing a plan of reorganization by looking at the totality of the circumstances surrounding the plan. *Id.*

60.     As explained in the Survivors' Committee's Dismissal Motion, the Debtor (along with the USOPC and their respective Settling Insurers) have stalled the mediation by failing to make a fair and comprehensive offer to the Survivors' Committee and its constituents.  Since the last mediation session in November 2019, USAG has not initiated a single substantive plan-related communication with the Survivors' Committee.  Rather than engaging in good faith discussions, the Debtor has instead proposed a settlement that the Survivors' Committee believes offers insufficient compensation to the Abuse Claimants relative to the value of their claims and grants non-consensual releases and the benefits of a channeling injunction to the USOPC, Settling Insurers and the other Non-Debtor CGL Settling Insured Covered Persons.  The releases and channeling injunction would extinguish all claims relating to sex abuse against USOPC and other non-debtors, without regard to whether the claims are related to the bankruptcy case, or based on willful misconduct or fraud, in the absence of any monetary contribution to the Settlement by the non-debtor parties (other than insurers) that are to receive this expansive relief.

61.     The Settlement offers the Abuse Claimants insurance policy proceeds, but the Plan misstates the amount of these proceeds that would actually be paid to the Abuse Claimants under the Settlement Election (which is unknown because uncapped amounts can be used to pay indemnity claims, professionals and Trust related expenses) and the Disclosure Statement makes

33

no attempt to quantify the amount of proceeds that will actually be available to the Abuse Claimants if the Plan is rejected. Most critically, the Debtor does not offer a single dime of its own funds in consideration for the discharge it seeks under the Plan and inexplicably relieves the Debtor from any obligation to prosecute avoidance actions, without disclosing their value.

62.     The Debtor's Plan, on its face, does not reflect a fair, shared sacrifice by the Debtor, or the USOPC which will benefit from the blanket releases and channeling injunction under the Plan even though, neither the Debtor or USOPC are contributing their own funds or assets to fund the Settlement. Although the Debtor and the USOPC (which is a substantially solvent entity) could take reasonable steps to ensure more value is put into the Trust for the Abuse Claimants' benefit, the Debtor and the USOPC are making no effort whatsoever in that regard. This is not good faith. *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002) (plan proposed in good faith if it has "the legitimate purpose of reorganizing the business affairs of each of the Debtors and <u>maximizing the returns available to creditors</u> of the Debtors" (emphasis added)); *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994,1002 (E.D. Va. 1994) (proposed plan was not proposed in good faith and "presents a fundamental abuse of the provisions of Chapter 11 because . . . it does not adequately commit the full range of the debtors resources to repayment of Crestar's debt"); *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) (plan must be proposed with "honesty and good intentions"); *Stolrow v. Stolrow's, Inc. (In re Stolrow's Inc.)*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988) (plan proponent must have exhibited "a fundamental fairness in dealing with one's creditors").

63.     To meet the "good faith" requirement and be "fair and equitable," the Debtor must contribute its own assets. As discussed below at paragraph 63, Abuse Claims in Class 6 are being unfairly and disparately treated, in comparison to General Unsecured Claims in Class 5,

which claims will receive an 80% recovery including from the Debtor's future revenue. Under the Litigation Election, the Abuse Claimants will not be entitled to any portion of the Debtor's future revenue.

64. The Debtor's bad faith is further demonstrated by the Plan requirement that under the Litigation Election, the Abuse Claimants receive nothing under the Plan from the Debtor, but the Debtor nonetheless receives a discharge. The Abuse Claimants are limited to recovering against the Debtor's insurance coverage but are barred from any recovery against the Debtor's or Reorganized Debtor's assets or revenue. *The Litigation Election is nothing more than a dismissal of the case with a discharge for the Debtor*. [24]

### e. The Plan Is Not Fair and Equitable.

65. As the Debtor seeks to cram down a rejecting class, the Debtor's failure to allocate any of its own assets or going concern value to the Abuse Claimants runs afoul of the "fair and equitable" requirement of section 1129(b) of the Bankruptcy Code. *FSLIC v. D& F Const., Inc. (In re D& F Constr.),* 865 F.2d 673, 675 (5th Cir. 1989) ("Section 1129(b)(2) sets *minimal* standards [that] plans must meet. However, it is not to be interpreted as requiring that every plan not prohibited be approved. A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is 'fair and equitable.'" (emphasis added)). *See also In re Pullman Constr. Indus.*, 107 B.R. 909, 939 (Bankr. N.D. Ill. 1989) ("Section 1129(b)(2) sets forth the minimum standards which must be met for confirmation"; citing and quoting *D & F Construction*); *In re Grandfather Mt. Ltd. Pshp.*, 207 B.R. 475, 487 (Bankr. M.D. N.C. 1996)

---

[24] The Plan at Section 19.1 grants the Debtor a discharge even if Class 6 (Abuse Claims) votes for the Litigation Election. Also, if the Abuse Claimants vote to reject the Plan, the Debtor intends to cram-down the Plan, impose the Litigation Election upon them, and receive a discharge.

Humphrey Appellant Appendix 139

("the plan must literally be fair and equitable"; factors that may be considered include "whether, for an unsecured class, the percentage or formula for proposed payment demonstrates a good faith effort to repay those obligations" and "whether other particular inequities are inherent in the plan, including special prejudice to a dissenting class arising from its particular circumstances"); *In re 20 Bayard Views, LLC*, 445 B.R. 83, 104 Bankr. E.D. N.Y. 2011) (express portions of section 1129(b) "establish a floor, and satisfaction of these statutory requirements does not guarantee that the plan will meet the fair and equitable standard").

66.     In the non-profit setting, where the absolute priority rule is not easily applied because of the absence of shareholders, the Seventh Circuit views the allocation of a significant portion of the going concern value of the debtor as a critical element of the fair and equitable test. *In re Wabash Valley Power Ass'n*, 72 F.3d 1305, 1312-13, 1320 (7th Cir. 1995) ("The value of the [non-profit debtor] to its Members exceeds its value to any third-party buyer because the [non-profit debtor] is tailored exactly to the Members' requirements . . . . The bankruptcy court found that [the non-profit debtor's] Plan provided the maximum amount that [creditors] could possibly obtain.  It met the requirements of 11 U.S.C. § 1129(b) and was confirmable"). The Debtor's Plan falls far short of providing creditors the maximum amount that could possibly be obtained, and accordingly, should not be confirmed.

### f.     Inter-Class Unfair Discrimination/Disparate Treatment.

67.     As previously discussed, the Plan also unfairly separately classifies General Unsecured Claims excluding Abuse Claims into Class 5. Class 5 is projected to receive an 80% recovery—substantially higher than the likely recovery for most of the Abuse Claimants under the Plan (from the Debtor's assets) under the Litigation Election.  Further, holders of General Unsecured Claims will be paid in large part over three years after the Effective Date from the

Humphrey Appellant Appendix 140

Debtor's post-confirmation revenues and other cash receipts. [*See* Ex. 2 of Disclosure Statement (Cash Flow Projections).] As discussed above, USAG should be required to contribute its own funds and other assets, not only insurance proceeds, in order to receive a discharge under the Litigation Election. The Disclosure Statement does not explain why Abuse Claimants are excluded from receiving distributions funded in part by the Debtor's post-confirmation revenues and receipts, including, for example, any avoidance action recoveries (which are not even considered as an asset in the Liquidation Analysis).

g.    **De Facto Separate Classes/Unfair Discrimination.**

68.    With respect to the treatment of Abuse Claims in Class 6, the Plan actually provides for different treatment of Abuse Claims depending on whether the claim falls within one of four subsets (Elite Gymnasts, Non-Elite Gymnasts, Other Claimants, and Derivative Claimants). Each subset is provided a different pool of cash (although the amounts are not accurately stated), ranging from approximately $2 million to $82.55 million, out of which the applicable claimants will share on a pro rata basis. Even if there were a legitimate basis for such disparate treatment—which the Debtor has not attempted to explain or demonstrate—each subset, or subclass, should be considered a separate class, because each subset is being provided funds in different amounts. *See* 11 U.S.C. § 1123(a)(4) (plan must provide the same treatment for each claim of a particular class). In all events, the Debtor must disclose a reasonable basis for the different fund allocations and how such allocations were determined. This is both a disclosure issue, and a confirmation issue, because the Plan on its face unfairly discriminates among the Abuse Claimants without articulating a reasonable basis. Even assuming *arguendo*, the Debtor's subclass criteria and fund allocations are not *ad hoc* or unreasonably discriminatory, the Court should be wary of the Debtor's possible use of the subclass allocations as a pretext to

Humphrey Appellant Appendix 141

improperly incentivize certain subclasses to squeeze out other subclasses in respect to Class 6 voting.

69.     The UST's Objection[25] contains a thoughtful and comprehensive discussion of the reasons the Plan violates the requirements of section 1123(a)(4) of the Bankruptcy Code by not providing the same treatment to the members of Class 6.  [*See* UST Objection at 14-19.]  The Survivors' Committee joins in that portion of the UST Objection and incorporates it by reference herein.

### h.     The Exculpation Provisions are Improper.

70.     The exculpation provision in Section 19.4 of the Plan improperly excludes the Survivors' Committee and its professionals if Class 6 votes to accept the Litigation Election.  Specifically, the Plan provides that "[i]n the event Class 6 makes the Settlement Election, 'Exculpated Parties' will also include the Survivors' Committee, the Survivors' Committee's Professionals, the Settling Insurers, the Participating Parties, and their respective Related Persons."  [*See* Plan § 1.1.39.]  There is no legitimate basis for excluding the Survivors' Committee from the exculpation under the Litigation Election.  The Survivors' Committee and its professionals have served in good faith in this case and are entitled to exculpation, even if Abuse Claimants vote for the Litigation Election.  The conditional exculpation appears to be an effort to pressure the Survivors' Committee to urge Abuse Claimants to accept the Plan and vote for the Settlement Election.

71.     Additionally, Section 1.1.39 of the Plan exculpates the Settling Insurers and the Participating Parties under the Settlement Election.  Courts have properly recognized that plan exculpation provisions should only encompass estate fiduciaries like the Survivors' Committee

---

[25] "UST's Objection" shall refer to the *United States Trustee's Objection to Disclosure Statement for First Amended Chapter 11 Plan of Reorganization Proposed by USA Gymnastics* [Doc 984] filed on March 24, 2020.

and not non-fiduciary third parties. *See, e.g., In re Wash. Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) ("The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers."); *In re Midway Gold US, Inc.*, 575 B.R. 475, 512-13 (Bankr. D. Colo. 2017) (similar).

### i.     Abuse Claim Objection Issues.

72.    The Plan states the objection procedures in relation to Abuse Claims will be set forth in the Trust Agreement, but that document is silent on this issue. The Debtor should consult with the Survivors' Committee to delineate reasonable claims objection and related trust distribution procedures (the "TDPs") in the event Class 6 chooses the Settlement Election. The TDPs are frequently used in mass tort proceedings to implement a fair process for cost-effective, non-adversarial evaluation of claims.

### j.     Miscellaneous Plan Issues.

71.    The Plan contains various other provisions that are objectionable and that must be addressed by the Debtor, including the following:

(i)     Pursuant to Section 14.1 of the Plan, the Debtor imposes an arbitrary 30-day deadline (from after the Effective Date) for Abuse Claimants to take various critical actions, including (a) filing a state court lawsuit against the Debtor if the claimant did not file a Pre-Petition Lawsuit against the Debtor, and (b) in the event the claimant had filed a Pre-Petition Lawsuit, filing in the Pre-Petition Lawsuit a notice to recommence litigation. If the Abuse Claimant does not meet the 30-day deadline, he or she "shall be forever barred from asserting the Holder's Claim." These deadlines under the Plan are unreasonably short and should be lengthened to provide a fair opportunity for the Abuse Claimants.

(ii)     The Plan, at Section 16.3, provides for service of claim objections on certain parties. With respect to Abuse Claims, for privacy and confidentiality reasons, an objection to an Abuse Claim should be served only on counsel for the applicable Abuse Claimant (unless requested otherwise by the Abuse Claimant).

Humphrey Appellant Appendix 143

       (iii)     The Plan, at Section 16.5.2, requires a claimant to claim an Undeliverable Distribution within 30 days after the Distribution was deemed to be an Undeliverable Distribution. This deadline is unfairly short, and reasonable procedures should be implemented to try to apprise claimants that their Distribution is an Undeliverable Distribution.

       **WHEREFORE**, the Survivors' Committee requests that the Court enter an order (i) sustaining this Objection, (ii) denying approval of the Disclosure Statement, and (iii) setting such further and other relief as may be just and appropriate.

       Respectfully submitted,

       PACHULSKI STANG ZIEHL & JONES LLP

Dated: <u>May 19, 2020</u>       <u>/s/ James I. Stang</u>
       James I. Stang, Esq. (admitted *pro hac vice*)
       Kenneth H. Brown, Esq. (admitted *pro hac vice*)
       Iain A.W. Nasatir, Esq.
       Jonathan J. Kim, Esq.
       10100 Santa Monica Blvd., 13th Floor
       Los Angeles, CA 90067-4003
       Telephone: (310) 277-6910
       Facsimile: (310) 201-0760
       E-mail: jstang@pszjlaw.com
           kbrown@pszjlaw.com
           inasatir@pszjlaw.com
           jkim@pszjlaw.com

           -and-

       RUBIN & LEVIN, P.C.

       <u>/s/ Meredith R. Theisen</u>
       Meredith R. Theisen, Esq.
       Deborah J. Caruso, Esq.
       135 N. Pennsylvania Street, Suite 1400
       Indianapolis, IN 46204
       Telephone: (317) 634-0300
       Facsimile: (317) 263-9411
       Email: dcaruso@rubin-levin.net
           mtheisen@rubin-levin.net

       *Counsel for the Survivors' Committee*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-09108-RLM-11 |
| Debtor. | |

OBJECTION OF THE ADDITIONAL
TORT CLAIMANTS COMMITTEE OF SEXUAL ABUSE
SURVIVORS TO DEBTOR'S MOTION FOR ORDER APPROVING THE
DISCLOSURE STATEMENT AND PLAN CONFIRMATION PROCEDURES

The Additional Tort Claimants Committee of Sexual Abuse Survivors (the "Survivors'

Committee"), appointed in this case under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"), hereby objects (the "Objection") to the *Debtor's Motion for Order*

*Approving the Disclosure Statement and Plan Confirmation Procedures* (the "Procedures

Motion") [Doc 931].[2]  In support of its Objection, the Survivors' Committee respectfully states

as follows:

I. **PRELIMINARY STATEMENT**

The Procedures Motion seeks approval of confirmation and balloting/solicitation

procedures that are unclear, unfair and deficient.  The most glaring issues are the following:

First, the proposed ballot for members of Class 6 (the "Abuse Claimants") (i) should

explain that if the Plan is rejected, neither the Settlement Election or the Litigation Election will

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

[2] All capitalized terms not defined herein have the meaning ascribed to such term in the Procedures Motion or the *First Amended Chapter 11 Plan of Reorganization Proposed by USA Gymnastics* (the "Plan") [Doc 928], as applicable.

apply and that if an Abuse Claimant votes to reject the Plan, no vote on the Settlement Election or the Litigation Election should be cast; and (ii) should provide an explanation, immediately next to the "box" to vote for the Settlement Election, that all claims against USOPC and other non-debtor parties will be extinguished and channeled to the Trust with a specific reference to the pages in the Plan and Disclosure Statement that describe the scope of the releases and the impact of the channeling injunction.

Second, the proposed balloting procedures are inappropriate.

Third, the tallying procedures in connection with Class 6 Ballots are unclear and contradict the Plan. Moreover, the Class 6 Ballot gives the misleading impression that *each* Abuse Claimant will be able to elect to settle or litigate if they accept the Plan, and make the corresponding election, when in reality all Abuse Claimants within Class 6 will be required to settle or litigate if the Plan is accepted by Class 6.

Fourth, where the Abuse Claimant's proof of claim indicates they are represented by counsel the Solicitation Packages should be sent to such counsel and counsel should be permitted to submit ballots if authorized to do so.

Fifth, if solicitation of the Plan is authorized, the Survivors' Committee should be permitted to include in the solicitation package a letter expressing its view and recommendations.

Sixth, the proposed deadlines in the Procedures Motion are unreasonable.

## II.  ARGUMENT

The Survivors' Committee agrees with the assessment of the United States Trustee (the "UST") that the procedures proposed by the Debtor unfairly disadvantage the Abuse Claimants and are inappropriate. *See United States Trustee's Objection to Debtor's Motion for Order Approving the Disclosure Statement and Plan Confirmation Procedures* (the "UST Objection")

2

[Doc 985] filed on March 24, 2020.  Specifically, the Survivors' Committee takes issue with the following proposed balloting/solicitation procedures:

**A.** **Class 6 Ballot Should Contain Additional Information and the Survivors' Committee's Recommendation to Reject the Plan.**

1.     In order for Abuse Claimants to make a fully informed decision, the Class 6 Ballot at a minimum (i) should explain that if the Plan is rejected, neither the Settlement Election or the Litigation Election will apply and that if an Abuse Claimant votes to reject the Plan, no vote on the Settlement Election or the Litigation Election should be cast, and (ii) should provide an explanation, immediately next to the "box" to vote for the Settlement Election, that all claims against USOPC and other non-debtor parties will be extinguished and channeled to a trust with a specific reference to the pages in the Plan and Disclosure Statement that describe the scope of the releases and the impact of the channeling injunction.

2.     The Plan also separates Class 6 into four subclasses, with each subclass receiving different amounts under the Settlement Election.  The Class 6 Ballot should identify which subclass the Debtor intends to classify the Abuse Claimant receiving the ballot and the estimated amount that will be paid to that Abuse Claimant if the Settlement Election is made. Alternatively, the Debtor could create different versions of the Class 6 Ballot for each sub-class and mail the different versions of the ballots to each abuse Claimant or their counsel (see argument below) based on which subclass the Debtor is proposing for them.

3.     In addition, the Solicitation Package sent to Abuse Claimants should include the form of release[3] Abuse Claimants will be required to execute to receive payment under the Settlement Election.

_____

[3] The Disclosure Statement informs Abuse Claimants that to receive payment from the Trust, each of them must execute a "full and complete release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties… and the Non-Debtor CGL Covered Persons" in a form acceptable to the persons and entities

Humphrey Appellant Appendix 147

**B.      The Proposed Balloting Procedures are Inappropriate.**

4.      <u>Treatment of Ambiguous and Inconsistent Ballots</u>.  The Debtor's proposal that ambiguous and/or inconsistent ballots should be counted as acceptances is improper. [Procedures Motion at ¶ 26(a)(ix)-(xi).]  There is no reason an ambiguous and/or inconsistent ballot should be considered more likely an acceptance rather than a rejection.  Ambiguous ballots that fail to clearly indicate acceptance or rejection of the Plan should not be counted.  However, in the event an Abuse Claimant votes to reject the Plan and votes for either the Settlement Election or the Litigation Election, such a ballot should be counted as a rejection rather than as an ambiguous or inconsistent ballot.  Moreover, if the same claimant submits inconsistent ballots and the timing of the ballots submission cannot be ascertained, such ballots should not be counted.[4]

5.      <u>Treatment of Improperly Submitted Ballots</u>.  The Debtor proposes that ballots received by the Court, the Debtor, the Debtor's agents or representatives (other than the Balloting Agent) shall not be counted or considered.  [Procedures Motion at ¶ 26(c)(ii).]  Instead, the Court, the Debtor, and its agents or representatives should be required to forward any ballots erroneously received to the Balloting Agent and the date of receipt shall be the date the ballots were originally received.  The Debtor also proposes that any Ballot that does not contain an original signature shall not be counted or considered.  [Procedures Motion at ¶ 26(c)(iv).]  As more fully discussed below, the Class 6 Ballot should be modified to allow for the original signature by the Abuse Claimant's counsel.

---

to be released.  [Disclosure Statement at 47.]  The language of the proposed release is not set forth in the Disclosure Statement, Plan, Trust Agreement or the Class 6 Ballot.

[4] The Survivors' Committee does not take issue with the proposed procedures for multiple ballots as outlined in paragraph 26(e) of the Procedures Motion.

6.     <u>Rejected Ballots</u>.  The Debtor expressly reserves the right "to reject any and all Ballots that are not in proper form, the acceptance of which, in the opinion of the Debtor, would not be in accordance with the provisions of the Bankruptcy code, the Bankruptcy Rules, the Local Rules, or the proposed Disclosure Statement Order."  [Procedures Motion at ¶ 26(d).]  Any rejected and/or defective Class 6 Ballot should be promptly shared with the Survivors' Committee and the Survivors' Committee should have the right to review all Class 6 Ballots and confirm the Debtor's vote tabulations for Class 6.

7.     <u>Returned Solicitation Packages and Notices</u>.  The Debtor proposes that it should not be required to re-send any Solicitation Packages or other related notices returned as undeliverable.  [Procedures Motion at ¶ 26(h).]  Any Solicitation Packages in connection with Abuse Claimants that are returned as undeliverable should be promptly shared with the Survivors' Committee.

**C.     The Tallying Procedures for Class 6 Ballots are Unclear and Contradict the Plan.**

8.     The statements in the Disclosure Statement regarding tallying procedures for Class 6 Ballots contradict statements in the Plan regarding the same, and therefore, it is unclear how the Debtor intends to tabulate the Class 6 Ballots.  Article 8.2 of the Plan states that holders of claims in an impaired class shall have accepted the Plan if it is accepted by at least two-third (2/3) in dollar amount and more than one-half (1/2) in number have voted to accept the Plan.  However, Section III.C.3 of the Disclosure Statement states that if individuals holding more than half of the Class 6 Abuse Claims vote in favor of the Plan, it will have been accepted by the Class, with no mention of the two-thirds (2/3) requirement.

9.     The Disclosure Statement and Class 6 Ballot are also vague and misleading on how votes will be counted.  They incorrectly imply that *each* Abuse Claimant can effect a

Litigation or Settlement Election for herself if the Plan is accepted. What happens, for example, if an Abuse Claimant wants to accept the Plan but only on the condition that the Settlement Election is chosen by the class? What happens if more than one-half of Class 6 accepts the Plan, but neither the Settlement Election, nor the Litigation Election, receives more than half of the Class 6 votes? The Debtor must explain its proposed tallying procedure. The Disclosure Statement and the Class 6 Ballot must address and clarify all of these issues.

**D.**     **Solicitation Packages Should be Delivered to
            Counsel where the Abuse Claimants are Represented and
            <u>Such Counsel Should be Permitted to Submit Ballots on Behalf of their Clients.</u>**

10.     In mass tort bankruptcies, it is a common practice to send master ballots directly to all lawyers known to be representing persons with tort claims against the debtor and to allow such counsel to vote to accept or reject the plan on behalf of each client who has authorized them to do so. *See, e.g., In re Combustion Eng'g. Inc.*, 391 F.3d 190, 245 n. 66 (3rd Cir. 2004) (noting that "the entire solicitation and voting process was conducted through a small group of law firms who collectively represented hundreds of thousands of individual claimants"). This process facilitates voting by large number of claimants and is authorized by Bankruptcy Rule 3018(c). Fed. R. Bankr. P. 3018(c) (permitting voting by "an authorized agent" for a creditor or equity security holder).

11.     This process should be adhered to in this case. Abuse Claimants who have indicated on their proofs of claim that they are represented by counsel should have their solicitation packages sent to their counsel rather than to their homes, and such counsel should be permitted to submit ballots on behalf of their clients if authorized to do so. The Class 6 Ballot should be modified to allow for the signature by the Abuse Claimant's counsel.

Humphrey Appellant Appendix 150

E.      **The Survivors' Committee Should Be
        Permitted to Include a Letter in the Solicitation Package.**

        12.     The Debtor should be required to include a letter from the Survivors' Committee

(the "Survivors' Committee Letter") as part of the Solicitation Packages.

        13.     Bankruptcy Rule 3017(d) specifies the materials to be distributed to holders of

allowed claims and equity interests upon approval of a disclosure statement, including the court-

approved plan and disclosure statement and notice of the time within which acceptances and

rejections of the plan may be filed.  Fed. R. Bankr. P. 3017(d) (1)-(3).  Bankruptcy Rule

3017(d)(4) further provides that "any other information as the court may direct" may be included

in the materials distributed to creditors and equity holders.  Fed. R. Bankr. P. 3017(d) (4); s*ee*

*also In re Tenn-FLA Partners*, 1993 Bankr. LEXIS 789, at *2 (Bankr. W.D. Tenn. Apr. 29,

1993) ("[Rule] 3017(d)(4) . . . provides for much discretion as to what other information the

court may deem appropriate to send out with the disclosure statement.").

        14.     This information may include a letter by an official committee recommending that

creditors vote to reject (or accept) a plan.  *See, e.g., In re Tucker Freight Lines, Inc.*, 62 B.R. 213,

215 n.1 (Bankr. W.D. Mich. 1986) (permitting a creditors' committee objecting to a disclosure

statement to include in the ballot package a letter recommending that creditors vote against

acceptance of the plan); *In re Federated Dep't Stores, Inc.*, Consolidated Case No. 1-90-00130,

1992 Bankr. LEXIS 392, at *21 (Bankr. S.D. Ohio Jan. 10, 1992) (solicitation packages included

a letter from the appropriate creditors' committee recommending a vote in favor of the plan); *In*

*re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [Dkt. No. 1639]

(order authorizing debtors to send letters from committees to creditors in voting classes); *In re*

*JHT Holdings, Inc., et al.*, Case No. 08-11267 (BLS) (Bankr. D. Del. Aug. 29, 2008) [Dkt. No.

Humphrey Appellant Appendix 151

302] (disclosure statement included bold, all capital letters recommendation by creditors' committee summarizing concerns and urging creditors to reject the plan).

**F.**      **The Proposed Deadlines are Unreasonable.**

15.      The Debtor seeks to require objections to the Plan to be filed only two days after proposed Voting Report Deadline.  [Procedures Motion at ¶ 10.]  This is schedule is not fair or reasonable. Certain objecting parties intend to conduct extensive discovery relating to the Plan, and therefore the Survivors' Committee request that no deadline on Plan objections be set by the Court prior to a status conference to consider the time needed to complete discovery.

**WHEREFORE**, the Survivors' Committee requests that the Court enter an order (i) sustaining this Objection, (ii) denying the Procedures Motion, and (iii) setting such further and other relief as may be just and appropriate.

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

Dated:  May 19, 2020      /s/ James I. Stang
                          James I. Stang, Esq. (admitted *pro hac vice*)
                          Kenneth H. Brown, Esq. (admitted *pro hac vice*)
                          Iain A.W. Nasatir, Esq.
                          Jonathan J. Kim, Esq.
                          10100 Santa Monica Blvd., 13th Floor
                          Los Angeles, CA 90067-4003
                          Telephone:  (310) 277-6910
                          Facsimile:  (310) 201-0760
                          E-mail:  jstang@pszjlaw.com
                                   kbrown@pszjlaw.com
                                   inasatir@pszjlaw.com
                                   jkim@pszjlaw.com

                                 -and-

                          RUBIN & LEVIN, P.C.

                          /s/ Meredith R. Theisen
                          Meredith R. Theisen, Esq.
                          Deborah J. Caruso, Esq.
                          135 N. Pennsylvania Street, Suite 1400

Humphrey Appellant Appendix 152

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-09108-RLM-11 |
| Debtor. | |

## DEBTOR'S MOTION FOR ORDER APPROVING THE DISCLOSURE STATEMENT AND PLAN CONFIRMATION PROCEDURES

USA Gymnastics, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**" or "**USAG**"), hereby submits this motion (the "**Motion**") for the entry of an order (the "**Disclosure Statement Order**"), substantially in the form attached hereto as Exhibit A: (a) approving the Disclosure Statement (defined below); (b) establishing the voting deadline, and other related dates and deadlines in connection with voting on the Plan (defined below); (c) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; (d) approving the manner and forms of notice and other related documents; and (e) granting other relief relating thereto as set forth herein. In support of this Motion, the Debtor respectfully states as follows:

### JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (L), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The last four digits of the Debtor's federal tax identification number are 7871.  The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

2.      The statutory and legal predicates for the relief requested herein are sections 105(a), 502, 1123(a), 1124, 1125, 1126 and 1128 of title 11 of the United States Code, 11 U.S.C. §§ 101– 1532 (the "**Bankruptcy Code**"), Rules 2002, 3003, 3016, 3017, 3018, and 3020 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 3018-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Indiana (the "**Local Rules**").

## BACKGROUND

3.      On December 5, 2018, USAG filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtor remains in possession of its property and continues to operate and maintain its organization as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in this chapter 11 case.

5.      On February 21, 2020, the Debtor filed the *First Amended Chapter 11 Plan of Reorganization Proposed By USA Gymnastics* [Dkt. 928] (the "**Plan**") and corresponding *Disclosure Statement For First Amended Chapter 11 Plan Of Reorganization Proposed By USA Gymnastics* [Dkt. 930] (the "**Disclosure Statement**").[2]

6.      Concurrently with the filing of this Motion, the Debtor will provide notice (the "**Disclosure Statement Hearing Notice**"), in substantially the form attached hereto as <u>Exhibit B</u>, of a hearing to seek approval of the Disclosure Statement, which is scheduled for **March 31, 2020 at 1:30 p.m. (prevailing Eastern time)** (the "**Disclosure Statement Hearing**").

---

[2] Capitalized terms used herein and not defined shall have the meanings ascribed to such terms in the Plan or Disclosure Statement.

Humphrey Appellant Appendix 154

7.      In accordance with Section 1126 of the Bankruptcy Code, the Plan classifies all holders of Claims into certain Classes for all purposes, including with respect to voting to accept or reject the Plan, as follows:

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|-------|-------------|------------|--------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | PNC Bank Claim | Unimpaired | Deemed to Accept |
| 3 | Sharp Claim | Unimpaired | Deemed to Accept |
| 4 | General Unsecured Convenience Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Abuse Claims | Impaired | Yes |
| 7 | Personal Injury Claim | Impaired | Yes |
| 8 | USOPC Claim | Impaired | Yes |
| 9 | Indemnification Claims | Impaired | Yes |
| 10 | FCR Claim *(only if there is a Settlement Election)* | Impaired | Yes |
| 11 | Sexual Abuse Claims Filed After The Bar Date *(only if there is a Litigation Election)* | Impaired | Deemed to Reject |

8.      Based on the foregoing, the Debtor will solicit votes to accept or reject the Plan from holders of Claims in Classes 5, 6, 7, 8, 9, and 10 (but Class 10's vote will only be considered if there is a Settlement Election) (collectively, the "**Voting Classes**"). The Debtor will not solicit votes to accept or reject the Plan from Classes 1, 2, 3, 4, and 11 (collectively, the "**Non-Voting Classes**").

## RELIEF REQUESTED

9.      The Debtor respectfully requests that the Court enter the Disclosure Statement Order: (a) approving the Disclosure Statement; (b) establishing the voting deadline, and other related dates and deadlines in connection with voting on the Plan; (c) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan;

3

(d) approving the manner and forms of notice and other related documents; and (e) granting other relief relating thereto as set forth herein.

10.     The following chart provides a timeline of the key dates and deadlines for which the Debtor seeks approval:

| Event | Proposed Date |
|---|---|
| Disclosure Statement Hearing | March 31, 2020 |
| Solicitation Deadline | April 6, 2020 |
| Voting Deadline | May 8, 2020 |
| Voting Report Filing Deadline | May 13, 2020 |
| Plan Objection Deadline | May 15, 2020 |
| Deadline to Respond to Plan Objections | May 29, 2020 |
| Confirmation Hearing | June 3-4, 2020 |

## BASIS FOR RELIEF

## I.     The Disclosure Statement Should Be Approved.

11.     The Debtor requests that the Disclosure Statement be approved as providing "adequate information" within the meaning of Section 1125 of the Bankruptcy Code. Under Section 1125 of the Bankruptcy Code, a debtor must provide creditors with "adequate information" regarding any proposed chapter 11 plan:

> "[A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information …."

11 U.S.C. § 1125(a)(1).

4

12.     Thus, a disclosure statement must, as a whole, provide information that is reasonably practicable to permit an informed judgment by creditors entitled to vote on the debtor's plan of reorganization. *See, e.g., In re Distance Learning Systems of Indiana, Inc.*, No. 10-14617, Dkt. 112 (Bankr. S.D. Ind. Apr. 19, 2012) (order approved disclosure statement as containing adequate information); *In re Greenwood Point, LP*, No. 10-569, Dkt. 116 (Bankr. S.D. Ind. Oct. 15, 2010) (same); *In re Critical Access Health Services Corp.*, 09-92085, Dkt. 399 (Bankr. S.D. Ind. Dec. 22, 2009); *In re Kmart Corp.*, 310 B.R. 107, 120 (Bankr. N.D. Ill. 2004) (recognizing that disclosure statement was adequate). As one court has noted, "Congress purposely left vague the standard for judging what constitutes adequate information to allow the Court to make a case-by-case determination." *In re Ashley River Consulting, LLC*, No. 14-13046, 2015 WL 6848113, at *7 (Bankr. S.D.N.Y. Nov. 6, 2015) (unpub.). A debtor need not include all potentially relevant information in a disclosure statement, as burdening a disclosure statement with "overly technical and extremely numerous additions . . serve[s] only to diminish the understanding of a typical creditor." *Id.*

13.     Here, the Disclosure Statement contains ample information regarding the Plan. It describes the events leading to the bankruptcy case and the major events in the bankruptcy case, provides a narrative summarizing the Plan, identifies the Classes of Claims and estimated recoveries, describes the Debtor's non-monetary commitments embodied in the Plan, and appends a liquidation analysis and cash flow projections. Accordingly, the Debtor respectfully submits that the Disclosure Statement more than satisfies the requirements of Section 1125 of the Bankruptcy Code and should be approved.

Humphrey Appellant Appendix 157

## II. The Solicitation And Voting Procedures Should Be Approved.

### A. The Voting Deadline Should Be Approved.

14.     Bankruptcy Rule 3017(c) provides that prior to approving the disclosure statement, the Court must fix a time within which the holders of claims may accept or reject the plan, and may also fix a date for the hearing on confirmation of the plan. Fed. R. Bankr. P. 3017(c). The Debtor requests the Court establish a date that is not less than twenty-eight (28) days from the deadline for the Debtor to distribute solicitation and other voting materials to holders of Claims in Voting Classes (the "**Solicitation Deadline**") as the deadline (the "**Voting Deadline**") by which Ballots (defined below) must be received by Omni Agent Solutions, Inc. (the "**Balloting Agent**"). The Debtor further requests that the Court require that all holders of Claims entitled to vote to accept or reject the Plan complete, execute, and return their Ballots so that they are **actually received** by the Balloting Agent on or before the Voting Deadline.

### B. Approval Of Form Of Ballots.

15.     In accordance with Bankruptcy Rule 3018(c) and Local Rule 3018-1(b), the Debtor seeks approval of customized ballots (the "**Ballots**"). Although based on Official Form No. 314, the Ballots have been modified to: (a) with respect to the holders of Class 6 Abuse Claims, request that Class 6 Claimants voting in favor of the Plan select the "Settlement Election" or the "Litigation Election"; (b) with respect to the holder of the FCR Claim, to clarify that Class 10's vote will only be considered if there is a Settlement Election; and (c) include certain additional information that is relevant and appropriate for holders of Claims within the Voting Classes.

16.     Local Rule 3018-1(b) allows the use of customized ballots so long as they are approved by the Court. The proposed form of Ballots should be approved because they are tailored to the specific needs and circumstances of this chapter 11 case. For example, the Ballots provide

6

helpful voting instructions for claimants, and the Debtor's Balloting Agent will customize each Ballot to include the name and address of the Claimant entitled to vote each Ballot, as well as the amount of their Claim (although holders of Claims in Classes 6, 7, 8, 9, and 10 will be allocated $1.00 solely for voting purposes, as described below).

17.    The Debtor therefore requests that the Court approve the proposed form of Ballots. The proposed Ballots are attached as Exhibits to the proposed Disclosure Statement Order as follows:

   a.  <u>Class 5 Ballot</u>: the ballot for the holders of Class 5 General Unsecured Claims is appended as **Exhibit 1** to the proposed Disclosure Statement Order;

   b.  <u>Class 6 Ballot</u>: the ballot for the holders of Class 6 Abuse Claims is appended as **Exhibit 2** to the proposed Disclosure Statement Order;

   c.  <u>Class 7 Ballot</u>: the Ballot for the holder of the Class 7 Personal Injury Claim is appended as **Exhibit 3** to the proposed Disclosure Statement Order;

   d.  <u>Class 8 Ballot</u>: the Ballot for the holder of the Class 8 USOPC Claim is appended as **Exhibit 4** to the proposed Disclosure Statement Order;

   e.  <u>Class 9 Ballot</u>: the Ballot for the holders of Class 9 Indemnification Claims is appended as **Exhibit 5** to the proposed Disclosure Statement Order; and

   f.  <u>Class 10 Ballot</u>: the Ballot for the holder of the Class 10 FCR Claim is appended as **Exhibit 6** to the proposed Disclosure Statement Order.

**C.**    **Approval Of Solicitation Packages.**

18.    Bankruptcy Rule 3017(d) sets forth the materials that must be provided to holders of claims entitled to vote to accept or reject a plan for the purposes of soliciting their votes to accept or reject such plan and providing adequate notice of the hearing to confirm such plan. These materials include: (a) the plan; (b) the approved disclosure statement; (c) a notice of time within which acceptances and rejections of such plan may be filed; and (d) any other information that the court may direct to certain holders of claims. Fed. R. Bankr. P. 3017(d).

7

19.     Consistent with Bankruptcy Rule 3017(d), on or prior to the Solicitation Deadline, the Debtor will cause to be distributed solicitation packages (each, a "**Solicitation Package**," and collectively, the "**Solicitation Packages**") by first-class U.S. mail to those holders of Claims in the Voting Classes, or by e-mail if the Debtor does not have a mailing address for the holder of a Claim, consisting of the following:

     a.  the form of letter (the "**Cover Letter**") explaining the solicitation process and urging holders of Claims to vote to accept the Plan, and holders of Abuse Claims to select the Settlement Election, substantially in the form attached to the proposed Disclosure Statement Order as **Exhibit 7**;

     b.  the proposed Disclosure Statement Order (excluding exhibits thereto);

     c.  the notice of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing Notice**"), substantially in the form attached to the proposed Disclosure Statement Order as **Exhibit 8**;

     d.  an appropriate form of Ballot;

     e.  the Disclosure Statement (and exhibits thereto, including the Plan); and

     f.  such other materials as the Court may direct.

20.     Additionally, the Debtor will provide: (a) Solicitation Packages (excluding the Ballots and the Cover Letter) to the U.S. Trustee, the Survivors' Committee, the Indiana Attorney General, and all parties who have filed requests for notices under Bankruptcy 2002 as of the date the proposed Disclosure Statement Order is entered by the Court; and (b) the Confirmation Hearing Notice to all known holders of Claims.

21.     The Debtor submits that the materials contained in the Solicitation Packages provide holders of Claims entitled to vote to accept or reject the Plan with the information they need to be able to make informed decisions with respect to how to vote. The requested procedures afford holders of Claims entitled to vote to accept or reject the Plan at least 28 days within which to review and analyze such materials and subsequently make an informed decision, prior to the

8

Voting Deadline, on whether to vote to accept or reject the Plan. These procedures are consistent with the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

### D. Notices To Non-Voting Classes.

22.     The holders of Claims in the Non-Voting Classes are not entitled to vote to accept or reject the plan because, in the case of Classes 1-4, they are not impaired, and in the case of Class 11, they will receive nothing under the plan. *See* 11 U.S.C. § 1126(f). Accordingly, the Debtor proposes to send holders of Claims in the Non-Voting Classes a notice of non-voting status (the "**Notice Of Non-Voting Status**"), in substantially the form attached to the proposed Disclosure Statement Order as **Exhibit 9**. The Notice of Non-Voting Status will include, among other things: (a) instructions as to how to view or obtain copies of the Disclosure Statement (including the Plan and other exhibits thereto) and the proposed Disclosure Statement Order; (b) notice of the Plan Objection Deadline (defined below); and (c) notice of the Confirmation Hearing (defined below), and information related to plan confirmation generally.

23.     The Debtor submits that the mailing of the Notice Of Non-Voting Status in lieu of Solicitation Packages satisfies the requirements of Bankruptcy Rule 3017(d). Thus, unless the Court orders otherwise, the Debtor will distribute the Notice Of Non-Voting Status to holders of Claims in the Non-Voting Classes instead of Solicitation Packages.

### E. The Solicitation And Voting Procedures Should Be Approved.

24.     The Debtor respectfully requests that the Court approve the solicitation and voting procedures incorporated into the proposed Disclosure Statement Order (the "**Solicitation and Voting Procedures**") and described herein, which are consistent with section 1126 of the Bankruptcy Code, Bankruptcy Rule 3018(a), and this Court's Local Rules. The Debtor proposes

9

the Solicitation and Voting Procedures solely for the purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, any Claims, and without prejudice to the rights of the Debtor in any other context.

25. The Debtor requests that this Court exercise its authority under Sections 105(a) and 502(c) of the Bankruptcy Code to approve the Solicitation and Voting Procedures. A brief summary of the treatment of the Claims in each of the Voting Classes for voting purposes is provided below:

    a. <u>Class 5: General Unsecured Claim</u>. Each holder of a Class 5 General Unsecured Claim that is liquidated, and each Class 5 General Unsecured Claim that is partially liquidated and partially unliquidated, and that has not been disallowed or objected to, shall be entitled to vote on account of such Claim in the liquidated amount. Each holder of a Class 6 General Unsecured Claim that is scheduled as contingent or unliquidated or disputed, or for $0.00, for which no proof of claim has been filed, shall not be entitled to vote on account of such Claim.

    b. <u>Class 6: Abuse Claims</u>. Each holder of a Class 6 Abuse Claim will be allowed to vote and allocated a Claim in the amount of $1.00 for voting purposes only. To be clear, this allocation is solely to facilitate the ability of holders of Class 6 Claims, which are unliquidated, to vote to accept or reject the Plan, and does not reflect any assessment of the value of such Class 6 Claims.

    c. <u>Class 7: Personal Injury Claim</u>. The holder of the Class 7 Personal Injury Claim will be allowed to vote and allocated a Claim in the amount of $1.00 for voting purposes only. To be clear, this allocation is solely to facilitate the ability of holder of the Class 7 Claim, which is unliquidated, to vote to accept or reject the Plan, and does not reflect any assessment of the value of the Class 7 Claim.

    d. <u>Class 8: USOPC Claim</u>. The holder of the Class 8 USOPC Claim will be allowed to vote and allocated a Claim in the amount of $1.00 for voting purposes only. To be clear, this allocation is solely to facilitate the ability of holder of the Class 8 Claim, which is unliquidated, to vote to accept or reject the Plan, and does not reflect any assessment of the value of the Class 8 Claim.

    e. <u>Class 9: Indemnification Claims</u>. Each holder of a Class 9 Indemnification Claim will be allowed to vote and allocated a Claim in the amount of $1.00 for voting purposes only. To be clear, this allocation is solely to facilitate the ability of holders of Class 9 Claims, which are unliquidated, to vote to accept or reject the Plan, and does not reflect any assessment of the value of such Class 9 Claims.

Humphrey Appellant Appendix 162

    f.   Class 10: FCR Claim. The holder of the Class 10 FCR Claim will be allowed to vote and allocated a Claim in the amount of $1.00 for voting purposes only. To be clear, this allocation is solely to facilitate the ability of holder of the Class 10 Claim, which is unliquidated, to vote to accept or reject the Plan, and does not reflect any assessment of the value of the Class 10 Claim. The vote of the Class 10 FCR Claim will only be counted if Class 6 votes to accept the Plan and selects the Settlement Election.

26.    Additional Solicitation and Voting Procedures are as follows:

    a.   Allowance of Claims for Voting Purposes:

        i.   If a Claim is deemed Allowed under the Plan, such Claim shall be Allowed for voting purposes in the deemed Allowed amount set forth in the Plan.

        ii.   If a Claim is partially liquidated and partially unliquidated, such Claim shall be allowed in the liquidated amount solely for purposes of voting on the Plan.

        iii.   The holders of Claims in Classes 6, 7, 8, 9, and 10 shall have their Claims temporarily allowed to vote and allocated a Claim in the amount of $1.00 for voting purposes only; *provided, however*, this allocation is made solely to facilitate the ability of holders of Claims in Classes 6, 7, 8, 9, and 10 to vote to accept or reject the Plan, because the Claims in such Classes are unliquidated, and does not reflect any assessment of the value of such Claims.

        iv.   Claims scheduled as contingent, unliquidated, or disputed, and for which no proof of claim has been filed, are disallowed for voting purposes.

        v.   Claims scheduled by the Debtor for $0.00, and for which no proof of claim has been filed, as well as proofs of claim filed for $0.00, are disallowed for voting purposes.

        vi.   If a Claim has been amended, the Claimant shall be entitled to vote on account of the subsequently filed amending Claim, and the Claimant shall not be entitled to vote on account of the previously filed amended Claim, regardless of whether the Debtor has objected to such amended Claim.

        vii.   Any entity who has filed or purchased duplicate Claims within the same Voting Class shall be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Voting Class, regardless of whether the Debtor has objected to such duplicate Claims.

        viii.   To the extent any entity holds or has filed more than one non-duplicative Claim in a particular Voting Class, such entity must vote all of its non-duplicative Claims in a particular Voting Class either to accept or reject the Plan, and may not split its vote within a particular Voting Class. For

11

the purposes of the numerosity requirement of Section 1126(c) of the Bankruptcy Code, separate Claims held by a single entity in a particular Class shall be aggregated as if such entity held one Claim against the Debtor in such Class, and the vote on account of such Claims shall be treated as a single vote to accept or reject the Plan.

ix. If any Ballot is validly executed and submitted to the Balloting Agent on or before the Voting Deadline but does not indicate either acceptance or rejection of the Plan, such Ballot will be counted as an acceptance of the Plan.

x. Any validly executed and timely Ballot that indicates both acceptance and rejection of the Plan shall be counted as an acceptance of the Plan.

xi. If the Debtor's Balloting Agent receives more than one Ballot on the same day and on account of the same Claim, and each Ballot is voted inconsistently, such Ballots will constitute an acceptance of the Plan.

b. <u>Challenges To Allowance Of Claims For Voting Purposes</u>. If any entity seeks to challenge the disallowance of their Claim for voting purposes, or the amount in which their Claim is Allowed for voting purposes, such entity shall file with the Court and serve upon the Debtor, the Survivors' Committee, and the U.S. Trustee a motion for an order pursuant to Bankruptcy Rule 3018(a) (a "**Rule 3018(a) Motion**") temporarily allowing such Claim in a requested amount for purposes of voting to accept or reject the Plan on or before the date that is at least three (3) business days prior to the Voting Deadline. As to any entity filing a Rule 3018(a) Motion, such entity's Ballot shall not be counted unless temporarily allowed by the Court for voting purposes, after notice and a hearing, which hearing may be held contemporaneously with the Confirmation Hearing.

c. <u>Ballots Not Counted</u>. The following Ballots shall not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

i. Any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim.

ii. Any Ballot sent to the Debtor, the Debtor's agents or representatives (other than the Balloting Agent), or the Bankruptcy Court.

iii. Any Ballot transmitted to the Balloting Agent by facsimile or other means not specifically approved herein.

iv. Any Ballot that does not contain an original signature.

v. Any Ballot cast by an entity that (1) does not hold a Claim in a Voting Class or (2) is not otherwise entitled to vote pursuant to the procedures described herein

d. <u>Rejected Ballots</u>. Except as otherwise provided herein and subject to any contrary order of the Court, the Debtor shall be entitled to reject as invalid, and exclude from counting for voting purposes, any Ballot that is not timely submitted on or prior to the Voting Deadline. Furthermore, expressly reserved

12

are the Debtor's rights to reject any and all Ballots that are not in proper form, the acceptance of which, in the opinion of the Debtor, would not be in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the proposed Disclosure Statement Order.

e. <u>Multiple Ballots</u>. If multiple Ballots are received from the same holder of a Claim with respect to the same Claim prior to the Voting Deadline, the last validly executed Ballot timely received shall count for voting purposes, subject to contrary order of the Court.

f. <u>No Vote-Splitting</u>. Any Ballot that partially rejects and partially accepts the Plan will not be counted.

g. <u>Defective Ballots</u>: The Debtor, subject to contrary order of the Court, may waive any defects or irregularities as to any particular Ballot at any time, either before or after the Voting Deadline; *provided, however*, that (1) any such waivers shall be documented in the voting report required by Local Rule 3018-1(c) (the "**Voting Report**"); (2) neither the Debtor, nor any other entity, will be under any duty to provide notification of such defects or irregularities other than as provided in the Voting Report, nor will any such party incur any liability for failure to provide such notification; and (3) unless waived by the Debtor, subject to contrary order of the Court, any defects or irregularities associated with the delivery of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted.

h. <u>Returned Solicitation Packages And Notices</u>. If any Solicitation Packages, Disclosure Statement Hearing Notices, Confirmation Hearing Notices, or other mailings contemplated by the proposed Disclosure Statement Order are returned as undeliverable by the United States Postal Service or other carrier, or by e-mail, the Debtor shall not be required to re-send such mailings to the applicable entity, and the Debtor's notice obligations under the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the proposed Disclosure Statement Order with respect to each such mailing shall be deemed satisfied. The Debtor shall only be required to re-send any Solicitation Package, notice, or other mailing if the entity whose service was returned as undeliverable provides the Debtor's Balloting Agent with an accurate mailing address not less than ten (10) calendar days prior to the Solicitation Deadline. For the avoidance of doubt, if any entity has changed its mailing address during this chapter 11 case, the burden rests exclusively upon such entity to advise the Balloting Agent of its new address.

i. <u>Non-Substantive Or Immaterial Modification</u>: The Debtor shall be permitted to make non-substantive or immaterial changes to the Disclosure Statement, Plan, Ballots, Disclosure Statement Hearing Notice, Confirmation Hearing Notice, Cover Letter, Notice Of Non-Voting Status, and any other related documents approved by the proposed Disclosure Statement Order without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the Disclosure

13

Statement, the Plan, and any other materials in the Solicitation Packages prior to their distribution.

27.     The Debtor believes that the Solicitation and Voting Procedures and other relief as requested herein are appropriate and in compliance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules. Good cause exists for the approval of the Solicitation and Voting Procedures, as these Solicitation and Voting Procedures will maximize efficiencies in the solicitation and voting processes and minimize costs to the Debtor's estate. The Debtor therefore requests that the Court approve the Solicitation and Voting Procedures.

**F.     Establishing Confirmation Hearing Date, Notice, And Objection Procedures.**

28.     In accordance with Bankruptcy Rule 3017(c) and Section 1128 of the Bankruptcy Code, the Debtor requests that the Court establish June 3-4, 2020, beginning at 10:00 a.m. (prevailing Eastern time) each day, as the dates for the hearing at which the Court will consider confirmation of the Plan (the "**Confirmation Hearing**"). The Debtor requests that any order setting the Confirmation Hearing provide that the hearing may be continued from time to time by the Debtor or by the Court without further notice to parties in interest other than by announcing such adjournment in open court and/or a notice of adjournment filed by the Debtor and posted on the Debtor's restructuring website at https://omniagentsolutions.com/usagymnastics.

29.     Bankruptcy Rules 2002(b), 2002(d), and 3018(a) require not less than twenty-eight (28) days' notice to all creditors of the time fixed for filing objections and the hearing to consider confirmation of a chapter 11 plan. To satisfy this requirement, the Debtor will serve a notice of the Confirmation Hearing (the "**Confirmation Hearing Notice**") on all known holders of Claims and the parties entitled to notice in the Debtor's case (regardless of whether such parties are entitled to vote to accept or reject the Plan) by the Solicitation Deadline, which will provide all

Humphrey Appellant Appendix 166

parties in interest adequate notice of the Plan Objection Deadline (defined below) and of the Confirmation Hearing. The Debtor will also post the Confirmation Hearing Notice on its website.

30.     The Confirmation Hearing Notice will include, without limitation: (a) instructions as to how to view or obtain copies of the Disclosure Statement (including the Plan and the other exhibits thereto), the proposed Disclosure Statement Order, and all other materials in the Solicitation Packages from the Debtor's restructuring website, the Balloting Agent, and the Court's website via PACER; (b) notice of the Voting Deadline; (c) notice of the date by which the Debtor will file the Plan Supplement, if any; (d) notice of the Plan Objection Deadline; and (e) notice of the Confirmation Hearing and information related thereto.

31.     Pursuant to Bankruptcy Rule 3020(b)(1), objections to confirmation of a plan must be filed and served "within a time fixed by the court." Fed. R. Bank. P. 3020(b)(1). The Debtor requests that the Court establish May 15, 2020 as the deadline by which objections to the Plan must be filed with the Court and served so as to be **actually received** by the Debtor (the "**Plan Objection Deadline**"). The Confirmation Hearing Notice provides, and the Debtor requests that the Court direct that, objections to confirmation of the Plan or proposed modifications to the Plan, if any, must (a) be in writing, (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court, (c) state the name and address of the objecting party and the amount and nature of the Claim of such party, (d) state with particularity the basis and nature of any objection to the Plan and, if practicable, provide a proposed modification or additional suggested language to amend the Plan in a manner that would resolve such objection, and (e) be filed, contemporaneously with a proof of service, with the Court on or before the Plan Objection Deadline. The Debtor further requests leave to file a consolidated response to any Plan objections.

15

32.     The proposed timing for filing and service of objections and proposed modifications, if any, will afford the Court, the Debtor, and other parties in interest sufficient time to consider the objections and proposed modifications prior to the Confirmation Hearing.

33.     The Debtor submits that good cause exists to approve the various deadlines and procedures described above in connection with the Court's consideration of the Debtor's Disclosure Statement and confirmation of the Debtor's Plan.[3] Accordingly, the Debtor requests that the Court enter the proposed Disclosure Statement Order.

## NOTICE

34.     The Debtor will provide notice of this Motion in accordance with the *Order Granting Debtor's Motion For Order Establishing Certain Notice, Case Management, And Administrative Procedures* [Dkt. 213].

35.     In addition, upon filing this Motion, the Debtor will serve all known creditors and all other parties entitled to notice pursuant to Bankruptcy Rule 2002 with a copy of this Motion and the Disclosure Statement Hearing Notice, which as set forth above includes, without limitation: (a) the date, time, and place of the Disclosure Statement Hearing; (b) the manner in which a copy of the Disclosure Statement (and exhibits thereto, including the Plan) can be obtained; and (c) the deadline and procedures for filing objections to the approval of the Disclosure Statement. Further, in accordance with Bankruptcy Rule 3017(a), the Debtor shall provide copies of the Plan and the Disclosure Statement to the U.S. Trustee, the Survivors' Committee, the Indiana Attorney General, and any other party in interest who requests such copies in writing.

---

[3] Although Bankruptcy Rule 3017(a) contemplates notice to the Securities and Exchange Commission as well, the Debtor submits that such notice is unnecessary under the particular facts and circumstances of this chapter 11 case. The Debtor is a non-profit organization with no reporting obligations to the Securities and Exchange Commission.

16

36.    In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

WHEREFORE, the Debtor respectfully requests that the Court enter the order substantially in the form annexed hereto as <u>Exhibit A</u>, granting the relief requested herein and such further relief as is just and proper.

Dated: February 21, 2020                              Respectfully submitted,


**JENNER & BLOCK LLP**

By: <u>/s/ *Catherine Steege*</u>

Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root (#24230-49)
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com

*Counsel for the Debtor*

Humphrey Appellant Appendix 169

THIS DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THE DEBTOR RESERVES THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR TO THE HEARING TO APPROVE THIS DISCLOSURE STATEMENT.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

|  |  |
|---|---|
| In re:<br><br>USA GYMNASTICS,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 18-09108-RLM-11 |

## DISCLOSURE STATEMENT FOR FIRST AMENDED
## CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY USA GYMNASTICS

JENNER & BLOCK LLP
Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com

*Counsel for the Debtor*

Dated: February 21, 2020

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

| SUBCLASS[2] | SUBCLASS MEMBERS | TOTAL ALLOCATION (%) | TOTAL ALLOCATION ($)[3] | PRO RATA ALLOCATION |
|---|---|---|---|---|
| 6A (Elite Gymnasts) | 66 | 40% | $82,550,000.00 | $1,250,757.58 |
| 6B (Non-Elite Gymnasts) | 142 | 35% | $72,231,250.00 | $508,670.77 |
| 6C (Other Claimants) | 284 | 24% | $49,530,000.00 | $174,401.41 |
| 6D (Derivative Claimants) | 25 | 1% | $2,063,750.00 | $82,550.00 |

Each Claimant in a designated subclass will receive their Pro Rata allocation without the need to present evidence as to the merits of their claim or the amount of damages suffered.

In exchange for payment of their Pro Rata allocation, Abuse Claimants shall agree to a full and complete release of the Debtor, its Estate, the Reorganized Debtor, the Settling Insurers (identified below), the Participating Parties (identified below), and all known or unknown parties who may claim coverage under any insurance policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons (identified below).

The Settling Insurers include the following CGL Settling Insurers, who sold the Debtor's CGL Insurance Policies, all of which also provide coverage to the United States Olympic & Paralympic Committee (the "**USOPC**") as an additional or named insured:

- ACE American Insurance Company;
- Chubb Indemnity Company, also known as Ace American Insurance Company;
- CIGNA Insurance Company, now known as Ace American Insurance Company;
- Great American Assurance Company;
- National Casualty Company Transamerica Insurance Company;
- National Union Fire Insurance Company of Pittsburgh, also known as American International Group, Inc.;
- TIG Insurance Company; and,
- Virginia Surety Company, Inc., formerly known as Combined Specialty Insurance Company.

The Settling Insurers also include the Twistars Settling Insurers:

- Lexington Insurance Company;
- Nationwide Mutual Insurance Company;

---

[2] 553 Abuse Claims were filed. 33 of those Abuse Claims are duplicative, 1 Abuse Claim has been disallowed, 1 Abuse Claim is subject to a pending objection, and 1 Abuse Claim has been withdrawn. The Trust Agreement provides that those 36 claims will receive nothing from the Trust. Seven Abuse Claims are late Claims. The Trust Agreement gives the Trustee the discretion to treat late-filed Abuse Claims as timely filed or as disallowed. This chart assumes that the Trustee will treat late-filed Abuse Claims as timely filed.

[3] The Trust Agreement provides that the Trustee's fees and expenses incurred in the administration of the Trust will be paid from Trust Assets. The amounts set forth for the Total Allocation and Pro Rata Allocation are stated in gross amounts and do not reflect those anticipated fees and expenses.

**Special Considerations If Your Claim Was Filed After The Bar Date**. For those seven Claimants who filed their Abuse Claims after the Bar Date, the Settlement Election is the only option that allows you to recover. Under the Litigation Election, untimely Abuse Claims receive no recovery and may not commence or continue lawsuits to recover under the Debtor's CGL Insurance Policies. Under the Settlement Election, untimely Abuse Claims will be treated the same as timely Abuse Claims without any requirement that the Claimant seek Bankruptcy Court approval for such treatment.

**Preservation of the Twistars Contribution**. Lawyers for certain of the Holders of the Abuse Claims negotiated a settlement with Twistars and the Twistars Settling Insurers for the limits of Twistars' insurance coverage. That settlement was expressly conditioned upon the settlement being implemented through a plan of reorganization that provides for channeling injunctions and other releases for Twistars and the Twistars Settling Insurers. Implementation of the Twistars settlement is only possible if Abuse Claimants select the Settlement Election. If Abuse Claimants select the Litigation Election or vote no on the Plan and the Court confirms the Plan resulting in the Litigation Election, the Twistars settlement will not be implemented. Twistars will proceed with a motion to dismiss that was set for argument at the time of settlement was reached and Abuse Claimants risk the court granting that motion to dismiss. If the Twistars motion to dismiss is granted, it will likely have a negative impact on the Abuse Claims against the Debtor and other parties.

In sum, if Abuse Claimants want certain compensation without years of litigation, they should vote to accept the Plan and select the Settlement Election.

### d. The Settlement Election Would Not Be Possible Without The Releases And Injunctions, Including A Release Of The USOPC.

The Settling Insurers conditioned their $217,125,000.00 contribution on certain releases and plan injunctions for the Settling Insurers, Participating Parties, and other individuals. The Debtor and its counsel did not accept the Settling Insurers' demand for releases and injunctions blindly. The Debtor and its counsel evaluated potential reasonably available alternatives and determined that none exist. The only way that the Settlement Election occurs is if the parties contributing to the Trust receive this release. The Debtor believes that Abuse Claimants will be better off receiving a timely distribution from the Trust in exchange for this release, as opposed to rejecting the release and proceeding with highly uncertain litigation.

The USOPC is a beneficiary of the Settlement Election's release and its injunctions. This treatment is required because the USOPC is an additional or named insured under the CGL Insurance Policies. The USOPC has rights to payment under those policies that are independent of any of the Debtor's rights. The CGL Settling Insurers have conditioned the payment of their settlement contributions upon the USOPC giving up its rights under the policies. The only way the USOPC will agree to that result is if it is protected by the releases and injunctions described above.

The Debtor cannot unilaterally strip the USOPC of its rights to proceeds of the CGL Insurance Policies. Courts have consistently held that the rights of additional insureds, like the USOPC, are not a debtor's property that it can sell or otherwise extinguish without that third party's consent. For example, one court within this Circuit determined that an additional insured

## B.     Trust.

### 1.     Establishment Of The Trust.

On the Effective Date, the Trust shall be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq. The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

### 2.     Trust Funding.

On or before the Effective Date, each CGL Settling Insurer shall make its portion of the Plan Payment to the Trust by wire transfer. Five (5%) percent of the Plan Payment shall be used to create a Future Claimant Reserve for the benefit of any Future Claimants. On or before the Effective Date, each Twistars Settling Insurer shall make its portion of the Twistars Contribution to the Trust by wire transfer. Each Participating Party shall be deemed to have released any and all Claims such Participating Party may have against the Debtor, the Estates, or the Reorganized Debtor and its Insurance Policies.

### 3.     Appointment Of The Trustee.

The initial Trustee will be identified in a supplement to the Plan to be filed by the Debtor at least 14 days prior to the Confirmation Hearing. The Trustee shall commence serving as the Trustee on the Confirmation Date. However, the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from an earlier date, as authorized by the Debtor, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

### 4.     Tax Matters.

The Trust shall not be deemed to be the same legal entity as the Debtor, but only the assignee of certain Assets of the Debtor and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code, the regulations promulgated thereunder, and applicable state law, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

### 5.     Cooperation By The Debtor And Reorganized Debtor.

The Debtor, the Estate, the Reorganized Debtor, and their counsel shall reasonably cooperate with the Trustee as requested in connection with the Trustee's administration of the Trust.

Humphrey Appellant Appendix 172

6. **Objections To Channeled Claims.**

No Person other than the Trustee has the right to object to the Channeled Claims, and any such objection will be prosecuted and resolved in accordance with the terms of the Trust Documents.

7. **Trust Indemnification Obligations.**

From and after the Effective Date, the Trust shall defend, indemnify, and hold harmless the Protected Parties with respect to any and all Channeled Claims, Medicare Claims, and Claims against the Debtor, the Estate, the Reorganized Debtor, a Participating Party, or a Settling Insurer Policy relating to an Abuse Claim, including: all Claims made by (a) any Person claiming to be insured (as a named insured, additional insured, or otherwise) under any Settling Insurer Policy; (b) any Person who has made, will make, or can make (but for the Plan) an Abuse Claim or a Claim against the Debtor, the Estate, the Reorganized Debtor, a Participating Party, or a Settling Insurer; (c) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any Settling Insurer Policy relating to Sexual Abuse or other abuse. The Protected Parties shall have the right to defend any Claims identified in this Section and shall do so in good faith. The Protected Parties may undertake the defense of any Claim on receipt of such Claim. The Protected Parties shall notify the Trust as soon as practicable of any Claims identified in this Section and of their choice of counsel. The Protected Parties' defense of any Claims shall have no effect on the obligations of the Trust, as applicable, to indemnify any such party for such Claims, as set forth in this Section. The Trust shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by the Protected Parties in defending such Claims. In defense of any such Claims, the Protected Parties may settle or otherwise resolve a Claim consistent with the terms of the Plan and with the prior consent of the indemnifying party, which consent shall not be unreasonably withheld.

C. **Liquidation And Payment Of Channeled Claims.**

1. **Resolution And Payment Of Channeled Claims.**

The Trust shall pay Abuse Claims in accordance with the Plan, the Confirmation Order, and the Trust Documents. The FCR Claim shall be paid from the Future Claimant Reserve and not from any other Trust Assets. The USOPC Claim and the Indemnification Claims shall be satisfied by granting the USOPC Claim and the Indemnification Claims the benefit of the Channeling Injunction and by deeming any Abuse Claim against the USOPC or a Holder of an Indemnification Claim to be a Channeled Claim.

2. **Conditions To Payment Of Abuse Claims And FCR Claims.**

As a pre-condition to receiving any payment from the Trust, each Abuse Claimant or Future Claimant shall execute and deliver to the Trust a full and complete release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties, and all known or unknown parties who may claim coverage under any Insurance Policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons, in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers, of any and all Claims arising from or relating to Abuse Claims or Future Claims. In addition, within

47

ten (10) days after receiving any payment from the Trust, an Abuse Claimant or Future Claimant shall dismiss with prejudice any lawsuit that such Abuse Claimant or Future Claimant had brought against the Debtor, any Participating Party, and any Non-Debtor CGL Settling Insurer Covered Person.

### 3. Effect Of No Award On Channeled Claims.

If a Channeled Claim, including an Abuse Claim filed after the Bar Date, is denied payment from the Trust, the Holder of such Channeled Claim will have no further rights against the Debtor, the Estate, the Reorganized Debtor, the Trust, the Trustee, any Participating Party, or any Settling Insurer, and any of their respective assets or property, including any Revested Assets, relating to such Channeled Claim.

### 4. Treatment Of Attorneys' Fees And Costs Of Channeled Claimants.

The fees and expenses of attorneys representing Channeled Claimants who receive payment from the Trust will be borne by such Channeled Claimants based on applicable state law and individual arrangements made between such Channeled Claimants and their respective attorneys. The Debtor, the Estate, the Reorganized Debtor, the Released Parties, the Settling Insurers, the Non-Debtor CGL Settling Insurer Covered Persons, the Trust, and the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Channeled Claimants, and all Claims for such fees and expenses, if any, will be disallowed.

### 5. Withdrawal Of Channeled Claims.

A Channeled Claimant may withdraw a Channeled Claim at any time on written notice to the Trustee. If withdrawn, (a) the Channeled Claim will be withdrawn with prejudice and may not be reasserted, and (b) as a condition to withdrawal of the Channeled Claim, any funds paid to the Channeled Claimant by the Trust shall be returned to the Trust.

### 6. Adding Participating Parties.

After the Effective Date, upon the consent of the Trustee, any Person may become a Participating Party if the Bankruptcy Court, after notice and hearing, approves an agreement between such Person and the Trustee (a "**Participating Party Agreement**"). After the Effective Date, the Trustee shall have the exclusive authority to seek approval of such a Participating Party Agreement. Upon the Bankruptcy Court's entry of a Final Order approving such an Agreement, Exhibit B to the Plan will be amended by the Trustee to include such Person. Any Person becoming a Participating Party shall have all of the rights, remedies, and obligations of a Participating Party notwithstanding that such Person originally may have been excluded as a Participating Party under any provision of the Plan, including, without limitation, the terms and conditions of the Channeling Injunction.

### 7. Adding Settling Insurers.

After the Effective Date, upon the consent of the Trustee and the Reorganized Debtor, a Person may become a Settling Insurer if the Bankruptcy Court, after notice and hearing, approves an agreement between such Person and the Trustee. After the Effective Date a Person may become

Humphrey Appellant Appendix 174

a Settling Insurer with the consent of the Trustee and the Reorganized Debtor and upon approval of the Bankruptcy Court. If the addition of such Person is approved pursuant to a Final Order, Exhibit C to the Plan will be deemed amended to include such Person. Any Person becoming a Settling Insurer shall have all of the rights, remedies, and duties of a Settling Insurer notwithstanding that such Person originally may have been excluded as a Settling Insurer under any provision of the Plan. Such rights, remedies, and duties shall include, without limitation, the terms and conditions of the Channeling Injunction.

### 8. Future Claimant Process.

A Future Claimant must file a Claim with the Trustee on or before the fifth (5th) anniversary of the Effective Date. The Claim will be entitled to a Distribution from the Future Claimant Reserve, provided funds remain in such Future Claimant Reserve, only if the Trustee, in consultation with the FCR, determines that the Holder of such Claim has proven by a preponderance of the evidence that such Holder meets the definition of a Future Claimant and such Holder's Claim meets the definition of a Sexual Abuse Claim. Except as provided in the Plan, Future Claimants will have no right to payment or any other right under the Plan or against the Debtor, the Estate, or the Reorganized Debtor, or any of their respective property including any Revested Assets, or against the Settling Insurers, or the Participating Parties. Following the fifth (5th) anniversary of the Effective Date, any funds held in the Future Claimant Reserve shall be released to the Trustee to, at the Trustee's discretion, (a) administer to Holders of Abuse Claims consistent with the Trust Documents and the terms of the Plan; or (b) distribute to a charitable entity mutually agreed upon by the Trustee and the Reorganized Debtor; provided, however, that any such funds shall not revert to the Debtor, the Estate, the Reorganized Debtor, the National Gymnastics Foundation, or the USOPC.

## D. CHANNELING INJUNCTION

### 1. EFFECTIVE DATE INJUNCTIONS.

THE INJUNCTIONS PROVIDED FOR IN THE PLAN SHALL BE DEEMED ISSUED, ENTERED, VALID, AND ENFORCEABLE ACCORDING TO THEIR TERMS. THE INJUNCTIONS SHALL BE PERMANENT AND IRREVOCABLE AND MAY ONLY BE MODIFIED BY THE BANKRUPTCY COURT.

### 2. CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS.

IN CONSIDERATION OF THE UNDERTAKINGS OF THE PARTICIPATING PARTIES AND SETTLING INSURERS PURSUANT TO THE TERMS OF THE PLAN, INCLUDING THE FUNDING OF THE TRUST, AND TO FURTHER PRESERVE AND PROMOTE THE SETTLEMENTS EMBEDDED IN THE PLAN BETWEEN AND AMONG THE PARTICIPATING PARTIES, THE SETTLING INSURERS, AND THE DEBTOR, AND PURSUANT TO SECTIONS 105, 363, AND 1129 OF THE BANKRUPTCY CODE:

(A)     ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE

Humphrey Appellant Appendix 175

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

In re:

USA GYMNASTICS,[1]

                      Debtor.

Chapter 11

Case No. 18-09108-RLM-11

---

## FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
## PROPOSED BY USA GYMNASTICS

---

JENNER & BLOCK LLP
Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root #24230-49
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com

*Counsel for the Debtor*


Dated: February 21, 2020

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

1.1.40. **"Final Decree"** means the decree contemplated under Bankruptcy Rule 3022.

1.1.41. **"Final Order"** means an order, judgment, or other decree (including any modification or amendment thereof) of the Bankruptcy Court, the District Court, or any other court having jurisdiction that remains in effect and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired or, if such appeal or review has been taken, it has been resolved and no longer remains pending.

1.1.42. **"Future Claim"** means a Claim by a Future Claimant.

1.1.43. **"Future Claimant"** means a Person who (a) held a Sexual Abuse Claim against the Debtor as of the Bar Date; and (b) meets one of the following criteria: (i) was under the age of majority under applicable state law as of March 1, 2019; (ii) as of March 1, 2019, the statute of limitations for such Person was tolled under applicable state law or had not begun to run under applicable state law; (iii) as of March 1, 2019, the Debtor was estopped under applicable state law from asserting the statute of limitations; or (iv) such Person's Sexual Abuse Claim was barred by the applicable statute of limitations as of March 1, 2019, but is or becomes no longer barred by the applicable statute of limitations for any reason, including the enactment of legislation that revives such claims; *provided, however*, that the following persons are not Future Claimants: any Person who has, at any time before the Bar Date, asserted a claim against, asserted a cause of action against, provided notice to, or made a demand to or against the Debtor, arising out of or relating to Sexual Abuse or whose parent or guardian or other legal representative had done so on behalf of such Person.

1.1.44. **"FCR"** means Fred Caruso, appointed pursuant to the Order Authorizing Appointment of Future Claimants' Representative and Appointing Fred C. Caruso as Future Claimants' Representative [Dkt. 516], entered by the Bankruptcy Court on May 17, 2019, and any successor or such other person appointed by the Bankruptcy Court or otherwise.

1.1.45. **"FCR Claim"** means the Claim of the FCR on behalf of Future Claimants.

1.1.46. **"FCR's Professionals"** means Development Specialists, Inc., FrankGecker LLP, and all other professionals, if any, which the FCR has retained or may retain to provide professional services in accordance with the Bankruptcy Code and as approved by the Bankruptcy Court.

1.1.47. **"General Unsecured Claim"** means any Claim against the Debtor that is not an Abuse Claim, Personal Injury Claim, USOPC Claim, the FCR Claim, Indemnification Claim, Administrative Claim, Priority Tax Claim, Other Priority Claim, or a Claim that is otherwise classified under the Plan.

1.1.48. **"General Unsecured Convenience Claim"** means any General Unsecured Claim in an amount of $500.00 or less, or voluntarily reduced to $500.00 by the Holder of such Claim. To the extent a Creditor filed multiple General Unsecured Claims, if those Claims in the aggregate exceed $500.00, none of those Claims will be treated as General Unsecured Convenience Claims, unless the Holder of those Claims voluntarily reduces their aggregate value to $500.00.

1.1.49. **"Holder"** means the legal or beneficial holder of any Claim or Interest.

Humphrey Appellant Appendix 177

**2.11   No Admissions.** The Plan makes no judgments about the validity of any Claims. Nothing contained in this Plan constitutes an admission or denial by any Person of liability for, or the validity, priority, amount, or extent of, any Claim, lien, or security interest asserted against the Debtor or against any third party.

**2.12   Computation of Time.** In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. If any act under the Plan is required to be performed on a date that is not a Business Day, then the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Enlargement of any period of time prescribed or allowed by the Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

**2.13   Merger.** The Plan supersedes all prior plans, drafts of the Plan, and all prior negotiations, agreements, and understandings with respect to the Plan, evidence of which shall not affect the interpretation of any provision of the Plan.

## ARTICLE III.  MEANS OF FUNDING THE PLAN

**3.1   Abuse Claims, Indemnification Claims, the USOPC Claim, and the FCR Claim.** The Debtor's Insurance Policies are the only Assets the Debtor has to provide a Distribution to Abuse Claimants and Future Claimants. Through this Plan, the Debtor is making its Insurance Policies and the proceeds thereof available to the Abuse Claimants and Future Claimants in one of two alternative ways.  To date, certain of the Debtor's CGL Insurers are willing to offer Two Hundred Fifteen Million Dollars ($215,000,000.00) (the "**Plan Payment**") to resolve the Abuse Claims and Future Claims.  The Debtor is offering the Holders of Abuse Claims and Future Claims the choice of accepting the Plan Payment and the Two Million One Hundred Twenty Five Thousand ($2,125,000.00) Twistars Contribution or continuing the prosecution of their Claims in a non-bankruptcy forum with recovery from the Debtor limited to the amounts available under the Debtor's CGL Insurance Policies and Other Insurance Policies (if any) that provide coverage for Abuse Claims. The treatment for Indemnification Claims, the USOPC Claim, the FCR Claim, and Abuse Claims filed after the Bar Date will depend on whether the Abuse Claimants, who will be classified in Class 6, make the Settlement Election or Litigation Election. If the Litigation Election is selected the Twistars Contribution shall not be a part of the Plan.

    **3.1.1.   Settlement Election.** If Class 6 makes the Settlement Election, the Plan provides for the creation of a Trust for the exclusive benefit of the Holders of Abuse Claims and the FCR Claim. The Trust will assume liability for all Channeled Claims, which shall include Abuse Claims, the USOPC Claim, Indemnification Claims, the FCR Claim, and any Claim against a Participating Party or Settling Insurer arising from, in connection with, or related in any way to a Channeled Claim. The Trust's assets will consist of contributions by the CGL Settling Insurers and the Participating Parties. Trust assets will be used to fund the Trust's costs and expenses and payments to the Holders of Abuse Claims and the FCR Claim. Distributions and reserves from the Trust to Holders of Abuse Claims and Future Claims will be determined by the Trust Documents. The creation of the Trust and payments into and out of the Trust to resolve Claims shall not be deemed an admission of liability by the Debtor. The Indemnification Claims and the USOPC Claim shall receive the benefit of the Channeling Injunction in complete satisfaction of their claims and will not receive any payment from the Trust or the Debtor or its Estate. For the avoidance of doubt, to

the extent of any conflict between the terms of this Plan and the Debtor's bylaws or any agreements between the Debtor and the Holder of the USOPC Claim or an Indemnification Claim, this Plan controls. The Participating Parties, the Non-Debtor CGL Settling Insurer Persons, and the Settling Insurers will receive the benefit of injunctions provided under the Plan. Nothing in this Plan, including Article XII, is intended to replace and does not affect, diminish, or impair the liabilities of any Non-Participating Co-Defendant under applicable non-bankruptcy law. The Settlement Election requires the release of USOPC because USOPC is an insured under the Debtor's CGL Insurance Policies and the CGL Settling Insurers have conditioned the payment of the Insurance Settlement Amount upon USOPC being part of any settlement.

    **3.1.2.  Litigation Election.** If Class 6 makes the Litigation Election, the Plan permits the Holders of Abuse Claims filed or deemed to be filed before the Bar Date to prosecute their Claims against the Reorganized Debtor in name only in the courts where such Claims were pending before the Petition Date or the courts in which such Claims could have been brought, but for the automatic stay imposed by Section 362 of the Bankruptcy Code, and to recover any judgments or awards exclusively from the Reorganized Debtor's CGL Insurance Policies (and Other Insurance Policies, if any, that provide coverage for Abuse Claims). For the avoidance of doubt, only the proceeds of the Reorganized Debtor's CGL Insurance Policies (and Other Insurance Policies, if any, that provide coverage for Abuse Claims) will be available to satisfy Abuse Claims. The Debtor is not admitting liability for any such Claims. Subject to Section 22.1(vi) of this Plan, Abuse Claims that are not filed or deemed filed by the Bar Date are disallowed and will receive nothing under the Plan. The USOPC Claim and Indemnification Claims will not receive a Distribution; *provided, however,* that to the extent that the USOPC or the Holder of an Indemnification Claim has a right to recovery under any of the Debtor's Insurance Policies, such rights are preserved and will not be impaired under the Plan. For the avoidance of doubt, to the extent of any conflict between the terms of this Plan and the Debtor's bylaws or any agreements between the Debtor and the USOPC or the Holder of an Indemnification Claim, this Plan controls.

**3.2    Claims Other Than Abuse Claims, Indemnification Claims, and the USOPC Claim.** General Unsecured Claims will be paid from existing and future revenues of the Reorganized Debtor over time in accordance with the Plan. The Plan permits the Personal Injury Claimant to settle her claim with the Personal Injury Insurer or prosecute a lawsuit against the Reorganized Debtor in name only in the court in which the Personal Injury Claim could have been brought, but for the automatic stay, and to recover any judgments or settlement awards exclusively from the Personal Injury Insurance Policy. For the avoidance of doubt, only the proceeds of the Personal Injury Insurance Policy are available to satisfy the Personal Injury Claim. The Debtor is not admitting liability for the Personal Injury Claim. The Allowed Other Priority Claims, the PNC Bank Claim, the Sharp Claim, and the General Unsecured Convenience Claims are unimpaired under the Plan.

**3.3    Discharge.** The Debtor will receive the benefit of a Section 1141(d) discharge.

**3.4    Applicability Of Plan Provisions.** Articles IX-XIII are only applicable if Class 6 makes the Settlement Election. Articles XIV-XV are only applicable if Class 6 makes the Litigation Election. All other Articles are applicable to both the Settlement Election and Litigation Election.

## ARTICLE IV. TREATMENT OF UNCLASSIFIED CLAIMS

**4.1 Administrative Claims.** Requests for allowance and payment of Administrative Claims must be filed and served no later than thirty (30) days after a notice of the Effective Date is filed with the Bankruptcy Court. Each Holder of an Allowed Administrative Claim against the Debtor shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, Cash equal to the Allowed amount of such Allowed Administrative Claim, either (a) on or as soon as practicable following the Effective Date, or, if later, the Allowance Date; or (b) upon such terms as may be agreed to in writing by the Administrative Claimant. Provided, however, that any Administrative Claim incurred post-petition by the Debtor in the ordinary course of its operations or arising pursuant to one or more post-petition agreements or transactions entered into by the Debtor with Bankruptcy Court approval, shall be paid or performed in accordance with the terms and conditions of the particular transaction(s) and any agreement(s) relating thereto, or as otherwise agreed by the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date), on the one hand, and the Holder of such Administrative Claim, on the other.

**4.2 Professional Claims.**

**4.2.1. Bar Dates for Professional Claims.** All Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of Sections 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 Case) shall file and serve in accordance with the Bankruptcy Court's case management order an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than the Professional Claims Bar Date.

**4.2.2. Objections to Professional Claims.** Objections to Professional Claims or Claims of other Persons for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtor and the Professionals or other Persons to whose application the objections are addressed on or before (a) twenty-one (21) days after the Professional Claims Bar Date; or (b) such later date as (i) the Bankruptcy Court shall order upon application made prior to the end of such 21-day period or (ii) is agreed between the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date), as applicable, and the affected Professional or other Person.

**4.3 U.S. Trustee Fees.** All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid in Cash as soon as practicable after the Effective Date. After the Effective Date, the Reorganized Debtor shall pay quarterly fees to the U.S. Trustee, in Cash, until the Chapter 11 Case is closed and a Final Decree is entered. In addition, the Reorganized Debtor shall file post-Confirmation Date reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and the Estate.

**4.4 Priority Tax Claims.** With respect to each Allowed Priority Tax Claim not paid prior to the Effective Date, the Reorganized Debtor shall (a) pay such Claim in Cash as soon as practicable

Humphrey Appellant Appendix 180

after the Effective Date; or (b) provide such other treatment agreed to by the Holder of such Allowed Priority Tax Claim and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

## ARTICLE V.  CLASSIFICATION OF CLAIMS

**5.1     Classification of Claims.** All Claims except Administrative Claims and Priority Tax Claims are placed in the following Classes for all purposes including voting, confirmation of the Plan, and Distributions pursuant to the Plan. A Claim is classified in a particular Class only to the extent the Claim qualifies within the description of that Class and is classified in a different Class to the extent the Claim qualifies within the description of that different Class. Except as otherwise provided under the Bankruptcy Code or applicable law, if a Claim (other than a Claim entitled to priority status under Section 507 of the Bankruptcy Code) is acquired or transferred, the Claim will be placed in the Class where it would have been placed if it were owned by the original Holder of such Claim. If a Claimant has more than one Claim in the same Class, such Claims will be aggregated and treated as a single Claim. If a Claimant has Claims in different Classes, such Claims will be aggregated only within the same Class and not between Classes.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|-------|-------------|------------|--------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | PNC Bank Claim | Unimpaired | Deemed to Accept |
| 3 | Sharp Claim | Unimpaired | Deemed to Accept |
| 4 | General Unsecured Convenience Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Abuse Claims | Impaired | Yes |
| 7 | Personal Injury Claim | Impaired | Yes |
| 8 | USOPC Claim | Impaired | Yes |
| 9 | Indemnification Claims | Impaired | Yes |
| 10 | FCR Claim *(only if there is a Settlement Election)* | Impaired | Yes |
| 11 | Sexual Abuse Claims filed after the Bar Date *(only if there is a Litigation Election)* | Impaired | No |

**5.2     Treatment in Complete Satisfaction.** The treatment in this Plan is in full and complete satisfaction of all of the legal, contractual, and equitable rights that each Holder of a Claim may have against the Debtor, the Estate, or its Assets. This treatment supersedes and replaces any agreements or rights those Holders have in or against the Debtor, the Estate, or its Assets. All Distributions under the Plan will be tendered to the Person holding the Claim.

Humphrey Appellant Appendix 181

# ARTICLE VI.  TREATMENT OF UNIMPAIRED CLASSES OF CLAIMS

**6.1**     **Class 1: Other Priority Claims.**

    **6.1.1.    Impairment and Voting.** Class 1 is unimpaired under the Plan. Holders of Class 1 Claims are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

    **6.1.2.    Treatment.** The Holders of Class 1 Claims will receive either (a) payment from the Reorganized Debtor of the full amount of their Allowed Claims in Cash, without interest on or as soon as practicable following the Effective Date or, if later, the Allowance Date; or (b) payment of their Allowed Claims upon such terms as may be agreed in writing by the Claimant and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

**6.2**     **Class 2: PNC Bank Claim.**

    **6.2.1.    Impairment and Voting.** Class 2 is unimpaired under the Plan. PNC Bank is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and is not entitled to vote on the Plan.

    **6.2.2.    Treatment.** The VISA Commercial Card Agreement dated as of May 7, 2010, as amended from time to time, between PNC Bank and the Debtor shall be reinstated and become the obligation of the Reorganized Debtor.  PNC Bank shall retain all of its rights and collateral pledged under the VISA Commercial Card Agreement.

**6.3**     **Class 3: Sharp Claim.**

    **6.3.1.    Impairment and Voting.** Class 3 is unimpaired under the Plan. Sharp is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and is not entitled to vote on the Plan.

    **6.3.2.    Treatment.** The Value Lease Agreement, Equipment Sales Agreement, and Customer Care Maintenance Agreement between Sharp Business Systems and the Debtor shall be deemed assumed and will become the obligation of the Reorganized Debtor. Sharp Business Systems shall retain all of its rights and collateral under the Value Lease Agreement, Equipment Sales Agreement, and Customer Care Maintenance Agreement.

**6.4**     **Class 4: General Unsecured Convenience Claims.**

    **6.4.1.    Impairment and Voting.** Class 4 is unimpaired under the Plan. The Holders of Class 4 Claims are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

    **6.4.2.    Treatment.** The Holders of Class 4 Claims will receive either (a) payment from the Reorganized Debtor of the full amount of their Allowed General Unsecured Convenience Claims in Cash, on or as soon as reasonably practicable following the Effective Date or, if later, the Allowance Date; or (b) payment of their Allowed General Unsecured Convenience Claims upon

Humphrey Appellant Appendix 182

such terms as may be agreed in writing by the Claimant and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

## ARTICLE VII.  TREATMENT OF IMPAIRED CLASSES OF CLAIMS

**7.1    Class 5: General Unsecured Claims.**

**7.1.1.    Impaired and Voting.** Class 5 is impaired under the Plan. The Holders of Allowed General Unsecured Claims are entitled to vote on the Plan.

**7.1.2.    Treatment.** The Holders of Allowed General Unsecured Claims will receive payment from the Reorganized Debtor of 80% of their Allowed General Unsecured Claims, payable in equal installments on September 1, 2020, September 1, 2021, and September 1, 2022; or, at the Reorganized Debtor's discretion, in less than three installments so long as the Reorganized Debtor accelerates payment to all Holders of Allowed General Unsecured Claims.

**7.2    Class 6: Abuse Claims.**

**7.2.1.    Impaired and Voting.** Class 6 is impaired under the Plan. The Holders of Allowed Abuse Claims are entitled to vote on the Plan. Only for purposes of voting, each Claim in Class 6 is deemed to be $1.00.

**7.2.2.    Election.** The Ballot for Holders of Class 6 Claims will provide that Holders of Class 6 Claims voting in favor of the Plan may select the Settlement Election or the Litigation Election. If the required number and dollar amount of Class 6 Claims selects the Settlement Election, all Class 6 Claims will receive the treatment in Section 7.2.3. If the required number and dollar amount of Class 6 Claims select the Litigation Election, all Class 6 Claims will receive the treatment in Section 7.2.4. If Class 6 does not accept the Plan, and the requirements under Section 1129(b) are met, the treatment for Holders of Class 6 Claims will be the Litigation Election.

**7.2.3.    Class 6 Treatment Under Settlement Election.** On the Effective Date, the Trust shall assume all liability for and the Trust will pay all Class 6 Claims pursuant to the provisions of the Plan and the Trust Documents. No Holder of a Class 6 Claim shall be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date. Other than the Settling Insurer Injunction and the exculpations and releases in this Plan, the Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 6 Claims, including the liability of any Non-Participating Co-Defendant, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under this Plan and Bankruptcy Code Section 1141(d). Class 6 Claims under the Settlement Election will include Sexual Abuse Claims that are not filed by the Bar Date.

**7.2.4.    Class 6 Treatment Under Litigation Election.** On the Effective Date, and pursuant to Section 14.1 of the Plan, the automatic stay and the stay imposed by the 105 Order shall be lifted and each Holder of a Class 6 Claim shall have thirty (30) days to: (a) file a lawsuit against the Reorganized Debtor, subject to any applicable statute of limitations or repose, or the equitable doctrine of laches, in accordance with Section 108(c) of the Bankruptcy Code; or (b) to the extent a Holder of a Class 6 Claim was a plaintiff in a Pre-Petition Lawsuit, file a notice in such Pre-

Humphrey Appellant Appendix 183

Petition Lawsuit stating that the Holder of the Class 6 Claim is electing to resume its litigation against the Reorganized Debtor pursuant to the terms of the Plan. A Holder of a Class 6 Claim that does not commence suit or file a notice to resume the litigation of a Pre-Petition Lawsuit within such thirty (30) day period shall be forever barred from asserting the Holder's Class 6 Claim. The allowance or disallowance of Class 6 Claims will be determined in the Post-Effective Date Litigation related to such Class 6 Claims. To the extent the Holder of a Class 6 Claim obtains a Post-Effective Date Award, the sole source of recovery for such Claimant shall be from Insurance Coverage, if any, under the Debtor's Insurance Policies to pay for such types of claims. Any and all of the Debtor's liability on account of Class 6 Claims shall be discharged pursuant to the provisions of Section 1141(d) of the Bankruptcy Code. No Holder of a Class 6 Claim shall be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date. Nothing contained herein shall enlarge the rights or claims of Holders of Class 6 Claims or limit any defenses to Class 6 Claims. Such discharge shall not affect the liability of any other Person on, or the property of any other Person for, the Class 6 Claims, including the liability of any Insurer, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under this Plan and Section 1141(d) of the Bankruptcy Code. Nothing in the Plan is intended to affect, diminish, or impair any Holder of a Class 6 Claim's rights against a Co-Defendant, including that Co-Defendant's joint and several liability for Sexual Abuse. Pursuant to Section 22.1(vi), the Bankruptcy Court may determine on a motion that an Abuse Claim is deemed to be filed before the Bar Date. In the event of the Litigation Election, Abuse Claims that were not filed by the Bar Date are not part of Class 6 and will receive nothing under the Plan.

### 7.3    Class 7: Personal Injury Claim.

**7.3.1.    Impaired and Voting.** Class 7 is impaired under the Plan. The Holder of the Class 7 Claim is entitled to vote on the Plan. Only for purposes of voting, the Claim in Class 7 is deemed to be $1.00.

**7.3.2.    Treatment.** On the Effective Date, the stay shall be lifted and the Holder of the Class 7 Claim shall have thirty (30) days to file a lawsuit against the Reorganized Debtor, subject to any applicable statute of limitations or repose, or the equitable doctrine of laches, in accordance with Section 108(c) of the Bankruptcy Code, or reach a settlement paid by the Personal Injury Insurer. The allowance or disallowance of the Class 7 Claim will be determined in the Post-Effective Date Litigation related to the Class 7 Claim. To the extent the Holder of the Class 7 Claim obtains a Post-Effective Date Award, the sole source of recovery for such Claimant shall be from the Personal Injury Insurance Policy. The Holder of the Class 7 Claim shall not be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date. Nothing contained herein shall enlarge the rights or claims of the Holder of the Class 7 Claim or limit any defenses to the Class 7 Claim. Unless otherwise provided in this Plan, the Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 7 Claim including the liability of the Personal Injury Insurer, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under this Plan and Section 1141(d) of the Bankruptcy Code. Nothing in the Plan is intended to affect, diminish, or impair the Holder of the Class 7 Claim's right against a Non-Participating Co-Defendant, including that Non-Participating Co-Defendant's joint and several liability.

Humphrey Appellant Appendix 184

**7.4     Class 8: USOPC Claim.**

   **7.4.1.   Impairment and Voting.** Class 8 is impaired under the Plan. The Holder of the USOPC Claim is entitled to vote on the Plan. Only for purposes of voting, the Claim in Class 8 is deemed to be $1.00.

   **7.4.2.   Treatment Under Settlement Election.** If Class 6 makes the Settlement Election, all rights that the USOPC has to receive indemnification or reimbursement from the Debtor, including any right to receive reimbursement, indemnification, or a defense under any of the Debtor's Insurance Policies, shall be satisfied by granting the USOPC Claim the benefit of the Channeling Injunction and by deeming any Abuse Claim against the USOPC to be a Channeled Claim. The USOPC shall not be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date and shall release all Claims against the Debtor, the Estate, and the Reorganized Debtor.

   **7.4.3.   Treatment Under Litigation Election.** If Class 6 makes the Litigation Election, in accordance with Section 502(e)(1) of the Bankruptcy Code, the sole source of recovery for the USOPC Claim shall be from Insurance Coverage, if any, under the Debtor's Insurance Policies. The USOPC will receive no Distribution under the Plan. The Debtor's discharge of the USOPC Claim shall not affect the liability of any Person other than the Debtor on, or the property of any Person other than the Debtor for, the USOPC Claim, including the liability of any Insurer, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under this Plan and Section 1141(d) of the Bankruptcy Code. For the avoidance of doubt, to the extent of any conflict between the terms of this Plan and the Debtor's bylaws or any agreements between the Debtor and the USOPC, this Plan controls.

**7.5     Class 9: Indemnification Claims.**

   **7.5.1.   Impairment and Voting.** Class 9 is impaired under the Plan. The Holders of Indemnification Claims are entitled to vote on the Plan. Only for purposes of voting, each Claim in Class 9 is deemed to be $1.00.

   **7.5.2.   Treatment Under Settlement Election.** If Class 6 makes the Settlement Election, all rights that the Holder of a Class 9 Claim has to receive indemnification or reimbursement from the Debtor, including any right to receive reimbursement, indemnification, or a defense under any of the Debtor's Insurance Policies, shall be satisfied by granting the Holder of a Class 9 Claim the benefit of the Channeling Injunction and by deeming any Abuse Claim against the Holder of a Class 9 Claim to be a Channeled Claim. The Holders of Class 9 Claims shall not be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date and shall release all Claims against the Debtor, the Estate, and the Reorganized Debtor.

   **7.5.3.   Treatment Under Litigation Election.** If Class 6 makes the Litigation Election, in accordance with Section 502(e)(1) of the Bankruptcy Code, the Class 9 Claims will receive no Distribution; *provided, however*, that to the extent that the Holder of an Indemnification Claim has a right to recovery under any of the Debtor's Insurance Policies, such rights are preserved and will not be impaired under the Plan. The Debtor's discharge of the Indemnification Claims shall not

Humphrey Appellant Appendix 185

affect the liability of any Person other than the Debtor on, or the property of any Person other than the Debtor for, the Indemnification Claims, including the liability of any Insurer, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under this Plan and Section 1141(d) of the Bankruptcy Code. For the avoidance of doubt, to the extent of any conflict between the terms of this Plan and the Debtor's bylaws or any agreements between the Debtor and the Holder of a Class 9 Claim, this Plan controls.

**7.6    Class 10: Future Claimants Representative Claim (Only In The Event Of A Settlement Election).**

**7.6.1.    Impaired and Voting.** Class 10 only exists under the Settlement Election. Class 10 is impaired under the Plan. The FCR is deemed to be the Holder of the Class 10 Claim and is entitled to vote on the Plan on behalf of the Future Claimants. Only for purposes of voting, the Claim in Class 10 is deemed to be $1.00.

**7.6.2.    Treatment Under Settlement Election.** On the Effective Date, the Trust shall assume all liability for and the Trust will pay all Class 10 Claims pursuant to the provisions of the Plan and the Trust Documents; *provided, however*, that no Holder of a Class 10 Claim shall have an interest in the Trust Assets other than the Future Claimant Reserve. No Holder of a Class 10 Claim shall be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date. The Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 10 Claims, including the liability of any Non-Participating Co-Defendant, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under this Plan and Section 1141(d) of the Bankruptcy Code.

**7.7    Class 11: Sexual Abuse Claims Filed After The Bar Date (Only In The Event Of A Litigation Election).**

**7.7.1.    Impaired and Voting.** Class 11 only exists under the Litigation Election. Class 11 is impaired under the Plan.  The Holders of Class 11 Claims are deemed to have voted no on the Plan. In the event of a Settlement Election, the Sexual Abuse Claims which were not filed or deemed to be filed by the Bar Date will be classified within Class 6.

**7.7.2.    Treatment Under the Litigation Election**. The Class 11 Claims will receive no distributions under the Plan. No Holder of a Class 11 Claim shall be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date or from the Debtor's Insurance Policies. The Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 11 Claims, including the liability of any Non-Participating Co-Defendant, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under this Plan and Section 1141(d) of the Bankruptcy Code.

## ARTICLE VIII.  ACCEPTANCE OR REJECTION OF PLAN

**8.1** **Impaired Classes to Vote.** Each Holder of a Claim in an impaired Class shall be entitled to vote separately to accept or reject the Plan unless such Holder is deemed to accept or reject the Plan.

**8.2** **Acceptance by Class of Creditors.** An impaired Class of Holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

## ARTICLES APPLICABLE TO SETTLEMENT ELECTION ONLY

### ARTICLE IX.  TRUST FUNDING AND FORMATION

**9.1** **Resolution of the Insurance Coverage Adversary Proceeding as to the CGL Settling Insurers.** The Confirmation Order shall provide that, subject to the occurrence of the Effective Date, the Debtor shall dismiss with prejudice its claims against the CGL Settling Insurers in the Insurance Coverage Adversary Proceeding, *provided, however*, that such dismissal shall not affect the Personal Injury Insurance Coverage.

**9.2** **The CGL Settling Insurers' Payments.**

**9.2.1.** **Insurance Settlement Amount.** The CGL Settling Insurers will pay the cumulative amount of Two Hundred Nineteen Million Seven Hundred Fifty Thousand ($219,750,000.00) (the "**Insurance Settlement Amount**"). The Insurance Settlement Amount reflects the amount of money that the CGL Settling Insurers have been willing to pay to date: (a) to settle on behalf of the Debtor, the USOPC, and the Non-Debtor CGL Settling Insured Covered Persons, the Abuse Claims (for which $215,000,000.00 of the Insurance Settlement Amount is allocated); and (b) to settle the Debtor's contractual rights to have its Insurance Reimbursement Claims paid (for which $4,750,000.00 of the Insurance Settlement Amount is allocated). The Debtor reserves its right to amend this Plan to, among other things, increase the Insurance Settlement Amount. The CGL Settling Insurers' obligation to contribute the Insurance Settlement Amount is subject to the Bankruptcy Court issuing the Confirmation Order, pursuant to Sections 1129, 363(f), and 105(a) of the Bankruptcy Code, barring, estopping, and permanently enjoining all Persons from asserting any (a) Claims against the CGL Settling Insurer Policies; (b) Claims against the CGL Settling Insurers with regard to, by reason of, based on, arising out of, relating to, or in any way connected with, the CGL Settling Insurer Policies; and (c) Medicare Claims. The Insurance Settlement Amount will be paid to the Debtor on or before the Effective Date. Notwithstanding the foregoing, the Personal Injury Insurance Policy will remain in place solely for purposes of defending the Personal Injury Claim and indemnifying the Debtor, the Estate, and the Reorganized Debtor from the Personal Injury Claim. The CGL Settling Insurers will continue to reimburse the Debtor for ongoing Insurance Reimbursement Claims in the ordinary course through the Effective Date. To the extent any such amounts are outstanding on the Effective Date (the "**Outstanding Amount**"), the Outstanding Amount shall be paid by the applicable CGL Settling Insurer in addition to the CGL Settling Insurer's portion of the Insurance Settlement Amount.

23

**9.2.2. Plan Payment.** The Plan Payment shall be made to the Trust in exchange for the entry of an Order by the Bankruptcy Court imposing a nonconsensual release, remise, and discharge of all Claims relating to the CGL Settling Insurer Policies (excepting the Personal Injury Claim), including all Channeled Claims, by all Persons who now hold or in the future may hold such Claims against the CGL Settling Insurers pursuant to Section 105 of the Bankruptcy Code.

**9.3 Trust Formation and Funding.**

**9.3.1. Trust Purpose.** The Trust shall be established for the benefit of the Abuse Claimants and Future Claimants and will assume all liability for the Channeled Claims. The Trust will receive, liquidate, and distribute Trust Assets in accordance with this Plan and the Trust Documents. The proposed Trust Agreement is attached hereto as <u>Exhibit D</u>.

**9.3.2. Funding of Trust.** As set forth in Section 10.2, the Trust shall be funded, on or before the Effective Date, by: (a) the Plan Payment; and (b) the Participating Party Contributions.

**9.3.3. Payment of Professional Fees.** The Trust shall pay all unpaid Allowed Professional Claims of the Survivors' Committee's Professionals within seven (7) days after the later of the Effective Date or the Bankruptcy Court's order on such Claims and shall pay and reimburse the Debtor, the Estate, or the Reorganized Debtor, as the case may be, for the costs and expenses of publication of the notices of insurance settlement and plan confirmation within seven (7) days after the Effective Date.

**9.4 Approval of Settlement.** Pursuant to Section 105(a) of the Bankruptcy Code and in consideration of the classification, distributions, and other benefits provided under the Plan, including, *inter alia*, (a) the Plan Payment; and (b) the Participating Party Contributions, the provisions of the Plan shall constitute a good faith compromise and settlement of all Abuse Claims against the Debtor. The entry of the Confirmation Order will constitute the order approving the compromises and settlements required under this Plan. The Bankruptcy Court's findings in the Confirmation Order shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Claimants holding Abuse Claims, the Holders of other Claims, the Settling Insurers, the Participating Parties, the Non-Debtor CGL Settling Insurer Persons, and other parties in interest, and are fair, equitable, and within the range of reasonableness, and an appropriate exercise of each such Person's business judgment under the applicable laws of corporate governance.

**9.5 Future Claimant Reserve.** The Trust shall establish a Future Claimant Reserve which shall be funded with five (5%) percent of the Plan Payment. Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the FCR shall continue until he or his successor resigns or the funds in the Future Claimant Reserve are completely distributed as provided in Section 11.7 of the Plan.

**9.6 Closing.** Closing will be conducted in the offices of Jenner & Block, 353 North Clark Street, Chicago, Illinois, 60654, or at such other location designated by the Reorganized Debtor, as soon as reasonably practicable following the Effective Date for the purpose of the Reorganized Debtor, and the Participating Parties executing and delivering the Plan Documents and completing those actions necessary for the Reorganized Debtor and the Participating Parties to establish and

Humphrey Appellant Appendix 188

fund the Trust and make other distributions required to be made upon, or promptly following, the Effective Date. As soon as practicable after the conditions set forth in Section 18.1 have been satisfied or waived in accordance with Section 18.2, the Reorganized Debtor shall file a notice of the Closing and the occurrence of the Effective Date.

**9.7    Obligations of the Reorganized Debtor.** The Reorganized Debtor will:

(a)    In the exercise of its business judgment, review all Claims filed against the Estate except for Channeled Claims, and, if advisable, object to such Claims;

(b)    In the exercise of its business judgment, investigate, prosecute, settle, dismiss, or otherwise resolve Causes of Action that are not resolved under this Plan. Unless otherwise provided in this Plan, the Reorganized Debtor will be entitled to receive recoveries from Causes of Action;

(c)    Honor all of the Debtor's obligations under the Personal Injury Insurance Policy and the Other Insurance Policies; and

(d)    Perform all of its obligations under this Plan and Plan Documents, in each case, as and when the same become due or are to be performed.

## ARTICLE X.  TRUST

**10.1    Establishment of Trust.** On the Effective Date, the Trust shall be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.*, as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 *et seq.* The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

**10.2    Trust Funding.** On or before the Effective Date, each CGL Settling Insurer shall make its portion of the Plan Payment to the Trust by wire transfer. Five (5%) percent of the Plan Payment shall be used to create a Future Claimant Reserve for the benefit of any Future Claimants. On or before the Effective Date, each Twistars Settling Insurer shall make its portion of the Twistars Contribution to the Trust by wire transfer. Each Participating Party shall be deemed to have released any and all Claims such Participating Party may have against the Debtor, the Estate, or the Reorganized Debtor and its Insurance Policies.

**10.3    Appointment of the Trustee.** The initial Trustee shall be identified in a supplement to be filed by the Debtor within fourteen (14) days prior to the Confirmation Hearing. The Trustee shall commence serving as the Trustee on the Confirmation Date; *provided, however*, that the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Debtor, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

25

**10.4    Tax Matters.** The Trust shall not be deemed to be the same legal entity as the Debtor, but only the assignee of certain Assets of the Debtor and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code, the regulations promulgated thereunder, and applicable state law, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

**10.5    Cooperation by the Debtor and Reorganized Debtor.** The Debtor, the Estate, the Reorganized Debtor, and their counsel shall reasonably cooperate with the Trustee as requested in connection with the Trustee's administration of the Trust.

**10.6    Objections to Channeled Claims.** No Person other than the Trustee has the right to object to the Channeled Claims, and any such objection will be prosecuted and resolved in accordance with the terms of the Trust Documents.

**10.7    Trust Indemnification Obligations.** From and after the Effective Date, the Trust shall defend, indemnify, and hold harmless the Protected Parties with respect to any and all Channeled Claims, Medicare Claims, and Claims against the Debtor, the Estate, the Reorganized Debtor, a Participating Party, or a Settling Insurer Policy relating to an Abuse Claim, including: all Claims made by (a) any Person claiming to be insured (as a named insured, additional insured, or otherwise) under any Settling Insurer Policy; (b) any Person who has made, will make, or can make (but for this Plan) an Abuse Claim or a Claim against the Debtor, the Estate, the Reorganized Debtor, a Participating Party, or a Settling Insurer; (c) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any Settling Insurer Policy relating to Sexual Abuse or other abuse. The Protected Parties shall have the right to defend any Claims identified in this Section and shall do so in good faith. The Protected Parties may undertake the defense of any Claim on receipt of such Claim. The Protected Parties shall notify the Trust as soon as practicable of any Claims identified in this Section and of their choice of counsel. The Protected Parties' defense of any Claims shall have no effect on the obligations of the Trust, as applicable, to indemnify any such party for such Claims, as set forth in this Section. The Trust shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by the Protected Parties in defending such Claims. In defense of any such Claims, the Protected Parties may settle or otherwise resolve a Claim consistent with the terms of this Plan and with the prior consent of the indemnifying party, which consent shall not be unreasonably withheld.

## ARTICLE XI.  LIQUIDATION AND PAYMENT OF CHANNELED CLAIMS

**11.1    Liquidation and Resolution of Channeled Claims.**

**11.1.1.    Resolution and Payment of Channeled Claims.** The Trust shall pay Abuse Claims in accordance with the Plan, the Confirmation Order, and the Trust Documents. The FCR Claim shall be paid from the Future Claimant Reserve and not from any other Trust Assets. The USOPC Claim and the Indemnification Claims shall be satisfied by granting the USOPC Claim and the Indemnification Claims the benefit of the Channeling Injunction and by deeming any Abuse Claim against the USOPC or a Holder of an Indemnification Claim to be a Channeled Claim.

Humphrey Appellant Appendix 190

**11.1.2. Conditions to Payment of Abuse Claims and FCR Claims.** As a pre-condition to receiving any payment from the Trust, each Abuse Claimant or Future Claimant shall execute and deliver to the Trust a full and complete release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties, and all known or unknown parties who may claim coverage under any Insurance Policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons, in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers, of any and all Claims arising from or relating to Abuse Claims or Future Claims. In addition, within ten (10) days after receiving any payment from the Trust, an Abuse Claimant or Future Claimant shall dismiss with prejudice any lawsuit that such Abuse Claimant or Future Claimant had brought against the Debtor, any Participating Party, and any Non-Debtor CGL Settling Insurer Covered Person.

**11.1.3. Trust Documents May Not Modify The Plan.** Nothing in the Trust Documents shall (a) impose any costs, directly or indirectly, upon the Debtor, the Estate, the Reorganized Debtor, any Participating Party, or any Settling Insurer relating to the treatment of Channeled Claims, or (b) otherwise modify the rights or obligations of the Debtor, the Estate, the Reorganized Debtor, any Participating Party, or any Settling Insurer as otherwise set forth in the Plan.

**11.2 Effect of No Award on Channeled Claims.** If a Channeled Claim, including an Abuse Claim filed after the Bar Date, is denied payment from the Trust, the Holder of such Channeled Claim will have no further rights against the Debtor, the Estate, the Reorganized Debtor, the Trust, the Trustee, any Participating Party, or any Settling Insurer, and any of their respective assets or property, including any Revested Assets, relating to such Channeled Claim.

**11.3 Treatment of Attorneys' Fees and Costs of Channeled Claimants.** The fees and expenses of attorneys representing Channeled Claimants who receive payment from the Trust will be borne by such Channeled Claimants based on applicable state law and individual arrangements made between such Channeled Claimants and their respective attorneys. The Debtor, the Estate, the Reorganized Debtor, the Released Parties, the Settling Insurers, the Non-Debtor CGL Settling Insurer Covered Persons, the Trust, and the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Channeled Claimants, and all Claims for such fees and expenses, if any, will be disallowed.

**11.4 Withdrawal of Channeled Claims.** A Channeled Claimant may withdraw a Channeled Claim at any time on written notice to the Trustee. If withdrawn, (a) the Channeled Claim will be withdrawn with prejudice and may not be reasserted, and (b) as a condition to withdrawal of the Channeled Claim, any funds paid to the Channeled Claimant by the Trust shall be returned to the Trust.

**11.5 Supplementing <u>Exhibit B</u> to Add Participating Parties.**

**11.5.1. Participating Party Agreement.** After the Effective Date and notwithstanding any present exclusionary language contained in this Plan, upon the consent of the Trustee, any Person may become a Participating Party if the Bankruptcy Court, after notice and hearing, approves an agreement between such Person and the Trustee (a "**Participating Party Agreement**"). After the Effective Date, the Trustee shall have the exclusive authority to seek approval of such a Participating Party Agreement. Upon the Bankruptcy Court's entry of a Final Order approving

Humphrey Appellant Appendix 191

# TRUST AGREEMENT

This Trust Agreement is made and entered into between USA Gymnastics ("**USAG**", the "**Debtor**", or the "**Reorganized Debtor**") and [_____] (the "**Trustee**"), pursuant to the terms of the *First Amended Chapter 11 Plan Of Reorganization* (as it may hereafter be amended or modified, the "**Plan**"), filed by the Debtor in its chapter 11 case in the United States Bankruptcy Court for the Southern District of Indiana (the "**Bankruptcy Court**").[1]

## RECITALS

A.      On December 5, 2018, USAG filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtor remained in possession of its property and continued to operate and maintain its organization as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.      On February 21, 2020, the Debtor filed the Plan. On [_____ __], 2020, the Bankruptcy Court confirmed the Plan by entering the Confirmation Order. The Debtor will become the Reorganized Debtor upon the Effective Date of the Plan.

C.      Pursuant to the Settlement Election under the Plan, a Trust is created for the benefit of Abuse Claimants and Future Claimants. All Abuse Claims and Future Claims are channeled to the Trust, along with the USOPC Claim, the Indemnification Claims, all other claims arising from or related in any way to the Abuse Claims, and any claims for punitive damages, alter ego liability, or piercing the corporate veil against any Participating Party, Settling Insurer, or Non-Debtor CGL Settling Insurer Covered Person. Distributions to Holders of Allowed Abuse Claims and Holders of Allowed Future Claims shall be made from assets contributed to the Trust by the Settling Insurers and Participating Parties.

D.      The Trust is intended to qualify as a "Designated" or "Qualified" Settlement Fund pursuant to Section 468B of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.*, as may be amended (the "**Internal Revenue Code**"), and the regulations promulgated thereunder, 31 C.F.R. §§ 900 *et seq.* (the "**Treasury Regulations**").

E.      The Trustee is duly appointed as a representative of the Debtor and its Estate for the sole purpose of implementing the Plan through the Trustee's administration of the Trust  and distribution of the Trust Assets (defined below) pursuant to 11 U.S.C. §1123(a)(5)(B).

---

[1] The definitions set forth in Article I of the Plan apply to capitalized terms used, but not defined, in this Trust Agreement. The rules of construction set forth in Article II of the Plan apply to this Trust Agreement. To the extent that any provision of this Trust Agreement conflicts with any term of the Plan, the terms of the Plan shall control.

NOW, **THEREFORE**, pursuant to the Plan and the Confirmation Order and in consideration of the mutual covenants set forth herein, it is agreed as follows:

## ARTICLE I. AGREEMENT OF TRUST

**1.1    Contingent Upon Settlement Election.** For the avoidance of doubt, and as set forth in Section 13.1 of this Trust Agreement, the Trust described herein shall be created only if: (1) the Abuse Claimants vote to accept the Plan, (2) the Abuse Claimants vote to select the Settlement Election, (3) the Bankruptcy Court confirms the Plan, and (4) the Reorganized Debtor and the Trustee execute this Trust Agreement. If any of these conditions are not met, the terms of this Trust Agreement shall have no effect whatsoever.

**1.2    Creation and Name.** The Debtor hereby creates a trust known as "The USA Gymnastics Settlement Election Trust" as the Trust provided by the Settlement Election under the Plan.

**1.3    Purpose.** The Trust is established for the benefit of the Abuse Claimants and Future Claimants and shall assume all liability for the Channeled Claims. The Trust shall receive and distribute the Trust Assets (defined below) to Abuse Claimants and Future Claimants in accordance with the terms of this Trust Agreement, the Plan, and the Confirmation Order.

**1.4    Irrevocability.** The Trust is irrevocable. The Reorganized Debtor shall not alter, amend, revoke, or terminate the Trust. The Reorganized Debtor shall have no power or authority to direct the Trustee to return any of the Trust Assets to the Reorganized Debtor. The Trustee shall nevertheless have the power to amend this Trust Agreement for the purpose of conforming the Trust Agreement to the provisions of the Plan and the Confirmation Order, subject to approval by the Bankruptcy Court.

## ARTICLE II. CORPUS OF THE TRUST

**2.1    Trust Corpus.** The Settling Insurers shall fund the Trust with payments of $217,125,000.00 in the aggregate (the "**Trust Assets**"). Of the Trust Assets, the CGL Settling Insurers shall contribute the Plan Payment of $215,000,000.00 and the Twistars Settling Insurers shall contribute the Twistars Contribution of $2,125,000.00.

**2.2    Future Claimant Reserve.** The Trust shall establish a Future Claimant Reserve funded with five percent (5%) of the Plan Payment ($10,750,000.00).

**2.2.1.    Expiration Of Future Claimant Reserve.** Following the fifth (5th) anniversary of the Plan's Effective Date, any funds held in the Future Claimant Reserve shall be released to the Trustee to, at the Trustee's discretion, (a) administer to Holders of Abuse Claims consistent with the terms of this Trust Agreement, the Plan, and the Confirmation Order; or (b) distribute to a charitable entity mutually agreed upon by the Trustee and the Reorganized Debtor; provided, however, that any such funds shall not revert to the Debtor, the Estate, the Reorganized Debtor, the National Gymnastics Foundation, or the United States Olympic & Paralympic Committee.

2

**2.3    Transfer Of Trust Assets.** Following: (a) the Bankruptcy Court's entry of the Confirmation Order in  form and substance reasonably acceptable to the Debtor; and (b) the Trustee's and Reorganized Debtor's execution of this Trust Agreement, the Reorganized Debtor and the Settling Insurers shall irrevocably and absolutely transfer, grant, assign, convey, set over, and deliver to the Trustee all of their rights, titles, and interests in and to the Trust Assets to be held in trust. The Trustee hereby agrees to accept and hold the Trust Assets in trust for the Abuse Claimants and Future Claimants.

**2.4    Trustee's Right To And Title And Interest In Trust Assets.** Upon the transfer of the Trust Assets, the Trustee shall succeed to all of the Debtor's, the Estate's, the Reorganized Debtor's, the Settling Insurers', and the Participating Parties' rights, titles, and interests, if any, in and to the Trust Assets, and the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, and the Participating Parties shall have no further rights, titles, or interests in, or with respect to, the Trust Assets.

**2.5    No Tax On Transfers To Trust.** Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Trust Agreement, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by this Trust Agreement, the Plan, and the Confirmation Order and any transfer to the Trust, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax, or other similar tax.

**2.6    Spendthrift Provision.** To the fullest extent permitted by law, the Trust Assets shall not, in whole or in part, be subject to any legal or equitable claims of creditors of any Abuse Claimant, Future Claimant, Channeled Claimant, or others, and the Trust Assets shall not be subjected to any legal process or any voluntary or involuntary attempts to transfer, assign, pledge, encumber, or otherwise alienate such Trust Assets, except as may be ordered by the Bankruptcy Court.

**2.7    Payment Obligations.** Pursuant to Sections 9.3.3 and 10.7 of the Plan, the Trust shall (1) pay all unpaid Allowed Professional Claims of the Survivors' Committee's Professionals within seven days after the later of the Effective Date or the Bankruptcy Court's order on such Claims; (2) pay and reimburse the Debtor, the Estate, or the Reorganized Debtor, as the case may be, for the costs and expenses of publication of the notices of insurance settlement and plan confirmation within seven days after the Effective Date; and (3) defend, indemnify, and hold harmless certain Protected Parties as set forth in Section 10.7 of the Plan. These payments shall be deducted from Available Trust Assets (defined below).

3

## ARTICLE III. POWERS AND DUTIES OF TRUSTEE

**3.1    Powers and Duties.** The Trustee shall have, in addition to any other powers and duties conferred on the Trustee by applicable trust, bankruptcy, or tax law, the following powers and duties:

1. Receive, deposit, and invest Trust Assets in compliance with Section 345 of the Bankruptcy Code.

2. Open and maintain bank accounts on behalf of the Trust, deposit funds into such accounts, and draw checks on such accounts.

3. Establish such reserves as required by this Trust Agreement, the Plan, and the Confirmation Order; *provided, however*, nothing in this provision shall restrict the Trustee's authority to pool the Trust's accounts for investment purposes or require separate bank accounts for the reserves required by this Trust Agreement, the Plan, and the Confirmation Order.

4. Allocate and make distributions to Abuse Claimants and Future Claimants.

5. Make, sign, execute, acknowledge, deliver, and file, including with any governmental authority, any documents that may be necessary or appropriate to effectuate the purpose of the Trust or to establish, maintain, or administer the Trust.

6. Fulfill all reporting obligations to the United States Department of Health and Human Services and other governmental authorities, as contemplated by Section 11.8 of the Plan.

7. File a motion with the Bankruptcy Court, with notice to parties in interest, for the enforcement of any provision of the Plan or the Confirmation Order pertaining to the Trust, or any provision of this Trust Agreement, as may be appropriate to effectuate the purpose of the Trust.

8. File a motion with the Bankruptcy Court, with notice to parties in interest, for a modification of the provisions of this Trust Agreement if the Trustee determines that such modification is necessary to effectuate the purpose of the Trust.

9. Retain and rely upon the advice of any counsel, consultants, experts, accountants, investment advisors, and such other agents or professionals (each, a "**Professional**") as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Trust, subject to the Bankruptcy Court's approval of such employment.

10. Fulfill any and all other obligations imposed on the Trust by this Trust Agreement, the Plan, or the Confirmation Order.

**3.2    Limitations on the Trustee.** The Trustee is prohibited from taking the following acts:

1. Making any transfers or distributions of Trust Assets other than as authorized by this Trust Agreement, the Plan, and the Confirmation Order.

2. Loaning or encumbering the Trust Assets, or issuing a guaranty with recourse to the Trust Assets.

Humphrey Appellant Appendix 195

3. Conducting any trade or business using or affecting the Trust Assets.

4. Engaging in any investments or activities inconsistent with the treatment of the Trust as a "Designated" or "Qualified" settlement fund pursuant to the Internal Revenue Code and the Treasury Regulations.

## ARTICLE IV. ALLOCATION METHOD FOR ABUSE CLAIMS

**4.1    Trust Assets Available For Abuse Claims.** The Trust shall make distributions to Holders of Allowed Abuse Claims from the Trust Assets minus the amounts contained in the Future Claimant Reserve (the "**Available Trust Assets**"). As of the date of this Trust Agreement, there is $206,375,000.00 of Available Trust Assets; *provided, however*, that, the Future Claimant Reserve may expire pursuant to Section 2.2.1 of this Trust Agreement and the terms of the Plan and the Confirmation Order, at which time the remaining amounts contained in the Future Claimant Reserve may become Available Trust Assets.

**4.2    Allocation Method.** Distributions to Holders of Allowed Abuse Claims are allocated based upon the location where Abuse Claimants allege Sexual Abuse occurred. Holders of Allowed Abuse Claims are classified into Subclasses 6A, 6B, 6C, and 6D for this purpose. The Subclasses are then allocated percentages of Available Trust Assets for Pro Rata distributions to members of each Subclass.

**4.2.1. Subclass 6A (Elite Gymnasts).** Claimants are classified into Subclass 6A if they allege Sexual Abuse at the Olympics, the National Team Training Center, or a National Team event, such as the Olympic Team Trials or the World Championships. Subclass 6A is allocated 40% of Available Trust Assets for distribution ($82,550,000.00).

**4.2.2. Subclass 6B (Non-Elite Gymnasts).** Claimants are classified into Subclass 6B if they allege Sexual Abuse at an event sanctioned by the Debtor, such as the National Championships or the U.S. Classic, as well as events held at Twistars. Subclass 6B excludes all Claimants who otherwise qualify for treatment under Subclass 6A. Subclass 6B is allocated 35% of Available Trust Assets for distribution ($72,231,250.00).

**4.2.3. Subclass 6C (Other Claimants).** Claimants are classified into Subclass 6C if they do not qualify for treatment under Subclass 6A or Subclass 6B, such as Claimants who allege Sexual Abuse solely at Michigan State University. Subclass 6C is allocated 24% of Available Trust Assets for distribution ($49,530,000.00).

**4.2.4. Subclass 6D (Derivative Claimants).** Claimants are classified into Subclass 6D if allege liability solely on account of Sexual Abuse committed against a third party, such as a spouse or family member. Subclass 6D is allocated 1% of Available Trust Assets for distribution ($2,063,750.00).

**4.2.5. Late-Filed Abuse Claims.** There are seven (7) Abuse Claims that were filed after the deadline for submitting Abuse Claims in the Case. The Trustee, in his sole discretion, may treat such late-filed Abuse Claims as timely or disallowed. If the Trustee treats late-filed Abuse Claims as timely filed, each late-filed Abuse Claim shall be classified in Subclass 6A, 6B, 6C, or 6D, as appropriate.

Humphrey Appellant Appendix 196

**4.2.6. Duplicative Abuse Claims.** There are thirty three (33) Abuse Claims that are duplicative of Abuse Claims already classified within Subclasses 6A, 6B, 6C, and 6D. These duplicative Abuse Claims shall receive no distribution from the Trust.

**4.3     Pro Rata Distributions To Abuse Claimants.** Distributions to Holders of Allowed Abuse Claims shall be Pro Rata based upon the Available Trust Assets allocated to each Subclass. Members of each Subclass holding Allowed Abuse Claims shall take equal shares of the Available Trust Assets allocated to their Subclass.

**4.4     Release & Dismissal Of Litigation.** Before the Trust may make any distribution to any Abuse Claimant, such Abuse Claimant shall execute and deliver to the Trust a full and complete release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties, and all known or unknown parties who may claim coverage under any Insurance Policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons, in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers, of any and all Claims arising from or relating to Abuse Claims or Future Claims. In addition, within ten (10) days after receiving any payment form the Trust, an Abuse Claimant shall dismiss with prejudice any lawsuit that such Abuse Claimant had brought against the Debtor, any Participating Party, and any Non-Debtor CGL Settling Insurer Covered Person.

**4.5     Attorneys' Fees And Costs.** Pursuant to Section 11.3 of the Plan, the fees and expenses of attorneys representing Abuse Claimants who receive payment from the Trust will be borne exclusively by such Abuse Claimants based on applicable state law and individual arrangements made between such Abuse Claimants and their respective attorneys. The Trust, the Trustee, and the other parties listed in Section 11.3 of the Plan shall have no liability for any such fees and expenses, and any Claims for such fees and expenses shall be disallowed.

## ARTICLE V. ALLOCATION METHOD FOR FUTURE CLAIMS.

**5.1     Submission Of Future Claims And Eligibility For Distribution.** A Future Claimant must file a Claim with the Trustee on or before the fifth (5th) anniversary of the Plan's Effective Date. The Claim shall be entitled to a distribution exclusively from the Future Claimant Reserve and no other Trust Assets, provided funds remain in the Future Claimant Reserve, only if the Trustee, in consultation with the FCR, determines that the Holder of such Claim has proven by a preponderance of the evidence that such Holder meets the definition of a Future Claimant and such Holder's Claim meets the definition of a Sexual Abuse Claim.

**5.2     Allocation Method.** If the requirements of Section 5.1 of this Trust Agreement are satisfied, the Trustee, in his sole discretion, may allocate a distribution to a Future Claimant from funds remaining in the Future Claimant Reserve. In determining the amount of a Future Claimant's distribution, the Trustee shall consider the distribution the Future Claimant would receive if treated as an Abuse Claimant and classified into a Subclass of Abuse Claimants as specified in Section 4.2 of this Trust Agreement; *provided, however*, that the Trustee is not bound by such a comparison and may approve distributions to Future Claimants in lesser or greater amounts in light of the amount of funds remaining in the Future Claimant Reserve.

6

**5.3** **Release And Dismissal Of Litigation.** Before the Trust may make any distribution to any Future Claimant, such Future Claimant shall execute and deliver to the Trust a full and complete release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties, and all known or unknown parties who may claim coverage under any Insurance Policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons, in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers, of any and all Claims arising from or relating to Abuse Claims or Future Claims. In addition, within ten (10) days after receiving any payment from the Trust, a Future Claimant shall dismiss with prejudice any lawsuit that such Future Claimant had brought against the Debtor, any Participating Party, and any Non-Debtor CGL Settling Insurer Covered Person.

**5.4** **Attorneys' Fees And Costs.** Pursuant to Section 11.3 of the Plan, the fees and expenses of attorneys representing Future Claimants who receive payment from the Trust will be borne exclusively by such Future Claimants based on applicable state law and individual arrangements made between such Future Claimants and their respective attorneys. The Trust, the Trustee, and the other parties listed in Section 11.3 of the Plan shall have no liability for any such fees and expenses, and any Claims for such fees and expenses shall be disallowed.

## ARTICLE VI. TERMINATION OF THE TRUST

**6.1** **When Termination Shall Occur.** The Trustee shall terminate the Trust after the Trust Assets are fully and completely distributed in accordance with this Trust Agreement, the Plan, and the Confirmation Order, and after the Trustee has fully and completely performed all other duties set forth in this Trust Agreement, the Plan, and the Confirmation Order. The Trust Assets shall be deemed totally distributed when the amount remaining in the Trust is less than $50,000.

**6.2** **Termination Distribution.** Upon termination of the Trust, provided that all fees and expenses of the Trust have been paid or provided for in full, the Trustee shall deliver all funds and other investments remaining in the Trust, if any, including any investment earnings thereon, to a charitable entity mutually agreed upon by the Trustee and the Reorganized Debtor; *provided, however*, that any such funds shall not revert to the Debtor, the Estate, the Reorganized Debtor, the National Gymnastics Foundation, or the United States Olympic & Paralympic Committee.

**6.3** **Termination Procedures.** After termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall retain the books, records, documents, and files that were delivered to or created by the Trustee. The Trustee, at his discretion, may destroy all such books, records, documents and files at any time following the later of: (a) one year following the final distribution of the Trust Assets; and (b) the date until which applicable law requires the Trustee to retain such books, records, documents, and files; *provided, however*, the Trustee shall not destroy any books, records, documents, or files relating to the Trust without giving the Reorganized Debtor, the Participating Parties, the Settling Insurers, Abuse Claimants, other Channeled Claimants, and the FCR reasonable prior written notice thereof.

7

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-09108-RLM-11 |
| Debtor. | |

**MOTION OF THE ADDITIONAL TORT CLAIMANTS COMMITTEE OF
SEXUAL ABUSE SURVIVORS FOR ENTRY OF AN ORDER PURSUANT TO
11 U.S.C. §§ 105(a), 349 AND 1112(b) DISMISSING THE BANKRUPTCY CASE
AND GRANTING RELATED RELIEF**

The Additional Tort Claimants Committee of Sexual Abuse Survivors (the "Survivors'

Committee"), appointed in this case under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"), hereby moves this Court (the "Motion") for entry of an order, pursuant to

sections 105(a), 349, and 1112(b) of the Bankruptcy Code, dismissing the above-captioned

bankruptcy case (the "Case") of USA Gymnastics ("USAG") and granting related relief.  In

support of this Motion, the Declaration of James I. Stang (the "Stang Declaration") is attached as

**Exhibit A** and incorporated herein.  In further support of the Motion, the Survivors' Committee

respectfully states as follows:

**Preliminary Statement**

1.      Nearly five years ago, USAG/United States Olympic Committee (the "USOC")[2]

Team USA gymnast Maggie Nichols reported Larry Nassar was molesting children.  Since that

very first day, USAG/USOC, and its revolving door of executives since, have done everything in

---

[1] The last four digits of USAG's federal tax identification number are 7871. The location of USAG's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

[2] The USOC recently rebranded itself as the "United States Olympic & Paralympic Committee" but for the ease of reference, it is referred to herein as the "USOC."

their collective power to conceal the truth from Nassar's hundreds of survivors, the more than 100 survivors of abuse suffered at the hands of coaches over the past several decades, law enforcement authorities, and the American public.  The coordinated strategy of USAG and the USOC was, and remains to be, to delay, deflect and deny them and non-Nassar survivors justice for the horrible crimes committed upon them as children.  Sadly, USAG and the USOC have used this bankruptcy proceeding as yet another tool to inflict pain upon these sexual abuse survivors – both Nassar and non-Nassar survivors – and to deny justice to these girls and women who competed for this institution and their country.  The Survivors' Committee seeks, and indeed, implores this Court to dismiss this Case and grant related relief to appropriately effectuate the dismissal for the legal reasons cited herein.  The Court should also grant the Motion because it has come time for *some* court or institution to give these women the right to finally have their cases heard before a jury.  Enough is enough.

2. The core of this bankruptcy proceeding has been the intent of USAG and the USOC to string both the Court and the Survivors' Committee along, ingratiating them and the media with platitudes of change about athlete safety.  However, these hollow promises of reform have been tools to buy USAG and the USOC time to delay and create a narrative that will keep their respective organizations free from scrutiny long enough for these organizations to indulge in their respective financial windfalls from the 2020 Summer Olympics in Tokyo, Japan.  Grandiose statements that have been issued by USAG (such as the January 8, 2020 tweet from current USAG President Li Li Lueng ("Ms. Leung")) are merely intended to placate sponsors to continue their support, before investigative agencies, criminal prosecutions, and adversarial civil process will reveal the true depravity of the organizational cover-up of sexual abuse of athletes.  This proceeding, and the purported "good-faith" attempts by USAG to reach a mutually

2

agreeable plan for reorganization, are nothing but a concerted effort by USAG and the USOC to buy time and protect its collective asset in the 2020 Summer Olympic revenue stream, nothing more.

3.      The Survivors' Committee is compelled to seek dismissal of this Case because USAG, the USOC and their respective insurance carriers (the "Insurers") have failed to propose a fair, comprehensive settlement with the Survivors' Committee and its constituents.  The three lengthy mediation sessions with the Survivors' Committee and the intra-insurance company mediations have not resulted in a compromise, neither monetary and importantly, non-monetary. Since the last mediation session on November 21, 2019, USAG has not initiated a single substantive plan-related communication with the Survivors' Committee.  Indeed, this Case instituted by USAG, and which (in the Survivors' Committee's view) was done in coordination with and at the direction of the USOC, was a tactic taken by these entities to halt the vigorous civil discovery inquiry into their horrendous conduct in concealing its widespread child molestation problems, halt de-certification proceedings against USAG, and represent to the public that it is, in the words of Ms. Lueng, "…focusing on reaching resolution with the survivors and emerging from bankruptcy."[3]  This Case, having been filed more than 13 months ago, is yet another platform for USAG and the USOC to delay justice to the Survivors' Committee and their constituents, and the Court should no longer indulge USAG and the USOC by allowing them to continue dragging survivors through this morass.  Extensive mediations on the monetary and non-monetary issues involved in this Case have resulted in an impasse between

---

[3] Li Li Leung (@Li_Li_Leung), TWITTER (Jan. 8, 2020, 5:20 PM),
https://twitter.com/Li_Li_Leung/status/1215080810707025923 (a copy of which is attached as **Exhibit 1** to the Stang Declaration).

the parties; this proceeding serves only the interests of delay.  The survivors' claims should be liquidated now in their respective venues, and this Case should be dismissed.

4.     Without disclosing information, communications or the substance of the mediation, the members of the Survivors' Committee unanimously agree that these failed mediations have only broadened the divide between the Survivors' Committee and USAG/USOC, not bridged it.  The Survivors' Committee has continued to feel demeaned, belittled, and offended by the mediation process.  In contrast to the grandiose media statements made by USAG that it is moving the Case towards resolution, the Survivors' Committee feels these are not accurate, nor faithful representations of the dismal prospect of resolving this matter.

5.     Subsequent to the explosion of the Nassar cover-up in September of 2016, USAG continually proves itself incapable of addressing the systemic and cultural problems with sexual abuse in its sport, having a revolving door of executives with subsequent scandal, after scandal, after scandal.  USAG has, and continues, to view the issue of sexual abuse in sports as a marketing and image problem that can be willed away with public relations branding.  This culture within USAG has continued, from executive-to-executive, and illustrates why the parties have made no progress in the numerous attempts to resolve this matter at mediation.  By way of history and example, the President of USAG when the Nassar allegations were first publicly revealed was Steve Penny; who is currently indicted in the State of Texas for evidence tampering.  His successor, Ms. Kerry Perry, lasted as the President of USAG for less than a year, and was forced to resign upon the USOC placing pressure on her to do so for her mishandling of the sexual abuse crisis at USAG.  Senator Richard Blumenthal characterized her tenure as

4

President in exhibiting "…a willful and heartless blindness to the concerns of survivors…."[4]
Her successor, Ms. Mary Bono, lasted approximately 100 hours as President of USAG, after her
Twitter feed was found to have tweets decrying Colin Kapernick's protest of the National
Football League.  Her successor, and current USAG President, Ms. Lueng, too, has engaged in
similarly misguided behavior.[5]  During her first few months, Ms. Lueng hired Dr. Edward
Nyman as the new Director of Sports Medicine for USAG.  One day later, Dr. Nyman was fired
after it was "discovered" that there were allegations of physical abuse coming from the gym he,
and his wife, operated.  Moreover, when referring to her time as a gymnast, herself, Ms. Lueng
stated that she was not abused by Nassar because her coach was next to her during the treatment;
a common situation for many of the survivors in this action, **who were molested by Nassar with
their coach standing next to them**.  Ms. Leung then apologized publicly for making these ill-
advised comments.  This all occurred in April of 2019, **after the institution of this Case**.  This
is an institution that continues to widen the divide amongst USAG and the Survivors'
Committee.[6]

6.      Thus, more than 3 years after the Nassar abuse allegations entered the national
media spotlight and more than 13 months having passed since the Case filing, the Sexual Abuse
Claimants (defined herein) are still without any credible prospects of meaningful resolution in

---

[4] Juliet Macur & Ken Belson, *Kerry Perry, U.S.A. Gymnastics Chief, Is Forced Out*, N.Y. TIMES, Sept. 4,
2018, https://www.google.com/amp/s/www.nytimes.com/2018/09/04/sports/usa-gymnastics-kerry-
perry.amp.html (a copy of which is attached as **Exhibit 2** to the Stang Declaration).

[5] Despite repeated requests, USAG refused to engage the Survivors' Committee in the hiring process that
resulted in Ms. Leung's employment.  [*See generally Response of the Additional Tort Claimants
Committee of Sexual Abuse Survivors to Debtor's Motion for Authority to Enter into Employment
Agreement*, Doc 348.]

[6] USAG and the USOC objected to providing the Survivors' Committee the documents that they already
had produced to governmental investigators and Ropes & Gray even though the survivors' state court
counsel would have borne the burden of reviewing the documents.  From the survivors' perspective, these
objections evidenced a continuing effort to deny them transparency, especially since the documents
already had been produced to other third parties.

Humphrey Appellant Appendix 203

this Case.  With no global settlement among the parties, only two basic paths remain:  USAG can propose a plan that cannot be confirmed over the opposition of the Sexual Abuse Claimants,[7] or the Court can dismiss this Case.[8]  This Court itself explained in another chapter 11 case, where there was no reasonable likelihood of the debtor being able to successfully reorganize including proposing a confirmable plan, that dismissal of the chapter 11 case would be the appropriate action:  "Dismissal is appropriate where 'further suspension of the creditor's rights in order to allow a debtor to reorganize would be futile as there has been no progress in that direction and there was little prospect of future progress.'"  *In re Uptown Bus. Ctr., LLC*, No. 13-8032, 2013 Bankr. LEXIS 4324, at *12 (Bankr. S.D. Ind. Oct. 15, 2013).  Unfortunately, due to USAG's and others' (in)actions, that is the situation presently before the Court.  For all of the reasons set forth herein, this Case should be dismissed.

### Jurisdiction and Venue

7.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8.      Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory predicates for the relief requested herein are sections 105(a), 349, and 1112(b) of the Bankruptcy Code.

---

[7] Undoubtedly, because of the significant legal and financial leverage of the USOC over USAG, any plan proposed by USAG would have a blanket, nonconsensual release for the USOC with respect to Sexual Abuse Claims (defined herein) and related claims and liabilities.  The Survivors' Committee is informed and believes nearly all, if not all, of Sexual Abuse Claimants would vote against a USAG-plan with a non-consensual release for the USOC.

[8] As explained herein, USAG is a non-profit entity and thus, as a matter of statute, its Case cannot be converted to a chapter 7 case under section 1112 absent USAG's consent, and the appointment of a trustee under section 1112 would be a pointless exercise since the trustee would likewise have to clash with USAG, the USOC, and the Insurers.

6

## Relevant Facts

### A.  Filing of this Case and Enjoining of the Prepetition Lawsuits.

10.  On December 5, 2018 (the "Petition Date"), USAG filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

11.  USAG remains in possession of its property and continues to operate and maintain its organization as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner in this Case.

12.  On December 19, 2018, the United States Trustee appointed the Survivors' Committee to represent in this Case the interests of sexual abuse tort claimants (collectively, "Sexual Abuse Claimants") with claims ("Survivors' Claims") against USAG.

13.  The horrific sexual abuse perpetrated by Larry Nassar has been well documented in the national news media.  Employed by Michigan State University and serving as a volunteer to USAG, Nassar committed numerous acts of sexual abuse upon gymnasts at various events and camps, including camps held at what was previously USAG's National Team Training Center. USAG has been named as a defendant in more than 100 lawsuits brought by survivors of Nassar's abuse (the "Prepetition Lawsuits"), which Prepetition Lawsuits have been stayed vis-à-vis USAG since the Petition Date by the automatic stay, as well as vis-à-vis other non-debtor defendants, including the USOC, pursuant to orders of the Court (the "Lawsuits Stay Orders") expressly enjoining the continued prosecution of certain lawsuits by way of stipulations among the applicable litigation parties.  [*See* Docs 372 & 426.][9]

---

[9] The Prepetition Lawsuits plaintiffs who are parties to and covered by the Lawsuits Stay Orders are referred to herein as the "Prepetition Lawsuit Sexual Abuse Claimants."

7

14.     If the Motion were to be granted by the Court, the Prepetition Lawsuits would recommence and ultimately administer and resolve the Survivors' Claims.  **The Survivors' Committee is informed and believes that all of the Prepetition Lawsuit Sexual Abuse Claimants, through their counsel, support the granting of this Motion**.

15.     According to USAG, more than 500 claims have been filed against USAG, most of which claims are of Sexual Abuse Claimants relating to Nassar and non-Nassar abuse.  The Sexual Abuse Claimants of USAG will soon be upon ***the 3 ½ year anniversary*** of the publication of the 2016 *Indianapolis Star* article,[10] which had amplified the sexual abuse perpetrated by Nassar and put a national spotlight on these tragic matters.[11]

**B.      The Unsuccessful Mediation and USAG's Utter Failure to Further Any Settlement or Consensual Plan Process.**

16.     Upon USAG's motion, pursuant to orders entered in May 2019 [Docs 514 & 522], USAG, the Survivors' Committee, the USOC, and the Insurers prepared for and participated in mediation (the "Mediation") before the Honorable Gregg W. Zive in an attempt to consensually resolve the parties' relevant disputes including the treatment of the Survivors'

---

[10] Tim Evans, Mark Alesia & Marisa Kwiatkowski, *Former USA Gymnastics Doctor Accused of Abuse*, THE INDIANAPOLIS STAR, Sept. 12, 2016, https://www.indystar.com/story/news/2016/09/12/former-usa-gymnastics-doctor-accused-abuse/89995734/ (a copy of which is attached as **Exhibit 3** to the Stang Declaration).  The Survivors' Committee respectfully requests the Court to take judicial notice of the articles cited herein pursuant to Rules 201 and 902(6) of the Federal Rules of Evidence.

[11] To state the obvious, the Sexual Abuse Claimants' respective ordeals have actually been longer than the afore-referenced 3 ½ years, since the abuse they had sustained and related claims predate the *Indianapolis Star* article.  As a point of reference, Michigan State University, which had employed Larry Nassar, had reached a $500 million settlement with Nassar survivors within approximately 20 months after the 2016 *Indianapolis Star* article.  *See, e.g.,* Mitch Smith & Anemona Hartocollis, *Michigan State's $500 Million for Nassar Victims Dwarfs Other Settlements*, N.Y. TIMES, May 16, 2018, https://www.nytimes.com/2018/05/16/us/larry-nassar-michigan-state-settlement.html (a copy of which is attached as **Exhibit 4** to the Stang Declaration).

Humphrey Appellant Appendix 206

Claims and insurance coverage matters. [12]  The Mediation took place over six days in three

sessions – July 16-18, 2019, August 20-21, 2019 and November 21, 2019.  Additionally, the

Survivors' Committee is informed that the mediators have been in regular discussions with the

Insurers, including a face-to-face mediation that preceded the November 21st mediation session

with the Survivors' Committee.  The Mediation did not result in any settlement, and there is no

further all-parties Mediations scheduled.

17.     After the November 21, 2019 mediation session, USAG's counsel provided no

substantive update to counsel for the Survivors' Committee as to any potential global settlement

among the key parties, other than informing committee counsel that USAG had been trying to

resolve certain insurance coverage disputes.  [*See* Stang Declaration, ¶ 11.]  In short, after the

unsuccessful Mediation, USAG has done nothing to engage the Survivors' Committee in

advancing the ball towards a settlement or a consensual plan of reorganization.  The result of

these failed mediations was not progress, but rather, exchanges that only left those on the

Survivors' Committee feeling insulted, marginalized, and betrayed by USAG, the USOC and

their purported publicly stated commitment to change the trajectory of their respective

organizations in regard to treatment of athletes.  In short, the Mediation has only crystallized the

void between Survivors' Committee members and USAG (and the USOC), not bridged it.

18.     More than 13 months having passed since the Case filing, USAG has not

proposed, and has given no indication that it is anywhere close to formulating and filing, any

chapter 11 plan, and has asked the Court once again to extend its plan and solicitation exclusivity

periods until April 3, 2020 and May 29, 2020, respectively.  [*See Debtor's Fifth Motion for*

---

[12] In September 2019, Paul J. Van Osselaer joined Judge Zive as a co-mediator to assist in mediating insurance coverage and related issues.  [*See Supplemental Order Re Appointment of Additional Mediator*, Doc 798.]  Judge Zive and Mr. Van Osselaer have jointly mediated with USAG, USOC and their respective Insurers at meetings other than the three sessions noted herein.

Humphrey Appellant Appendix 207

*Order Extending the Debtor's Exclusive Periods to File and to Solicit Acceptances of a Chapter 11 Plan*, Doc 870.]  The Survivors' Committee did not object to this extension request; however, the extension is meaningless given USAG's inability and failure to propose a confirmable plan. Important in the Survivors' Committee's view is the substantial leverage – legal and financial – that the USOC has over USAG, as evidenced by, *inter alia*, the USOC's November 5, 2018 pending petition to revoke USAG's recognition as a member National Governing Body of the USOC and the fact that many of USAG's insurance policies include the USOC as an additional insured.  The USOC's leverage makes settlement in this Case virtually impossible if the USOC insists (as it undoubtedly will in the context of any plan proposed by USAG) upon a complete release of claims against it.

19.     The Summer Olympic Games will commence in late July 2020 – only six months from now.[13]  Based on communications with USAG's counsel, USAG apparently has not undertaken any material efforts and other actions to obtain and maintain important sponsorships for and in connection with the Summer Olympic Games, which sponsorships would be important revenue streams for the benefit of the bankruptcy estate (the "Estate") and its creditors.[14]  [*See* Stang Declaration, ¶ 12.]  Such certainly is not the case with the USOC which provides USAG with a share of its Olympics revenues.

---

[13] Press Release, IOC, *Unprecedented Levels of Excitement Around the Olympic Games Tokyo 2020* (Jan. 10, 2020, https://www.olympic.org/news/unprecedented-levels-of-excitement-around-the-olympic-games-tokyo-2020 (a copy of which is attached as **Exhibit 5** to the Stang Declaration).

[14] Certainly, USAG previously lost many of its sponsorships and revenue sources in the wake of the national publicity surrounding Nassar.  *See, e.g.*, Ruth McCambridge, *Corporate Sponsors Abandon Nonprofit USA Gymnastics, But Not the Athletes*, NPQ (NONPROFIT QUARTERLY), Jan. 29, 2018, https://nonprofitquarterly.org/corporate-sponsors-abandon-nonprofit-usa-gymnastics-not-athletes/ (a copy of which is attached as **Exhibit 6** to the Stang Declaration); Scott M. Reid, *Nike Looked to Sponsor USA Gymnastics While Both Were Mired in Sexual Misconduct Scandals*, THE ORANGE COUNTY REGISTER, May 11, 2018, https://www.ocregister.com/2018/05/11/nike-looked-to-sponsor-usa-gymnastics-while-both-were-mired-in-sexual-misconduct-scandals/ (a copy of which is attached as **Exhibit 7** to the Stang Declaration).

Humphrey Appellant Appendix 208

20.     As discussed herein, the Sexual Abuse Claimants have waited far too long for USAG (and/or other responsible parties) to redress the claims and damages suffered by the Sexual Abuse Claimants.  As explained above, the lack of any meaningful progress toward a compromise and consensual plan clearly evidences that USAG, the USOC, and the Insurers are in no rush to reach a fair and equitable resolution with the Sexual Abuse Claimants.  With the parties at an impasse, the Survivors' Committee submits that, unfortunately under all of these circumstances, only one viable alternative remains – dismissal of this Case.

<u>**Argument**</u>

**A.     <u>Applicable Legal Standards.</u>**

21.     Under section 1112(b) of the Bankruptcy Code, upon a party in interest's motion, the Court must dismiss the chapter 11 case or convert it to chapter 7 if there is "cause" to do so. 11 U.S.C. § 1112(b)(1).  If the Court determines that there is cause to dismiss or convert, it must also:  (i) decide whether dismissal, conversion, or the appointment of a trustee or examiner is in the best interests of creditors and the estate; and (ii) identify whether there are "unusual circumstances" that establish that dismissal or conversion is not in the best interests of creditors and the estate.[15]  11 U.S.C. § 1112(b)(1), (b)(2).

22.     The Court has broad discretion in determining what constitutes cause under section 1112(b) of the Bankruptcy Code.  *See In re Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994); *Uptown Bus. Ctr., LLC*, 2013 Bankr. LEXIS 4324, at *10 (bankruptcy courts have

---

[15] "The Code does not define 'unusual circumstances,' but the phrase 'contemplates conditions that are not common in most chapter 11 cases.'"  *In re Aurora Memory Care LLC*, 589 B.R. 631, 638 (Bankr. N.D. Ill. 2018).  Further, in addition to there being unusual circumstances establishing that dismissal or conversion is not in the best interests of the estate and creditor, the debtor must demonstrate that a plan is reasonably likely to be confirmed within the applicable deadline, and that the debtor had a "reasonable justification" for the act or omission constituting cause for dismissal or conversion and the act or omission will be cured within a "reasonable time."  11 U.S.C. §§ 1112(b)(2)(A) & (b)(2)(B); *Aurora Memory Care LLC*, 589 B.R. at 638.

11

"broad discretion" to dismiss case). The movant bears the burden of establishing by a preponderance of the evidence that cause exists. *Id.*; *In re Royalty Props., LLC*, 604 B.R. 742, 748 (Bankr. N.D. Ill. 2019) (citing *In re Draiman*, 450 B.R. 777, 826 (Bankr. N.D. Ill. 2011)).

23.    "Cause" is defined in section 1112(b)(4) of the Bankruptcy Code with a list of certain enumerated examples, but the list is not exclusive. *Uptown Bus. Ctr., LLC*, 2013 Bankr. LEXIS 4324, at *10; *Aurora Memory Care LLC*, 589 B.R. at 637-38.  As discussed further herein, USAG has no reasonable prospect of reorganizing including filing a confirmable plan under the current circumstances.  As this Court has explained, such unlikelihood of proposing a viable plan ties into several enumerated causes for dismissal, including section 1112(b)(4)(A) of the Bankruptcy Code which lists the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"[16] as one potential cause to dismiss. *Uptown Bus. Ctr., LLC*, 2013 Bankr. LEXIS 4324, at *11-12.  Importantly, "[d]ismissal is appropriate where 'further suspension of the creditor's rights in order to allow a debtor to reorganize would be futile as there has been no progress in that direction and there was little prospect of future progress'" *Id.* at *12 (citations omitted); *accord*, *Aurora Memory Care LLC*, 589 B.R. at 640 ("Before the 2005 amendments to the Code, section 1112(b)(2) specifically listed the 'inability to effectuate a plan' as 'cause' to convert or dismiss a chapter 11 case…. It was therefore proper to dismiss a case 'if the court determine[d] that it [was] unreasonable to expect that a plan [could] be confirmed.'" citing *Woodbrook Assocs.*, 19 F.3d at 316).  "Although this example of cause was deleted from the statute in 2005, a debtor's 'inability to effectuate a plan' continues to be 'a viable basis for dismissal because the listed examples of cause are not

---

[16] There is continuing diminution of the Estate in that, as USAG's filed monthly operating reports reflect, substantial amounts of administrative claims continue to accrue in this Case, and as discussed herein, USAG has evidently failed to obtain sponsorships and facilitate other revenue sources as the Olympic Games approach.

Humphrey Appellant Appendix 210

exhaustive." *Aurora Memory Care LLC,* 589 B.R. at 640 (citation omitted) (cause existed for dismissal or conversion of case where there was no reasonable likelihood of reorganization and debtor had failed to file requisite reports); *In re Seasons Apts., Ltd. Pshp.*, 215 B.R. 953, 960 (Bankr. W.D. La. 1997) (chapter 11 case dismissed approximately 16 months after petition filing, where any plan by debtor could not be confirmed over key creditor's objection; "considering the impasse in the settlement negotiations demonstrated by [creditor]'s latest filing, this case is ripe for dismissal under 11 U.S.C. § 1112(b)."); *see also Woodbrook Assocs.*, 19 F.3d at 317 ("The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless.").

**B.      Cause Exists to Dismiss Because USAG Has No Reasonable Likelihood of Proposing a Confirmable Plan or Otherwise Reorganizing.**

24.      As discussed, the Survivors' Committee has brought this Motion, with no other choice left.  USAG, the USOC, and the Insurers are not interested in expeditiously resolving the parties' disputes in any sort of fair, comprehensive compromise as part of a consensual chapter 11 plan.  The Mediation to date has not worked; no further Mediation is scheduled and USAG has not made any meaningful overtures since the November 21st mediation session toward a global settlement or an acceptable plan.  Further, there is no indication that USAG is making any real efforts to obtain sponsors and tap other potential revenue sources for the benefit of the Estate and its creditors.

25.      Absent a settlement with and support of the Sexual Abuse Claimants, under no conceivable circumstance could USAG confirm a plan.  From USAG's perspective, whether under joint tortfeasor, indemnification and/or other theories of liability, USAG will continue to be exposed to litigation risk if the USOC's potential or actual liabilities relating to Survivors' Claims are not released, and thus, any plan that would be proposed by USAG would inevitably

include a blanket release for the USOC. However, under the circumstances of this Case, USAG cannot cram down any plan over the objection of the Sexual Abuse Claimants that gives a blanket release to the USOC (or any other third parties) of Survivors' Claims.[17]  *See, e.g.*, *Airadigm Commc'ns v. FCC (In re Airadigm Commc'ns)*, 519 F.3d 640, 655-58 (7th Cir. 2008) (any nonconsensual third party release and related injunction must meet the following requirements:  (i) the release must be narrow in that it applies only to claims "arising out of or in connection with" the reorganization and may not include "willful misconduct," (ii) it must be necessary for the reorganization, (iii) it may not provide for "blanket immunity," (iv) the immunity afforded by the release must not affect matters beyond the jurisdiction of the court or unrelated to the reorganization, and (v) there must be "adequate evidence" that the beneficiaries of the releases required them before making a monetary contribution "which was itself essential to the reorganization"); *In re Ingersoll, Inc.*, 562 F.3d 856, 865 (7th Cir. 2009) (the court "preached caution" in approving non-debtor releases and announced that "[i]n most instances, [non-debtor] releases . . . will not pass muster under [the *Airadigm*] rule"; "A nondebtor release should only be approved in 'rare cases' . . . because it is 'a device that lends itself to abuse.'"); *In re Berwick Black Cattle Co.* 394 B.R. 448, 457, 462 (Bankr. C.D. Ill. M. 2008) (denying confirmation of a plan that included blanket third party release provisions that included

---

[17] In all likelihood, any USAG-proposed plan would also suffer other fatal defects, including lack of feasibility and lack of good faith.

Humphrey Appellant Appendix 212

prepetition claims and claims unrelated to the bankruptcy case including claims in a

nonbankruptcy suit over which the court had no jurisdiction).[18]

26.     Based on discussions with the respective lawyers for the Prepetition Lawsuit

Sexual Abuse Claimants and other attorneys representing Sexual Abuse Claimants, the

Survivors' Committee believes nearly all Sexual Abuse Claimants would reject any

nonconsensual plan proposed by USAG that included a broad release for the USOC.[19]  That is,

USAG cannot confirm a plan without the support of the class of Sexual Abuse Claimants.  In

short, the parties are at an impasse, and there is "little prospect of future progress."  *Uptown Bus.*

*Ctr., LLC*, 2013 Bankr. LEXIS 4324, at *12, *19-20 (dismissing case where court concluded that

debtor was not likely to be able to confirm a plan and after dismissal, relevant matters would

have to be resolved in state court; "If the Debtor were to file a plan containing terms similar to

those discussed at the hearing, it would be difficult for the Debtor to meet the confirmation

criteria under § 1129 [including obtaining a consenting, impaired, non-insider class of claims]");

*Aurora Memory Care LLC*, 589 B.R. at 640 (cause existed for dismissal or conversion of case

where there was no reasonable likelihood of reorganization and debtor had failed to file requisite

reports); *Seasons Apts., Ltd. Pshp*., 215 B.R. at 960 (chapter 11 case dismissed where any plan

by debtor could not be confirmed over key creditor's objection; "considering the impasse in the

---

[18] *See also OPS3 LLC v. Am. Chtd. Bank*, No. 13-cv-04398, 2017 U.S. Dist. LEXIS 120442, at *7 (N.D. Ill. Aug. 1, 2017) (rejecting non-consensual third party release of "all guaranties by or on behalf of any of the Debtors" as beyond the scope permitted by *Aradigm*); *In re GAC Storage Lansing, LLC*, 489 B.R. 747, 768-69 (Bankr. N.D. Ill. 2013) (rejecting plan provisions that would release guarantors of the debtor's pre-petition debt as beyond the permissible scope of *Aradigm*); *In re Draiman,* 450 B.R. 777, 799 (Bankr. N.D. Ill. 2011) (rejecting releases of "the Liquidation Trustee, the Debtor, and their respective officers, directors, shareholders, employees, consultants, agents, advisors, attorneys, accountants, financial advisors, and other representatives and Professionals" as overly extensive); *In re Shelbourne N. Water St. L.P*., 556 B.R. 874, 884 (Bankr. N.D. Ill. 2016) (plan provision releasing non-debtor from claims by non-creditor not enforceable).

[19] As noted above, the Survivors' Committee is informed and believes that all of the Prepetition Lawsuit Sexual Abuse Claimants, through their counsel, support the granting of this Motion.

Humphrey Appellant Appendix 213

settlement negotiations demonstrated by [creditor]'s latest filing, this case is ripe for dismissal under 11 U.S.C. § 1112(b)."). Accordingly, this Case should be dismissed.

**C.      Dismissal Is the Proper Remedy Under Section 1112(b) Rather Than the Appointment of a Chapter 11 Trustee.**

27.      Rather than dismiss a case pursuant to section 1112(b)(1) of the Bankruptcy Code, a court may convert a case or appoint a chapter 11 trustee if to do so "is in the best interests of creditors and the estate." First, USAG is a non-profit entity and as such, its Case cannot be converted to a chapter 7 proceeding. *See* 11 U.S.C. 1112(c) ("The court may not convert a case under this chapter to a case under chapter 7 of this title if the debtor is … a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.").

28.      Further, no purpose would be served by the appointment of a trustee in this Case: In all events, any trustee would have to deal and clash with the same key parties including the USAG, the USOC, and the Insurers, and nothing in the record suggests these parties would change their strategies. For the reasons discussed herein, only one viable option – dismissal of this Case – remains and is in the best interest of the Estate and its creditors at this critical point.

**D.      Related Relief.**

29.       In connection with the requested dismissal of this Case, the Survivors' Committee requests that the Court's order on the Motion (the "Dismissal Order") provide certain related relief to appropriately effectuate the dismissal as follows:

(a)      Notwithstanding section 349 of the Bankruptcy Code, all prior rulings and orders entered in this Case (including all adversary proceedings), with the exception of the Lawsuit Stay Orders (the "Prior Orders") should remain in full force and effect and survive the dismissal of this Case, including, without limitation, (i) all Prior Orders entered by this Court and the District Court in Bankr. Adv. Case No. 19-50012 and 1:18-cv-1306-RLY-MPB (*USA Gymnastics v. Ace*

16

*American Ins. Co. f/k/a Cigna Ins. Co., et al.*); and (ii) all Prior Orders relating to the fee applications of professionals.

(b)     The Court should retain jurisdiction with respect to any matters, claims, rights or disputes arising from or relating to the implementation of the Dismissal Order or any Prior Orders.

(c)     The Court should retain jurisdiction over (i) the hearing on and resolution of any and all fee applications that have been or will be filed (including after dismissal of the Case) in this Case, and relatedly, (ii) the entry and enforcement of any Court orders relating to fee applications (including compelling USAG to pay all approved fees and expenses).

30.     The Survivors' Committee respectfully submits that the foregoing related relief is reasonable and necessary to adequately protect the interests of the Sexual Abuse Claimants and the Survivors' Committee (including its professionals).  Numerous bankruptcy courts have recognized the propriety of and need for such protective and other administrative provisions in the event of a chapter 11 case dismissal.  *See, e.g., In re Coach Am Group Holdings Corp.*, Case No. 12-10010 (KG) (Bankr. D. Del. May 31, 2013) (order, Doc 1568); *In re 155 Route 10 Associates, Inc.*, Case No. 12-24414 (NLW) (order, Doc 30); *In re Trade Secret, Inc.*, Case No. 10-12153 (KG) (Bankr. D. Del. Jan. 31, 2011) (order, Doc 767); *In re Foamex Int'l Inc.*, Case No. 09-10560 (KJC) (Bankr. D. Del. Jan. 20, 2010) (order, Doc 761); *In re Dawarhare's of Lexington, LLC,* Case No. 08-51381 (Bankr. E.D. Ky. Dec. 30, 2008) (order, Doc 316); *In re Cornell Trading, Inc.*, Case No. 06-10017-JNF (Bankr. D. Mass. June 5, 2007) (order, Doc 770); *In re Felda Plantation, LLC*, 2012 WL 1965964 (Bankr. M.D. Fla. May 29, 2012); *In re Inverness Distribution Ltd.*, Case No. 11-12106 (SCC) (Bankr. S.D.N.Y. May 4, 2015) (order, Doc 86); *In re Omaha Standing Bear Pointe, LLC*, Case No. 10-81413 (Bankr. D. Neb. March 11, 2011) (order, Doc 52).  *See generally Wiese v. Cmty. Bank of Cent. Wis.*, 552 F.3d 584, 590 (7th Cir. 2008) (court has discretion to provide for continued viability of prior order after case dismissal notwithstanding section 349, based on creditors' interests and rights).

## Notice

31.     A copy of this Motion is being given to (a) USAG, (b) USAG's counsel, (c) the United States Trustee, (d) the USOC, (e) the USOC's counsel, and (e) those parties who have appeared in this Case or have requested notice pursuant to Bankruptcy Rule 2002.  In addition, pursuant to Rule 2002(a)(4) of the Federal Rules of Bankruptcy Procedure, the Survivors' Committee will provide notice of this motion and any hearing on those parties listed above and all creditors who have filed proofs of claim in this Case.  The Survivors' Committee respectfully submits that no other or further notice is necessary under the circumstances.

## Conclusion

**WHEREFORE,** the Survivors' Committee respectfully requests that the Court enter an order:  (a) granting the Motion in all respects; (b) dismissing this Case; (c) granting the requested related relief to implement the dismissal; and (d) granting such other and further relief as may be just and appropriate under the circumstances.

Humphrey Appellant Appendix 216

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

Dated: January 21, 2020

*/s/ James I. Stang*

James I. Stang, Esq. (admitted *pro hac vice*)
Ilan D. Scharf, Esq. (admitted *pro hac vice*)
Jonathan J. Kim
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760
E-mail:  jstang@pszjlaw.com
       isharf@pszjlaw.com
       jkim@pszjlaw.com

-and-

RUBIN & LEVIN, P.C.

*/s/ Meredith R. Theisen*

Meredith R. Theisen, Esq.
Deborah J. Caruso, Esq.
135 N. Pennsylvania Street, Suite 1400
Indianapolis, IN 46204
Telephone:  (317) 634-0300
Facsimile:  (317) 263-9411
Email:  dcaruso@rubin-levin.net
      mtheisen@rubin-levin.net

*Counsel for the Survivors' Committee*

Humphrey Appellant Appendix 217

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2020, a copy of the foregoing *Motion of the Additional Tort Claimants Committee of Sexual Abuse Survivors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 349 and 1112(b) Dismissing the Bankruptcy Case and Granting Related Relief* was filed electronically.  Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System.  Parties may access this filing through the Court's system.

Nancy D Adams     ndadams@mintz.com
Annemarie C Alonso     annie@sllawfirm.com
Martin Beeler     mbeeler@cov.com
Megan A Bonanni     mbonanni@pittlawpc.com
Tonya J. Bond     tbond@psrb.com, jscobee@psrb.com
Wendy D Brewer     wbrewer@fmdlegal.com, cbellner@fmdlegal.com
Kenneth H. Brown     kbrown@pszjlaw.com
Charles D. Bullock     cbullock@sbplclaw.com, lhaas@sbplclaw.com
George Calhoun     george@ifrahlaw.com, Heather.Simpson@kennedyscmk.com
Douglas N. Candeub     dcandeub@morrisjames.com
John Cannizzaro     john.cannizzaro@icemiller.com, Thyrza.Skofield@icemiller.com
Deborah Caruso     dcaruso@rubin-levin.net, dwright@rubin-levin.net;jkrichbaum@rubin-levin.net;atty_dcaruso@bluestylus.com
Dianne Coffino     dcoffino@cov.com
Jesse Max Creed     creed@psb.law, alegria@psb.law
Heather M. Crockett     Heather.Crockett@atg.in.gov, darlene.greenley@atg.in.gov
Alex Cunny     acunny@manlystewart.com
Edward DeVries     edward.devries@wilsonelser.com
Karen M Dixon     kdixon@skarzynski.com
Kimberly A. Dougherty     kim.dougherty@andruswagstaff.com, sandra.martin@andruswagstaff.com
Laura A DuVall     Laura.Duvall@usdoj.gov, Catherine.henderson@usdoj.gov
Jeffrey B. Fecht     jfecht@rbelaw.com, rmcclintic@rbelaw.com
Sarah Lynn Fowler     sarah.fowler@mbcblaw.com, deidre.gastenveld@mbcblaw.com
Eric D Freed     efreed@cozen.com, mmerola@cozen.com
Frances Gecker     fgecker@fgllp.com, csmith@fgllp.com;csucic@fgllp.com;mmatlock@fgllp.com
Cameron Getto     cgetto@zausmer.com
Steven W Golden     sgolden@pszjlaw.com
Douglas Gooding     dgooding@choate.com
Gregory Michael Gotwald     ggotwald@psrb.com, scox@psrb.com
Manvir Singh Grewal     mgrewal@4grewal.com
Susan N Gummow     sgummow@fgppr.com, bcastillo@fgppr.com
Katherine Hance     khance@goodwin.com
Samuel D. Hodson     shodson@taftlaw.com, aolave@taftlaw.com
Jeffrey A Hokanson     jeff.hokanson@icemiller.com, bgnotices@icemiller.com
John R. Humphrey     jhumphrey@taftlaw.com, aolave@taftlaw.com
Cassandra Jones     cjones@walkerwilcox.com,

Humphrey Appellant Appendix 218

vhosek@wwmlawyers.com;docket@walkerwilcox.com
Bruce L. Kamplain     bkamplain@ncs-law.com, dhert@ncs-law.com;klong@ncs-law.com
Kevin P Kamraczewski     kevin@kevinklaw.com
Ronald David Kent     ronald.kent@dentons.com
Adam L. Kochenderfer     akochenderfer@wolfsonbolton.com
Christopher E. Kozak     ckozak@psrb.com
Micah R Krohn     mkrohn@fgllp.com,
mmatlock@fgllp.com;csmith@fgllp.com;csucic@fgllp.com
Carl N. Kunz     ckunz@morrisjames.com, wweller@morrisjames.com
Cynthia Lasher     clasher@ncs-law.com, dcouch@ncs-law.com;dhert@ncs-law.com
Adam Le Berthon     adam.leberthon@wilsonelser.com
Jonathan C Little     jon@sllawfirm.com
Michael M. Marick     mmarick@skarzynski.com
Jonathan Marshall     jmarshall@choate.com
Phillip Alan Martin     pmartin@fmdlegal.com, cbellner@fmhd.com
John McDonald     jmcdonald@briggs.com
Mathilda S. McGee-Tubb     msmcgee-tubb@mintz.com
Harley K Means     hkm@kgrlaw.com, kwhigham@kgrlaw.com;cjs@kgrlaw.com
Geoffrey M. Miller     geoffrey.miller@dentons.com, ndil_ecf@dentons.com
Robert Millner     robert.millner@dentons.com, ndil_ecf@dentons.com
James P Moloy     jmoloy@boselaw.com,
dlingenfelter@boselaw.com;mwakefield@boselaw.com
Ronald J. Moore     Ronald.Moore@usdoj.gov
Whitney L Mosby     wmosby@bgdlegal.com, fwolfe@bgdlegal.com
Joel H. Norton     jnorton@rsslawoffices.com
Michael P. O'Neil     moneil@taftlaw.com, aolave@taftlaw.com
Weston Erick Overturf     wes.overturf@mbcblaw.com,
deidre.gastenveld@mbcblaw.com;ellen.sauter@mbcblaw.com
Dean Panos     dpanos@jenner.com
Stephen Jay Peters     speters@kgrlaw.com, acooper@kgrlaw.com
Ginny L. Peterson     gpeterson@k-glaw.com, acoy@k-glaw.com
Robert J Pfister     rpfister@ktbslaw.com
John Thomas Piggins     pigginsj@millerjohnson.com, ecfpigginsj@millerjohnson.com
Michael L Pitt     mpitt@pittlawpc.com
George Plews     gplews@psrb.com
Amanda Koziura Quick     amanda.quick@atg.in.gov, Marie.Baker@atg.in.gov
Michael L. Ralph     mralph@rsslawoffices.com
Abigail E. Rocap     arocap@batescarey.com
Melissa M. Root     mroot@jenner.com, wwilliams@jenner.com
James Pio Ruggeri     jruggeri@goodwin.com
Syed Ali Saeed     ali@sllawfirm.com, betty@sllawfirm.com
Ilan D Scharf     ischarf@pszjlaw.com
Thomas C Scherer     tscherer@bgdlegal.com, fwolfe@bgdlegal.com
David J. Schwab     djschwab@rsslawoffices.com
Igor Shleypak     ishleypak@fgppr.com, jfecteau@fgppr.com
Heather Elizabeth Simpson     heather.simpson@kennedyscmk.com

Casey Ray Stafford    cstafford@k-glaw.com, lsmith@k-glaw.com
James I. Stang    jstang@pszjlaw.com
Catherine L. Steege    csteege@jenner.com,
mhinds@jenner.com;thooker@jenner.com;aswingle@jenner.com
Laura B. Stephens    lbstephens@mintz.com
Keith Teel    kteel@cov.com
Meredith R. Theisen    mtheisen@rubin-levin.net,
atty_mtheisen@bluestylus.com;mralph@rubin-levin.net;csprague@rubin-levin.net
Jonathan Toren    jtoren@cozen.com, jonathan-toren-1988@ecf.pacerpro.com
U.S. Trustee    ustpregion10.in.ecf@usdoj.gov
Susan Walker    susan.walker@dentons.com
Joshua D Weinberg    jweinberg@goodwin.com
Gabriella B. Zahn-Bielski    gzahnbielski@cov.com

I further certify that on January 21, 2020, a copy of the foregoing *Motion of the Additional Tort Claimants Committee of Sexual Abuse Survivors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 349 and 1112(b) Dismissing the Bankruptcy Case and Granting Related Relief* was served via electronic mail to the following:

**United States Olympic Committee:** Chris McCleary at Chris.McCleary@usoc.org
**The Alexander, a Dolce Hotel and Wyndham Hotel Group, LLC:** Daniel M. Eliades at daniel.eliades@klgates.com and David S. Catuogno at david.catuogno@klgates.com

*/s/ Meredith R. Theisen*
Meredith R. Theisen

22

# EXHIBIT A

**[Stang Declaration]**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-09108-RLM-11 |
| Debtor. | |

## DECLARATION OF JAMES I. STANG
## IN SUPPORT OF MOTION OF THE ADDITIONAL TORT CLAIMANTS
## COMMITTEE OF SEXUAL ABUSE SURVIVORS FOR ENTRY OF
## AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 349 AND 1112(b)
## DISMISSING THE BANKRUPTCY CASE AND GRANTING RELATED RELIEF

I, James I. Stang, hereby declare:

1.      I am a partner of Pachulski Stang Ziehl & Jones LLP, counsel of record to the

Additional Tort Claims Committee of Sexual Abuse Survivors (the "Survivors' Committee") in

the above-captioned chapter 11 case (the "Case").

2.      I make this declaration in support of the *Motion of the Additional Tort Claimants*

*Committee of Sexual Abuse Survivors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a),*

*349 and 1112(b) Dismissing the Bankruptcy Case and Granting Related Relief* (the "Motion") in

the Case.[2]  Except as otherwise indicated, all statements in this Declaration are based upon my

personal knowledge, my review of relevant documents collected by my firm's employees and/or

my opinion based on my experience serving as a bankruptcy counsel to the Survivors'

Committee.  If I were called to testify as a witness in this matter, I could and would competently

---

[1] The last four digits of USAG's federal tax identification number are 7871. The location of USAG's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

[2] All capitalized terms not defined herein have the meaning ascribed to them in the Motion.

testify to each of the facts set forth herein based upon my personal knowledge, review of documents and/or opinion.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of a message on Twitter posted by Li Li Leung (@Li_Li_Leung) on January 8, 2020, available at https://twitter.com/Li_Li_Leung/status/1215080810707025923.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of the newspaper article, *Kerry Perry, U.S.A. Gymnastics Chief, Is Forced Out*, by Juliet Macur & Ken Belson, N.Y. TIMES, Sept. 4, 2018, available at https://www.google.com/amp/s/www.nytimes.com/2018/09/04/sports/usa-gymnastics-kerry-perry.amp.html.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of the newspaper article, *Former USA Gymnastics Doctor Accused of Abuse*, by Tim Evans, Mark Alesia & Marisa Kwiatkowski, THE INDIANAPOLIS STAR, Sept. 12, 2016, available at https://www.indystar.com/story/news/2016/09/12/former-usa-gymnastics-doctor-accused-abuse/89995734/.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of the newspaper article *Michigan State's $500 Million for Nassar Victims Dwarfs Other Settlements*, by Mitch Smith & Anemona Hartocollis, N.Y. TIMES, May 16, 2018, available at https://www.nytimes.com/2018/05/16/us/larry-nassar-michigan-state-settlement.html.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the press release by the International Olympic Committee, *Unprecedented Levels of Excitement Around the Olympic Games Tokyo 2020* (Jan. 10, 2020), available at https://www.olympic.org/news/unprecedented-levels-of-excitement-around-the-olympic-games-tokyo-2020.

Humphrey Appellant Appendix 223

8.      Attached hereto as **Exhibit 6** is a true and correct copy of the publication *Corporate Sponsors Abandon Nonprofit USA Gymnastics, But Not the Athletes*, by Ruth McCambridge, NPQ (NONPROFIT QUARTERLY), Jan. 29, 2018, available at https://nonprofitquarterly.org/corporate-sponsors-abandon-nonprofit-usa-gymnastics-not-athletes/.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of the newspaper article, *Nike Looked to Sponsor USA Gymnastics While Both Were Mired in Sexual Misconduct Scandals*, by Scott M. Reid, THE ORANGE COUNTY REGISTER, May 11, 2018, available at https://www.ocregister.com/2018/05/11/nike-looked-to-sponsor-usa-gymnastics-while-both-were-mired-in-sexual-misconduct-scandals/.

10.      Upon USAG's motion, pursuant to orders entered in May 2019, USAG, the Survivors' Committee, the USOC, and the Insurers prepared for and participated in Mediation before the Honorable Gregg W. Zive.  The Mediation took place over six days in three sessions – July 16-18, 2019, August 20-21, 2019 and November 21, 2019.[3]  Additionally, I have been informed that the mediators have been in regular discussions with the Insurers, including a face-to-face mediation that preceded the November 21st mediation session with the Survivors' Committee.  The Mediation did not result in any settlement, and there is no further all-parties Mediations scheduled.

11.      After the November 21, 2019 mediation session, USAG's counsel provided no substantive update to me or any other advisors to the Survivors' Committee as to any potential

---

[3] In September 2019, Paul J. Van Osselaer joined Judge Zive as a co-mediator to assist in mediating insurance coverage and related issues.  I have been informed that Judge Zive and Mr. Van Osselaer have jointly mediated with USAG, USOC and their respective Insurers at meetings other than the three sessions noted herein.

Humphrey Appellant Appendix 224

global settlement among the key parties, other than informing me that USAG had been trying to resolve certain insurance coverage disputes.

12.     Based on my communications with USAG's counsel, USAG apparently has not undertaken any material efforts and other actions to obtain and maintain important sponsorships for and in connection with the Summer Olympic Games.

13.     Based on my discussions with the respective lawyers for the Prepetition Lawsuit Sexual Abuse Claimants and other attorneys representing Sexual Abuse Claimants, I am informed and believe that nearly all Sexual Abuse Claimants would reject any nonconsensual plan proposed by USAG that included a broad release for the USOC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of January, 2020 at Los Angeles, California.


_____*/s/James I. Stang*_____
James I. Stang

Humphrey Appellant Appendix 225

# EXHIBIT 1

Humphrey Appellant Appendix 226



## Li Li Leung ✔
@Li_Li_Leung

Follow  ⌄

✕

Copy link to Tw...

Embed Tweet

I recently reflected on the past year as President & CEO of @USAGym & shared my vision as we look toward the future. 2020 will be an important year as we continue towards being more athlete-centric. I'm ready & excited for what lies ahead – here's to 2020!



**A message to the gymnastics community from USA Gymnastics CEO Li Li Le...**
I am very excited that 2020 is now upon us. Not only does it mark the arrival of an Olympic year, but also the start of a new decade. Before leaping into 2020, I'd like ...
usagym.org

5:20 PM - 8 Jan 2020

**11** Retweets  **85** Likes

💬 14    🔁 11     85



**Marybeth**    @poeticdiction · Jan 8    ⌄
Replying to @Li_Li_Leung @USAGym
Fire Leslie King.

💬    🔁 1     19

Humphrey Appellant Appendix 227

1/1

# A message to the gymnastics community from USA Gymnastics CEO Li Li Leung

*posted on 01/08/2020*

Like    Share    74 people like this. Be the first of your friends.

Tweet



Happy New Year! I hope each of you were able to enjoy the holiday season with family and friends.

I am very excited that 2020 is now upon us. Not only does it mark the arrival of an Olympic year, but also the start of a new decade. Before leaping into 2020, I'd like to take a moment to reflect on the past year.

I hope you'll agree that 2019 was a year of change for our organization. A new Safe Sport Policy was launched and along with it our educational outreach initiatives; mediation with the survivors got underway; team selection procedures were rewritten; and internal reorganizing and restructuring began. As part of this reorganization, we have brought on new team members to lead some key positions. We have appointed Kim Kranz to a newly-created role in which she will be responsible for overseeing the strategy and execution of our holistic athlete health and wellness initiatives, including sports medicine, psychology and nutrition services, as well as athlete-development programs. On February 1, Jason Woodnick will step into the role of vice president for men's gymnastics and will be responsible for overseeing the men's program, from grassroots to the national teams. We're excited to have both Kim and Jason join the organization and look forward to introducing more new team members in the coming months.

Humphrey Appellant Appendix 228

This year also saw exciting achievements for our athletes and coaches. The U.S. men joined the women by qualifying as a team, and rhythmic gymnastics qualified for two individual berths for the Olympic Games. And, Simone Biles cemented her place as the greatest of all time with her gravity-defying moves, while also earning the Associated Press and Team USA awards, among many others, for top female athlete of 2019.

As we look toward the future, 2020 will be an important year as we continue to shift the organization to be more athlete-centric, while also focusing on reaching resolution with the survivors and emerging from bankruptcy. For our elite athletes and coaches, this year represents the final leg of the journey toward achieving dreams of making the acrobatic World Championships or U.S. Olympic Teams for gymnastics.

As we continue to move forward, I want you to know that we will never forget the lessons of the past that serve as the foundation for both changing and rebuilding for the future. I want to thank all of you who have taken the time to share your thoughts and perspectives, which have been invaluable these past 10 months. While I have learned a great deal, I will continue to listen and ask questions to make sure we're serving you the way we should. We are ready and excited for what lies ahead in 2020 and hope you will join us in our pursuit of fostering the best possible environment for athletes and all of our members. Thank you again for coming along on this journey and for the opportunity to continue serving you.

Sincerely,
Li Li Leung
President and CEO, USA Gymnastics

# **EXHIBIT 2**

Humphrey Appellant Appendix 230

The New York Times | https://nyti.ms/2Cgxx5p

# Kerry Perry, U.S.A. Gymnastics Chief, Is Forced Out

By Juliet Macur and Ken Belson

Sept. 4, 2018

The U.S.A. Gymnastics president, Kerry Perry, was forced to resign over the weekend by the United States Olympic Committee, ending her brief, tumultuous tenure at the top of one of the country's most successful Olympic sports.

Ms. Perry held the job for less than a year and was criticized for the way she handled the sexual abuse scandal that has left the sport reeling.

Last week, the organization hired the longtime coach Mary Lee Tracy to an elite position, but it asked Ms. Tracy to step down only a few days later after she was heavily criticized for initially defending Lawrence G. Nassar, the former national team doctor who is serving what amounts to a lifetime prison sentence for molesting numerous girls and women.

While Ms. Perry stumbled in her role since being hired late last year — failing to make changes to the organization on her own and needing direction from the Olympic committee to do things like install an entire new board of directors — the U.S.O.C. chief executive, Sarah Hirshland, has already been much more forceful in her decision-making.

After the gymnastics federation erred in its hiring of Ms. Tracy as the elite development director for women, Ms. Hirshland, who joined the U.S.O.C. in July, said on Friday that it was "time to consider making adjustments in the leadership" of U.S.A. Gymnastics. Two days later, Ms. Perry was gone.

"The U.S.A. Gymnastics Association needs new leadership," Ms. Tracy said in a statement, "and I'm encouraged by today's news. Kerry Perry, despite her best intentions, was not suited to lead the association during these difficult times."

Senator Richard Blumenthal, Democrat of Connecticut and the ranking member of the Senate subcommittee that oversees the U.S.O.C., issued a scathing statement on Tuesday about Ms. Perry's time in charge.

"Throughout her disastrous nine-month tenure as president of U.S.A. Gymnastics, Perry demonstrated nothing but a willful and heartless blindness to the concerns of survivors who were abused by Larry Nassar," the statement said. "As president, Perry perpetuated U.S.A.G.'s complicity with Nassar's horrific actions with her stunning and utterly shameful appearance before Congress in July and utterly misguided hiring of Mary Lee Tracy as the organization's new elite development coordinator."

Mr. Blumenthal's statement added, "I hope that Perry's resignation marks a turning point for U.S.A.G. and sparks real change and reflection — and I encourage U.S.A.G. to seek the input of survivors when selecting a new leader."

Ms. Perry had problems establishing herself as a trusted leader atop the gymnastics organization. Nassar victims criticized her for only briefly attending Dr. Nassar's days-long sentencing hearings in Michigan, and for failing to reach out to the highest-profile women who had been abused, including the three-time Olympic gold medalist Aly Raisman.

"All we want is these people in charge to talk to us, so we can help them make changes," Ms. Raisman told The New York Times in July. "But they won't even bother to reach out to us."

Ms. Perry replaced the longtime U.S.A. Gymnastics president Steve Penny, who was forced to resign in March 2017 under pressure from the U.S.O.C. He is under scrutiny for his mismanagement of hundreds of abuse cases, including those involving Dr. Nassar, during his tenure at the organization.

U.S.A. Gymnastics said it would appoint an interim chief executive and form a search committee to find a permanent replacement.

Humphrey Appellant Appendix 231

# **EXHIBIT 3**

Humphrey Appellant Appendix 232

# Former USA Gymnastics doctor accused of abuse

<u>Tim Evans, Mark Alesia and Marisa Kwiatkowski</u>, IndyStar    Published 3:46 p.m. ET Sept. 12, 2016 | Updated 4:35 p.m. ET Jan. 24, 2018



*(Photo: Sean Fujiwara for IndyStar/USAToday)*

**Editor's note: Since this article published, at least 150 people have come forward with allegations of sexual abuse against Dr. Larry Nassar. He was sentenced Jan. 24, 2018, to 175 years in prison after pleading guilty to sexually abusing seven girls.**

**This story was originally published Sept. 12, 2016.**

Two former gymnasts, one an Olympic medalist, have accused a prominent, longtime team physician for USA Gymnastics of sexual abuse.

One of the women <u>filed a civil lawsuit (https://www.documentcloud.org/documents/3106054-JANE-JD-COMPLAINT-Signed.html</u>) Thursday in California that was released Monday. The other filed a complaint two weeks ago with police in Michigan.

The women, in separate interviews with IndyStar, provided detailed accounts that closely mirrored each other as they outlined their allegations against <u>Dr. Larry G. Nassar (http://sportsmed.msu.edu/pages/Nassar/index.html</u>). Nassar served as USA Gymnastics' team physician during four Olympic Games and left his position last September with little public notice.

Nassar, a faculty member at Michigan State University who has treated the university's gymnasts, has not been charged with any crime. His lawyer, Matthew Borgula, said Nassar "emphatically" denies any wrongdoing.

After being shown a copy of the lawsuit Monday, Borgula said, "Dr. Nassar, to the extent the allegations are against him, adamantly denies any misconduct at this or any other time."

**Dr. Larry Nassar, D.O.** *(Photo: Becky Shink/Lansing State Journal 2008 file photo)*

The women said they were molested during multiple treatments in the 1990s and early 2000s. The two women said the doctor fondled their genitals and breasts. One of them said Nassar also spoke about oral sex and made other inappropriate comments when they were alone, according to court records. The other woman said she told police Nassar was visibly aroused as he examined her during one medical visit.

The Olympic medalist sued Nassar and USA Gymnastics (https://usagym.org/) in California, where she lives. The woman, who is unnamed in the suit, alleges that the Indianapolis-based organization failed to act on suspicions about the doctor's conduct. Her attorney would not provide IndyStar with evidence to support that allegation.

"I'm not going to get into the details because, frankly, it would give the defense an unfair advantage," the attorney, John Manly, said.

ADVERTISEMENT

His client said USA Gymnastics allowed Nassar to examine her alone in private rooms in violation of best practices and the organization's current standards of conduct.

Doctor disputes USA Gymnastics claim
(http://www.indystar.com/story/news/investigations/2016/09/13/doctor-disputes-usa-gymnastics-claim/90304998/)

The other woman, who lives in Louisville, Kentucky, filed a police complaint against Nassar last week at Michigan State University. As a teenage gymnast, she was treated there by Nassar, according to medical records.

The university said it suspended Nassar from "clinical and patient duties" Aug. 30, when it received the criminal complaint. He will remain suspended during the investigation. University officials also began an investigation under Title IX of the federal Education Amendments of 1972, which prohibit discrimination on the basis of gender in educational programs.

On Monday, USA Gymnastics reiterated a statement it made last week in response to previous questions about Nassar from IndyStar:

"Dr. Nassar is no longer affiliated with USA Gymnastics. Upon learning of athlete concerns, USA Gymnastics immediately notified law enforcement. Since then, we have cooperated fully with the law enforcement agency, including refraining from making further statements or taking any other action that might interfere with the agency's investigation. We are grateful to the athletes for coming forward to share their concerns."

The organization, which serves as the sport's national governing body and selects the Olympic team, would not respond to specific questions about its handling of the allegations against Nassar. But after the story was published on IndyStar.com, USA Gymnastics issued a subsequent statement with more detail.

It said USA Gymnastics received the allegations in the summer of 2015 and "relieved Dr. Nassar of his duties."

In addition to serving as a faculty member at Michigan State's College of Osteopathic Medicine (http://www.com.msu.edu/), Nassar is a team physician at Twistars Gymnastics Club (http://www.twistarsusa.com/) USA in Michigan and worked as a team physician for Michigan State University and Holt High School. Officials at Michigan State and Twistars said USA Gymnastics did not inform them of the concerns. Nassar resigned from USA Gymnastics last

fall but continued to work with young athletes at Michigan State and Twistars.

In August, an IndyStar investigation (/story/news/investigations/2016/08/04/usa-gymnastics-sex-abuse-protected-coaches/85829732/) revealed that USA Gymnastics executives repeatedly failed to forward allegations of sexual abuse at its member clubs to law enforcement authorities. The organization relied on a policy of not alerting authorities unless allegations came directly from an athlete or an athlete's parent or guardian, according to testimony in court records.

IndyStar is not naming the California woman at her request and because she was identified only as "Jane Doe" in the lawsuit. The other, Rachael Denhollander, said reading IndyStar's investigation inspired her to speak out.

"Over the last 16 years, I've realized I have a responsibility, and the question about whether or not to speak publicly cannot center around what's easy for me," she said. "This isn't something I want to do."

## 'Damaged goods'

Denhollander filed a criminal complaint against Nassar two weeks ago with Michigan State University Police, alleging the doctor sexually assaulted her when she received treatment for lower back pain as a 15-year-old club-level gymnast in 2000. University officials confirmed that police are conducting a criminal investigation.

She said Nassar gradually became more abusive over five treatments, massaging her genitals, penetrating her vagina and anus with his finger and thumb and unhooking her bra and massaging her breasts. She said she also relayed those details to police.

Nassar's attorney said his client never used a procedure that involved penetration.

Denhollander said her mother was present during Nassar's treatments, but that he positioned himself and her in such a way that only her head and back were visible.

Buy Photo



**Rachael Denhollander poses at her home in Louisville, Kentucky, on Aug. 23, 2016. She recently filed a police report in Michigan, alleging that she was sexually abused by Dr. Larry Nassar, formerly the main physician for USA Gymnastics.** *(Photo: Robert Scheer/IndyStar)*

"I was terrified," she recalled. "I was ashamed. I was very embarrassed. And I was very confused, trying to reconcile what was happening with the person he was supposed to be. He's this famous doctor. He's trusted by my friends. He's trusted by these other gymnasts. How could he reach this position in the medical profession, how could he reach this kind of prominence and stature if this is who he is?"

She said she figured the problem must be with her.

"Part of that, I know now, is a very common response that victims have," Denhollander said. "It's much easier in some ways to hide from what's happening and just go somewhere else mentally. It was easier to not have to verbalize and recognize what was happening."

Case 1:19-cv-02522-SEB-MPB   Document 8-21   Filed 01/30/20   Page 237 of 283   PageID #: 1825

Years later, while Denhollander and her husband, Jacob, were dating and contemplating a future together, she nervously told him about the alleged abuse. They were on swings at a playground.

"She was telling it from the perspective of feeling that she was damaged goods, that she was broken, and would I put up with that," Jacob Denhollander said. "To me, that was one of the most heartbreaking things, to hear that had been her experience, and her perspective was, 'I'm dirty because of it. I'm damaged.'"

Rachael Denhollander said she knows that if her case is prosecuted, she might be called to testify publicly in court about deeply personal and sensitive experiences.

"I hate that idea," she said. "I hate it. But if I don't, he can continue."

## 'Instrumental to the success'

Nassar, 53, has been a high-profile figure in gymnastics for decades. During one of the sport's iconic moments, U.S. Olympic team officials handed over gymnast Kerri Strug to Nassar for medical attention after she performed on the vault with an injured ankle. At the time, it was believed to be the performance necessary to secure the gold medal in the 1996 Olympics.

USA Gymnastics President Steve Penny (https://usagym.org/pages/aboutus/pages/steve_penny.html) once praised Nassar as being "instrumental to the success of USA Gymnastics at many levels, both on and off the field of play." In that 2014 news release (https://usagym.org/pages/post.html? PostID=14677&prog=h), Penny added that Nassar's "contributions over the years are immeasurable and will continue to be so."

Nassar is president of the Gymnastics Doctor Autism Foundation (http://www.gdafoundation.org/), which helps gymnastics clubs establish programs for special needs children, and his Facebook page is filled with tributes to him.

"He's an extremely professional physician," John Geddert (http://thegymnasticscoach.com/about-john-geddert-the-gymnastics-coach/), the 2012 Olympic team head coach and owner of Twistars Gymnastics, told IndyStar. "Very competent and goes above and beyond the call of duty in treating athletes. He's probably one of the most respected gymnastics professionals I've ever had to deal with."

IndyStar was unable to find any other allegations of sexual misconduct against Nassar in civil or criminal court records.

In 2014, he posted on Facebook (https://www.documentcloud.org/documents/3089890-Nassar-2014-Announcement.html) that he would continue working with women's artistic gymnastics "for as long as the program feels I can be an asset to them." In June 2015, Nassar wrote a Facebook post (https://www.documentcloud.org/documents/3089892-Nassar-2015-Announcement.html) saying he intended to stay on as U.S. Olympic team doctor through the Rio Olympics.

Yet three months later, Nassar was no longer team doctor. Last month, Nassar explained on Facebook (https://www.documentcloud.org/documents/3089895-Nassar-School-Board-Run.html) why he wasn't at the Rio Olympics. He said he retired so he could run for a school board position in Holt, Michigan.

"I knew that if I dedicated the time needed to be at the 2016 Rio Olympics, I would not be able to prepare a campaign for the school board," he wrote.

Borgula, his lawyer, said Nassar's retirement had nothing to do with allegations of sexual abuse, but he did acknowledge that USA Gymnastics had informed the doctor of potentially criminal allegations prior to his resignation.

USA Gymnastics would not tell IndyStar which law enforcement agency it reported to. And Borgula said no agency ever contacted Nassar concerning the allegations USA Gymnastics said it forwarded to police.

How many athletes expressed concerns to USA Gymnastics, and when those concerns were received, is unclear. The two athletes who approached IndyStar said they did not report their concerns directly to USA Gymnastics.

The lawsuit was filed in Sacramento County against Nassar, USA Gymnastics and the organization's past three presidents, including Penny. None of the individuals was mentioned by name, but Manly, the attorney, confirmed the identities of the defendants targeted by the suit.

The lawsuit claims USA Gymnastics not only hid complaints about Nassar, it failed to adequately supervise his activities. The lawsuit claims Nassar "would do anal and vaginal examinations of Plaintiff and other gymnasts in the care of (USA Gymnastics) without gloves, a chaperone, and/or any form of lubricant."

The California woman told IndyStar she didn't report the alleged abuse at the time because she didn't know it was wrong. According to the lawsuit, the abuse started when she was 12 or 13 and continued until she was 18.

"It felt like a privilege to be seen by him," she said. "I trusted him."

Her lawsuit said the procedures Nassar performed were "well outside any recognized and/or accepted technique and were done for the Perpetrator's … own sexual gratification."

Nassar would "fondle and grope Plaintiff's feet, ankles, thighs, buttocks, hips, waist, breasts, arms, shoulders and neck, placing Plaintiff under the impression this inappropriate contact was part of treatment," according to the suit.

The lawsuit also claims Nassar talked to the California gymnast about sex, describing oral sex and telling her that other underage gymnasts were doing it.

The California woman told IndyStar it took her more than a decade to understand what Nassar had done. She never told anyone until July. And she wept as she tried to talk about how it affected her life.

The lawsuit says she "suffered immensely" from anxiety, depression, a lack of trust and "self-medicating behavior."

"It's a lot," she said.

*Call IndyStar reporter Mark Alesia at (317) 444-6311. Follow him on Twitter: @markalesia (https://twitter.com/markalesia).*

*Call IndyStar reporter Marisa Kwiatkowski at (317) 444-6135. Follow her on Twitter: @IndyMarisaK (https://twitter.com/IndyMarisaK).*

*Call IndyStar reporter Tim Evans at (317) 444-6204. Follow him on Twitter: @starwatchtim (https://twitter.com/starwatchtim).*

## Share your experiences

IndyStar will continue to investigate this topic. If you have information you would like to share, please email investigations@indystar.com or call (317) 444-6262.

## Get help

Anyone who has reason to believe a child is being abused or neglected should immediately call police or the child welfare agency. Survivors of sexual abuse can contact the National Sexual Assault Hotline at (800) 656-4673 or online.rainn.org. For resources or more information on the Rape, Abuse and Incest National Network,  visit https://www.rainn.org/ (https://www.rainn.org/).

A blind eye to sex abuse: How USA Gymnastics failed to report cases (http://www.indystar.com/story/news/investigations/2016/08/04/usa-gymnastics-sex-abuse-protected-coaches/85829732/)

Ex-gymnast speaks out about her sexual abuse (http://www.indystar.com/story/news/investigations/2016/08/26/kid-they-said-wasnt-worth/89339532/)

Why coaches' hugs make Becca Seaborn cringe (http://www.indystar.com/story/news/investigations/2016/08/04/usa-gymnastics-why-coaches-hugs-make-becca-seaborn-cringe/87967164/)

IndyStar seeks to unseal abuse documents (http://www.indystar.com/story/news/investigations/2016/08/04/indystar-seeks-unseal-usa-gymnastics-coach-abuse-documents/87912400/)

Georgia judge to unseal USA Gymnastics sex abuse records (http://www.indystar.com/story/news/investigations/2016/08/29/georgia-judge-consider-indystar-request-records/89531452/)

How IndyStar investigated USA Gymnastics (http://www.indystar.com/story/news/investigations/2016/08/04/usa-gymnastics-sex-abuse-investigation/87907306/)

Out of Balance (http://www.indystar.com/topic/out-of-balance/local?from=global&sessionKey=&autologin=)

Read or Share this story: http://indy.st/2cUlWeJ

# EXHIBIT 4

1/21/2020   Michigan State's $500 Million for Nassar Victims Dwarfs Other Settlements - The New York Times

**The New York Times**   https://nyti.ms/2GoIFdp

# Michigan State's $500 Million for Nassar Victims Dwarfs Other Settlements

By Mitch Smith and Anemona Hartocollis

May 16, 2018

Victims of Lawrence G. Nassar, the Michigan State University physician who sexually abused young women under the guise of medical treatment, would receive $500 million from the university in a settlement that is believed to be the largest ever reached in a sexual abuse case involving an American university.

It dwarfed the size of the settlement reached in the sex abuse scandal at Pennsylvania State University. And it was larger than many of the settlements that followed the child sex abuse crisis in the Roman Catholic Church.

"I think the number being so large sends a message that is undeniable, that something really terrible happened here and that Michigan State owns it," said John Manly, a lawyer for many of the 332 women who sued the university over abuse by Dr. Nassar. "When you pay half a billion dollars, it's an admission of responsibility."

Women who say they were abused by Dr. Nassar still have lawsuits against U.S.A. Gymnastics, the United States Olympic Committee and others, and the settlement with Michigan State could add pressure in those cases. The settlement by Michigan State, a public university that is the state's largest, also sent a loud warning to other colleges about the potentially devastating cost of ignoring misconduct.

The agreement comes as officials at the University of Southern California are under fire for failing to report a gynecologist who faced allegations of misconduct for decades, and as other colleges find themselves grappling with a growing number of sexual abuse and assault complaints over the last few years. By late Wednesday, officials at U.S.C. said they had received about 85 complaints about George Tyndall, the gynecologist.

"People now know that these scandals can happen at any university, and they need to understand and be prepared for that," said Thomas Harnisch, director of state relations and policy analysis at the American Association of State Colleges and Universities.

Humphrey Appellant Appendix 239

Case 1:20-cv-02521-SEB-MPB  ECF No. 1-30, PageID.233, Page ID of: 1829

It was uncertain how the settlement would be paid by Michigan State, an institution that has already seen its credit rating downgraded because of the Nassar scandal. On Wednesday, officials at the university did not respond to questions about how it plans to pay, but taxpayers and Michigan State students, officials signaled earlier, are likely to shoulder at least some of the cost. The university is also expected to try to recoup some of its costs from insurance.

The financial toll is only the latest fallout for Michigan State over Dr. Nassar, who worked at the institution for about 20 years, even as women said they made complaints about his conduct to university coaches, trainers or counselors since at least the late 1990s.

Many women said the university enabled Dr. Nassar's abuse and for years ignored those who came forward with complaints, and top leaders at Michigan State have lost their jobs over the matter, including Lou Anna K. Simon, the president. Michigan's attorney general is overseeing a criminal investigation into how Dr. Nassar had been permitted to operate at the university for as long as he did. The federal Education Department is investigating the university's actions. And the F.B.I. is conducting an internal review of what its agents knew about Dr. Nassar's conduct and when they knew it, Christopher A. Wray, the agency's director, told Congress on Wednesday.

The settlement was approved by the university's elected trustees in a conference call on Tuesday night, but final details still had to be handled.

For the women, some of whom shared their stories of abuse in emotional testimony before judges who sentenced Dr. Nassar to more than 100 years in prison, the financial settlement was a step toward healing, but not a fix for systemic failings at Michigan State.

"I hope that our experiences at M.S.U. have opened up the world's eyes to the suffering that survivors of sexual assault deal with every day," said Amanda Thomashow, who complained to university officials in 2014 about Dr. Nassar's conduct. "And I hope that we can change our attitude toward victims. And I hope that our culture shifts from enabling predators to empowering survivors."

For about 20 years, Dr. Nassar preyed on young women who came to him for medical care at a Michigan State clinic. When some patients claimed abuse, Dr. Nassar insisted he was performing legitimate medical treatment, and university officials allowed him to continue seeing patients.

All the while, Dr. Nassar's reputation grew. Big Ten athletes sought treatment from him. He traveled abroad with the national gymnastics team. He was on the sidelines during the Olympics. Dr. Nassar's victims included some of the best gymnasts in the world, as well as local girls who trained after school at a Michigan club.

Humphrey Appellant Appendix 240

Case 1:20-cv-02522-SEB-MPB   Document 5-21   Filed 11/30/21   Page 242 of 283   PageID #: 1820

Many experts said they believed the settlement was the largest involving sex abuse for a university, though there have been higher settlements outside of universities: The Roman Catholic Archdiocese of Los Angeles agreed in 2007 to pay up to $650 million.

Until now, perhaps the biggest university sex abuse settlement was the roughly $109 million related to Jerry Sandusky, an assistant football coach at Penn State who was convicted of abusing boys over 15 years. There were more than 30 plaintiffs in that case. Penn State also paid a $60 million fine as part of a punishment levied by the N.C.A.A. and spent nearly $30 million more over two years on internal legal and investigative costs, according to a 2015 audit. Penn State continues to dispute how much of the payout should be covered by insurance.

In March, John Engler, Michigan State's interim president, noted Penn State's ongoing effort to get insurance to cover more of its settlement. Before Michigan legislators, Mr. Engler said that he hoped insurance would cover at least some of Michigan State's settlement cost, but that students and taxpayers would likely have to cover the rest.

The $500 million settlement would amount to almost 37 percent of the annual general fund budget of $1.36 billion for 2017-18, according to university documents. Of that, almost three-quarters, or $983 million, came from tuition and fees, while state appropriations accounted for a fifth, or $281 million. Michigan lawmakers have capped the amount by which the university can raise tuition. And Michigan State's endowment is $2.7 billion, but federal law restricts the use of endowments in such situations.

Mr. Harnisch said the money for Michigan State's settlement would likely come from some combination of insurance, state aid and revenue from student tuition. "They'll likely have to use reserve funds and borrow money," he said, "but I think definitely borrowing money is going to be a key piece to paying for this."

Kenneth Feinberg, the mediator in the Sandusky case at Penn State and the special master of the fund to compensate victims of the Sept. 11 terrorist attacks, said the fact that the parties were able to voluntarily settle the case would help Michigan State rebuild its reputation.

About 10 law firms represented Dr. Nassar's victims. Mr. Manly, who represents many of the women, did not say how much of the settlement money would go to lawyers in the cases. Each woman will receive just under $1.3 million on average; some will get much more, and others much less, he said.

"It certainly makes sense for Michigan State to try and rebuild and enhance its reputation by quickly resolving all of these claims with these 300 people, without forcing them further damage by litigating," Mr. Feinberg said. "It makes sense."

Humphrey Appellant Appendix 241

1/21/2020
Michigan State's $500 Million for Nassar Victims Dwarfs Other Settlements - The New York Times

In the months ahead, Michigan State leaders have promised to change policies to prevent future abuse and to begin restoring the university's tattered reputation. Michael Roach, 73, a 1966 graduate of Michigan State, said he was relieved to learn of the settlement, which he hoped would spare the university from a lengthy lawsuit and troubling media attention.

"It's bringing some closure, for the survivors and the university," said Mr. Roach, who plans to continue donating to the college. "If they needed to use my monies" for the settlement, he said, "I guess I would be willing to say, 'O.K.'"

https://www.nytimes.com/2018/05/16/us/larry-nassar-michigan-state-settlement.html

# **EXHIBIT 5**

Case 1:20-cv-02522-VEB-MRR 892cument 6-21 Filed 11/30/20 Page 245 of 283 PageID of:
1823



# UNPRECEDENTED LEVELS OF EXCITEMENT AROUND THE OLYMPIC GAMES TOKYO 2020



📷 IOC/CHRISTOPHE MORATAL

DATE 10 JAN 2020    TAGS OLYMPIC NEWS, TOKYO 2020, IOC NEWS

FROM 24 JULY TO 9 AUGUST THIS YEAR, TOKYO AND JAPAN WILL BE AT THE CENTRE OF THE WORLD'S ATTENTION AS THE NEXT HOSTS OF THE OLYMPIC GAMES. WITH 339 EVENTS IN 33 SPORTS, THE OLYMPIC GAMES TOKYO 2020 WILL HAVE PLENTY OF SPORTING HIGHLIGHTS THIS SUMMER; BUT EVEN BEFORE THE GAMES HAVE BEGUN, THERE IS ALREADY "AN UNPRECEDENTED LEVEL OF EXCITEMENT" FOR THE GAMES, ACCORDING TO INTERNATIONAL OLYMPIC COMMITTEE (IOC) COORDINATION COMMISSION CHAIR JOHN COATES.

Humphrey Appellant Appendix 244
1/21/2020, 2:03 PM

Case 1:20-cv-02522-SFB-MRB Document 6-21 Filed 11/30/20 Page 246 of 283 PageID #: 1824

Presenting at the IOC Session in Lausanne, the Tokyo 2020 delegation, led by its CEO Toshiro Muto, highlighted the high levels of engagement both at home and abroad. According to Tokyo 2020, 8.8 million applications for Olympic Games tickets have been received since domestic sales started, with 3.6 million tickets being sold in the first phase of sales alone, exceeding the organisers' expectations.



TOKYO 2020

In addition, over 535,000 applications have been received for 10,000 torchbearer positions for the Olympic Torch Relay, which will begin in Greece on 12 March. The Japanese leg of the Relay will get underway on 26 March in Fukushima, and will tour all 47 prefectures of Japan over 121 days. There were also over 200,000 applications to be volunteers for the Tokyo Games.

Internationally, the Tokyo 2020 Olympic Truce resolution was adopted at the United Nations General Assembly on 9 December last year, with 186 countries co-sponsoring the resolution.

Humphrey Appellant Appendix 245

1/21/2020, 2:03 PM

Case 1:20-cv-02522-SEB-MPB Document 6-21 Filed 11/30/20 Page 247 of 283 PageID #: 1825

Tokyo also now has 79 commercial partners, including both Worldwide and domestic partners. This strong support by both international and local companies has helped the Organising Committee to unveil its latest budget with revenues of USD 5.9 billion, while expenditures are USD 300 million lower at USD 5.6 million.

On the venue front, eight of the nine new venues to be used for the Games are now complete, while the Tokyo Aquatics Centre will be ready next month. The Olympic Village was also handed over to the Organising Committee in December after completion of the permanent structures. The Mayor of the Village will be Saburo Kawabuchi, an Olympian in football and former President of the Japan Football Association.

Last November, the decision was made to move the marathon and race walk events to Sapporo. In December, the IOC Executive Board approved Sapporo Odori Park as the venue for the start and finish lines, while all courses have been approved thanks to close cooperation with World Athletics. With regard to the competition schedules, it was decided that the events will take place over the final four days of the Games, from 6 to 9 August.

The organisers noted that they are continuing to work on refining their heat countermeasure plans for each venue and stakeholder across the Games theatre.

Tokyo 2020 is also working hard to deliver sustainable Games, which was acknowledged through its ISO 20121 certification, an internationally recognised standard for sustainable management systems, last November. In another sustainability initiative, Worldwide Olympic Partner Toyota will provide around 3,700 vehicles for the Tokyo Games, of which 90 per cent will be electric vehicles, with 500 hydrogen-powered fuel cell vehicles.

Transport plans have also been tested for the Games and refined to ensure good transport conditions for the athletes.

With only 196 days to go, the Tokyo organisers were congratulated on their successes so far, and encouraged to keep up their good work in this final stretch of preparations.

TAGS   OLYMPIC NEWS , TOKYO 2020 , IOC NEWS



© Copyright 2019. All rights reserved

Humphrey Appellant Appendix 246

1/21/2020, 2:03 PM

# **EXHIBIT 6**

Case 1:20-cv-00522-SEB-MPB Document 5-21 Filed 02/03/20 Page 2 of 4 PageID #:

**NPQ**

PHILANTHROPY, POLICY, SPONSORSHIPS

# Corporate Sponsors Abandon Nonprofit USA Gymnastics, But Not the Athletes

Humphrey Appellant Appendix 248



By Agência Brasil Fotografias [CC BY 2.0], via Wikimedia Commons

January 29, 2018; The Conversation

As Dr. Larry Nassar's trial for sexual abuse progressed, and some of the highest-profile gymnasts in the country began to speak out publicly about the culpability they felt was due the nonprofit USA Gymnastics (USAG), sponsors began to fall away. Still, it took a direct demand from the US Olympic Committee (USOC) for the board to resign from USAG. After that, will the sponsors come back, and what will that do to the sport?

Procter & Gamble was the first to sever ties with the nonprofit, followed in the last few days by AT&T. Also leaving their sponsorship roles, reports the *Chicago Tribune*, are Under Armour, Kellogg's, and Hershey's.

> "USA Gymnastics is facing a crisis, one that will influence sponsor decision-making for years," said Professor T. Bettina Cornwell, academic director of Warsaw Sports Marketing Center at the University of Oregon. "Partnerships in sport are all about sharing valued associations. Brands want to associate with things like ruggedness, grace, passion, joy, success and even trying hard in the face of failure. They are fearful to associate with an organization tied to the horrific Larry Nassar."

Additionally, the organization will be dealing with lawsuits for years to come. While the necessary accountability is visited on the organization, what will become of the athletes it was supposed to be nurturing?

In a statement, AT&T says the company was suspending its ties "until [USA Gymnastics] is rebuilt and we know that the athletes are in a safe environment," assuring the athletes that it remains committed to them and will look for other ways to support them until USAG is sufficiently reformed to receive its money. Under Armour ended its partnership with USAG in December, saying, "We stand with these athletes and hope our decision to end this partnership resounds with USAG leadership and helps to facilitate necessary change."

Ronald Goodstein, associate professor of marketing at Georgetown University's McDonough School of Business, says that recruiting some of those who were subjected to the abuse for leadership positions on the board "would go a long way" toward restoring confidence in the organization.

"There has to be tangible action the public can see," Goodstein said. "This all has to happen before they seek sponsors."

But the gymnasts have also charged that the USOC was complicit in creating the environment that enabled the abuse. As George P. Cunningham observes in *The Conversation*, "Since corporate sponsors and other outside

Humphrey Appellant Appendix 249

# **EXHIBIT 7**

Case 1:20-cv-02522-SEB-MPB   8-21   Filed 11/30/20   ... of 283   PageID #: 1830

# Nike looked to sponsor USA Gymnastics while both were mired in sexual misconduct scandals

Nike took the first step toward sponsoring USA Gymnastics in January even as the organization was being dropped by some of corporate America's top brands amid the biggest sexual abuse scandal in American sports history, according to documents obtained by the Orange County Register.

The ongoing talks between USA Gymnastics and Nike have taken place while the national governing body and the Oregon-based athletic shoe giant are engulfed in sexual misconduct scandals.

USA Gymnastics is under investigation by Congress and the U.S. Olympic Committee and the target of lawsuits by hundreds of former gymnasts who charge that former U.S. Olympic and USA Gymnastics national team physician Larry Nassar's alleged sexual abuse of them was ignored by the organization and was the byproduct of a culture of abuse within the sport allowed by USA Gymnastics and former U.S. national team directors Martha and Bela Karolyi.

Five senior level managers were ousted at Nike this week amid published reports of widespread sexual harassment and discrimination against employees at the company. At least nine and possibly as many as 14 top Nike officials have resigned because of the scandal, according to The Oregonian.

In a recent USA Gymnastics memo outlining discussions between the organization and Nike the first headline listed under a section of links to news stories titled "RECENT NIKE NEWS" was "SECOND TOP NIKE EXECUTIVE DEPARTS AMID COMPLAINTS OF WORKPLACE BEHAVIOR."

USA Gymnastics and Nike did not respond to requests for comment.

USA Gymnastics reported revenues of $34.47 million for the 2016 fiscal year, according to financial records and documents filed with the Internal Revenue Service. In recent years, marketing revenues have accounted for more than 35 percent (up to $9.4 million) of USA Gymnastics' total revenues.

Procter & Gamble, the name sponsor of the USA Gymnastics national championships for the past five seasons, and Kellogg's, sponsor of a series of lucrative nationwide tours, however, declined to renew sponsorship deals with USA Gymnastics late last year.

AT&T, Hershey's and Under Armour also dropped USA Gymnastics. AT&T said it was discontinuing its sponsorship "until it (USA Gymnastics) is re-built and we know that the athletes are in a safe environment."

Under Armour said in a statement "We stand with these athletes and hope our decision to end this partnership resounds with USAG leadership and helps to facilitate necessary change."

Humphrey Appellant Appendix 251

Case 1:20-cv-02522-SEB-MPB Document 61-21 Filed 11/30/21 Page 253 of 283 PageID #: 1831

Nike officials had their first telephone conversation with USA Gymnastics chief executive officer Kerry Perry and Adrienne Evans from USA Gymnastics' marketing department on Jan. 18. The call came a day after Gina Nichols, mother of former U.S. national team member Maggie Nichols, confronted Perry during her testimony at Nassar's Michigan sentencing hearing.

"I don't want to hear any more statements from anybody else – we're doing this and we're doing that," Gina Nichols said turning toward Perry, who was sitting in the courtroom. "We have a safe place now. It's too late now."

The call also came three days after Olympic all-around champion Simone Biles revealed she had been sexually abused by Nassar. Biles is one of only two gymnasts ever sponsored by Nike. Olympic champion Shawn Johnson is the other.

Evans sent Nike partnership documents on Jan. 24 – the same day Nassar was sentenced to 40 to 175 years in prison for sexual assault in Michigan.

"I've just signed your death warrant," Judge Rosemarie Aquilina told Nassar in issuing her sentencing ruling.

Perry and Evans met with Lori Roth, Nike's senior Olympic marketing manager, and Curtis Graham, another Nike marketing official, on April 30.

Nike also sponsors U.S. national governing bodies in at least eight Olympic sports, including USA Track & Field, U.S. Soccer and USA Basketball.

Nike is also a major corporate sponsor of the U.S. Olympic Committee. Nike also reached a 10-year, $35 million sponsorship deal with Michigan State in 2015. Nassar was a longtime employee at Michigan State sports medicine staff.

Humphrey Appellant Appendix 252

**SO ORDERED: September 26, 2019.**

Robyn L. Moberly
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-09108-RLM-11 |
| Debtor. | |

## ORDER APPROVING JOINT STIPULATION DEEMING SEXUAL ABUSE
## CLAIM 546 TO BE TIMELY FILED AND DENYING LATE CLAIMS MOTION

This matter came before the Court on the *Joint Stipulation And Agreed Order Deeming*

*Sexual Abuse Claim 546 To Be Timely Filed And Withdrawing Late Claims Motion* (the "**Joint**

**Stipulation**"), filed by USA Gymnastics as debtor and debtor in possession (the "**Debtor**") and

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

Erin Kaufman ("**Kaufman**", and collectively with the Debtor, the "**Parties**"), for the entry of an order pursuant to Rule 3003 of the Federal Rules of Bankruptcy Procedure; and the Court finds that (i) it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; (ii) this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)-(B); (iii) entry of the Joint Stipulation is in the best interests of the Debtor, its estate, and creditors; and after due deliberation, and good and sufficient cause appearing therefore, the Court hereby determines the Joint Stipulation should be APPROVED.

IT IS HEREBY STIPULATED AND AGREED:

A.      On December 5, 2018, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the U.S. Code, 11 U.S.C. §§ 101-1532, *et seq.*, in the United States Bankruptcy Court for the Southern District of Indiana.

B.      Under the *Order Approving Debtor's Motion For Order Establishing Deadlines For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof* [Dkt. 301], the Court fixed April 29, 2019 as the deadline to file claims against the Debtor, including claims arising from sexual abuse (the "**Bar Date**").

C.      On June 21, 2019, Kaufman filed sexual abuse claim 546 ("**Sexual Abuse Claim 546**"), which asserts a claim based upon sexual abuse.

D.      On July 15, 2019, Kaufman filed her *Motion to File Claim After Bar Date* [Dkt. 657] ("the **Motion**"). The Motion requests that the Court deem Sexual Abuse Claim 546 to be timely filed, as well as extend the Bar Date for all "other creditors similarly" situated to Kaufman who allegedly lacked sufficient notice of the Bar Date. (Motion at 1.)

Humphrey Appellant Appendix 254

E.      Although the Debtor disputes the allegations of the Motion, it has agreed to treat

Kaufman's claim as timely filed in exchange for Kaufman's agreement that the balance of the

relief she requests be denied with prejudice.

IT IS THEREFORE ORDERED:

1.      Sexual Abuse Claim 546 is hereby deemed timely filed. All parties in interest,

including the Debtor and the Committee of Sexual Abuse Survivors, retain their rights to object to

Sexual Abuse Claim 546 on any basis other than timeliness.

2.      The balance of the relief sought in the Motion is denied with prejudice. Kaufman

shall prosecute Sexual Abuse Claim 546 solely in her individual capacity, and not on behalf of any

purported class.

3.      Nothing in this Agreed Order shall be construed as a modification of the Bar Date,

which remains unchanged and is not extended for any claimant. Further, the entry of this Order

shall not have any effect on any claim other than Sexual Abuse Claim 546, and shall not deem any

claim other than Sexual Abuse Claim 546 to be timely filed.

4.      The Debtor's agreement to this Joint Stipulation does not constitute an admission

that any untimely claim was filed late because of a claimant's excusable neglect. The Debtor

retains its right to object to all other untimely claims on any ground, including that they were filed

late without excusable neglect.

5.      The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Joint Stipulation.

###

3

**SO ORDERED: May 17, 2019.**

Robyn L. Moberly
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

In re:

USA GYMNASTICS,[1]

Debtor.

Chapter 11

Case No. 18-09108-RLM-11

## ORDER AUTHORIZING APPOINTMENT OF FUTURE
## CLAIMANTS' REPRESENTATIVE AND APPOINTING
## FRED C. CARUSO AS FUTURE CLAIMANTS' REPRESENTATIVE

This matter came before the Court on the *Debtor's Motion For Order Authorizing The*

*Appointment Of A Future Claimants' Representative* [Dkt. 363] and the *Debtor's Motion For*

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

*Order Appointing Fred C. Caruso As Future Claimants' Representative* (collectively, the "**FCR Motions**"), filed by USA Gymnastics as debtor and debtor in possession (the "**Debtor**"), for the entry of an order pursuant to sections 105(a) and 1109(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), and upon consideration of the *Declaration of Fred C. Caruso* (the "**Caruso Declaration**"); and the Court finds that (i) it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; (ii) this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O); (iii) the relief requested in the FCR Motions is in the best interests of the Debtor, its estate, and creditors; and after due deliberation, and good and sufficient cause appearing therefore, the Court hereby determines that the FCR Motions should be GRANTED.

IT IS HEREBY ORDERED:

1.      The FCR Motions are granted as set forth herein.

2.      The Court hereby authorizes the appointment of Fred C. Caruso (the "**Future Claimants' Representative**") to appear and be heard on behalf of Future Claimants. A "Future Claimant" is a Person who (a) held a Sexual Abuse Claim against the Debtor as of the Sexual Abuse Claims Bar Date and (b) meets one of the following criteria: (i) is under the age of majority under applicable state law as of March 1, 2019; (ii) as of March 1, 2019, the statute of limitations for such Person was tolled under applicable state law or had not begun to run under applicable state law; (iii) as of March 1, 2019, the Debtor was estopped under applicable state law from asserting the statute of limitations; or (iv) such Person's Sexual Abuse Claim was barred by the applicable statute of limitations as of March 1, 2019 but is no longer barred by the applicable statute of limitations for any reason, including the enactment of legislation that revives such claims (the "**Future Claimants**"); provided however that the following persons are not Future Claimants: A) any Person who has, at any time before the Sexual Abuse Claims Bar Date, asserted a claim

2

against, asserted a cause of action against, provided notice to, or made a demand to or against the Debtor, arising out of or relating to Sexual Abuse or whose parent or guardian or other legal representative had done so on behalf of such Person.[2] The foregoing definition of Future Claimants is without prejudice to the right of the Future Claimants' Representative to petition the Court to modify the definition of Future Claimants or for the Court to modify such definition in connection with confirming a plan of reorganization for the Debtor.

3.      The Future Claimants' Representative shall have the following rights in this chapter 11 case:

a.   Standing: The Future Claimants' Representative shall have standing (1) to be heard regarding the definition of Future Claimants; (2) to negotiate treatment under a plan of reorganization; (3) to appear and be heard with respect to approval of a disclosure statement or plan of reorganization; and (4) to request compensation for services performed;

b.   Right to Receive Notices: The Future Claimants' Representative shall have the right to receive all notices and pleadings that are required to be served upon any statutory committee and its counsel pursuant to applicable law and the *Order Granting Debtor's Motion For Order Establishing Certain Notice, Case Management, And Administrative Procedures* [Dkt. 213]; and,

c.   Compensation: The Future Claimants' Representative's compensation shall be subject to further order of the Court after notice and a hearing.

4.      The Future Claimants' Representative shall be compensated in accordance with his normal rates and disbursement policies, as set forth in the Motion and the Caruso Declaration, pursuant to periodic applications to be considered by this Court in accordance with the procedures set forth in the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the Southern District of

---

[2] Incorporated in this Order are the definitions of "sexual abuse" and "Sexual Abuse Claims Bar Date" that are used in the *Order Approving Debtor's Motion For Order Establishing Deadlines For Filing Proofs Of Claim And Approving Notice Thereof* [Dkt. 301, at ¶¶ 4-5].

3

Indiana, and the *Order Granting Debtor's Motion For Entry Of Order Establishing Procedures For Interim Compensation And Reimbursement Of Professionals* [Dkt. 187].

     5.     Notwithstanding anything to the contrary, the terms and conditions of this order shall be immediately effective and enforceable upon its entry.

     6.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this order.

###

Humphrey Appellant Appendix 259

Robyn L. Moberly
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

In re:

USA GYMNASTICS,[1]

        Debtor.

Chapter 11

Case No. 18-09108-RLM-11

**ORDER APPROVING DEBTOR'S MOTION FOR ORDER ESTABLISHING
DEADLINES FOR FILING PROOFS OF CLAIM AND APPROVING FORM
AND MANNER OF NOTICE THEREOF**

This matter came before the Court on the *Debtor's Motion For Order Establishing*

*Deadlines For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof* (the

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's
principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

"Motion"),[2] filed by USA Gymnastics as debtor and debtor in possession (the "Debtor"), for the entry of an order (this "Bar Date Order") pursuant to sections 501 and 502 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and Rules 2002(a), 3001, 3002, and 3003 of the Federal Rules of Bankruptcy Procedure; and upon the Court's consideration of the objections filed to the Motion by the Additional Tort Claimants Committee of Sexual Abuse Survivors, Kelly Doe, and the Indiana Attorney General (the "Objections") [Dkts. 255, 261, and 269] and the Debtor's reply to those objections [Dkt. 270]; the Court finding that (i) it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) the relief requested in the Motion is in the best interests of the Debtor, its estate, and creditors; and after due deliberation, and good and sufficient cause appearing therefore, the Court hereby determines the Motion should be GRANTED.

IT IS HEREBY ORDERED:

1.    The Motion is granted as set forth herein.

2.    The Objections are overruled.

3.    The Personalized Proof of Claim Form, the Sexual Abuse Proof of Claim Form, the General Bar Date Notice, the Sexual Abuse Claims Bar Date Notice, the Publication Notice, and the Confidentiality Agreement substantially in the forms attached hereto as Exhibits 1, 2, 3, 4, 5, and 6, respectively, are approved in all respects. The form and manner of notice of the Bar Dates approved herein are deemed to fulfill the notice requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules for the Bankruptcy Court for the Southern District of Indiana, and notice of the Bar Dates in the form and manner as proposed by the Debtor herein is fair and reasonable and will provide good, sufficient, and due notice to all creditors of their rights

---

[2] Capitalized terms used herein and not defined shall have the meanings given to them in the Motion.

Humphrey Appellant Appendix 261

and obligations in connection with claims they may assert against the Debtor's estate in this chapter 11 case. Accordingly, the Debtor is authorized and directed to serve and/or publish the Bar Date Notice Packages in the manner described herein and in the Motion.

4.　　Except as otherwise provided herein, all persons and entities that assert a claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtor which arose before December 5, 2018 (the **"Petition Date"**), including both Survivors asserting Sexual Abuse Claims and other creditors, shall submit a written proof of such Claim so that it is ***actually received*** on or before **4:00 p.m. (prevailing Eastern time) on April 29, 2019** (the "General Bar Date" and the **"Sexual Abuse Claims Bar Date"**) by Omni Management Group, Inc. (the **"Claims Agent"**), in accordance with this Bar Date Order.

5.　　For the purposes of determining whether an individual should submit a General Claim or Sexual Abuse Claim, sexual abuse is defined as any and all acts or omissions that the Debtor may be legally responsible for that arise out of, are based upon, or involve sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault and/or battery, rape, pedophilia, ephebophilia, or sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, or any other sexual misconduct or injury, or contacts or interactions of a sexual nature between an adult or child and a medical professional, coach, trainer, therapist, volunteer, or other authority figure affiliated with the Debtor, or any current or former employee or volunteer of the Debtor, or any other person for whose acts or failures the Debtor is or was allegedly responsible, or the alleged failure by the Debtor or its agents, employees, or volunteers to report the same. An adult or child may have been sexually abused whether or not this activity involved explicit force, whether or not this activity

3

involved genital or other physical contact, and whether or not there was physical, psychological, or emotional harm to the adult or child.

6.      Proofs of Claim asserted by governmental units must be submitted so as to be *actually received* by the Claims Agent on or before **4:00 p.m. (prevailing Eastern time) on June 3, 2019** (the "**Governmental Bar Date**"), the date that is 180 days from the Petition Date.

7.      If the Debtor amends or supplements its Schedules of Assets and Liabilities and/or Statement of Financial Affairs (the "**Schedules**") subsequent to the date hereof, the Debtor shall provide notice of any amendment or supplement to the holders of Claims affected thereby. The Debtor shall also provide such claimants with notice that they may be entitled to file amended or original Proofs of Claim in light of the amendment(s) to the Schedules, but that they must do so on or before the later of: (a) the General Bar Date; or (b) 30 days after the holder of a claim is served with notice that the Debtor amended its Schedules to identify, reduce, delete, or change the amount, priority, classification, or other status of such claim (the "**Amended Schedules Bar Date**").

8.      Any person or entity that holds a Claim arising from the rejection of an executory contract or unexpired lease must submit a Proof of Claim based on such rejection on or before the later of: (a) the General Bar Date; or (b) any date the Court may fix in the applicable order authorizing such rejection or, if no such date is provided, 30 days from the date of entry of such order (the "**Rejection Bar Date**"). The Debtor will provide notice of the Rejection Bar Date to the contract or lease counterparty whose contract or lease is being rejected at the time the Debtor rejects any executory contract or unexpired lease.

9.      The Debtor shall mail to all known creditors **other than Survivors who do not have claims other than Sexual Abuse Claims** a Personalized Proof of Claim Form substantially

Humphrey Appellant Appendix 263

in the form attached hereto as <u>Exhibit 1</u>, which is hereby approved, indicating on the form how the Debtor has listed each creditor's Claim in the Schedules (including the amount of the Claim; whether the Claim has been scheduled as contingent, unliquidated, or disputed; whether the Claim is listed as secured, unsecured priority, or general unsecured; and that the Personalized Proof of Claim Form should not be used to assert a Sexual Abuse Claim).

10.     The following procedures shall apply to the submission of all Proofs of Claim **other than for Sexual Abuse Claims** against the Debtor in this chapter 11 case:

a.     Each Proof of Claim asserting a General Claim, Governmental Claim, Amended Schedules Claim, or Rejection Claim must be submitted so as to *actually be received* by the Claims Agent on or before the applicable Bar Date either by: (i) the interface available on the Claims Agent's website: https://omnimgt.com/usagymnastics; or (ii) first-class U.S. Mail, overnight mail, or hand-delivery at the following address: USA Gymnastics Claims Processing, c/o Omni Management Group, 5955 DeSoto Avenue, Suite 100, Woodland Hills, California 91367; *provided, for the avoidance of doubt,* **PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED AND WILL NOT BE DEEMED TIMELY SUBMITTED.**

b.     Each Proof of Claim asserting a General Claim, Governmental Claim, Amended Schedules Claim, or Rejection Claim must: (i) be written in English; (ii) include a Claim amount denominated in United States dollars; (iii) conform substantially with the Personalized Proof of Claim Form or Official Form 410; (iv) be signed or electronically transmitted, through the interface available on the Claims Agent's website at: https://omnimgt.com/usagymnastics by the claimant or by an authorized agent or legal representative of the claimant; and (v) unless otherwise consented to by USAG in writing, include supporting documentation unless voluminous, in which case a summary must be attached or an explanation provided as to why documentation is not available.

c.     Parties who submit a Proof of Claim asserting a General Claim, Governmental Claim, Amended Schedules Claim, or Rejection Claim by mail and who wish to receive proof of receipt thereof must include an additional copy of their Proof of Claim and a self-addressed, stamped envelope.

Humphrey Appellant Appendix 264

11.     Sexual Abuse Claims shall be submitted on a Sexual Abuse Proof of Claim Form substantially in the form attached hereto as <u>Exhibit 2</u>. The following procedures shall apply to the submission of Sexual Abuse Claims against the Debtor in this chapter 11 case:

a.      Each Sexual Abuse Proof of Claim Form, including any supporting documentation, must be submitted so as to ***actually be received*** by the Claims Agent on or before the Sexual Abuse Claims Bar Date by: (a) the interface available on the Claims Agent's website at https://omnimgt.com/usagymnastics/sexualabuseclaims; or (b) first-class U.S. Mail, overnight mail, or hand-delivery at the following address: USA Gymnastics Sexual Abuse Claims Processing, c/o Omni Management Group, 5955 DeSoto Avenue, Suite 100, Woodland Hills, California 91367; ***provided, for the avoidance of doubt*, SEXUAL ABUSE PROOF OF CLAIM FORMS SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED AND WILL NOT BE DEEMED TIMELY SUBMITTED.**

b.      Each Sexual Abuse Proof of Claim Form must: (i) be written in English; (ii) conform substantially with the Sexual Abuse Proof of Claim Form provided by USAG; and (iii) be signed or electronically transmitted by the Survivor asserting the Sexual Abuse Claim or by an authorized agent or legal representative of the Survivor.

c.      Survivors who submit a Sexual Abuse Proof of Claim Form by mail and who wish to receive proof of receipt thereof must include an additional copy of their Sexual Abuse Proof of Claim Form and a self-addressed, stamped envelope.

12.     The following **"Confidentiality Protocol"** with respect to the Sexual Abuse Claims shall apply:

a.      Survivors are directed not to file a Sexual Abuse Proof of Claim Form with the Court. Instead, the Sexual Abuse Proof of Claim Form must be: (i) submitted electronically using the interface available on the Claims Agent's website at: https://omnimgt.com/usagymnastics/sexualabuseclaims;          or (ii) mailed or delivered to the Claims Agent at the following address: **USA Gymnastics Sexual Abuse Claims Processing, c/o Omni Management Group, 5955 DeSoto Avenue, Suite 100, Woodland Hills, California 91367.**

b.      Submitted Sexual Abuse Proof of Claim Forms will not be available to the general public unless the Survivor designates otherwise on the

6

Sexual Abuse Proof of Claim Form. The Confidentiality Protocol is for the benefit of the Survivors. Accordingly, Survivors may elect to make any of the information contained in their submitted Sexual Abuse Proof of Claim Form public.

c.   Sexual Abuse Proof of Claim Forms submitted by Survivors shall be held and treated as confidential by the Claims Agent, the Debtor, and the Debtor's counsel and upon request by the parties listed below (the **"Permitted Parties"**), subject to each Permitted Party, the Debtor, and its professionals executing and returning to the Debtor's counsel (with a copy to counsel to the Sexual Abuse Survivors' Committee) a confidentiality agreement substantially in the form attached hereto as <u>Exhibit 6</u> (the **"Confidentiality Agreement"**) by which they agree to keep the information provided in a Sexual Abuse Proof of Claim Form confidential.

13.   The Permitted Parties include:[3]

a.   counsel to the Debtor retained pursuant to an order of the Bankruptcy Court;

b.   officers, directors, and employees of the Debtor necessary to assist the Debtor and its counsel in reviewing and analyzing the Sexual Abuse Claims;

c.   the Claims Agent;

d.   counsel for the Sexual Abuse Survivors' Committee;

e.   members of the Sexual Abuse Survivors' Committee and their personal counsel (after the Sexual Abuse Proof of Claim Form has been redacted to remove the Survivor's name, address, any other personally identifying information, responses to Question V.7(a), and the signature block);

f.   the United States Trustee;

g.   insurance companies (including their successors) that provided insurance that may cover the claims described in the Sexual Abuse Proof of Claim Forms, including authorized claim administrators of such insurance companies and their reinsurers and attorneys;

---

[3] With the exception of counsel the Debtor retained pursuant to order of this Court, counsel to the Sexual Abuse Survivors' Committee, the United States Trustee's attorneys, and the Claims Agent, each Permitted Party receiving access to the Sexual Abuse Proof of Claim Forms (or any information aggregated or derived therefrom) must execute the Confidentiality Agreement.

Humphrey Appellant Appendix 266

h.    any future or unknown claims representative;

i.    any special arbitrator, mediator, or claims reviewer appointed to review and resolve the claims of Survivors;

j.    any trustee, or functional equivalent thereof, appointed to administer payments to Survivors;

k.    any person with the express written consent of the Debtor and the Sexual Abuse Survivors' Committee upon seven (7) business days' notice to Sexual Abuse Claimants; and,

l.    such other persons as the Court determines should have the information in order to evaluate Sexual Abuse Claims upon seven (7) business days' notice to Sexual Abuse Claimants.

14.    In accordance with Bankruptcy Rule 3003(c)(2) and except as provided below, all persons and entities holding pre-petition claims, including, without limitation, the following entities, must file Proofs of Claim on or before the Bar Date applicable to their Claim:

a.    Any person or entity whose pre-petition claim against the Debtor is not listed in the Schedules or whose pre-petition claim is listed in the Schedules but is listed as disputed, contingent, or unliquidated and that desires to participate in this case or share in any distribution in this case;

b.    Any person or entity that believes that its pre-petition claim is improperly classified in the Schedules or is listed in an incorrect amount and that desires to have its claim allowed in a classification or amount other than that identified in the Schedules; and,

c.    Any Survivor who believes that he or she has a Sexual Abuse Claim, including but not limited to Survivors who have previously filed lawsuits or asserted claims against the Debtor, and Survivors who have never filed a lawsuit, asserted a claim against the Debtor, entered into a settlement, or reported their abuse.

15.    The following persons or entities are not required to file a proof of claim on or before any applicable Bar Date:

a.    Any person or entity that has already properly filed a proof of claim against the Debtor with the Clerk of the Court for the United States Bankruptcy Court for the Southern District

Humphrey Appellant Appendix 267

of Indiana, or with the Claims Agent; *provided, however,* **that a Survivor who previously filed a Sexual Abuse Claim on a standard proof of claim form (*e.g.,* Official Form 410) must re-file that Claim using the Sexual Abuse Proof of Claim Form on or before the Sexual Abuse Claims Bar Date for it to be timely filed; and *further provided,* that the Debtor shall give such Survivor prompt notice that the Survivor must re-file the Claim;**

b.    Any person or entity: (i) whose claim is listed in the Schedules or any amendments thereto; and (ii) whose claim is not described therein as "disputed," "contingent," or "unliquidated;" and (iii) who does not dispute the amount or classification of its claim as set forth in the Schedules;

c.    Any person or entity that asserts an administrative expense claim against the Debtor pursuant to section 503(b) and section 507(a)(2) of the Bankruptcy Code; *provided, however,* that any person or entity asserting a claim entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code must assert such claim by filing a Proof of Claim on or prior to the General Bar Date.

d.    Any person or entity whose claim against the Debtor has been allowed by an order of the Court entered on or before the applicable Bar Date; and,

e.    Any person or entity whose claim has been paid in full; *provided, however,* **this subsection does not include Survivors or others who were paid pursuant to settlement agreements but who believe they have additional claims against the Debtor beyond what was agreed to in the applicable settlement agreement.**

16.    The Debtor shall retain the right to: (i) dispute, or assert offsets or defenses against, any filed claim or any claim listed or reflected in the Schedules as to nature, amount, liability, classification or otherwise; and (ii) subsequently designate any claim as disputed, contingent, or unliquidated.

17.    Nothing contained herein shall constitute a waiver by the Debtor of (a) any defenses in connection with any claims that are asserted against it; or (b) the right to assert that any claims are barred by applicable statutes of limitations.

Humphrey Appellant Appendix 268

18.   In accordance with Bankruptcy Rule 3003(c)(2), any person or entity that is required, but fails, to submit a Proof of Claim in accordance with this Bar Date Order on or before the applicable Bar Date will be forever barred, estopped, and enjoined from asserting such Claim—including any Sexual Abuse Claim—against the Debtor, and the Debtor and its property will be forever discharged from any and all indebtedness or liability with respect to or arising from that Claim. Moreover, such creditor will be prohibited from (a) voting on any chapter 11 plan filed in this chapter 11 case on account of such Claim, and (b) participating in any distribution in this chapter 11 case on account of such Claim.

19.   The notice substantially in the form attached as <u>Exhibit 3</u> hereto is approved and shall be deemed adequate and sufficient if served by first-class mail at least 60 days prior to the General Bar Date upon:

    a.   the U.S. Trustee for the Southern District of Indiana;

    b.   counsel to the Sexual Abuse Survivors' Committee;

    c.   any persons or entities that have requested notice of the proceedings in this chapter 11 case pursuant to Bankruptcy Rule 2002;

    d.   all persons or entities that have submitted Proofs of Claim against USAG;

    e.   all known creditors and other known holders of potential Claims against USAG, including all persons or entities listed in the Schedules for which USAG has addresses;

    f.   all parties to executory contracts and unexpired leases of USAG;

    g.   all parties to litigation with USAG and their counsel (if known);

    h.   the United States Olympic Committee;

    i.   the United States Attorney for the Southern District of Indiana;

    j.   the United States Attorney for the Western District of Michigan;

    k.   the Internal Revenue Service for the Southern District of Indiana;

Humphrey Appellant Appendix 269

l.    the Indiana Attorney General's office;

m.    the Texas Attorney General's office;

n.    the Michigan Attorney General's office;

o.    the House Energy and Commerce Committee;

p.    the House Oversight and Government Reform Committee;

q.    the Senate Finance Committee;

r.    the Texas Rangers; and

s.    any additional persons and entities as deemed appropriate by USAG; *provided, however,* **that the General Bar Date Notice Package will not be sent to Survivors, as Survivors will be sent the Sexual Abuse Claims Bar Date Notice Package.**

20.    The notice substantially in the form attached hereto as <u>Exhibit 4</u> is approved and shall be deemed adequate and sufficient if served by first-class mail at least 60 days prior to the Sexual Abuse Claims Bar Date upon known Survivors (to the extent a mailing address is reasonably available) and/or to counsel who have appeared for such known Survivors who:

a.    filed, or threatened to file, lawsuits against the Debtor, alleging they were abused;

b.    contacted the Debtor to report that they were survivors of abuse, whether or not the individual's claim was considered to be substantiated and regardless of whether the report was written or verbal;

c.    entered into a settlement agreement with the Debtor stemming from allegations of abuse; or,

d.    received payment from the Debtor as a result of an allegation of abuse.

21.    Pursuant to Bankruptcy Rules 2002(f) and 2002(l), the Debtor shall publish a form of the General Bar Date Notice and the Sexual Abuse Claims Bar Date Notice, substantially in the form attached as <u>Exhibit 5</u> hereto, on one occasion in USA Today (National Edition), at least 28

11

days prior to the General Bar Date and Sexual Abuse Claims Bar Date. The publication thereof is hereby approved and deemed good, adequate, and sufficient publication notice of the Bar Dates.

22.     The Debtor shall also provide further notice of the Sexual Abuse Claims Bar Date by taking the following measures:

a.     Upon entry of the Bar Date Order, the Debtor will cause the Claims Agent to post component parts of the Sexual Abuse Claims Bar Date Notice Package on the case website at: https://omnimgt.com/usagymnastics.

b.     Upon entry of the Bar Date Order the Debtor will post the Sexual Abuse Claims Bar Date Notice Package on its website at: www.usagym.org, on its Facebook page at: https://www.facebook.com/USAGymnastics/, and on its Twitter feed at: https://twitter.com/USAGym (including "pinning" the notice to the Debtor's Twitter page), and the Debtor will post the Publication Notice on its Instagram account.

c.     The Debtor will maintain a toll free number which may be used by Survivors to ask questions or obtain copies of the Sexual Abuse Claims Bar Date Notice Package or parts thereof.

d.     Within one week of the service of the Sexual Abuse Claims Bar Date Notice Package, the Debtor will mail or e-mail a copy of the Sexual Abuse Claims Bar Date Notice to each gymnasium or similar facility that is a member of, or affiliated with, USAG. The Debtor shall include in such mailing or e-mail a letter from USAG requesting that the gymnasium or facility give notice to its members of the Sexual Abuse Claims Bar Date Notice Package.

e.     The Debtor shall provide notice of the Sexual Abuse Claims Bar Date by publication on one occasion in USA Today (National Edition), at least 28 days prior to the Sexual Abuse Claims Bar Date.

f.     The Debtor shall request placement of the Sexual Abuse Claims Bar Date Notice on the Safesport website.

g.     The Debtor shall provide notice of the Sexual Abuse Claims Bar Date by publication on one occasion in one or more of the following at least 28 days prior to the Sexual Abuse Claims Bar Date: Gymcastics podcasts, Meetscores website, Inside Gymnastics, International Gymnastics, ESPN Women.

h.     The Debtor will send the Sexual Abuse Claims Bar Date Notice Package to the: the House Energy and Commerce Committee, the House Oversight and Government Reform Committee, the Senate Finance Committee, the Indiana Attorney General, the Texas Attorney General, the Michigan

Humphrey Appellant Appendix 271

Attorney General, the Texas Rangers, and the United States Attorney for the Western District of Michigan.

23.    Any person or entity who desires to rely on the Schedules will have the responsibility for determining that such person's or entity's Claim is accurately listed in the Schedules.

24.    The Claims Agent shall provide copies of Sexual Abuse Proofs of Claim to counsel to the Sexual Abuse Survivors' Committee (a) within 2 business days of the time it provides copies of such claims forms to the Debtor (including its counsel); or (b) within 2 business days of a request for such claims forms from counsel to the Sexual Abuse Survivors' Committee.

25.    Notwithstanding anything to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

26.    The Debtor and its Claims Agent are authorized to take all actions to effectuate the relief granted pursuant to this Bar Date Order.

27.    Entry of this Order is without prejudice to the right of the Debtor to seek a further order of this Court fixing a date by which holders of claims not subject to the applicable Bar Dates established herein must file Proofs of Claim or be barred from doing so.

28.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

###

Humphrey Appellant Appendix 272

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE:<br><br>USA GYMNASTICS,<br><br>Debtor. | CASE NO. 18-09108-RLM-11 |

**NOTICE OF APPOINTMENT OF ADDITIONAL TORT CLAIMANTS
COMMITTEE OF SEXUAL ABUSE SURVIVORS**

Nancy J. Gargula, United States Trustee, pursuant to 11 U.S.C. §

1102(a) hereby appoints the following members to the Additional Tort

Claimants Committee of Sexual Abuse Survivors[1] in the above captioned cause:

1. Marcia Frederick Blanchette
   c/o Kimberly Dougherty, Esq.
   Andrus Wagstaff, P.C.
   19 Belmont St.
   Easton, MA 02375
   marciafrederick123@gmail.com

2. Alyssa Corn
   c/o Megan A. Bonanni and Michael L. Pitt
   Pitt McGhee Palmer & Rivers, P.C.
   117 W. Fourth St., Suite 200
   Royal Oak, MI  48067
   ahcorn@umich.edu

3. Rachel Denhollander
   c/o Stephen R. Drew/Adam C. Sturdivant
   Drew, Cooper & Anding
   80 Ottawa Ave., NW Ste. 200
   Grand Rapids, MI  49503
   rjd.requests@gmail.com

---

[1] Due to a lack of response, no unsecured creditors committee has been appointed at
this time.

4. Kenzie Gassaway
   c/o Manvir S. Grewal
   2290 Science Parkway
   Okemos, MI  48864
   kenziemsu@gmail.com

5. Sarah Klein
   c/o Manvir S. Grewal
   2290 Science Parkway
   Okemos, MI  48864
   kleinsarahg@gmail.com

6. Alexandra Raisman
   c/o John Manley
   Manly, Stewart & Finaldi
   19100 Von Karman Ave., Suite 800
   Irvine, CA  92613
   Lavenderlove8888@gmail.com

7. Kyla Ross
   c/o John Manley
   Manly, Stewart & Finaldi
   19100 Von Karman Ave., Suite 800
   Irvine, CA  92613
   Rosskb96@gmail.com

8. Tasha Schwikert-Warren
   c/o Kevin Boyle & Jesse Creed
   Panish, Shea & Boyle LLP
   11111 Santa Monica Blvd., Ste. 700
   Los Angeles, CA  90025
   tashaschwikertusagspecialcomm@gmail.com

9. Jessica Thomashow
   c/o Stephen R. Drew/Adam C. Sturdivant
   Drew, Cooper & Anding
   80 Ottawa Ave., NW Ste. 200
   Grand Rapids, MI  49503
   jessicagthomashow@gmail.com

2

Respectfully Submitted,

Nancy J. Gargula
UNITED STATES TRUSTEE

By:  /s/ Laura A. DuVall
Laura A. DuVall
U.S. Department of Justice
Office of the United States Trustee
101 W. Ohio Street, Suite 1000
Indianapolis, IN 46204
Tel. (317) 226-6101
Fax (317) 226-6356
Laura.DuVall@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

Deborah Caruso     dcaruso@rubin-levin.net, dwright@rubin-levin.net, jkrichbaum@rubin-levin.net, atty_dcaruso@bluestylus.com
Adam L. Kochenderfer     akochenderfer@wolfsonbolton.com
Ronald J. Moore     Ronald.Moore@usdoj.gov
Dean Panos     dpanos@jenner.com
Amanda Koziura Quick     amanda.quick@atg.in.gov, Darlene.Greenley@atg.in.gov
Melissa M. Root     mroot@jenner.com, wwilliams@jenner.com
James I. Stang     jstang@pszjlaw.com
Catherine L. Steege     csteege@jenner.com, mhinds@jenner.com, thooker@jenner.com
Meredith R. Theisen     mtheisen@rubin-levin.net, atty_mtheisen@bluestylus.com, mralph@rubin-levin.net

I further certify that on December 19, 2018, a copy of the foregoing was mailed by first-class U.S. Mail, postage prepaid, and properly addressed to the following:

3

None

/s/ Laura A. DuVall
Laura A. DuVall

| Fill in this information to identify your case: |
| --- |
| United States Bankruptcy Court for the: |
| SOUTHERN DISTRICT OF INDIANA |
| Case number *(if known)* _____ Chapter __11__ |

☐ Check if this an amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy    4/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

**1. Debtor's name**  USA Gymnastics

**2. All other names debtor used in the last 8 years**
Include any assumed names, trade names and *doing business as* names

DBA  USA Gymnastics Inc.

**3. Debtor's federal Employer Identification Number (EIN)**  75-1847871

**4. Debtor's address**

**Principal place of business**

130 E. Washington Street
Suite 700
Indianapolis, IN 46204
Number, Street, City, State & ZIP Code

Marion
County

**Mailing address, if different from principal place of business**

P.O. Box, Number, Street, City, State & ZIP Code

**Location of principal assets, if different from principal place of business**

Number, Street, City, State & ZIP Code

**5. Debtor's website (URL)**  https://usagym.org/

**6. Type of debtor**

☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
☐ Partnership (excluding LLP)
☑ Other. Specify:  501(c)(3) organization

Humphrey Appellant Appendix 277

| Debtor | USA Gymnastics | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

B. *Check all that apply*

☑ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor.
See http://www.uscourts.gov/four-digit-national-association-naics-codes.

\_\_\_\_\_

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check all that apply:*

☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☑ No.

☐ Yes.

| District | _____ | When | _____ | Case number | _____ |
| District | _____ | When | _____ | Case number | _____ |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list

☑ No

☐ Yes.

| Debtor | _____ | | Relationship | _____ |
| District | _____ | When _____ | Case number, if known | _____ |

Humphrey Appellant Appendix 278

| Debtor | USA Gymnastics | Case number (*if known*) | |
| --- | --- | --- | --- |
| | Name | | |

**11. Why is the case filed in this district?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____

Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

**Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
| --- | --- | --- |
| ☐ 1-49 | ☑ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15. Estimated Assets**

| | | |
| --- | --- | --- |
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50  million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☑ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
| --- | --- | --- |
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50  million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☑ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

| Debtor | USA Gymnastics | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

| | **Request for Relief, Declaration, and Signatures** |
|---|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is trued and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___December  5, 2018___
　　　　　　　　　MM / DD / YYYY

**X** _/s/ James Scott Schollenbarger_　　　　　　　　　James Scott Shollenbarger
　　Signature of authorized representative of debtor　　　　Printed name

Title ___Chief Financial Officer___

**18. Signature of attorney**

**X** _/s/ Catherine Steege_　　　　　　　Date ___December  5, 2018___
　　Signature of attorney for debtor　　　　　　　　　　MM / DD / YYYY

Catherine  Steege
Printed name

JENNER & BLOCK LLP
Firm name

353 N. Clark St.
Chicago, IL 60654
Number, Street, City, State & ZIP Code

Contact phone ___312-222-9350___　　Email address ___csteege@jenner.com___

IL 06183529
Bar number and State

# RESOLUTIONS OF THE BOARD OF DIRECTORS OF USA GYMNASTICS

## December 4, 2018

**WHEREAS**, the undersigned, representing each of the directors of the Board of Directors (the "**Board**") of USA Gymnastics ("**USAG**"), a 501(c)(3), not-for-profit organization, hereby adopt the following resolutions by written consent conducted via email;

**WHEREAS**, the Board of USAG, having considered the financial and operational conditions and strategic alternatives of USAG, and having reviewed, considered and received the recommendation of senior management to USAG and the advice of USAG's professionals and advisors with respect to the options available to USAG, including, without limitation, a filing under chapter 11 of the United States Code (the "**Bankruptcy Code**"), has determined that it is desirable and in the best interests of USAG, its creditors and employees and other interested parties that a petition be filed by USAG, seeking relief under the provisions of chapter 11 of the Bankruptcy Code;

**NOW THEREFORE, BE IT**

**RESOLVED**, that USAG be, and hereby is, authorized and empowered to file a petition seeking relief under the provisions of chapter 11 of the Bankruptcy Code, in the United Bankruptcy Court for the Southern District of Indiana:

**RESOLVED**, that members of the Board, USAG's officers, and any other person designated and so authorized to act by a director or officer of USAG (each an "**Authorized Person**" and, collectively, the "**Authorized Persons**") hereby are, and each of them is, authorized and empowered to: (i) execute, verify and file on behalf of USAG all documents necessary or appropriate in connection with the filing of USAG's chapter 11 petition, and any chapter 11 plan that the members of the Board deem to be in USAG's best interest, including, without limitation, all petitions, affidavits, declarations, schedules, statements of financial affairs, lists, motions, applications, pleadings, and other papers or documents in connection with such chapter 11 petition and plan; (ii) cause USAG to borrow funds from any such parties as them deem appropriate (a DIP facility) as reasonably necessary for the continuing conduct of the affairs of USAG and grant security interests in and liens upon all or substantially all of USAG's assets as may be deemed necessary in connection with such borrowings; (iii) take and perform any and all actions deemed necessary and proper to obtain such relief as authorized herein and in connection with USAG's chapter 11 case; (iv) appear as necessary at all bankruptcy proceedings on behalf of USAG; and (v) pay all such expenses where necessary or appropriate in order to carry out fully the intent and accomplish the purposes of the resolutions adopted herein;

**RESOLVED**, that the law firm of Jenner & Block LLP, be and hereby is employed as general bankruptcy counsel for USAG in USAG's chapter 11 case, subject to approval by the Bankruptcy Court;

**RESOLVED**, that the Authorized Persons be, and hereby are, authorized and empowered to employ and retain all assistance by legal counsel, accountants, financial advisors, restructuring

advisors, investment bankers, public relations professionals and other professionals, subject to approval by the Bankruptcy Court, and to perform any and all further acts and deeds the Authorized Persons deem necessary, proper, or desirable in furtherance thereof with a view to the successful prosecution of USAG's chapter 11 case;

**RESOLVED,** that the Authorized Persons be and are hereby authorized and empowered to amend, supplement or otherwise modify from time to time the terms of any petitions, affidavits, declarations, schedules, statements of financial affairs, lists, motions, applications, pleadings, and other papers or documents executed in conjunction with any of the forgoing resolutions;

**RESOLVED,** that the acts, actions and transactions taken by the officers or the Board or any other Authorized Person taken prior to the date of the foregoing resolutions adopted herein and within the authority conferred, are hereby ratified, confirmed, and approved in all respects as the act and deed of USAG.

IN WITNESS WHEREOF, the undersigned have electronically executed this written consent as of the date first above written.

DIRECTORS OF THE BOARD OF USA GYMNASTICS

/s/ Kathryn Carson
Kathryn Carson, Chair

/s/ Steven Legendre
Steven Legendre

/s/ David C. Rudd
David C. Rudd, Vice Chair

/s/ Dylan Mauer
Dylan Mauer

/s/ Stefanie Korepin
Stefanie Korepin, Treasurer

/s/ Staci Slaughter
Staci Slaughter

/s/ Lois Bingham
Lois Bingham

/s/ Justin Spring
Justin Spring

/s/ Kittia Carpenter
Kittia Carpenter

/s/ Julie Springwater
Julie Springwater

/s/ Ivana Hong
Ivana Hong

/s/ Kimberly Till
Kimberly Till

/s/ Brent Lang
Brent Lang

/s/ Kevin White
Kevin White

2